**ALSTON & BIRD LLP**
Jeffrey A. Rosenfeld (#136896)
jeffrey.rosenfeld@alston.com
Jesse Steinbach (#278923)
jesse.steinbach@alston.com
Brooke H. Bolender (#340689)
brooke.bolender@alston.com
333 South Hope Street
Los Angeles, CA 90071
Telephone: (213) 576-1143

**WILLIAMS & CONNOLLY LLP**
Kenneth J. Brown*
kbrown@wc.com
William P. Ashworth*
washworth@wc.com
R. Kennon Poteat III*
kpoteat@wc.com
Kathryn E. Hoover*
khoover@wc.com
680 Maine Avenue, SW
Washington, DC 20024
Telephone: (202) 434-5000

**KLEINBARD LLC**
Steven J. Engelmyer*
sengelmyer@kleinbard.com
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Telephone: (215) 568-2000

*(*pro hac vice* application
forthcoming)

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| T-MOBILE US, INC., CLEARWIRE SPECTRUM HOLDINGS LLC, CLEARWIRE SPECTRUM HOLDINGS II LLC, CLEARWIRE SPECTRUM HOLDINGS III LLC, FIXED WIRELESS HOLDINGS LLC, NSAC LLC, TDI ACQUISITION SUB LLC, AND WBSY LICENSING LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> WCO SPECTRUM LLC, SCH LLC, ACADEMIA SPECTRUM LLC, GARY WINNICK, CARL KATERNDAHL, ASHOK VASUDEVAN, ANDREAS BITZARAKIS, AND TYLER KRATZ, <br><br> Defendants. | Case No.  2:23-CV-4347 <br><br> **COMPLAINT FOR:** <br> **(1) VIOLATIONS OF RICO;** <br> **(2) CONSPIRACY TO VIOLATE RICO;** <br> **(3) FRAUD;** <br> **(4) AIDING AND ABETTING FRAUD;** <br> **(5) CONSPIRACY TO COMMIT FRAUD;** <br> **(6) VIOLATION OF CAL. PENAL CODE § 496;** <br> **(7) CONVERSION;** <br> **(8) VIOLATION OF CAL. BUS. & PROF. CODE § 17200** *et seq.*; <br> **(9) TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY AND CONTRACTUAL RELATIONSHIP;** <br> **(10) UNJUST ENRICHMENT; AND** <br> **(11) NEGLIGENT MISREPRESENTATION.** <br><br> **DEMAND FOR JURY TRIAL** |

## Contents

NATURE OF THE CASE .................................................................................. 1

FACTUAL BACKGROUND ............................................................................ 2

PARTIES ......................................................................................................... 6

JURISDICTION AND VENUE ....................................................................... 11

STATEMENT OF THE CASE ......................................................................... 12

   I.   The Spectrum Marketplace ................................................................. 12

   II.   T-Mobile Spectrum Marketplace Participation ................................. 13

   III.  Defendants' Fraudulent Scheme ....................................................... 14

       A.   Defendants Hatch Their Scheme ........................................ 14

       B.   Defendants Target T-Mobile ROFR Leases with Sham, Non-Binding Offers to Receive Kickbacks ............................. 15

       C.   Defendants' Fraudulent and Unfair Scheme Infects Every Purchase WCO Proposes ..................................................... 21

   IV.  Defendants Affirmatively Conceal Their Fraudulent Scheme from T-Mobile ............................................................................................ 24

   V.   Each Defendant Is Engaged with Every Aspect of the Scheme to Defraud T-Mobile ......................................................................................... 26

   VI.  Gary Winnick Has been Engaged in Improper Conduct for Decades ...... 28

   VII. Claim Accrual and Tolling ................................................................. 29

CLAIMS FOR RELIEF ................................................................................... 30

COUNT I ......................................................................................................... 30

COUNT II ....................................................................................................... 38

COUNT III ...................................................................................................... 40

COUNT IV ...................................................................................................... 42

COUNT V ....................................................................................................... 43

COUNT VI ...................................................................................................... 44

COUNT VII ..................................................................................................... 46

COUNT VIII .................................................................................................... 48

COUNT IX ...................................................................................................... 49

COUNT X ....................................................................................................... 51

COUNT XI ...................................................................................................... 52

PRAYER FOR RELIEF .................................................................................. 53

DEMAND FOR JURY TRIAL ....................................................................... 53

Plaintiffs T-Mobile US, Inc., Clearwire Spectrum Holdings LLC, Clearwire Spectrum Holdings II LLC, Clearwire Spectrum Holdings III LLC, Fixed Wireless Holdings LLC, NSAC LLC, TDI Acquisition Sub LLC, and WBSY Licensing LLC (collectively "T-Mobile" or "Plaintiffs") for their complaint against WCO Spectrum LLC, SCH LLC, Academia Spectrum LLC, Gary Winnick, Carl Katerndahl, Ashok Vasudevan, Andreas Bitzarakis, and Tyler Kratz (collectively "Defendants"), allege as follows:

## NATURE OF THE CASE

1.      T-Mobile brings this action to seek redress for Defendants' nationwide criminal scheme to defraud T-Mobile US, Inc. and its subsidiaries out of an amount believed to be more than $10 million.  T-Mobile leases the right to use certain wireless spectrum from educational institutions that hold Federal Communications Commission ("FCC") licenses for that spectrum.  T-Mobile's leases typically include a Right of First Refusal ("ROFR") provision, which provides that, if a third party makes a bona fide offer to purchase a spectrum license and the licensee intends to accept that offer, then T-Mobile typically has 30 days to match the third party's terms and acquire the license itself.  Beginning as early as June 2020, Gary Winnick—publicly branded "The Emperor of Greed"[1] and the "Master of Disaster"[2]—and his company WCO Spectrum LLC ("WCO") formed an illegal enterprise with their co-conspirators, including the other Defendants here, in which they make sham offers to educational institutions to purchase spectrum licenses that are intended to be conveyed to T-Mobile and to induce it to

---

[1] Julie Creswell & Nomi Prins, The Emperor of Greed with the Help of his Bankers, Gary Winnick Treated Global Crossing as his Personal Cash Cow—Until the Company Went Bankrupt., FORTUNE Magazine (Jun. 24, 2002), https://money.cnn.com/magazines/fortune/fortune_archive/2002/06/24/325183.

[2] Jill Stewart, Master of Disaster: How L.A.'s Super-Rich Gary Winnick is Trying to Wash Blood from the Global Crossing Implosion Off His Hands—and Make More Money in the Bargain, New Times L.A., (Apr. 25, 2002).

exercise its ROFR.  Simultaneously, WCO enters into secret side agreements with these institutions whereby WCO pockets a kickback—in the form of a percentage cut of the purchase price—in the likely event T-Mobile exercises its ROFR and acquires the license.  Through this scheme, Defendants already have siphoned an amount believed to be more than $10 million from T-Mobile to themselves, and their illegal conduct continues unabated.  T-Mobile fortuitously learned of Defendants' fraud only when a whistleblower (a former insider at WCO) came forward to alert T-Mobile's counsel to this scheme.  Defendants' fraudulent and unfair conduct violates the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961–1968, California Penal Code section 496, the California Unfair Competition Law ("UCL"), and California Business and Professions Code sections 17200, *et seq.*, and constitutes fraud, aiding and abetting fraud, conspiracy to commit fraud, conversion, tortious interference with contract, tortious interference with economic relations, unjust enrichment, and negligent misrepresentation.  It also has resulted in Defendants being unjustly enriched at T-Mobile's expense.  At their core, Defendants are fraudsters whose racketeering and unfair and deceptive conduct is precisely the type of behavior that the RICO and UCL statutes were designed to redress.

## FACTUAL BACKGROUND

2.     This case concerns Educational Broadband Service ("EBS") licenses issued by the FCC.  EBS is a range of spectrum that the FCC historically has licensed to educational entities.  There typically are twenty EBS channels in any given geographic market, each of which physically occupies a unique place within the radio frequency spectrum.  These fall within the band of spectrum from 2496 to 2690 MHz, which is commonly referred to as the "2.5GHz" band of spectrum.  Until an FCC rule change in April 2020, EBS licenses could be held only by educational institutions (and not commercial entities).  To build its nationwide cellular and data network, T-Mobile leased much of that wireless spectrum from the educational

institutions that hold the licenses.  The leases typically include a ROFR provision. In April 2020, the FCC changed course and allowed these licenses to be held by commercial entities.

3.      WCO and the other Defendants agreed and conspired together to take advantage of this rule change by forming a racketeering enterprise that works as follows:  At the outset, WCO, usually through an entity called Parkview Consulting ("Parkview"), issued public records requests to obtain spectrum lease agreements between T-Mobile and educational institutions containing ROFR provisions. Armed with this information, Defendants Winnick, Katerndahl, Kratz, and Bitzarakis work together to identify licenses to pursue with sham offers.  Through Defendant Katerndahl, along with at least Defendants Academia Spectrum LLC ("Academia") and its principal Bitzarakis, WCO then enters into discussions with the license holder, including negotiating a potential price for purchasing the license. WCO makes a sham, non-binding written "offer" to purchase the license, communicated to the license holder by Katerndahl or Academia/Bitzarakis. Defendants make these sham offers intending that they will be communicated to T-Mobile and cause T-Mobile to exercise its ROFR.  At the same time, WCO and the licensee execute a secret side contract, titled a "Commitment Costs Agreement" ("CCA"), which provides that, if T-Mobile exercises its ROFR (and thus matches WCO's offer and purchases the license), the licensee will pay WCO a material portion—usually 10%—of the purchase price.  To account for the kickback, WCO inflates its offers to EBS license holders—typically by the same percentage as the kickback itself.  That way, when T-Mobile exercises a ROFR and matches the "offer," it pays more than the license holder is willing to accept for its license and funds the kickback.  WCO tries to hide this kickback arrangement by requiring the licensee to sign a non-disclosure agreement ("NDA") that covers the CCA.  That same NDA expressly allows the sham offer to be communicated to T-Mobile.  In reality, WCO does not intend to honor its offer; instead its sole purpose is to deceive

T-Mobile into exercising the ROFR in T-Mobile's lease agreement. Indeed, on information and belief, WCO's proposed offers to EBS license holders, when totaled, amount to more than $1.6 billion and cover 167 spectrum licenses. Even if WCO intended to make good on any of its offers—to be clear, it did not—WCO lacks the capacity to make good on anything remotely approaching all of these offers.

4.    To support this scheme, WCO entered into a fake line of credit agreement with Defendant Vasudevan's entity, SCH LLC ("SCH"), pursuant to which SCH purports to lend WCO the funds needed to purchase spectrum licenses leased by T-Mobile. SCH's role in the scheme is essential, as it lends the appearance of legitimacy to WCO's offers. But SCH's purported line of credit is a farce. Under WCO's agreement with SCH, SCH purports to offer WCO *$2 billion* in credit. SCH does not have any apparent history, public presence, or lines of business, and it purportedly is run out of Vasudevan's apartment. SCH exists to create the illusion that WCO's offers are backed by legitimate financing so that, if pressed, WCO could provide (false) evidence that its offers are real. In exchange for SCH's fraudulent financing documents, SCH receives 8% of WCO's ill-gotten kickbacks.

5.    At its core, Defendants' goal is simple:  they intend to defraud T-Mobile of tens of millions of dollars through WCO's sham offers to purchase spectrum licenses. This conduct is designed to funnel kickbacks from T-Mobile's payments to educational institutions for purchase of EBS licenses to Defendants to support their criminal activities and to reward and incentivize participation in the scheme.

6.    WCO's sham offers are intentionally coercive. By fraudulently presenting its sham offers as legitimate, WCO intentionally and falsely led T-Mobile to believe that it faced a Hobson's choice—in order to maintain its mobile network, T-Mobile was required to either (1) spend vast sums of money to

purchase spectrum licenses at a price higher than what the license holder was willing to accept and that T-Mobile otherwise was content to continue leasing, or (2) risk the possibility that WCO would purchase the spectrum licenses and become T-Mobile's spectrum landlord, almost certainly guaranteeing that T-Mobile would have to pay a king's ransom later when its current lease agreements expired.  As WCO knows, T-Mobile needs access to the spectrum it currently leases from educational institutions in order to maintain a contiguous and efficient mobile network for its millions of customers.

7.    WCO has attempted to conceal its scheme from T-Mobile in at least two ways.  First, it requires the license holders that engage with Defendants regarding the supposed offers for their license to enter into NDAs that preclude them from disclosing to T-Mobile the contents of their discussions with WCO, including, critically, the existence of the CCAs between WCO and the licensees. Second, WCO and Academia have taken every possible step to prevent the details of their fraud from becoming public, including abandoning multiple deals rather than producing documents to T-Mobile that would have reflected Defendants' fraud and refusing to provide discovery related to Defendants' ROFR scheme in separate litigation between T-Mobile and Defendants.

8.    Notably, this is not the first time Gary Winnick finds himself enmeshed in a pattern of fraud and related misconduct.  Winnick began his career in partnership with Michael Milken, who was convicted of securities and tax violations for his work selling junk bonds while at Drexel Burnham Lambert.  Most notably, Winnick founded Global Crossing Limited in the 1990s, and for four years extracted more than $700 million for himself, while the company failed to realize any profits.  Global Crossing ultimately imploded in 2002, leaving its investors and employees in economic ruin.  As set forth more fully herein, Winnick's fraudulent scheme to defraud T-Mobile is merely the latest episode in a career marred by deceitful and unfair business dealings.

9.     As a result of Defendants' fraudulent and unfair scheme, T-Mobile already has suffered an amount believed to be more than $10 million in damages and stands to incur far more damages if WCO's conduct continues unabated.  T-Mobile is entitled to recover these damages, which are to be trebled under the civil RICO statute and California Penal Code section 496, in addition to the other forms of relief listed below.

## PARTIES

10.     Plaintiff T-Mobile US, Inc. ("T-Mobile US") is a Delaware corporation with a principal office at 12920 SE 38th Street, Bellevue, Washington, 98006.  Accordingly, T-Mobile US is a citizen of Delaware, Washington, and no other state.   T-Mobile US or its subsidiaries have provided wireless network coverage to customers since 1994.  Today, it or its subsidiaries provide 4G LTE and 5G network coverage to nearly 110 million customers, comprised of individuals, businesses, government entities, and educational institutions worldwide.

11.     Plaintiff Clearwire Spectrum Holdings LLC ("Clearwire") is a limited liability company organized under the laws of Delaware, with a principal office at 12920 SE 38th Street, Bellevue, Washington, 98006.  Its ultimate parent is T-Mobile US.  Clearwire's sole member is Clearwire Legacy LLC, a limited liability company organized under the laws of Delaware.  Clearwire Legacy LLC's sole member is Clearwire Communications LLC, a limited liability company organized under the laws of Delaware.  Clearwire Communications LLC's sole member is Sprint Communications LLC, a limited liability company organized under the laws of Delaware.  Sprint Communications LLC's sole member is Sprint LLC, a limited liability company organized under the laws of Delaware.   Sprint LLC's sole member is T-Mobile USA, Inc., a Delaware corporation with its principal place of business located at 12920 SE 38th Street, Bellevue, Washington 98006.  Accordingly, Clearwire is a citizen of Delaware, Washington, and no other state.

12.     Plaintiff Clearwire Spectrum Holdings II LLC ("Clearwire II") is a limited liability company organized under the laws of Delaware, with a principal office at 12920 SE 38th Street, Bellevue, Washington, 98006.  Its ultimate parent is T-Mobile US.  Clearwire II's sole member is Clearwire Legacy LLC, a limited liability company organized under the laws of Delaware.  Clearwire Legacy LLC's sole member is Clearwire Communications LLC, a limited liability company organized under the laws of Delaware.  Clearwire Communications LLC's sole member is Sprint Communications LLC, a limited liability company organized under the laws of Delaware.  Sprint Communications LLC's sole member is Sprint LLC, a limited liability company organized under the laws of Delaware.  Sprint LLC's sole member is T-Mobile USA, Inc., a Delaware corporation with its principal place of business located at 12920 SE 38th Street, Bellevue, Washington 98006.  Accordingly, Clearwire II is a citizen of Delaware, Washington, and no other state.

13.     Plaintiff Clearwire Spectrum Holdings III LLC ("Clearwire III") is a limited liability company organized under the laws of Delaware, with a principal office at 12920 SE 38th Street, Bellevue, Washington, 98006.  Its ultimate parent is T-Mobile US.  Clearwire III's sole member is Clearwire XOHM LLC, a limited liability company organized under the laws of Delaware.  Clearwire XOHM LLC's sole member is Nextel West Corp., a Delaware corporation with its principal place of business located at 12920 SE 38th Street, Bellevue, Washington 98006. Accordingly, Clearwire III is a citizen of Delaware, Washington, and no other state.

14.     Plaintiff Fixed Wireless Holdings LLC ("Fixed Wireless") is a limited liability company organized under the laws of Delaware, with a principal office at 12920 SE 38th Street, Bellevue, Washington, 98006.  Its ultimate parent is T-Mobile US.  Fixed Wireless's sole member is Clearwire Legacy LLC, a limited liability company organized under the laws of Delaware.  Clearwire Legacy LLC's

sole member is Clearwire Communications LLC, a limited liability company organized under the laws of Delaware.  Clearwire Communications LLC's sole member is Sprint Communications LLC, a limited liability company organized under the laws of Delaware.  Sprint Communications LLC's sole member is Sprint LLC, a limited liability company organized under the laws of Delaware.  Sprint LLC's sole member is T-Mobile USA, Inc., a Delaware corporation with its principal place of business located at 12920 SE 38th Street, Bellevue, Washington 98006.  Accordingly, Fixed Wireless is a citizen of Delaware, Washington, and no other state.

15.     Plaintiff NSAC LLC ("NSAC") is a limited liability company organized under the laws of Delaware, with a principal office at 12920 SE 38th Street, Bellevue, Washington, 98006.  Its ultimate parent is T-Mobile US.  NSAC's sole member is Clearwire XOHM LLC, a limited liability company organized under the laws of Delaware.  Clearwire XOHM LLC's sole member is Nextel West Corp., a Delaware corporation with its principal place of business located at 12920 SE 38th Street, Bellevue, Washington 98006.  Accordingly, NSAC is a citizen of Delaware, Washington, and no other state.

16.     Plaintiff TDI Acquisition Sub LLC ("TDI") is a limited liability company organized under the laws of Delaware, with a principal office at 12920 SE 38th Street, Bellevue, Washington, 98006.  Its ultimate parent is T-Mobile US.  TDI's sole member is T-Mobile License LLC, a limited liability company organized under the laws of Delaware.  T-Mobile License LLC's sole member is T-Mobile USA, Inc., a Delaware corporation with its principal place of business located at 12920 SE 38th Street, Bellevue, Washington 98006.  Accordingly, TDI is a citizen of Delaware, Washington, and no other state.

17.     Plaintiff WBSY Licensing LLC ("WBSY") is a limited liability company organized under the laws of Delaware, with a principal office at 12920 SE 38th Street, Bellevue, Washington, 98006.  Its ultimate parent is T-Mobile US.

Its sole member is SprintCom LLC, a limited liability company organized under the laws of Delaware. SprintCom LLC's sole member is Sprint Communications LLC, a limited liability company organized under the laws of Delaware. Sprint Communications LLC's sole member is Sprint LLC, a limited liability company organized under the laws of Delaware. Sprint LLC's sole member is T-Mobile USA, Inc., a Delaware corporation with its principal place of business located at 12920 SE 38th Street, Bellevue, Washington 98006. Accordingly, WBSY is a citizen of Delaware, Washington, and no other state.

18. Plaintiffs Clearwire, Clearwire II, Clearwire III, Fixed Wireless, NSAC, TDI, and WBSY are T-Mobile US subsidiaries that lease EBS spectrum from educational institutions.

19. Defendant WCO Spectrum LLC ("WCO") is a limited liability company organized and existing under the laws of the state of Delaware and doing business in the state of California with its principal office located at 9355 Wilshire Boulevard, Suite 200, Beverly Hills, California 90210. WCO purports to "help license holders generate significant liquidity by selling their licenses."

20. On information and belief, Defendant Gary Winnick ("Winnick") is an individual residing in Beverly Hills, California. Winnick is WCO's founder.

21. Defendant Carl Katerndahl ("Katerndahl") is an individual residing in Manhattan Beach, California. Katerndahl is WCO's Chief Executive Officer ("CEO") and Chairman.

22. Defendant Tyler Kratz ("Kratz") is an individual residing in San Juan, Puerto Rico. Kratz is a consultant hired by WCO to assist in implementing the fraudulent scheme at issue in this Complaint.

23. Defendant SCH LLC ("SCH") is a limited liability company organized and existing under the laws of the state of California and doing business in the state of California with its principal office at 10139 South Blaney Avenue, Apartment A, Cupertino, California 95014. SCH is WCO's supposed financier.

24. On information and belief, Defendant Ashok Vasudevan ("Vasudevan") is an individual residing in Cupertino, California. Vasudevan is SCH's principal.

25. SCH is the alter ego of Vasudevan. There exists a unity of interest between SCH and Vasudevan, and allowing SCH's actions to be treated as SCH's alone would produce an inequitable result. Specifically, on information and belief:

    a. SCH is a shell company and a sham created as a means of carrying out Vasudevan's and his co-Defendants' fraudulent scheme;

    b. Vasudevan is the sole owner and employee of SCH;

    c. SCH's registered address is the same address as Vasudevan's residential address;

    d. SCH, while purporting to have extended a $2 billion line of credit, has no apparent assets or funds, and as a result, SCH is undercapitalized;

    e. SCH has no public presence and no lines of business;

    f. SCH does not follow traditional corporate formalities, such as conducting business with the approval of a board of directors (or any other employees at all), carrying out shareholder meetings, or maintaining corporate records;

    g. Vasudevan transfers SCH's ill-gotten proceeds from the fraudulent scheme to himself for personal use;

    h. Vasudevan created SCH in order to use SCH's corporate form for purposes of preparing sham financing documents to provide false support for WCO's fraudulent offers. As a result, Vasudevan used SCH's corporate form in order to perpetrate this fraud, and allowing Vasudevan and SCH to be treated as distinct entities would permit a wrongful or inequitable purpose; and

COMPLAINT AND DEMAND FOR JURY TRIAL

      i.  Because SCH has no assets, Plaintiffs would be unable to collect any judgment from SCH.

26.    Defendant Academia Spectrum LLC ("Academia") is a limited liability company organized under the laws of the state of Virginia and doing business in the state of Connecticut with its principal office at 294 Watch Hill Road, Berlin, Connecticut 06037.  Academia is a broker that aids WCO in targeting specific transactions for its fraudulent scheme and communicating with licensees on behalf of WCO.

27.    Defendant Andreas Bitzarakis ("Bitzarakis") is an individual residing in Berlin, Connecticut.  Bitzarakis is Academia's principal and personally participates in the fraudulent scheme against T-Mobile on behalf of Academia and WCO.

## JURISDICTION AND VENUE

28.    This Court has subject matter jurisdiction over T-Mobile's federal law claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).  This Court has supplemental subject matter jurisdiction over T-Mobile's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so closely related to the federal claims brought herein as to form part of the same case or controversy.

29.    This Court has subject matter jurisdiction over T-Mobile's claims pursuant to 28 U.S.C. § 1332 because (a) the amount in controversy exceeds $75,000, exclusive of interest and costs; and (b) upon information and belief, there is complete diversity between Plaintiffs and Defendants.

30.    Personal jurisdiction is proper over all Defendants in this district pursuant to 18 U.S.C. § 1965(a) and (b) and Federal Rule of Civil Procedure 4(k).

31.    Venue is proper in this court under 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b)(2).  A substantial part of the events or omissions giving rise to the claims herein occurred in this District.

COMPLAINT AND DEMAND FOR JURY TRIAL

## STATEMENT OF THE CASE

**I.    The Spectrum Marketplace**

32.    Wireless spectrum refers to the invisible radio frequencies over which wireless signals travel, and it is the lifeblood of wireless networks.  The spectrum frequencies used for wireless communications comprise only one portion of the radio frequency spectrum.  Other parts of the electromagnetic spectrum are used for things like radio, television broadcasts, and government uses.  Spectrum is grouped in "bands" depending on its wavelength—the full electromagnetic spectrum ranges from 3 Hz to 300 EHz.  The portion used for wireless communication ranges from 20 KHz to 300 GHz.  To better understand how spectrum works, consider a radio dial.  As you go up and down the dial, you locate radio stations operating on particular frequencies.  Now imagine the radio dial expands much further in both directions—at those higher and lower frequencies you would find the frequencies assigned to other uses like wireless phones, satellite TV, air traffic control, and police radios.

33.    The FCC oversees commercial spectrum allocation and works closely with the National Telecommunications and Information Administration—which manages government use of spectrum—international bodies, and Congress to allocate spectrum bands.  The FCC designates certain spectrum as licensed, meaning it is bought or allocated for exclusive use by a specific provider, and other spectrum as unlicensed, meaning anyone can use the frequency (e.g., Bluetooth and Wi-Fi connections rely on unlicensed bands).

34.    The FCC historically has licensed spectrum in the 2.5 GHz band to educational institutions under its EBS licensing program.  *In re Transforming the 2.5 GHz Band*, 34 FCC Rcd. 5446, 5451 (2019), 2019 WL 3065514.  The original intent of the program was to reserve certain wireless spectrum for educational programming.  *See id.* at 5448.  To that end, the FCC issued EBS licenses to educational institutions across the country.  *See id.*

35.     Prior to April 2020, FCC regulations allowed only non-commercial entities that provided educational services to hold EBS spectrum licenses.  *See id.* at 5447.  The FCC, however, permitted EBS licensees—most of which lack the technical knowledge, expertise, and infrastructure to operate a telecommunications network—to lease all but 5% of the spectrum authorized by their licenses to commercial entities like T-Mobile.  *See id.* at 5448.  As of 2019, nearly all of the 1,300 EBS licensees had leased their excess capacity.  *See id.*  These leases took spectrum that otherwise would have gone unused and put it to work supporting modern, high-speed broadband and telecommunications services.  *See id.* at 5447–48.

36.     Effective April 27, 2020, the FCC eliminated the requirement that EBS licenses could only be owned by educational institutions, making it possible for licensees to sell their licenses to commercial entities.  According to the FCC, "technological changes of the last 30 years enable any educator with a broadband connection to access a myriad of educational resources" and "most licensees rel[ied] on lessees to deploy and operate broadband networks and use the leases as a source for revenues or devices."  *Id.* at 5451.

## II.     T-Mobile Spectrum Marketplace Participation

37.     T-Mobile relies heavily on 2.5 GHz spectrum for its nationwide cellular and data network.  Prior to the FCC's rule change in April 2020, T-Mobile primarily accessed this wireless spectrum through leases with educational institutions across the country.  At the time of the rule change in April 2020, T-Mobile held leases on 1,722 licenses for 2.5 GHz spectrum.

38.     Notwithstanding the April 2020 rule change, thousands of EBS licenses remain subject to lease agreements with commercial entities, under which the licensees make money by leasing the spectrum.  T-Mobile continues to lease spectrum from institutions that still own licenses.  At the time of this complaint, T-Mobile holds leases on more than 1,500 licenses for 2.5 GHz spectrum.

39.     T-Mobile's lease agreements with these institutions contain various provisions that protect its contractual rights in the event a third party makes an offer to acquire the EBS license, including ROFR and right to participate provisions.  The ROFR provision states that, if a third party makes a bona fide offer to purchase an EBS license subject to a lease and the licensee intends to accept such an offer, then the licensee must provide T-Mobile with a ROFR notice, upon receipt of which T-Mobile has 30 days to decide whether to match the third party's terms and acquire the license or, alternatively, to allow the licensee to sell the license to the third-party.  In the latter event, the third party would assume the licensee's obligations under T-Mobile's lease, effectively becoming T-Mobile's new landlord.  To trigger this type of provision, an EBS licensee must, *inter alia*, intend to accept an offer from a third party, send T-Mobile a ROFR notice (which starts the clock on the ROFR period), and establish that the offer is "bona fide," meaning the third-party offeror has the financial ability and intent to consummate the purchase and otherwise satisfies all of the requirements set forth in the lease.

## III.   Defendants' Fraudulent Scheme

### A.     Defendants Hatch Their Scheme

40.     On information and belief, in March 2020, Defendants Winnick and Katerndahl were introduced to Defendant Kratz at Winnick's office in Los Angeles, California.  Kratz was pursuing a business strategy related to purchasing EBS licenses.   Over the course of several months, Katerndahl explored the opportunity, and ultimately Winnick and Katerndahl agreed to pursue the business with Kratz.

41.     To that end, WCO was formed in Delaware on June 12, 2020. Winnick runs the company as founder, Katerndahl serves as a senior executive, and Kratz serves as a key consultant.

**B.    Defendants Target T-Mobile ROFR Leases with Sham, Non-Binding Offers to Receive Kickbacks**

42.    Notwithstanding that WCO describes itself as "a private investment firm investing in EBS spectrum licenses," WCO's strategy has been to target institutions that have lease agreements with T-Mobile that are subject to ROFRs. By making non-binding offers to these institutions, WCO generates revenue for itself through what it misleadingly has described as "breakup fees" or "diligence fees," but which in reality are improper kickbacks, without having to actually ever purchase the licenses on which those fees are paid.

43.    Not long after the FCC rule change permitting commercial entities to own spectrum licenses, WCO began using Parkview to issue public records requests—under Parkview's name in an effort to hide WCO's involvement—to educational institutions across the country seeking copies of T-Mobile's EBS lease agreements. WCO obtained a number of T-Mobile's confidential lease agreements this way. As a result, WCO knows the terms of many T-Mobile leases, including which agreements contain ROFRs.

44.    In spring 2021, Defendants targeted a license owned by Albright College ("Albright") that is subject to a lease agreement with T-Mobile subsidiary TDI. Albright's license is for certain EBS spectrum in the Reading, Pennsylvania area, and for years TDI had leased the right to use most of that spectrum from Albright. The relationship between TDI and Albright had been amicable and uneventful.

45.    Although it was neither the first nor the last license that Defendants have targeted, Defendants' engagement with Albright is notable because it was through this purported offer that Plaintiffs first caught wind of the fraud that is afoot.

46.    On February 22, 2021, Winnick, Katerndahl, Kratz, and Bitzarakis received a "deal memo" for Albright. Consistent with their strategy to target

institutions that have lease agreements with T-Mobile that are subject to ROFRs, the "deal memo" shows that WCO specifically considered whether the lease was subject to a ROFR and assessed the "potential TMO Strategy," including the likelihood that T-Mobile would exercise its ROFR.

47.     On April 30, 2021, WCO emailed a non-binding term sheet to Albright in which it proposed to purchase Albright's license for $16,200,000.  Soon after, Albright emailed TDI a purported ROFR notice.  Pursuant to its contractual rights, TDI sought certain information from Albright and WCO about the supposed offer.  Neither Albright nor WCO provided the required information.  Because Albright failed to establish that the offer was "bona fide," TDI sued Albright in the Court of Common Pleas of Berks County, Pennsylvania to enforce its contractual rights.  That case was captioned *TDI Acquisition Sub LLC v. Albright College*, No. 21-04881 (Nevius, J.) (the "*Albright* case").

48.     On October 25, 2021, during the pendency of the *Albright* case, a self-described whistleblower—who stated that he is a former insider at WCO, but whose identity remains unknown to Plaintiffs—called TDI's Pennsylvania counsel, Steven J. Engelmyer.  In a series of phone calls, the whistleblower described how WCO, in conjunction with numerous co-conspirators and EBS licensees, is perpetrating a fraudulent scheme against T-Mobile by which it uses sham offers to purchase EBS licenses to siphon money from T-Mobile to itself.

49.     According to the whistleblower, the scheme works as follows:  WCO, through Winnick and/or Katerndahl, enters into verbal discussions with an EBS licensee and agrees on a price for purchasing the license.  WCO then makes a sham, non-binding written offer to purchase the license that it knows and intends will be communicated to T-Mobile pursuant to T-Mobile's ROFR.  Before making the sham offer, WCO and the licensee execute a secret side contract, the CCA, which provides that, if T-Mobile matches WCO's offer and purchases the license, the licensee pays WCO a material portion of the purchase price.  WCO and the licensee

try to hide this kickback arrangement from T-Mobile by using an NDA.  In reality, WCO does not intend to honor its offer; its sole purpose is to trigger the ROFR in T-Mobile's lease agreement, coercively force T-Mobile to decide within 30 days whether to purchase the license, and allow WCO to pocket the kickback in the likely event T-Mobile exercises its ROFR.

50.  According to the whistleblower, WCO's offers are not backed by legitimate financing, but a fake line of credit agreement between WCO and Defendant Vasudevan's entity, SCH.  SCH purports to provide WCO access to **$2 billion** in financing, specifically earmarked for WCO to target spectrum licenses leased by T-Mobile.  In exchange, SCH receives, among other things, 8% of WCO's kickbacks.  SCH's line of credit is a sham.  SCH is a California company with no apparent history, no public presence, and no lines of business, which is run by a former movie producer (Vasudevan) out of a modest apartment in a multi-unit building in Cupertino.

51.  Following these discussions, the whistleblower provided a four-page narrative that described WCO's scheme in detail, consistent with his verbal descriptions, as well as various documents that corroborate the whistleblower's allegations.[3]

52.  Although the defendants in the *Albright* case did everything they could to obstruct discovery, T-Mobile was able to obtain some documents, all of which corroborate the whistleblower's narrative.  Specifically, documents obtained by subpoena from Academia—a spectrum broker run by Bitzarakis that WCO uses as a conduit with EBS licensees to implement the fraud—demonstrate how the scheme works:

---

[3] At WCO's insistence, the whistleblower's narrative, and the documents attached to that narrative, have been branded "Confidential" and thus cannot be filed publicly with this complaint.

a. On behalf of WCO, Bitzarakis reaches out to EBS license holders by email to gauge their interest in selling the EBS licenses they hold.  For example, on December 14, 2020, Bitzarakis emailed two Albright contacts, Rashmi Radhakrishnan and Jacquelyn Fetrow, "regarding a potential sale of Albright College's EBS licenses." Bitzarakis stated that he "ha[d] been hired by WCO Spectrum, LLC" which was "prepared to make Albright College an offer for [its] EBS licenses."  On January 5, 2021, he forwarded his email message to another Albright representative, Jeffrey Strader.  When Mr. Strader responded the same day, Bitzarakis reported to Winnick, Katerndahl, Kratz and others that he got "[a]nother hit today."

b. Once an EBS license holder expresses interest in selling its license, Bitzarakis negotiates the contours of the offer on WCO's behalf. On information and belief, these communications take place in person, by phone, and by email.   For example, in a report cataloguing "in-bound" activity, Bitzarakis noted that he met with Albright's CFO on January 7, and Albright had "activated" outside counsel, Todd Gray.   Thereafter, Bitzarakis communicated by phone and email with Mr. Gray to negotiate the terms of the potential sale.

c. After an EBS licensee expresses interest, Bitzarakis, on behalf of WCO, has the licensee enter into an NDA that precludes it from disclosing information provided during the course of negotiations, except that the licensee is permitted to "disclose any Offer to a third party to which Licensee is contractually bound by an existing contractual arrangement that requires disclosure of the Offer, including disclosure of the Offer in the context of the initiation of

a right of first refusal process with respect to the sale or lease of the License." In the case of Albright, the NDA was signed by Katerndahl on behalf of WCO.

d. In parallel, Winnick, Katerndahl, Bitzarakis, Kratz, and other WCO personnel consider the value of the deal, including the potential purchase price and the kickback they might be able to extract on the deal. For example, a January 25, 2021 "Pipeline" report circulated by email among this group reflects a potential "purchase price" for the Albright College license of $12,652,893 and a "DD & Costs Fee" of $1,265,289 or 10% of the purchase price.

e. Based on these internal discussions, Bitzarakis provides the EBS license holder with a proposed non-binding offer letter and CCA on behalf of WCO. For example, on February 26, 2021, Bitzarakis emailed Mr. Strader an offer letter and CCA. After some additional negotiation on the terms, the CCA and offer letter were executed—with Katerndahl signing on behalf of WCO. Notably, the offer letter stated that the proposed acquisition would be "funded by WCO" which had "sourced and deployed billions of dollars," and that "WCO [was] prepared to purchase the EBS license owned, controlled or operated by Licensee" at a purchase price of $16,200,000—that is $3,547,107 *more* than the purchase price first contemplated by WCO and reflected in its internal Pipeline report. Indeed, Albright itself conducted an independent valuation of its license and determined that "WCO['s] price was still superior." Moreover, WCO explicitly stated that the "letter is solely a non-binding offer and is not, and should not be, considered a legally binding indication or agreement in any manner." WCO

acknowledged that, while the offer was confidential, Albright "may disclose the terms of this offer to the extent required to comply with your obligations under the EBS leases." For its part, the CCA stated that if Albright's current lessee (T-Mobile) exercised its ROFR, Albright would pay WCO "commitment costs" in the amount of $1,620,000, or 10% of the purchase price offered.

f. After the offer letter and CCA are signed, the EBS licensee provides only the offer letter to T-Mobile, exactly as WCO intended. The sham offer as presented to T-Mobile is false and misleading, including because (i) WCO does not intend to consummate the transaction if T-Mobile declines to exercise its ROFR; (ii) its offers are backed by sham financing; and (iii) 10% of the offered purchase price is not actually an offer for the license, but rather the amount of WCO's illegal kickback.

53.     Beyond these documents, WCO's own website confirms the contours of its scheme. Cynically cloaked in the veneer of altruism, WCO describes its work as "liberat[ing]" educational institutions "from the US telecom industry." Its website does not describe a desire to actually purchase and hold EBS spectrum licenses or a vision for what it would do with licenses once purchased. Rather, WCO's stated mission is to "create maximum value for all EBS license holders," and it explains that it exists to "help license holders generate significant liquidity by selling their licenses" and touts its bottom line of "286 EBS Spectrum Licenses Sold"—not purchased by WCO. In reality, WCO and its co-conspirators are engaged in a fraudulent scheme to generate sales to T-Mobile and to siphon money from those sales to themselves.

54.     Indeed, during the course of the *Albright* case, WCO, through its counsel, admitted that WCO's strategy is to act as a "stalking horse"—exactly what

the whistleblower anticipated it would do.  Specifically, WCO's counsel explained, "there are breakup fees that are very common in bankruptcies across the country. When you want to induce bidding, you have somebody who is the stalking-horse who comes in and puts a bid and if they are the unsuccessful bidder they recover costs so there is nothing at all unusual."  This defense fails for obvious reasons— in the bankruptcy context where stalking horse bidders are often used, stalking-horse bids are *binding* on the bidder and breakup fees customarily are far smaller than the 10% fee WCO charged.  By contrast here, armed with the knowledge that T-Mobile enjoys a ROFR, Defendants have the freedom to make sham, *non-binding* offers to coerce T-Mobile into action without suffering any downside if T-Mobile does not take the bait.

55.    Defendants' scheme is wide-ranging in its reach.  In total, Defendants have targeted 167 T-Mobile licenses, proposing offers that, when totaled, amount to at least $1.6 billion—far more than WCO has the capacity to spend—and representing spectrum used to operate wireless networks across the United States.

## C.    Defendants' Fraudulent and Unfair Scheme Infects Every Purchase WCO Proposes

56.    The process by which WCO and its co-conspirators use sham, non-binding offers to trigger ROFRs and thereby collect ill-gotten rewards is the same for all T-Mobile leases that WCO targets.  Each and every time WCO submits an offer to an EBS license holder that is then communicated to T-Mobile and causes T-Mobile to exercise its ROFR, exactly as WCO intends, it constitutes fraud and is unfair.  The sham offer is false and misleading, including because WCO does not intend to consummate the transaction if T-Mobile declines to exercise its ROFR, WCO does not have legitimate financing to back up its offers, and 10% of the offered purchase price is not actually an offer for the license, but rather the amount of WCO's illegal kickback.  Were it not for these sham offers, T-Mobile

would not have purchased the licenses and would not have paid a purchase price higher than what the EBS license holders were willing to accept.

57.    WCO and its co-conspirators have succeeded in their scheme to defraud T-Mobile in connection with EBS licenses across the nation.  Attached as **Appendix A** to this complaint is a chart detailing each license for which T-Mobile exercised its ROFR after WCO submitted a sham offer to purchase that license, including the date on which WCO made the fraudulent offer to the licensee, the date on which the licensee communicated that fraudulent offer to T-Mobile pursuant to T-Mobile's ROFR, the date on which T-Mobile exercised its right to purchase the license, and the date on which an Asset Purchase Agreement ("APA") was executed for the license.  In each of these instances, Defendants' actions were unfair and deceptive, including because each offer letter transmitted to T-Mobile was false and misleading.

58.    Defendants' scheme to defraud was hatched in June 2020 or earlier, and they targeted the EBS license owned by La Roche University, located in Pittsburgh, Pennsylvania ("La Roche") shortly thereafter.

59.    T-Mobile and La Roche entered into a spectrum lease agreement beginning in 2007.  That lease agreement included a ROFR provision which entitled T-Mobile to purchase the license by matching any acceptable bona fide offer.  As typically is the case, T-Mobile had just 30 days to decide if it would exercise its ROFR once it was triggered.

60.    On October 27, 2020, Defendant Katerndahl, on behalf of WCO, emailed La Roche an offer letter, purporting to offer $13 million to purchase its EBS license.  Like Defendants' other offers, the offer letter made clear that, "[a]lthough this offer is a bona fide offer . . . this letter is not, and should not be considered a legally binding indication of agreement in any manner."  This statement was false—the offer was not, in fact, bona fide because WCO had no

intention of honoring the offer in the event that T-Mobile chose not to exercise its ROFR.

61. On November 12, 2020, La Roche informed T-Mobile via email, through counsel, that it intended to issue a ROFR notice as it had received a "third-party offer." The next day, T-Mobile received via email the ROFR notice, which La Roche's counsel represented as being triggered by a "bona fide third party offer to purchase [the La Roche] license . . . for the purchase price of $13 million." In that email, T-Mobile received a copy of WCO's offer to purchase the La Roche license for $13 million. Neither the ROFR notice nor WCO's offer letter identified the existence of a CCA between WCO and La Roche.

62. Over the next several weeks, T-Mobile sought, without success, additional information from La Roche about the purported offer it had received from WCO. Defendants instead offered Winnick's and Katerndahl's assurances in phone conversations with representatives of T-Mobile to justify the legitimacy of their offer. For example, on a December 15, 2020 call with T-Mobile representatives, Winnick indicated that WCO wanted to invest a sizable amount (over $1 billion) into spectrum and that the strategy was to buy and hold the spectrum, a strategy he believed would generate significant returns as the leases came due for renewal. All of these statements were false and intended to mislead as part of Defendants' scheme to defraud T-Mobile. On December 17, 2020, T-Mobile wrote to La Roche's counsel, seeking information designed to assess whether WCO's offer was, in fact, "bona fide," including the contents of any communications between La Roche and WCO in furtherance of the offer, which likely would have revealed the existence of a CCA between the parties. On December 24, 2020, counsel for La Roche wrote back, refusing to provide the requested information.

63. Faced with this stonewalling and a rapidly diminishing 30-day period in which to decide, T-Mobile was coerced into exercising its ROFR and executing

an APA for the La Roche license for $13 million on February 12, 2021. T-Mobile's decision to purchase the license for that price was the proximate result of Defendants' fraudulent offer. On information and belief, Defendants received a $1.3 million kickback as a result.

64. The situation with La Roche was not unique. To date, Defendants have coerced T-Mobile into exercising the ROFRs in the leases between T-Mobile and eleven EBS licensees covering sixty-eight EBS licenses with fraudulent and unfair sham offers, *see* App. A, which has translated into what is believed to be more than $10 million lining Defendants' pockets. In addition to the millions of dollars T-Mobile is coerced into paying to purchase the EBS licenses, under its lease agreements, T-Mobile also is required to cover EBS license holders' legal fees associated with negotiating the deal. Those fees, which amount to hundreds of thousands of dollars, would not have been incurred but for Defendants' fraudulent conduct.

## IV.    Defendants Affirmatively Conceal Their Fraudulent Scheme from T-Mobile

65. Defendants require every EBS license holder that engages with them on the purchase of any license to enter into an NDA that precludes the license holder from revealing the details of WCO's offer to any third parties, including T-Mobile.

66. Moreover, since the whistleblower and his allegations about WCO defrauding T-Mobile surfaced publicly, WCO and Academia have taken every possible step to prevent the details of their fraud from becoming public. In the *Albright* case, WCO and Academia brazenly obstructed discovery that would have confirmed the whistleblower's allegations. As part of that case, TDI served document subpoenas on WCO in Delaware and Academia in Virginia. WCO responded by frivolously challenging whether the Delaware court had jurisdiction to enforce a subpoena served on a Delaware LLC, and Academia did the same in

Virginia.   After the Delaware and Virginia courts rejected those baseless arguments, WCO filed a motion for a protective order in the *Albright* case seeking to stop all discovery.  In this filing, WCO represented that it was no longer pursuing the Albright transaction and asserted that the case therefore was moot.  WCO even intervened *as a plaintiff* in the *Albright* case to seek dismissal based on the same mootness argument.  In other words, WCO abandoned a deal rather than having to produce documents that would have revealed its fraud.  Despite these efforts to stave off T-Mobile's requests, at a hearing on March 21, 2022, the *Albright* court ruled that TDI could pursue its subpoenas in Delaware and Virginia in order to investigate the whistleblower's allegations concerning the Albright transaction. Determined to keep their fraudulent and unfair scheme under wraps, after stalling for weeks, Academia and WCO finally produced documents, but did so only after improperly—and heavily—redacting them for their purported lack of relevance.

67.    WCO went to similar lengths to conceal its fraud with respect to a sham offer it made to purchase the EBS license held by the St. Lucie School Board in Florida ("St. Lucie").  Counsel for St. Lucie approached T-Mobile on November 19, 2021 to relay that it had received an offer on October 22, 2021 from WCO to purchase its license for $6,795,000.  After T-Mobile counter-offered $5,000,000, St. Lucie came back to T-Mobile with a ROFR notice and an offer from WCO to purchase the license for $7,550,000—an amount in excess of what St. Lucie initially had shown a willingness to accept.  Critically, the increased offer price would have allowed WCO to take its 10% kickback and still leave St. Lucie with the originally offered amount of $6,795,000 in the event T-Mobile exercised its ROFR.  None of this came to be, however, because, as had happened before, T-Mobile pressed for more information about the offer St. Lucie received from WCO and the parties refused to provide the requested information.  And once again, after T-Mobile sued St. Lucie in order to compel production of information needed to verify the legitimacy of WCO's offer, WCO withdrew its offer to avoid detection.

68.    Defendants will no doubt point to the *one* instance when WCO actually did sign a contract to purchase an EBS license subject to a T-Mobile lease in an attempt to undermine T-Mobile's allegations.  But in reality, this situation is simply an example of WCO taking steps to cover up its scheme.  In January 2022, WCO signed a contract to buy the EBS license held by the Owasso Public School system in Tulsa, Oklahoma ("Owasso") after T-Mobile declined to exercise its ROFR.  This purchase occurred shortly after the whistleblower surfaced in the *Albright* case and Defendants learned that T-Mobile was on to their scheme.  This left WCO with little choice:  it could either walk away from the Owasso deal, thereby proving what the whistleblower alleged, or purchase the $5 million license—a small price to pay to cover the tracks of its exponentially larger, fraudulent conspiracy.  Not surprisingly, WCO chose the latter as part of its attempted cover up.  This in no way undermines the whistleblower's allegations or suggests that Defendants' conduct is anything other than fraudulent and unfair.

**V.    Each Defendant Is Engaged with Every Aspect of the Scheme to Defraud T-Mobile**

69.    Defendants have organized themselves into a cohesive unit with specific assigned responsibilities.  Defendants have long-standing and ongoing relationships rooted in ongoing business dealings and a mutual interest and participation in the scheme, as outlined above.  Defendants' enterprise has been structured to operate as a unit in order to accomplish the common goals and purposes of their fraudulent scheme.

70.    Sometime prior to the second half of 2020, WCO, at the direction of its executives Winnick and Katerndahl, initiated the scheme.  With the assistance of its key consultant Kratz, as well as its broker Academia (headed by Bitzarakis), WCO began targeting institutions that had leased spectrum to T-Mobile under agreements containing ROFR provisions.  Once WCO targets a particular license, Academia—through Bitzarakis—contacts the EBS licensee to negotiate the

fraudulent and unfair offer, including the kickback WCO is to receive. Finally, WCO and its co-conspirators enlisted SCH and its principal Vasudevan to provide a sham line of credit to present in the event the fraudulent and unfair offers are ever challenged. In exchange, SCH and Vasudevan receive significant payments from WCO derived from the fraudulent and unfair scheme.

71.     WCO stands at the center of the fraud. Under the direction of Winnick and Katerndahl, WCO developed the fraudulent and unfair scheme to make sham offers to EBS licensees in order to coerce T-Mobile into exercising its ROFRs. Winnick is WCO's founder and the ringleader of the scheme. Katerndahl is Winnick's second-in-command and, in addition to developing the scheme with Winnick, takes numerous actions in furtherance of the fraud. For instance, Katerndahl executes CCAs and sham offer letters on WCO's behalf in his capacity as CEO and chairman of WCO.

72.     WCO's key consultant Kratz developed (or helped develop) the fraudulent scheme and implemented it on a nationwide basis. Kratz sits alongside Winnick and Katerndahl on WCO's "Investment Committee," which identifies as targets EBS licenses that are leased to T-Mobile. Among other things, Kratz participates in preparing "deal memos" (like the one referenced above) that are used to effectuate the fraud against T-Mobile.

73.     WCO's broker Academia and its principal Bitzarakis help identify as targets EBS licenses that are subject to T-Mobile leases, and Academia and Bitzarakis serve as a conduit between WCO and various EBS licensees located across the country. Among other things, Bitzarakis participates in strategy sessions, contacts EBS licensees about WCO potentially making offers to them, and delivers the sham offers to those entities. Bitzarakis further facilitates the scheme by negotiating WCO's kickbacks and documenting them under the guise of CCAs, as well as the NDAs that try to hide those payments.

74.     Finally, WCO's supposed financier SCH and its principal Vasudevan create the appearance of providing WCO with $2 billion in financing, which is a sham designed for WCO to use in the event its financial wherewithal to make its substantial offers to EBS licensees is ever questioned.   Under WCO's credit agreement with SCH, SCH was entitled to 8% of all ill-gotten proceeds generated by the fraudulent scheme.  The credit agreement also was designed to be used only in targeting spectrum licenses currently leased by T-Mobile; any other spectrum purchases required prior consent by SCH.

## VI.     Gary Winnick Has been Engaged in Improper Conduct for Decades

75.     It should come as no surprise that Gary Winnick designed and leads WCO's fraudulent scheme.  Winnick began his business career at the notorious investment bank and junk bond dealer Drexel Burnham Lambert, where he worked as a senior vice president and partner to Michael Milken.  In 1989, Milken was indicted on ninety-eight felony charges, including racketeering, insider trading, and securities fraud, and later pleaded guilty to six counts of securities and tax violations, all of which took place while Winnick was a senior executive in Milken's high-yield bond group.

76.     In 1997, Winnick founded Global Crossing Limited, a telecommunications company that never turned a profit while he was at the helm. Yet he took the company public a year after its founding and enriched himself to the tune of $734 million as the company floundered and ultimately imploded in 2002.  By contrast, the Global Crossing employees who had purchased company stock for their pensions saw their savings evaporate as the company's stock plummeted from a high of $60 per share to less than $1 per share.  At the time Global Crossing filed for bankruptcy in 2002, it listed its debts as $12.4 billion.

77.     In the wake of Global Crossing's collapse, multiple lawsuits were filed against Winnick and others. JP Morgan Chase and other financial institutions alleged that Winnick and his business had engaged in a "massive scam" to

"artificially inflate" the company's performance in order to secure loans.[4]
Investors and former employees of Global Crossing likewise filed a lawsuit
alleging a scheme to manipulate the firm's financial results reaching to the highest
levels of the company.  These cases were both settled, with investors and former
employees receiving $325 million, of which Winnick agreed to contribute $30
million.

78.    Winnick has been hailed into court for a variety of other alleged
business transgressions, including claims for contractual fraud against business
partners, misrepresenting terms of investment deals, and breaching oral contracts
for his personal financial gain.[5]

## VII.   Claim Accrual and Tolling

79.    As a result of Defendants' conduct, T-Mobile was not aware of
Defendants' scheme and was prevented from learning the facts necessary to
commence an action against Defendants for the conduct alleged herein until at least
October 25, 2021, when the whistleblower came forward.  Until that point, the facts
necessary for T-Mobile to formulate a complaint and satisfy applicable pleading
standards were within the exclusive control of Defendants.

80.    Defendants expressly concealed the truth about the scheme by, among
other things, compelling EBS license holders to sign NDAs, refusing to comply
with T-Mobile's efforts to learn more about WCO's business through formal
discovery or otherwise, and making intentional misrepresentations to T-Mobile.

---

[4] Timothy L. O'Brien, *A New Legal Chapter for a 90's Flameout*, New York Times
(Aug. 15, 2004), https://www.nytimes.com/2004/08/15/business/a-new-legal-
chapter-for-a-90-s-flameout.html; see also Complaint, *JP Morgan Chase Bank v.
Winnick*, 350 F.Supp.2d 393 (S.D.N.Y. 2006).

[5] *See Stein v. Winnick*, Case No. 20SMCV01985 (L.A. Super. Ct. Dec. 22, 2020);
*MacDonald v. Winnick, et al.*, Case No. 22STCV03151 (L.A. Super. Ct. 2022);
*Shooker, et al. v. Superior Ct. of L.A. County*, 111 Cal. App. 4th 923 (2003).

81.     As a result, Defendants are equitably estopped from asserting that any otherwise applicable period of limitations has run, and the discovery rule applies to toll the statute of limitations until at least October 25, 2021.

## CLAIMS FOR RELIEF

## COUNT I

**(Violations of RICO, 18 U.S.C. § 1962(c) – Against All Defendants)**

82.     T-Mobile repeats and realleges the allegations set forth above as though fully set forth herein.

83.     At all relevant times, Plaintiffs were and are each a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

84.     At all relevant times, Defendants were and are each a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

85.     At all relevant times, each of the Defendants was, and is, a person that exists separate and distinct from the RICO enterprise, as described herein.

86.     WCO, SCH, and Academia are distinct entities, with their own independent existence and functions.

87.     WCO is organized under the laws of Delaware and does business in California.  It holds itself out as an investment firm whose mission is to create maximum value for EBS spectrum license holders.  Winnick is WCO's founder, Katerndahl acts as its CEO and Chairman, and Kratz serves as a key consultant. Academia, organized under the laws of Virginia and doing business in Connecticut, acts as a middleman and broker in the spectrum market, led by its principal Bitzarakis.  SCH is a California company that purportedly acts as a financier and provides a revolving line of credit to WCO; it is led by its principal Vasudevan.

### *The RICO Enterprise*

88.     Defendants constitute an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. § 1961(4).  Defendants are a group of persons associated together in fact for the common purpose of carrying on an

ongoing criminal enterprise.  In particular, the Enterprise has a common goal of defrauding T-Mobile of tens of millions of dollars through a coordinated and sustained scheme of deceptive conduct and material misrepresentations made in connection with WCO's sham offers to purchase EBS licenses.  This conduct is designed to funnel kickbacks from T-Mobile to Defendants to support their criminal activities and reward and incentivize participation in the scheme.

89.    The members of the Enterprise have long-standing and ongoing relationships rooted in ongoing business dealings and a mutual interest and participation in common criminal activities.

90.    The Enterprise has longevity sufficient to permit the Defendants to pursue the Enterprise's goal of defrauding T-Mobile to Defendants' profit.  The scheme at the heart of the Enterprise has been in operation since at least June 2020.

91.    The Enterprise has organized itself into a cohesive unit with specific assigned responsibilities, and is structured to operate as a unit in order to accomplish the common goals and purposes of its fraudulent scheme, including as follows:

      a. Gary Winnick maintains command and control of the Enterprise on a strategic level and is the principal authority figure with the final say on business decisions.  He has taken actions, and directed other members of the Enterprise to take actions, necessary to accomplish the overall goals of the Enterprise.  From and through his business relationships, including his position as founder of WCO, he has conducted and participated in the operation and management of the Enterprise and its affairs, and has been a central participant in the orchestration, planning, and execution of the scheme to defraud T-Mobile.  Winnick has benefited financially from the kickbacks paid pursuant to the CCAs executed by WCO and the EBS license holders.

b. Carl Katerndahl is responsible for command and control of the Enterprise on a strategic and tactical level, and has taken actions and directed other members of the Enterprise to take actions, necessary to accomplish the overall goals of the criminal Enterprise, including executing CCAs and sham offer letters on WCO's behalf in his capacity as CEO and chairman of WCO. From and through his business relationships, including his position as CEO and chairman of WCO, he has conducted and participated in the operation and management of the Enterprise and its affairs, and has been a central participant in the orchestration, planning, and execution of the scheme to defraud T-Mobile. Katerndahl has benefited financially from the kickbacks paid pursuant to the CCAs executed by WCO and the EBS license holders.

c. Tyler Kratz has been involved in, and held positions of responsibility with respect to, the strategic planning and execution of the scheme to defraud T-Mobile, and has taken actions, and directed other conspirators to take actions, necessary to accomplish the overall aims of the criminal Enterprise, including sitting on WCO's "Investment Committee," which identifies as targets EBS licenses that are leased to T-Mobile. From and through his business relationships, including his position as a consultant of WCO and member of the "Investment Committee," he has conducted and participated in the operation and management of the Enterprise and its affairs, and has been a central participant in the orchestration, planning, and execution of the scheme to defraud T-Mobile. On information and belief, Kratz has benefited financially from the kickbacks paid pursuant to the CCAs executed by WCO and the EBS license holders.

COMPLAINT AND DEMAND FOR JURY TRIAL

d. Directly and through its agent officers, directors, board members and/or employees, WCO has been an active participant and central figure in the operation and management of the Enterprise and its affairs, and in the orchestration, planning, perpetration, and execution of the scheme to defraud T-Mobile. WCO has been responsible for making sham offers and entering into agreements with EBS license holders, SCH, and others that directly facilitated the criminal activities of the Enterprise. WCO has, with the other Defendants, been responsible for regularly and systematically concealing and/or failing to disclose material information from T-Mobile and seeking to conceal the full extent and true nature of the Enterprise's scheme to defraud. WCO directly benefitted from the scheme to defraud.

e. Andreas Bitzarakis has been involved in, and held positions of responsibility with respect to, the planning and execution of the scheme to defraud T-Mobile. He has taken actions, and directed other conspirators to take actions, necessary to accomplish the overall aims of the criminal Enterprise. This includes identifying EBS licenses to target that are subject to T-Mobile leases and serving as the middleman for negotiations between WCO and the EBS license holders, which entails communicating WCO's sham offers to the EBS license holders and negotiating the terms of WCO's kickbacks and documenting them under the guise of CCAs. From and through his business relationships, including his position as the principal of Academia, he has conducted and participated in the operation and management of the Enterprise and its affairs, and has been a central participant in the orchestration, planning, and execution of the scheme to defraud T-Mobile. On

COMPLAINT AND DEMAND FOR JURY TRIAL

information and belief, Bitzarakis has benefited financially from the kickbacks paid pursuant to the CCAs executed by WCO and the EBS license holders.

f.  Directly and through its principal Bitzarakis, Academia has been an active participant and central figure in the operation and management of the Enterprise and its affairs, and in the orchestration, planning, perpetration, and execution of the scheme to defraud T-Mobile.   Academia has been responsible for identifying EBS licenses to target that are subject to T-Mobile leases and serving as the middleman for negotiations between WCO and the EBS license holders, including communicating WCO's sham offers to the EBS license holders and negotiating the terms of WCO's kickbacks and documenting them under the guise of CCAs.   Academia, with the other Defendants, has been responsible for regularly and systematically concealing and/or failing to disclose material information from T-Mobile and seeking to conceal the full extent and true nature of the Enterprise's scheme to defraud.   Academia directly benefitted from the scheme to defraud.

g.  Ashok Vasudevan has been involved in the execution of the scheme to defraud T-Mobile and has taken actions necessary to accomplish the overall aims of the criminal Enterprise, including purporting to extend a sham $2 billion line of credit to WCO. From and through his business relationships, including his position as the principal of SCH, he has conducted and participated in the operation of the Enterprise and its affairs, and has been a central participant in the orchestration and execution of the scheme to defraud T-Mobile.   On information and belief, Vasudevan has

COMPLAINT AND DEMAND FOR JURY TRIAL

benefited financially from the kickbacks paid pursuant to the CCAs executed by WCO and the EBS license holders.

h. Directly and through its agent principal Vasudevan, SCH—which is Vasudevan's alter ego—has been involved in the execution of the scheme to defraud T-Mobile and has taken actions necessary to accomplish the overall aims of the criminal Enterprise, including purporting to extend a sham $2 billion line of credit to WCO.  On information and belief, SCH has benefitted from the scheme to defraud.

92.     Each of the Defendants know of the existence of, and have conducted or participated in the operation or management of, the Enterprise and its affairs.

93.     At all relevant times, the Enterprise has been engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).  The Enterprise has engaged with EBS license holders in various states, made sham offers to EBS license holders in multiple states, and caused T-Mobile, located in the State of Washington, to exercise ROFRs in lease agreements with EBS license holders situated across the country.

### *Pattern of Racketeering Activity*

94.     Defendants conducted or participated in, directly or indirectly, the management or operation of the Enterprise and its affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c).  Specifically, they have consistently and regularly committed multiple acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 spanning a period of at least June 2020 through October 2021.  These multiple acts shared a common purpose, goal, result, participants, victim, and method of commission.  They are not isolated or sporadic incidents, but were coordinated as part of a continuous scheme to defraud.

95.    Defendants' scheme to defraud used sham offers to trick T-Mobile into believing the ROFRs in T-Mobile's lease agreements had been triggered, coercively force T-Mobile to decide within 30 days whether to purchase the license, and pocket the millions of dollars in kickbacks in the likely event T-Mobile exercises its ROFRs.    This scheme played out in separate and independent transactions related to each and every EBS license with a ROFR exercise date pre-dating October 25, 2021, which are included in the table at Appendix A.

96.    Defendants accomplished their scheme to defraud by regularly and systematically misrepresenting and failing to disclose material information to T-Mobile.    Specifically, Defendants represented to T-Mobile, through the EBS license holders, that WCO's offers to purchase EBS licenses were real offers when they were not.    WCO had no intent to consummate the transactions contemplated by those offers, its offers were backed by sham financing, and 10% of the purported "offer" was to cover WCO's illegal kickback, not to form part of the purchase price (facts Defendants took great lengths to conceal).

97.    Defendants knew the offers to be fraudulent when they submitted them.    Defendants had no intention to honor the offers in the event that T-Mobile chose not to exercise its ROFR—Defendants' intent was at all times to induce T-Mobile to exercise its ROFRs so that the Enterprise could profit from the agreed-to kickbacks.    Defendants secured the sham financing from SCH to provide a cover story were their offers ever questioned.    Because SCH and Vasudevan could not provide the financing they purported to offer, SCH and Vasudevan also knew the offers to be fraudulent.

98.    Each and every time Defendants made an offer to purchase an EBS license that was subject to a T-Mobile ROFR lease, the offer was fraudulent, and each mail or wire communication made in connection with those offers violates 18 U.S.C. §§ 1341 and 1343.    The details of Defendants' communications through the mails and wires in furtherance of their fraudulent scheme of which T-Mobile is

currently aware are set forth in **Appendix B**. In addition to the instances of mail and wire use that are outlined in Appendix B, Defendants' use of the mail and wires also include, but are not limited to, the following:

    a.  Emails, telephone calls, and other communications by wire and mail from or caused to be sent by WCO, Academia, Winnick, Katerndahl, Kratz, and Bitzarakis to EBS license holders (i) negotiating the sham offers to purchase EBS licenses, (ii) exchanging and executing agreements to facilitate the sham offers to purchase EBS licenses, including NDAs, CCAs, and offer documents, (iii) including or incorporating false or misleading statements, omitting material information about the sham offers, and (iv) otherwise promoting or furthering the scheme to defraud.

    b.  Emails, telephone calls, and other communications by wire and mail by and among each of the Defendants (i) facilitating and accomplishing the sham offers to purchase EBS licenses, and (ii) otherwise promoting or furthering the scheme to defraud.

    c.  Emails, telephone calls, and other communications by wire and mail to T-Mobile (i) supporting the sham offers to purchase EBS licenses in furtherance of the scheme to defraud, (ii) including or incorporating false or misleading statements, omitting material information about the sham offers, and (iii) otherwise promoting or furthering the scheme to defraud.

    d.  Fund transfers between and among Defendants as payment and reward for participation in the scheme and as incentive and motivation for continuing to participate in the scheme.

    e.  Fund transfers between and among Defendants and third parties with the intent that those funds be used to further the scheme to defraud.

COMPLAINT AND DEMAND FOR JURY TRIAL

99.    Each of the Defendants, through their control and participation in the Enterprise, took part in numerous acts of mail and wire fraud, or acted with knowledge that mails or wire communications would follow in the ordinary operation of the Enterprise, or could reasonably have foreseen that the mails or wires would be used in the ordinary course of business as a result of Defendants' acts.

100.    T-Mobile did, in fact, rely on the existence of these sham offers when it exercised its ROFRs and purchased EBS licenses it otherwise would have continued to lease under existing lease agreements.

101.    Defendants' misrepresentations, individually and in the aggregate, have caused T-Mobile substantial damages, which were contemplated and intended by Defendants.

### *Injury and Causation*

102.    T-Mobile has been injured in its business and property by reason of Defendants' violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.  The injuries to T-Mobile directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(c) include, but are not limited to, millions of dollars in overcharges in purchase prices and fees; legal fees associated with the negotiation of the license purchases; lost opportunities; and attorneys' fees and costs, including the attorneys' fees and costs associated with exposing and prosecuting Defendants' fraudulent activities.

103.    Pursuant to 18 U.S.C. § 1964(c), T-Mobile is entitled to recover treble damages, plus costs and attorneys' fees, from Defendants.

## COUNT II

### (Conspiracy to Violate RICO, 18 U.S.C. § 1962(d) – Against All Defendants)

104.    T-Mobile repeats and realleges the allegations set forth above as though fully set forth herein.

105.   Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

106.   By and through each of Defendants' close business and contractual relationships with one another, and their close coordination with one another in the affairs of the Enterprise, each Defendant knows the nature of the Enterprise and each Defendant knows that the Enterprise extends beyond the individual Defendant's role.  Moreover, through the same connections and coordination, each Defendant knows that Defendants were engaged in a conspiracy to commit predicate acts, and that the predicate acts were part of a pattern of racketeering activity, and each agreed to pursue the same criminal objective.

107.   Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(a) and 1962(c).   In particular, each Defendant is a knowing, willing, and active participant in the Enterprise and its affairs, and each Defendant shares a common purpose, namely, the orchestration, planning, perpetration, and execution of the scheme to defraud T-Mobile.  In the absence of agreement, the Enterprise could not have operated as it did.  Further evidence of coordination among Defendants is particularly within the control of Defendants.

108.   The participation and agreement of each of the Defendants was necessary to allow the commission of this pattern of racketeering activity.

109.   T-Mobile has been injured in its business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.  The injuries to T-Mobile directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in overcharges; lost opportunities; and

attorneys' fees and costs, including the attorneys' fees and costs associated with exposing and prosecuting Defendants' fraudulent, criminal activities.

110. Pursuant to 18 U.S.C. § 1964(c), T-Mobile is entitled to recover treble damages, plus costs and attorneys' fees, from Defendants.

## COUNT III

### (Fraud – Against All Defendants)

111. T-Mobile repeats and realleges the allegations set forth above as though fully set forth herein.

112. Defendants targeted institutions owning EBS licenses that had leased those licenses to T-Mobile under agreements with ROFR provisions. Defendants worked collectively to convey fraudulent offers to those institutions with the intent and knowledge that the offers would be conveyed to T-Mobile pursuant to the ROFR provisions in T-Mobile's leases. Specifically, WCO made the fraudulent offers; as employees and consultants of WCO, Winnick, Katerndahl, and Kratz, formulated the fraudulent offers and caused them to be made; and Academia, through its principal Bitzarakis, conveyed the offers to the institutions. These sham offers were false and misleading because they were not real—WCO had no intent to consummate the transactions contemplated by those offers, its offers were backed by sham financing, and 10% of the purported "offer" was to cover WCO's illegal kickback, not to form part of the purchase price.

113. Defendants WCO, Winnick, Katerndahl, Kratz, Academia, and Bitzarakis knew the offers to be fraudulent when they formulated, made, and conveyed them. Defendants knew WCO had no intention to honor the offers in the event that T-Mobile chose not to exercise its ROFR. They also knew that WCO's purported financing from SCH was a sham.

114. SCH and its principal Vasudevan participated in this fraud by providing a sham financing arrangement that could be used to substantiate the fraudulent offers, including in the event that T-Mobile challenged the legitimacy

of those offers.  In return, SCH and Vasudevan were entitled to, among other things, 8% of WCO's kickbacks.  SCH and Vasudevan knew that the purported line of credit extended from SCH to WCO was a sham and knew that the sham financing was being used to make fraudulent offers to purchase licenses subject to leases with T-Mobile.

115.  All Defendants worked together to formulate, make, and convey the fraudulent offers with the intent that T-Mobile would, in response to those offers, exercise its ROFRs, thus guaranteeing WCO and its coconspirators the illegal kickbacks based on prices artificially inflated by Defendants and negotiated under the guise of CCAs.

116.  T-Mobile did, in fact, rely on the existence of the fraudulent purported "offers" when it exercised its ROFRs and purchased EBS licenses it had previously leased.  T-Mobile had no reason to believe the offers to be fraudulent when it received ROFR notices from the EBS license holders.  As such, its reliance was justified.

117.  T-Mobile's reliance on Defendants' fraudulent offers was a substantial factor in causing its harm.  As a proximate result of the fraudulent offers, T-Mobile was damaged in an amount totaling what is believed to be more than $10 million.  As such, T-Mobile has suffered compensatory damages in an amount to be proven at trial, but in no event less than the amount of kickbacks Defendants received.

118.  Defendants also are liable for punitive damages because their actions, as described herein, involve a pattern and practice of fraudulent, oppressive, willful, despicable, and malicious misconduct that was committed with trickery and deceit.  Defendants' fraudulent offers were intentional misrepresentations of material facts known to Defendants and were made with the intent to deprive T-Mobile of property or legal rights or otherwise cause injury.  Defendants' conduct

was in conscious disregard of T-Mobile's rights, so as to justify an award of exemplary and punitive damages.

## COUNT IV

### (Aiding and Abetting Fraud – Against Defendants Winnick, Katerndahl, Kratz, Academia, Bitzarakis, SCH, and Vasudevan)

119.   T-Mobile repeats and realleges the allegations set forth above as though fully set forth herein.

120.   Defendants Winnick, Katerndahl, and Kratz were aware that WCO was submitting offers in a scheme to defraud T-Mobile and knew that these offers were false.  These Defendants provided substantial assistance to the fraud when they hatched the fraudulent scheme and, in strategy sessions, decided which particular T-Mobile spectrum leases it would target for purposes of defrauding T-Mobile.  As employees and consultants of WCO, Winnick, Katerndahl, and Kratz also formulated the fraudulent offers and caused them to be made.

121.   Defendants Academia and Bitzarakis also were aware that WCO was submitting offers in a scheme to defraud T-Mobile and knew that these offers were false.  Academia and Bitzarakis substantially assisted this fraud by, among other things, helping WCO target specific EBS license holders that leased spectrum to T-Mobile, negotiating sham offers (and delivering those offers) to the EBS license holders, and negotiating WCO's kickbacks and the NDAs that attempted to keep those kickbacks secret.

122.   Defendants SCH and Vasudevan also were aware that WCO was submitting offers in a scheme to defraud T-Mobile and knew that these offers were false.  SCH and its principal Vasudevan substantially assisted this fraud by providing a sham financing arrangement that could be used to substantiate the fraudulent offers, including in the event that T-Mobile challenged the legitimacy of those offers.  The sham financing agreement between SCH and WCO entitled SCH to, among other things, 8% of WCO's kickbacks and specifically

contemplated that WCO would target spectrum licenses under lease to T-Mobile and any other spectrum purchases required prior consent by SCH.

123.   Defendants Winnick, Katerndahl, Kratz, Academia, Bitzarakis, SCH, and Vasudevan's conduct was a substantial factor in causing harm to T-Mobile. T-Mobile has suffered compensatory damages in an amount to be proven at trial, but in no event less than the amount of kickbacks Defendants received.

124.   Defendants also are liable for punitive damages because their actions, as described herein, involve a pattern and practice of fraudulent, oppressive, willful, despicable, and malicious misconduct that was committed with trickery and deceit.

## COUNT V

### (Conspiracy to Commit Fraud – Against All Defendants)

125.   T-Mobile repeats and realleges the allegations set forth above as though fully set forth herein.

126.   On information and belief, commencing in June 2020, Defendants WCO, Winnick, Katerndahl, Kratz, Academia, and Bitzarakis entered into an agreement, combination, and conspiracy with each other with the intent to defraud T-Mobile.

127.   Each of said Defendants acted in furtherance of his or its own personal financial gain in entering into the agreement, combination, and conspiracy. Together, these Defendants conspired to submit fraudulent offers to EBS license holders with the intent that those fraudulent offers would be conveyed to T-Mobile, causing T-Mobile to exercise its ROFR.

128.   Defendants SCH and Vasudevan agreed to and joined the conspiracy to provide sham financing as a means of covering the tracks of Defendants' fraudulent scheme.  SCH and Vasudevan authored sham documents that purported to offer a $2 billion line of financing—specifically earmarked for WCO to target spectrum licenses under lease to T-Mobile—with the intent that T-Mobile would

43

believe the offers supported by that sham financing were real.  In exchange, SCH and Vasudevan were promised 8% of the ill-gotten proceeds from the fraudulent scheme.

129.   Defendants' conspiracy was a substantial factor in causing harm to T-Mobile.  As a direct and proximate result of Defendants' conspiracy to defraud, T-Mobile was damaged in an amount totaling what is believed to be more than $10 million.  As such, T-Mobile has suffered compensatory damages in an amount to be proven at trial, but in no event less than the amount of kickbacks Defendants received.

130.   Defendants are also liable for punitive damages because their actions, as described herein, involve a pattern and practice of fraudulent, oppressive, willful, despicable, and malicious misconduct that was committed with trickery and deceit.  Defendants' conspiracy was conducted with malice in conscious disregard of T-Mobile's rights.  Defendants acted with a specific motive, purpose, and actual intent to injure and defraud T-Mobile, as to justify an award of exemplary and punitive damages in an amount to be proven at trial.

## COUNT VI

### (Cal. Penal Code § 496(c) – Against All Defendants)

131.   T-Mobile repeats and realleges the allegations set forth above as though fully set forth herein.

132.   California Penal Code section 4969(c) provides a statutory right of action for recovery of treble damages, costs of suit, and reasonable attorneys' fees against any "person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing that property to be stolen or obtained" in violation of section 496(a).

133.   "Theft," in turn, is defined by California Penal Code section 484(a) as feloniously stealing or taking the personal property of another or knowingly and designedly, by any fraud or fraudulent representation or pretense, defraud any other person of money, among other acts.

134.   Through the carefully planned sham "offer" scheme discussed above, Defendants intentionally and knowingly stole an amount believed to be more than $10 million from T-Mobile by fraudulently diverting portions of the purchase price for EBS licenses in the form of illegal kickbacks to themselves in a manner constituting theft and extortion.  Defendants received and thereafter had possession of T-Mobile's stolen funds knowing they were stolen, including because they perpetrated the theft.

135.   Defendants worked collectively to convey fraudulent representations in the form of offers to institutions with EBS licenses with the intent and knowledge that the offers would be conveyed to T-Mobile pursuant to the ROFR provisions in T-Mobile's leases.  Specifically, WCO made the fraudulent offers; as employees and consultants of WCO, Winnick, Katerndahl, and Kratz, formulated the fraudulent offers and caused them to be made;  Academia, through its principal Bitzarakis, conveyed the offers to the institutions; and SCH, through its agent and alter ego Vasudevan, served as sham financial backing for the fraudulent offers.  These sham offers were a false pretense because they were not real—WCO had no intent to consummate the transactions contemplated by those offers, its offers were backed by sham financing, and 10% of the purported "offer" was to cover WCO's illegal kickback, not to form part of the purchase price.

136.   All Defendants worked together to formulate, make, and represent the fraudulent offers with the intent that T-Mobile would, in response to those offers, exercise its ROFRs, thus guaranteeing WCO and its coconspirators the illegal kickbacks based on prices artificially inflated by Defendants and negotiated under the guise of CCAs.

137.   T-Mobile relied on the existence of the fraudulent purported "offers" when it exercised its ROFRs and purchased EBS licenses it had previously leased. T-Mobile had no reason to believe the offers to be fraudulent when it received ROFR notices from the EBS license holders.

138.   Defendants committed these acts with the intent to defraud T-Mobile. By representing fraudulent offers to purchase the spectrum licenses, Defendants intended to induce T-Mobile into exercising its ROFRs at a price artificially inflated by Defendants' sham offer and higher than T-Mobile would have paid absent Defendants' fraudulent scheme so that Defendants could obtain the excess price paid for the licenses in the form of kickbacks.

139.   Defendants also concealed these fraudulently diverted kickbacks, and the arrangements under which Defendants obtained them, from Plaintiffs through, *inter alia*, the use of NDAs.

140.   As a direct and proximate result of Defendants' violations of California Penal Code section 496, T-Mobile was damaged in an amount totaling what is believed to be more than $10 million.  As such, T-Mobile has suffered compensatory damages in an amount to be proven at trial, but in no event less than the amount of kickbacks Defendants received.

141.   Defendants are also liable for punitive damages because their actions, as described herein, involve a pattern and practice of fraudulent, oppressive, willful, despicable, and malicious misconduct that was committed with trickery and deceit.

142.   T-Mobile also is entitled to treble damages, costs of suit, and attorney's fees pursuant to California Penal Code section 496(c).

## COUNT VII

### (Conversion – Against All Defendants)

143.   T-Mobile repeats and realleges the allegations set forth above as though fully set forth herein.

144.   T-Mobile had a right to possess the money it spent exercising its ROFR for multiple EBS licenses and acquiring those licenses at improperly inflated prices.

145.   Defendants substantially interfered with T-Mobile's property through their carefully planned sham "offer" scheme discussed above, in which Defendants knowingly, intentionally, and fraudulently coerced T-Mobile into exercising its ROFR for multiple EBS licenses, ultimately causing T-Mobile to expend an amount believed to exceed $10 million to acquire such licenses at improperly inflated prices, with Defendants taking possession of T-Mobile's inflated payments in the form of kickbacks.

146.   T-Mobile did not consent to Defendants taking possession of T-Mobile's money.  And had T-Mobile known of Defendants' sham "offer" scheme, designed to force T-Mobile to exercise its ROFRs and pay artificially inflated prices for EBS licenses, it would not have paid the artificially inflated prices for those EBS licenses.

147.   Defendants damaged T-Mobile by wrongfully converting portions of the purchase price for EBS licenses in the form of illegal kickbacks to themselves, and illegally exerting dominion and control over those kickbacks.

148.   T-Mobile is entitled to recover the funds wrongfully converted by Defendants through the above-alleged scheme, i.e., the amount of the kickbacks. As such, T-Mobile has suffered compensatory damages in an amount to be proven at trial, but in no event less than the amount of kickbacks Defendants received.

149.   Defendants are also liable for punitive damages because their actions, as described herein, involve a pattern and practice of fraudulent, oppressive, willful, despicable, and malicious misconduct that was committed with trickery and deceit.

## **COUNT VIII**

**(Violation of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 – Against All Defendants)**

150.   T-Mobile repeats and realleges the allegations set forth above as though fully set forth herein.

151.   Plaintiffs and Defendants are all persons within the meaning of the California's Unfair Competition Law ("UCL").  *See* Cal. Bus. & Prof. Code § 17201.

152.   The statute makes unlawful "unfair competition," which is defined as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.

153.   Defendants violated the UCL by engaging in conduct that constitutes unfair, unlawful, and fraudulent business acts or practices.

154.   Defendants' business acts are unlawful within the meaning of Business and Professions Code section 17200 because they violate, *inter alia*, the federal RICO statute, California Penal Code section 496, and also give rise to the common law causes of action set forth herein.

155.   Defendants' business acts and practices are "fraudulent" under the UCL because they extended purported "offers" that they had no intention of consummating, rendering them false and likely to mislead T-Mobile and the public. Indeed, Defendants made these fraudulent "offers" to members of the public, including EBS license holders, with the intent that they would be conveyed to T-Mobile and trigger T-Mobile's ROFR.  Defendants concealed the fact that these "offers" were a sham, including because Defendants had no intention of consummating or following through on those offers.

156.   Defendants' business acts and practices are "unfair" under the UCL for at least the following reasons:

a. Defendants' conduct harms competition because they are not competing in good faith but are using sham, non-binding offers to coerce T-Mobile into purchasing licenses at prices higher than the licensees are willing to accept that it otherwise would not have purchased; and

b. The gravity of the harm to T-Mobile resulting from Defendants' acts and practices outweighs any legitimate utility of that conduct.

157.   As a result of Defendants' unlawful, fraudulent, and unfair conduct, T-Mobile has suffered an ascertainable loss in the form of, among other things, the amounts it paid to purchase EBS licenses that were siphoned off to Defendants as kickbacks.

158.   T-Mobile is likely to continue to be damaged by Defendants' unlawful, fraudulent, and unfair business acts and practices because Defendants are likely to continue to use sham, non-binding offers to coerce T-Mobile into exercising its ROFRs.

159.   Because Defendants are likely to continue using sham, non-binding offers to coerce T-Mobile into exercising its ROFRs in the future, T-Mobile has no other adequate remedy at law to address this threat of continuing harm.

160.   In accordance with Business and Professions Code section 17203, T-Mobile is entitled to an order enjoining Defendants from continuing to conduct business through unlawful, fraudulent and unfair acts and practices and an order for restitution of all monies which Defendants unjustly acquired through their deceptive and unfair acts.

## COUNT IX

### (Tortious Interference with Business Expectancy and Contractual Relationship – Against All Defendants)

161.   T-Mobile repeats and realleges the allegations set forth above as though fully set forth herein.

COMPLAINT AND DEMAND FOR JURY TRIAL

162.   T-Mobile had valid lease agreements with EBS license holders.  T-Mobile's lease agreements contained ROFR provisions that entitled T-Mobile to match any bona fide third-party offers to purchase the EBS license subject to the lease agreement.

163.   Defendants knew about the lease agreements between T-Mobile and the EBS license holders, as well as the specific terms of those agreements, including the ROFR provisions.

164.   Defendants, by submitting sham offers to the EBS license holders, intentionally and purposely induced T-Mobile to exercise its ROFR under the lease agreements.  Defendants' acts constitute an intentional act designed to disrupt the contractual lease arrangement between T-Mobile and each EBS license holder.

165.   Defendants further disrupted T-Mobile's contracts with EBS license holders by artificially inflating their sham offers to account for WCO's 10% kickback.  As a result, when T-Mobile exercised its ROFRs and matched the "offers," it was not only paying the EBS license holder to purchase the license, it also unknowingly was forced to fund WCO's 10% kickback.  Defendants actively concealed this fact from T-Mobile by having EBS license holders sign NDAs under which they could not reveal to T-Mobile the specific terms of Defendants' offers (including the 10% kickbacks Defendants received as part of those offers).

166.   As a result of Defendants' actions, the lease arrangements between T-Mobile and the EBS license holders were disrupted.  Specifically, Defendants' sham offers caused T-Mobile to exercise its ROFR and purchase the EBS license it had previously leased, bringing an end to the parties' lease agreement.

167.   Defendants' actions have tortiously interfered with T-Mobile's business expectancy and with its contractual relationships with multiple EBS license holders.

168.   Defendants' conduct in tortiously interfering with T-Mobile's business expectancy and with its contractual relationships with multiple EBS

license holders was a substantial factor in causing T-Mobile's harm. As a proximate consequence of the contractual and business expectancy disruption induced by Defendants' fraudulent and unfair acts, T-Mobile has incurred substantial costs and is entitled to damages in an amount to be proven at trial, but in no event less than the amount of kickbacks Defendants received.

169.   Defendants are also liable for punitive damages because their actions, as described herein, involve a pattern and practice of fraudulent, oppressive, willful, despicable, and malicious misconduct that was committed with trickery and deceit.

## COUNT X

### (Unjust Enrichment – Against All Defendants)

170.   T-Mobile repeats and realleges the allegations set forth above as though fully set forth herein.

171.   Defendants are engaged in a fraudulent and unfair scheme by which they collectively make sham, non-binding offers to purchase EBS licenses in order to coerce T-Mobile into exercising its ROFRs under various lease agreements and into purchasing EBS licenses for more than the licensees are willing to accept.

172.   After T-Mobile purchased the EBS licenses Defendants targeted, Defendants received a material portion of the purchase price through secret side agreements dubbed CCAs.

173.   Defendants' receipt of a portion of the purchase price is a result of Defendants' fraudulent and unfair scheme.

174.   Under the circumstances, it would be inequitable for Defendants to retain the above-described benefits.

175.   As a result of Defendants' unjust enrichment, T-Mobile was damaged in an amount to be determined at trial. T-Mobile seeks full disgorgement and restitution of Defendants' unjust enrichment.

## COUNT XI

**(Negligent Misrepresentation – Against All Defendants)**

176.   T-Mobile repeats and realleges the allegations set forth above as though fully set forth herein.

177.   Defendants made multiple statements of material facts, including representations as to the "bona fide" nature of their sham offers, in order to induce T-Mobile into exercising its ROFRs under long-standing contractual provisions with EBS license holders.

178.   Defendants' representations were untrue, and Defendants had no reasonable grounds to think otherwise.

179.   Defendants were negligent in making these misstatements because they should have known the statements were false.  Defendants had no intention of participating in the spectrum marketplace in good faith.  Instead, Defendants specifically inserted themselves into the market solely for the purpose of exploiting T-Mobile's ROFR provisions and enriching themselves through their illegal kickback dealings.  Each Defendant should have known that WCO had no intention of purchasing the EBS licenses for which it made non-binding offers.

180.   In making the misrepresentations, Defendants intended or expected to induce T-Mobile's reliance.

181.   T-Mobile did, in fact, rely on these misrepresentations when it exercised its ROFRs and purchased EBS licenses it had previously leased.  T-Mobile had no reason to believe the offers to be misrepresentations when it received ROFR notices from the EBS license holders.  As such, its reliance was reasonable and justified.

182.   T-Mobile's reliance on Defendants' misrepresentations was a substantial factor in causing its harm.  As a proximate result of Defendants' misrepresentations, T-Mobile was damaged in an amount totaling what is believed to be more than $10 million.  As such, T-Mobile has suffered compensatory

damages in an amount to be proven at trial, but in no event less than the amount of kickbacks Defendants received.

## **PRAYER FOR RELIEF**

WHEREFORE, T-Mobile prays for relief and judgment against Defendants as follows:

A.  Compensatory damages according to proof at trial;

B.  Treble damages according to statute;

C.  Restitution and disgorgement of all profits and unjust enrichment;

D.  Necessary and appropriate injunctive relief;

E.  An award of T-Mobile's reasonable attorneys' fees and costs and expenses according to statute;

F.  Punitive damages;

G.  Prejudgment interest; and

H.  Such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, T-Mobile demands a trial by jury in this action of all issues so triable.


Dated:  June 2, 2023                          Respectfully submitted,


By: */s/ Jeffrey A. Rosenfeld*
ALSTON & BIRD LLP
Jeffrey A. Rosenfeld (#136896)
jeffrey.rosenfeld@alston.com
Jesse Steinbach (#278923)
jesse.steinbach@alston.com
Brooke H. Bolender (#340689)
brooke.bolender@alston.com
333 South Hope Street
Los Angeles, CA 90071
Telephone: (213) 576-1143

COMPLAINT AND DEMAND FOR JURY TRIAL

WILLIAMS & CONNOLLY LLP
Kenneth J. Brown*
kbrown@wc.com
R. Kennon Poteat III*
kpoteat@wc.com
William P. Ashworth*
washworth@wc.com
Kathryn E. Hoover*
khoover@wc.com
680 Maine Avenue, SW
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

KLEINBARD LLC
Steven J. Engelmyer*
sengelmyer@kleinbard.com
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Telephone: 215-568-2000

* *pro hac vice* application forthcoming

*Attorneys for Plaintiffs*

COMPLAINT AND DEMAND FOR JURY TRIAL