1

2   **BUCHALTER APC**
Joshua M. Robbins (SBN 270553)
3     jrobbins@buchalter.com
Mark T. Cramer (SBN 198952)
4     mcramer@buchalter.com
Thomas J. Speiss, III (SBN 200949)
5     tspeiss@buchalter.com
S. Ross Garrett (SBN 330285)
6     rgarrett@buchalter.com
18400 Von Karman, Suite 800
7   Irvine, CA 92612-0514
949.760.1121

8   **MITTS LAW LLC**
Maurice R. Mitts (admitted *pro hac vice*)
9     mmitts@mittslaw.com
1822 Spruce Street
10  Philadelphia, PA 19103
215.866.0112

11
Attorneys for Defendants WCO Spectrum LLC,
12  Academia Spectrum LLC, Carl Katerndahl,
Andreas Bitzarakis, Tyler Kratz, and Karen
13  Winnick, as Trustee of the GKW Trust and Special
Administrator of the Estate of Gary Winnick

14

15               **UNITED STATES DISTRICT COURT**

16               **CENTRAL DISTRICT OF CALIFORNIA**

17

18  **T-Mobile US, Inc.,** *et al.*,          Civil Action No. 2:23-4347-DMG-E
(Hon. Dolly M. Gee)
19            Plaintiffs,

20       vs.                                  **Memorandum In Support Of**
**Defendants' Motion To Dismiss**
21  **WCO Spectrum LLC,** *et al.*,

22            Defendants.                      Hearing Date: April 26, 2024
Time:          9:30 a.m.
23                                             Courtroom:     8C

24
Complaint Filed: June 2, 2023
25

26

27

28

1

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...............................................................................................1

II.   FACTUAL BACKGROUND ............................................................................3

    A.    T-Mobile's Monopoly on EBS Spectrum.............................................3

    B.    T-Mobile's Conspiracy Theory ...........................................................4

        1.   The La Roche College transaction ...........................................5

        2.   The Albright College transaction .............................................5

        3.   The "Whistleblower" .................................................................6

        4.   T-Mobile keeps exercising ROFRs ..........................................7

III.  ARGUMENT .....................................................................................................7

    A.    Standard of Review...............................................................................8

    B.    T-Mobile Has Not Adequately Pled RICO Claims. .............................9

        1.   T-Mobile has not properly alleged harm to its business or property. ..................................................................................10

        2.   T-Mobile has not properly alleged racketeering activity. ........12

        3.   T-Mobile has not properly alleged a pattern of racketeering. ..18

    C.    T-Mobile Has Not Properly Pled Claims Under California Law. .......20

        1.   T-Mobile has not properly pled common law fraud claims. ....21

        2.   T-Mobile has not properly alleged a claim under California Penal Code § 496. ..................................................................23

        3.   T-Mobile has not properly alleged conversion. .......................23

        4.   T-Mobile has not properly alleged violation of the Unfair Competition Law. ..................................................................24

        5.   T-Mobile has not properly alleged tortious interference with contract or prospective economic relations. ...........................25

        6.   T-Mobile has not properly alleged unjust enrichment. ............26

        7.   T-Mobile has not properly alleged negligent misrepresentation. ..................................................................27

    D.    The Court Should Dismiss Without Leave to Amend.........................27

IV.   CONCLUSION ...............................................................................................27

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

5
*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...............................................................................8

6

7
*Baymiller v. Guarantee Mut. Life Co.*,
    2000 WL 1026565 (C.D. Cal. May 3, 2000) .......................................22

8

9
*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..........................................................................8, 14

10

11
*Buran Equip. Co., Inc. v. Hydro Elec. Constructors, Inc.*,
    645 F.Supp.864 (N.D. Cal. 1987).......................................................20

12

13
*Canyon Cnty. v. Syngenta Seeds, Inc.*,
    519 F.3d 969 (9th Cir. 2008) ..............................................................10

14
*Chaset v. Fleer/Skybox Int'l, LP*,
    300 F.3d 1083 (9th Cir. 2002) ............................................................10

15

16
*City of Clinton Ark. v. Pilgrim's Pride Corp.*,
    632 F.3d 148 (5th Cir. 2010) ..............................................................13

17

18
*City of Livonia Employees' Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.*,
    711 F.3d 754 (7th Cir. 2013)...............................................................16

19

20
*Cooper v. Pickett*,
    137 F.3d 616 (9th Cir. 1997) ..........................................................8, 13

21

22
*Davis v. HSBC Bank Nevada, N.A.*,
    691 F.3d 1152 (9th Cir. 2012).......................................................24, 25

23

24
*Eclectic Properties E, LLC v. The Marcus & Millichap Co.*,
    2012 WL 713289 (N.D. Cal. Mar. 5, 2012)........................................19

25

26
*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
    751 F.3d 990 (9th Cir. 2014)..........................................................13, 19

27

28
*Edwards v. Marin Park, Inc.*,
    356 F.3d 1058 (9th Cir. 2004)...............................................................9

*In re Gilead Sciences Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008)............................................................................8

*Glenn K. Jackson, Inc. v. Roe*,
    273 F.3d 1192 (9th Cir. 2001)..........................................................................27

*Glob. Acquisitions Network v. Bank of Am. Corp.*,
    2013 WL 2468386 (C.D. Cal. June 7, 2013) ....................................................22

*H.J., Inc. v. Northwestern Bell Tel. Co.*,
    492 U.S. 229 (1989)...................................................................................18, 19

*Hecht v. Com. Clearing House, Inc.*,
    897 F.2d 21 (2d Cir. 1990)..............................................................................10

*Higginbotham v. Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) ...........................................................................17

*Hoang v. Bank of Am., N.A.*,
    910 F.3d 1096 (9th Cir. 2018)..........................................................................27

*Holloway v. Clackamas River Water*,
    2014 WL 6998069 (D.Or. Sept. 9, 2014) .........................................................11

*Howard v. America Online, Inc.*,
    208 F.3d 741 (9th Cir. 2000)..............................................................................9

*In re Hydroxycut Mktg. & Sales Pracs. Litig*,
    299 F.R.D. 648 (S.D. Cal. 2014) ......................................................................13

*Izenberg v. ETS Servs., LLC*,
    589 F. Supp. 2d 1193 (C.D. Cal. 2008) ......................................................10, 11

*Jarvis v. Regan*,
    833 F.2d 149 (9th Cir. 1987)............................................................................20

*Jones v. Micron Technology Inc.*,
    400 F. Supp. 3d 897 (N.D. Cal. 2019)..............................................................24

*Kamal v. County of Los Angeles*,
    2019 WL 7195903 (C.D. Cal. Nov. 29, 2019)...................................................11

*Kauai Scuba Ctr., Inc. v. PADI Americas, Inc.*,
    2011 WL 13225132 (C.D. Cal. Mar. 15, 2011) ................................................22

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

*Kearns v. Ford Motor Co.*,
   567 F.3d 1120 (9th Cir. 2009)..........................................................................21

*Knappenberger v. City of Phoenix*,
   566 F.3d 936 (9th Cir. 2009)...........................................................................27

*Limcaco v. Wynn*,
   2021 WL 5040368 (C.D. Cal. Oct. 29, 2021)...............................................10

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*,
   431 F.3d 353 (9th Cir. 2005).............................................................................9

*Marder v. Lopez*,
   456 F.3d 445 (9th Cir. 2006).............................................................................9

*McGowan v. Weinstein*,
   505 F. Supp. 3d 1000 (C.D. Cal. 2020)....................................................19, 20

*Metaxas v. Lee*,
   503 F.Supp.3d 923 (N.D. Cal. 2020)..............................................................20

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008)......................................................................3, 8

*Miller v. Yokohama Tire Corp.*,
   358 F.3d 616 (9th Cir. 2004)...........................................................................12

*Natural Immunogenics Corp. v. Newport Trial Group*,
   2016 WL 11520711 (C.D. Cal. Aug. 1, 2016)...............................................19

*Ogden v. Wells Fargo Bank, N.A.*,
   2015 WL 13413390 (C.D. Cal. 2015) ............................................................10

*Olaniyi v. District Columbia*,
   763 F. Supp. 2d. 70 (D.D.C. 2011).................................................................13

*Oscar v. Univ., Students Coop. Ass'n*,
   965 F.2d 783 (9th Cir.) ...............................................................................9, 10

*Pacific Surf Designs, Inc. v. WhiteWater West Industries, Ltd.*,
   2021 WL 5326529 (S.D. Cal. Nov. 16, 2021)...............................................10

*Palantir Technologies, Inc. v. Abramowitz*,
   2020 WL 9553151 (N.D. Cal. July 13, 2020)................................................10

*Pemberton v. Nationstar Mortgage,*
   LLC, 331 F. Supp. 3d 1018 (S.D. Cal. 2018) ................................................ 24, 25

*Relig. Tech. Ctr. v. Wollersheim,*
   971 F.2d 364 (9th Cir. 1992) ................................................................................ 19

*Rosales-Martinez v. Palmer,*
   753 F.3d 890 (9th Cir. 2014) .................................................................................. 8

*Sanford v. MemberWorks, Inc.,*
   625 F.3d 550 (9th Cir. 2010) .............................................................................. 8, 9

*Sever v. Alaska Pulp Co.,*
   978 F.2d 1529 (9th Cir. 1992) .............................................................................. 20

*Thomas v. Baca,*
   308 F.App'x 87 (9th Cir. 2009) ............................................................................ 10

*In re Transforming the 2.5 GHz Band,*
   34 FCC Rcd. 5446 (2019), 2019 WL 3065514 ...................................................... 4

*Tyrone Pac. Int'l, Inc. v. MV Eurychili,*
   658 F.2d 664 (9th Cir. 1981) ................................................................................ 23

*United States. v. Lindsey,*
   850 F.3d 1009 (9th Cir. 2017) .............................................................................. 17

*Williams & Cochrane, LLP v. Quechan Tribe of Fort Yuma Indian
   Reservation,*
   2019 WL 4277431 (S.D. Cal. 2019) ..................................................................... 10

*Zucco Partners, LLC v. Digimarc Corp.,*
   552 F.3d 981 (9th Cir. 2009) ................................................................................ 16

**California Cases**

*Cel-Tech Comm'ns, Inc. v. Los Angeles Cellular Tel. Co.,*
   20 Cal. 4th 163 (1999) .......................................................................................... 24

*Fox v. Pollack,*
   181 Cal. App. 3d 954 (Cal. Ct. App. 1986) .......................................................... 27

*Ixchel Pharma, LLC v. Biogen, Inc.,*
   9 Cal. 5th 1130 (2020) .......................................................................................... 26

*Kasparian v. Los Angeles*,
  38 Cal. App. 4th 242 (1995)................................................................25

*Lacagnina v. Comprehend Sys., Inc.*,
  25 Cal. App. 955 (2018)...................................................................23

*Prakashpalan v. Engstrom, Lipscomb & Lack*,
  223 Cal. App. 4th 1105....................................................................26

*Schnall v. Hertz Corp.*,
  78 Cal. App. 4th 1144 (2000)............................................................24

*Siry Investment, L.P. v. Farkhondehpour*,
  13 Cal. 5th 333 (2022) ....................................................................23

*Youst v. Longo*,
  43 Cal. 3d 64 (1987) .......................................................................25

**Other State Cases**

*TDI Acquisition Sub, LLC v. Albright College*,
  No. 21-04881 (Ct. of C.P, Berks Cty., Pa. May 27, 2025).......................4, 5, 19

**Federal Statutes**

18 U.S.C.
  § 1341 .........................................................................................12
  § 1343 .........................................................................................12
  § 1961(1) ....................................................................................12
  § 1962(a) ....................................................................................12
  § 1962(c) ......................................................................................9
  § 1962(d) ..................................................................................9, 12
  § 1964(c)......................................................................................9

**California Statutes**

Cal. Pen. Code
  § 484(a) ......................................................................................23
  § 496 ..............................................................................2, 7, 23, 24
  § 496(c) ......................................................................................23

## Other Authorities

Fed. R. Civ. P.
    8 ................................................................................. 9, 13, 14, 20
    9(b) ................................................................................... *passim*
    12(b)(6) .................................................................................... 3, 9

Michael J. de la Merced, *T-Mobile and AT&T: What's $2 Billion Among Friends?*, NEW YORK TIMES, Dec. 20, 2011 ...................................................... 14

Vipal Monga, *AT&T Is Paying the Biggest Breakup Fee Ever*, WALL STREET JOURNAL, Dec. 19, 2011 ...................................................... 14

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## I.    INTRODUCTION

For years, T-Mobile[1] has leased spectrum to power its 5G network at below-market rates from non-profit schools that hold licenses to the spectrum, but lack the leverage to obtain a fair price. That changed in 2020, when the Federal Communications Commission authorized the schools to sell their licenses to commercial entities like Defendant WCO. WCO began bidding for the licenses throughout the country, aiming to deliver fair market value to the license holders now, and to turn a profit later by re-selling the licenses or revising the leases. To avoid paying fair prices for its leased spectrum, T-Mobile has spent the past two years blocking WCO's purchases, either by exploiting anticompetitive lease terms or by threatening and filing litigation. This lawsuit, alleging an illogical, self-defeating fraud, is an extension of that scheme to suppress competition and keep the schools under T-Mobile's thumb.

T-Mobile's Complaint asserts 11 counts based on a single theory: that Defendants defrauded T-Mobile by making "sham" offers to purchase spectrum, thereby "forcing" T-Mobile to exercise its contractual right of first refusal (ROFR) and overpay to purchase the spectrum to prevent WCO from obtaining it. This theory not only confirms the exploitative and anticompetitive purpose behind T-Mobile's actions, but also is not supported by the factual allegations in the Complaint or by related records.

*First,* the facts alleged do not show that Defendants made false representations or acted with intent to defraud because—even if true—they do not suggest that WCO's offers to buy the spectrum licenses were "shams." Rather, those facts are consistent with rational and good-faith business behavior: WCO's genuine effort to obtain the licenses and to protect itself from the risk and cost of

---

[1] Plaintiffs T-Mobile US, Inc., Clearwire Spectrum Holdings LLC, Clearwire Spectrum Holdings II LLC, Clearwire Spectrum Holdings III LLC, Fixed Wireless Holdings LLC, NSAC LLC, TDI Acquisition Sub LLC, and WBSY Licensing LLC are all affiliated entities, and thus will be referred to collectively as "T-Mobile" or "Plaintiffs."

pursuing them in vain. Other facts alleged show that Defendants could *not* have realistically sought to deceive T-Mobile in the manner it claims. This defeats at least two required elements of T-Mobile's claims under RICO, the California Penal Code, and common law.

*Second,* the facts alleged do not suggest that Defendants' supposed representations were material to T-Mobile's decisions, or that T-Mobile reasonably relied on them. By its own account, even after it was aware of facts that it now says demonstrate Defendants' fraud (*i.e.,* that WCO was not planning to buy the licenses), and even after it claimed in court that WCO's offers were not "bona fide," T-Mobile continued to exercise its ROFRs. This shows that it did not base its actions on Defendants' representations, which undercuts other required elements of the various claims.

*Third,* T-Mobile's allegations show that it has not been damaged. It does not dispute that it received something of value when it bought the licenses. While it claims to have "overpaid," it does not allege that there was any "market price" for the licenses, nor that it could or would have bought the licenses at a lower price if not for Defendants, nor even that it is financially worse off than if it had not bought the licenses. Its speculation about the prices the license holders "would have" accepted presumes a "but for" world that T-Mobile does not claim ever would have existed.

*Fourth*, the alleged facts do not establish other critical aspects of the claims. For example, even if it were true that Defendants had a scheme to defraud T-Mobile via the purchase offers, the conduct as described was too brief and too limited to amount to a "pattern" of racketeering for RICO purposes.

T-Mobile's allegations inevitably fall short for a very simple reason: its fraud theory defies history and logic. If T-Mobile believed WCO had no plans to buy spectrum licenses, its remedy would be simple: call WCO's bluff and stop blocking the purchases. That it admittedly has not done so, but instead has

continued to usurp WCO's purchase opportunities and to weaponize litigation to ward WCO off, speaks louder than any of its words. The Complaint should thus be dismissed with prejudice, so that WCO can challenge T-Mobile's ongoing monopoly.

## II.    FACTUAL BACKGROUND[2]

This case concerns the market for wireless spectrum in the United States. "Wireless spectrum" refers to the range of radio frequencies used to transmit information across cellular networks. (Compl. ¶ 32). Spectrum is grouped into "bands," one of which—ranging from approximately 20 KHz to 300GHZ—is used for wireless communication. (*Id.*). The FCC sells or awards licenses for exclusive use of certain frequencies in certain areas by certain entities. (*Id.*) For decades, the FCC restricted spectrum in the 2.5 GHz band to educational institutions under its "EBS"—Educational Broadband Services—licensing program. (*Id.* ¶ 34) (citing *In re Transforming the 2.5 GHz Band*, 34 FCC Rcd. 5446, 5451 (2019), 2019 WL 3065514, hereinafter "*Transforming the 2.5 GHz Band*").

### A.    T-Mobile's Monopoly on EBS Spectrum

Until 2020, FCC regulations allowed only non-commercial entities offering educational services and programming to hold EBS licenses. (Compl. ¶ 35). The EBS licensees were permitted, however, to lease 95% of their spectrum to commercial entities like T-Mobile. (*Id.*) (citing *Transforming the 2.5 GHz Band* at 5448). (*Id.*) Effective April 27, 2020, the FCC revised its rules so that commercial entities could purchase EBS licenses from the EBS license holders. (*Id.* ¶ 36). When that rule changed, T-Mobile held leases on 1,722 out of 2,193 licenses (over

---

[2] As is appropriate for a Rule 12(b)(6) motion, the factual recitation in this memorandum is limited to "the contents of the complaint, materials incorporated into the complaint by reference, and matters of which the [C]ourt may take judicial notice." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). Defendants do not concede that any allegation or characterization in T-Mobile's Complaint is true.

1   78%) for 2.5 GHz spectrum. (*Id.* ¶ 37; *Transforming the 2.5 GHz Band* at 5448).

2        T-Mobile's lease agreements with these institutions include a contractual

3   "right of first refusal." (*Id.* ¶ 39). The ROFR compels EBS licensees to tell T-

4   Mobile whenever they intend to accept an offer from a third party to purchase an

5   EBS license that T-Mobile leases. (*Id.*) T-Mobile then has—on paper—30 days to

6   decide whether to match the third party's offer and acquire the license for itself.

7   (*Id.*) If it does not, the third party may buy the license and assume the current EBS

8   licensee's obligations under T-Mobile's lease, effectively becoming T-Mobile's

9   new landlord. (*Id.*)

10    **B.**    **T-Mobile's Conspiracy Theory**

11        WCO has made offers to buy dozens of spectrum licenses from various

12   institutions. Its offers are explicitly non-binding, and contain Commitment Cost

13   Agreements that require the license holder to pay WCO a "commitment fee" if T-

14   Mobile exercises its ROFR and blocks the purchase. These commitment fees

15   compensate WCO for its time and investment in pursuing these complex

16   transactions if its bid falls short. (Compl. ¶ 42; Exhibit A to RJN).

17        T-Mobile has previously argued in court filings that WCO was a

18   "competitor" "trying to assemble a large block of EBS spectrum as would be used

19   in a telecommunications network." (Compl. ¶ 20, *TDI Acquisition Sub, LLC v.*

20   *Albright College*, No. 21-04881 (Ct. of C.P, Berks Cty., Pa. May 27, 2025)

21   (hereinafter "Exhibit B")). It now claims that the offers were "shams," and that

22   WCO never actually intended to go through with the purchases if T-Mobile did not

23   exercise its ROFRs. (Compl. ¶ 3.) Instead, T-Mobile claims, Defendants intended

24   for T-Mobile to falsely believe that these offers were real and to exercise the

25   ROFRs, so that WCO could pocket the commitment fees out of the sale proceeds.

26   (*Id.* ¶ 42.) The Complaint cites several transactions supposedly demonstrating this

27   purported scheme.

28

### 1.     The La Roche College transaction

In October 2020, WCO offered to buy an EBS license from La Roche College in Pittsburgh. (Compl. ¶ 60). The offer letter stated that "[a]lthough this offer is a bona fide offer … this letter is not, and should not be considered, a legally binding indication of agreement in any manner." (*Id.*) T-Mobile claims this statement was false, and the offer was not, in fact, "bona fide" because WCO had no plans to honor its offer if T-Mobile declined to exercise its ROFR. (*Id.*). Per its agreement with T-Mobile, on November 13, 2020, La Roche notified T-Mobile of the offer. (*Id.* ¶ 61).

T-Mobile claims that on December 15, 2020, now-deceased former defendant Gary Winnick told T-Mobile that WCO planned to invest over $1 billion in EBS spectrum, with plans to buy and hold it to generate "significant returns" as the leases came due for renewal. (*Id.* ¶ 62.) T-Mobile alleges that those statements, too, were false. (*Id.*) It also alleges that it sought information from La Roche's counsel "designed to assess whether WCO's offer was, in fact, 'bona fide,'" and that La Roche declined to provide it. (*Id.*) T-Mobile claims it was then "coerced" into exercising its ROFR because it was "[f]aced with this stonewalling and a rapidly diminishing 30-day period in which to decide." (*Id.*) At the same time, it says that it did not execute the ROFR until January 22, 2021—*seventy* days after it received the ROFR notice. (*Id.*, Appendix B.)

### 2.     The Albright College transaction

In Spring 2021, WCO sent a non-binding term sheet to Albright College in Reading, Pennsylvania, with an offer to purchase Albright's EBS license. (*Id.* ¶ 47). Albright then gave notice to T-Mobile. T-Mobile alleges that it sought information about WCO's offer, and then (on May 27, 2021) sued Albright because it had "failed to establish that the offer was 'bona fide.'" (*Id.*; *see also* Exhibit B).

### 3. The "Whistleblower"

On October 25, 2021, an anonymous, "self-described whistleblower," who claimed to be a former insider at WCO, allegedly contacted T-Mobile's counsel. (*Id.* ¶ 48.) The "whistleblower"—whom T-Mobile admits it still cannot identify two years later—supposedly said that WCO and co-conspirators, including nonprofit schools holding EBS licensees, were conspiring to siphon money from T-Mobile. (*Id.*)

T-Mobile alleges that the whistleblower described the "scheme" as follows: (1) WCO, "through Winnick and/or Katerndahl, enters into verbal discussions with an EBS licensee and agrees on a price for purchasing the license;" (2) WCO and the licensee "execute a secret side contract, the CCA, which provides that, if T-Mobile matches WCO's offer and purchases the license, the licensee pays WCO a material portion of the purchase price"; (3) WCO then "makes a sham, non-binding written offer to purchase the licenses that it knows and intends will be communicated to T-Mobile pursuant to T-Mobile's ROFR"; and (4) "WCO does not intend to honor its offer; its sole purpose is to trigger the ROFR in T-Mobile's lease arrangement, coercively force T-Mobile to decide within 30 days whether to purchase the license, and allow WCO to pocket the kickback in the likely event T-Mobile exercises its ROFR." (*Id.* ¶ 49).

T-Mobile further alleges that—according to the whistleblower—"WCO's offers are not backed by legitimate financing, but a fake line of credit between WCO and Defendant Vasudevan's entity, SCH." (Compl. ¶ 50). The Complaint (or the "whistleblower"—it is not entirely clear) further claims that "SCH's line of credit is a sham," and that SCH is a "California company with no apparent history, no public presence, and no lines of business, which is run by a former movie producer (Vasudevan) out of a modest apartment in a multi-unit building in Cupertino." (*Id.*). But the Complaint does not allege that Defendants or anyone else made any representations to T-Mobile about SCH or any related line of credit.

### 4. T-Mobile keeps exercising ROFRs

T-Mobile finally alleges that it believed  the WCO purchase offers were genuine, and feared having WCO obtain the licenses, because after the licenses expired, WCO would then force T-Mobile to pay a "king's ransom" to renew them. (*Id.* ¶ 6.) Thus, T-Mobile claims, it exercised the ROFRs and bought the licenses, allegedly at inflated prices. (*Id.* ¶ 115.) But according to Appendix B to the Complaint, it exercised 15 ROFRs and bought the corresponding licenses on dates ranging from September 2021 to March 2022—well after it had questioned whether WCO's La Roche offer was "bona fide," after it had sued Albright on the theory that WCO's offer to that college was not bona fide, and even (in 12 cases) after the purported whistleblower had detailed the alleged fraud scheme.

## III.  ARGUMENT

T-Mobile's Complaint fails because it is based on a fraud theory that is not supported by the facts alleged. Its claims under RICO, the California Penal Code, and the common law of fraud assume a broad scheme of false statements—misrepresenting that WCO actually planned to buy spectrum licenses— that caused T-Mobile to "overpay" for the licenses. But aside from the supposed two-year-old statements of an anonymous, self-proclaimed "whistleblower"—which the Court need not credit—the facts described in the Complaint do not support the inference that (1) Defendants misrepresented WCO's plans; (2) Defendants intended to defraud; (3) Defendants' statements were material to T-Mobile's decisions; (4) T-Mobile reasonably relied on the statements; or (5) T-Mobile suffered any financial harm as a result of Defendants' actions. Those failures preclude any liability for fraud under either federal or state law. Even if T-Mobile had properly pled fraud, the Complaint and judicially noticeable evidence show that the alleged scheme fell short of a "pattern" required for a RICO claim. The rest of T-Mobile's state law claims, which all derive from the same fraud theory, necessarily fail as well.

### A.      Standard of Review

To survive this motion to dismiss, T-Mobile must allege enough facts to "state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In assessing the Complaint, the Court need not accept "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). Instead, the Court should consider only the Complaint's "well-pleaded factual allegations," "assume their veracity," and "determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

T-Mobile's fraud claims must be pled with particularity under the Federal Rules of Civil Procedure. Fed. R. Civ. P. 9(b). "Rule 9(b) demands that the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct … so they can defend against the charge and not just deny that they have done anything wrong." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010) (citing *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009)). "Any averments which do not meet that standard should be 'disregarded' or 'stripped' from the claim for failure to satisfy Rule 9(b)." *Id.* Under Rule 9(b), the complaint must "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Id.* (citing *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004)).

On a motion to dismiss, the Court may consider the contents of "the complaint, materials incorporated into the complaint by reference, and matters of which the [C]ourt may take judicial notice." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). Where a complaint selectively quotes from a document, the Court may review the document's full text. *Cooper v. Pickett,* 137 F.3d 616, 623 (9th Cir. 1997); *see also Rosales-Martinez v. Palmer*,

753 F.3d 890, 895 (9th Cir. 2014) ("Courts are instructed, in deciding Rule 12(b)(6) motions, to read the allegations of a complaint in the context of the full documents and, where appropriate, to accept the documents, rather than a characterization of the documents, as the true account."). The Court may also consider "evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder v. Lopez*, 456 F.3d 445, 448 (9th Cir. 2006).

### B.    T-Mobile Has Not Adequately Pled RICO Claims.

RICO was "intended to combat organized crime, not to provide a federal cause of action and treble damages to every tort plaintiff." *Oscar v. Univ., Students Coop. Ass'n*, 965 F.2d 783, 786 (9th Cir.), *abrogated on other grounds by Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005). To state a RICO claim, a plaintiff must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing injury to plaintiff's business or property. *See Sanford v. Memberworks, Inc.*, 625 F.3d 550, 557 (9th Cir. 2010) (citing *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007) (en banc)); *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005)). Where, as here, a plaintiff's RICO claims are based on a fraud theory, they must satisfy the standard of Rule 9(b) as well as Rule 8. *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004). T-Mobile has not properly alleged RICO elements 3, 4, or 5.[3]

---

[3] These flaws affect T-Mobile's claims under both 18 U.S.C. § 1962(c) (Count 1) and §1962(d) (Count 2), and require dismissal of both. *See Howard v. America Online, Inc.*, 208 F.3d 741, 751 (9th Cir. 2000) ("Plaintiffs cannot claim that a conspiracy to violate RICO existed if they do not adequately plead a substantive violation of RICO").

**1.     T-Mobile has not properly alleged harm to its business or property.**

A party has standing to pursue a RICO claim only if it alleges (and later proves) that the defendant's conduct caused harm to its "business or property." 18 U.S.C. § 1964(c). This requires a showing of "concrete financial loss" proximately caused by the alleged racketeering activity. *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008). "Injury to mere expectancy interests or to an intangible property interest is not sufficient to confer RICO standing." *Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1087 (9th Cir. 2002).[4] T-Mobile describes its RICO injuries as (1) "millions of dollars in overcharges in purchase prices and fees"; (2) legal fees associated with the negotiation of the license purchases; (3) lost opportunities; and (4) attorney's fees and costs—including those involving its prior disputes with WCO and other Defendants. (Compl. ¶ 102.) None of those conveys RICO standing.

"Lost opportunities" do not suffice. Where a business opportunity is only prospective, the loss of that opportunity is too speculative to confer RICO standing. *Izenberg v. ETS Servs., LLC*, 589 F. Supp. 2d 1193, 1204-05 (C.D. Cal. 2008); *Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 24 (2d Cir. 1990). In particular, lost prospective business relationships are not sufficiently "concrete" for RICO standing. *Williams & Cochrane, LLP v. Quechan Tribe of Fort Yuma Indian Reservation*, 2019 WL 4277431 at *16 (S.D. Cal. 2019) (quoting *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 406 (9th Cir. 1991)).

Attorney fees and other legal costs do not count either. *Ogden v. Wells Fargo Bank, N.A.*, 2015 WL 13413390 *2 (C.D. Cal. 2015) ("The Ninth Circuit has generally refused to recognize legal fees as a valid injury to a business or property under RICO"); *Thomas v. Baca*, 308 F.App'x 87, 88 (9th Cir. 2009) ("This court

---

[4] *See also Oscar*, 965 F.2d at 785 (holding RICO injuries must be "concrete financial loss, and not mere injury to a valuable intangible property interest" or "purely speculative").

1  has not recognized the incurment of legal fees as an injury cognizable under RICO,

2  and we decline to do so here.").[5]

3      That leaves only T-Mobile's claim that Defendants' alleged scheme caused

4  it to "overpay" for the spectrum licenses. But the facts alleged do not indicate any

5  such overpayment. There is no dispute that T-Mobile obtained at least some value

6  for its money. It confirms that it "relies heavily on 2.5 GHZ spectrum for its

7  nationwide cellular and data network," and that obtaining control over licenses for

8  that spectrum ensured T-Mobile could continue using it without later paying a

9  "king's ransom" when its leases expired and the license holders could renegotiate

10 the lease fees. (Compl. ¶¶ 6, 37.) The Complaint neither alleges nor attempts to

11 determine what an objective "market" price for the licenses would be. Any such

12 effort must account for the fact that T-Mobile's own actions in negotiating the

13 ROFRs inevitably discourage potential bidders for the licenses, chilling demand

14 and artificially depressing prices. The Complaint thus does not establish any

15 meaningful "baseline" against which T-Mobile's ultimate purchase price can be

16 compared to determine any "overcharge."

17      T-Mobile's position is that the Commitment Agreement fees establish the

18 amount of the overpayment. Under this theory, because the license holder agrees

19 to pay WCO a certain portion of the purchase price as a commitment fee (or

20 "kickback," as T-Mobile puts it) if T-Mobile exercises the ROFR, that necessarily

21 means that the license holder would be willing to sell the license for the same

22 amount minus the fee if WCO did not enter a Commitment Cost Agreement with

23 it. (Compl. ¶ 56) Thus, T-Mobile claims, it ended up paying "a purchase price

24

25 [5] *See also, e.g., Limcaco v. Wynn*, 2021 WL 5040368, *17 (C.D. Cal. Oct. 29, 2021), *aff'd.* 2023 WL 154965 ("The Ninth Circuit has generally not recognized legal fees as a valid injury to business or property under RICO"); *Pacific Surf Designs, Inc. v. WhiteWater West Industries, Ltd.*, 2021 WL 5326529, *2 (S.D. Cal. Nov. 16, 2021); *Palantir Technologies, Inc. v. Abramowitz*, 2020 WL 9553151, *8 (N.D. Cal. July 13, 2020); *Kamal v. County of Los Angeles*, 2019 WL 7195903, *5 (C.D. Cal. Nov. 29, 2019); *Holloway v. Clackamas River Water*, 2014 WL 6998069, at *9 (D.Or. Sept. 9, 2014); *Itzenberg v. ETS Servs., LLC*, 589 F.Supp.2d 1193, 1204-05 (C.D. Cal 2008).

26

27

28

1  higher than what the EBS license holders were willing to accept."(*Id.*)

2  That theory is flawed on its face. There is no logical basis to find that if not

3  for Defendants' actions, T-Mobile could and would have bought the licenses for a

4  lower amount that excluded the commitment fees. Nor does the Complaint even

5  make that claim. Rather, it indicates that in a but-for world in which WCO had

6  never made any offers to the license holders, T-Mobile would not have bought the

7  licenses at all. (*Id.*)

8  The real measure of theoretical harm is whether T-Mobile is worse off

9  having bought the licenses than it would have been if Defendants had never gotten

10  involved and T-Mobile had simply continued to license the spectrum. T-Mobile

11  does not allege that is the case, and cannot do so without speculating. In fact, T-

12  Mobile's only prediction about that but-for world is that when the licenses expired,

13  it would have to pay a "king's ransom" to continue licensing the spectrum. (*Id.* ¶

14  6). That alone suggests that T-Mobile may well be *better* off for having made the

15  purchases.

16  **2.  T-Mobile has not properly alleged racketeering activity.**

17  A RICO claim must allege that the defendants committed one or more of

18  certain specified crimes. 18 U.S.C. §§ 1961(1), 1962(a), (d). Here, T-Mobile

19  alleges mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. (*See*

20  Compl. ¶¶ 94-101). To establish these claims, a plaintiff must show: (1) defendants

21  knowingly devised or participated in a scheme to defraud or to obtain money or

22  property through false or fraudulent pretenses, representations, or promises; (2) the

23  statements made or facts omitted were material; (3) defendants acted with intent to

24  defraud; and (4) the defendant used, or caused to be used, the mails or interstate

25  wires to carry out or attempt to carry out an essential part of the scheme. *Miller v.*

26  *Yokohama Tire Corp.*, 358 F.3d 616, 620-21 (9th Cir. 2004) (citing *Schreiber*

27  *Distrib. Co. v. Serv-Well Furniture Co., Inc.*, 806 F.2d 1393, 1400 (9th Cir. 1986)).

28  The term "defraud" in the mail fraud statute is given its "established common law

meaning." *Miller*, 358 F.3d at 620-21 (citing *Neder v. U.S.*, 527 U.S. 1, 21-25 (1999)). The Complaint falls short as to each of the first three elements.

### a. T-Mobile has not properly alleged that Defendants made any false statements, or acted with intent to defraud.

The essence of fraud, reflected in the first two elements listed above, is the intentional use of false and misleading statements to deceive a victim into handing over money or property. As to whether statements are false or misleading, Rule 8 demands that "[w]here 'more likely explanations' than those alleged by the Plaintiff exist, the Court should be reluctant to find that the plaintiff's allegations have sufficiently nudged his claims into the realm of plausibility," *Olaniyi v. District Columbia*, 763 F. Supp. 2d. 70, 85 (D.D.C. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662,681 (2009)), while Rule 9(b) is even more demanding. And while under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of mind of a person" may be alleged generally, a plaintiff must still "set forth facts from which an inference of scienter could be drawn." *Cooper*, 137 F.3d at 628.[6] This rule applies also to fraud-based RICO claims, which should be dismissed when the factual allegations do not support a plausible inference of intent to defraud and do not exclude reasonable alternative explanations for what occurred. *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999-1000 (9th Cir. 2014).

Here, T-Mobile alleges that WCO never intended to buy any spectrum licenses at all, but instead caused its offers to be conveyed to T-Mobile so as to trick T-Mobile into believing that WCO did plan to make such purchases. But the specific facts T-Mobile asserts do not support any such inference. Rather, the facts

---

[6] *See also In re Hydroxycut Mktg. & Sales Pracs. Litig*, 299 F.R.D. 648, 659 (S.D. Cal. 2014) ("A plaintiff must allege sufficient facts to support an inference or render plausible that the defendant acted with the requisite intent."); *City of Clinton Ark. v. Pilgrim's Pride Corp.*, 632 F.3d 148, 154 (5th Cir. 2010) (noting that Rule 9(b) does not give plaintiffs "license to base claims of fraud upon conclusory allegations").

that T-Mobile highlights to show that WCO's actions were fraudulent are "as much in line with rational and competitive business strategy" as any alleged fraud scheme. *Twombly*, 550 U.S. at 554. That is, they are entirely consistent with what a genuine purchaser of spectrum would do in the ordinary course—particularly where, as here, the spectrum is controlled by a telecommunications giant leaseholder armed with a ROFR. The Rule 8 and Rule 9(b) standards are thus not satisfied.

**"Secret side agreements and kickbacks."** T-Mobile suggests that the Non-Disclosure Agreements and Commitment Cost Agreements that WCO executes with EBS licensees are "secret side agreements" to arrange a "kickback" if T-Mobile exercises its ROFR. But it does not allege any facts indicating that such agreements, or the failure to disclose them to a party holding a ROFR, are inherently improper.

The Commitment Cost Agreements are meant to protect WCO from the risk that, after it has invested significant time and resources in a potential deal, another entity might swoop in and outbid it. *See generally* Exhibit A. While T-Mobile questions the size of the fees in WCO's agreements (10% of the purchase price), it does not allege that such a fee percentage cannot be commercially reasonable absent a kickback arrangement. In particular, the Complaint does not address whether the fact that T-Mobile had the ability to exercise ROFRs, and thus block WCO's purchases even without outbidding it, increased WCO's risk of losing the deals, and thus justified a higher fee. Nor does the Complaint dispute that, because the spectrum purchases were subject to FCC approval, there was an additional layer of regulatory risk that further affected the appropriate fee amount.

Indeed, T-Mobile is quite familiar with commitment or "break-up" fees, as its parent Deutsche Telecom received in 2012 what was then the largest such fee in history—reportedly between $4 and $6 billion—well over 10% of a cancelled

$39 billion deal for AT&T to buy T-Mobile.[7]

Nor is there anything questionable in Defendants (and the license-holders) not disclosing the Commitment Cost Agreements to T-Mobile. The Complaint does not assert that it is unusual for parties to complex financial transactions to refrain from publicizing deal terms—or even to subject them to non-disclosure agreements—at the early stages of those deals. That is particularly so where the terms of the agreements might reveal to a competing bidder aspects of the first bidder's business strategy. Further, the Complaint does not assert that if T-Mobile had known about the Commitment Cost Agreements, it would not have executed the ROFRs.

Separately, the Complaint does not consider that by raising the amount of the total offer (via adding the potential fee amount to the price), the Commitment Cost Agreements actually help to discourage T-Mobile from exercising the ROFRs—precisely the opposite result from what T-Mobile claims WCO sought.

**"Targeting" of T-Mobile Leases.** T-Mobile frames the fact that WCO has largely tried to purchase licenses leased by T-Mobile as evidence of intent to "target" T-Mobile for fraud. But T-Mobile's own allegations show that it leases the overwhelming majority of EBS licenses. (Compl. ¶¶ 37, 38) (alleging that T-Mobile leases or holds between 1,500 and 1,722 of the 2,193 EBS licenses). Thus, it is almost inevitable that anyone trying to purchase an EBS license would be "targeting" a lease owned by T-Mobile.

**Investigation of ROFRs.** T-Mobile complains that "WCO specifically considered whether the lease was subject to a ROFR and assessed the 'potential TMO Strategy,' including the likelihood that T-Mobile would exercise its ROFR." (Compl. ¶ 46). This is, again, much more consistent with rational business strategy

---

[7] Michael J. de la Merced, *T-Mobile and AT&T: What's $2 Billion Among Friends?*, NEW YORK TIMES, Dec. 20, 2011 (Exhibit C); Vipal Monga, *AT&T Is Paying the Biggest Breakup Fee Ever*, WALL STREET JOURNAL, Dec. 19, 2011. (Exhibit D).

than nefarious intent. Any investment firm intent on purchasing assets would investigate potential threats to their purchases—such as ROFRs—before investing time and effort into pursuing them.

**Offering "More than Willing to Accept."** T-Mobile alleges that because the license holders agreed to pay WCO commitment fees if T-Mobile exercised the ROFRs, the license holders would necessarily have been willing to sell for a lower amount with no commitment fee term. According to T-Mobile, this means that WCO had no reason to offer the higher amount unless its plan was to cause T-Mobile to exercise its ROFR, rather than to buy the spectrum license. But the alternative explanation is simpler and more compelling: WCO wanted to increase the offer to discourage T-Mobile from using the ROFR, and thus to win the bid, while protecting itself from the risk that T-Mobile would exercise the ROFR anyway.

**The "Whistleblower."** T-Mobile's allegations of fraudulent intent primarily rely on the alleged statements of its anonymous "whistleblower." But while the Court must assume it is true that such a person existed and conveyed allegations to T-Mobile, it does *not* have to—and should not—assume that those second-hand allegations are true. *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 998 (9th Cir. 2009) (affirming dismissal of securities fraud claim that relied on statements by five confidential witnesses, where witnesses' statements were vague, hearsay, and conclusory, and where Complaint did not show that the witnesses had personal knowledge of events they reported); *see also City of Livonia Employees' Ret. Sys. & Loc. 295/Loc. 851 v. Boeing Co.,* 711 F.3d 754, 759 (7th Cir. 2013) ("Allegations concerning … unnamed confidential sources of damaging information require a heavy discount. The sources may be ill-informed, may be acting from spite rather than knowledge, may be misrepresented, may even be nonexistent—a gimmick for obtaining discovery costly to the defendants and maybe forcing a settlement or inducing more favorable settlement terms").

Without knowing even who the anonymous source is or how he or she obtained the supposed information, T-Mobile cannot plausibly allege that source has any basis or credibility. Indeed, even if the "whistleblower" were a former WCO employee or "insider," such a person may be disgruntled or biased, and want to smear Winnick and/or WCO. *See Higginbotham v. Baxter Int'l, Inc.,* 495 F.3d 753, 757 (7th Cir. 2007) (recognizing the potential for ex-employees to be biased against company, stating "it is hard to see how information from anonymous [ex-employee] sources could be deemed 'compelling' or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist"). Indeed, T-Mobile's own complaint makes clear that Winnick has enemies. (*See* Compl. ¶¶ 75-78) (discussing lawsuits brought against Winnick or enterprises he was involved with, and the claims asserted therein, but not alleging that Winnick was ever found liable for any wrongdoing).

In all, these allegations are easily outweighed by the facts that T-Mobile itself alleged in court that WCO *did* intend to buy the licenses, and that T-Mobile continued exercising ROFRs well after the alleged whistleblower report. The reasonable inference is that T-Mobile does not actually believe what it asserts here.

### b. T-Mobile has not properly alleged that Defendants' supposed misrepresentations were material.

A statement is material if it has a "natural tendency to influence, or is capable of influencing" a person to part with money or property. *United States. v. Lindsey*, 850 F.3d 1009, 1013-1014 (9th Cir. 2017). Based on the assertions in the Complaint, as well as other material the Court can consider at this stage, there is no reason to believe that any representations made to T-Mobile about WCO's purchase offers were material to T-Mobile's decisions regarding whether to exercise its ROFRs.

///

On May 27, 2021, T-Mobile questioned whether WCO's offer to purchase Albright College's license was bona fide, and filed a Pennsylvania lawsuit on that basis. (Compl. ¶ 47.) Five months later, in October 2021, T-Mobile allegedly heard from the "whistleblower," who purportedly described the planned fraud. (*Id.* ¶ 48.) Thus, by at least May 27, 2021, and certainly by October 2021, T-Mobile—by its own account—was well on notice of the possibility that the offers were not "bona fide." Any further decision to exercise the ROFRs and purchase licenses could not have rationally been influenced by the representation that the offers were genuine. After all, if the offers were not bona fide, T-Mobile could defeat the scheme by doing nothing: WCO's offers would lapse and T-Mobile's status quo would be undisturbed.

But T-Mobile confirms that it exercised its ROFRs even after it received that information. Appendix A to the Complaint states that T-Mobile purchased all but one of the licenses *after* it filed the May 2021 lawsuit disputing whether the WCO offers were bona fide. The same appendix also states that in at least a dozen cases *after* the alleged whistleblower disclosures (December 2021 to April 2022), WCO made an offer and T-Mobile exercised a ROFR and purchased a spectrum license. The obvious inference is that information that the offers were not genuine did *not* and could not have influenced T-Mobile's decision.

### 3. T-Mobile has not properly alleged a pattern of racketeering.

To prove a "pattern" of racketeering, a plaintiff must "show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). Continuity can refer either to "past conduct that by its nature projects into the future with a threat of repetition" (so-called "open-ended continuity") or to "a closed period of repeated conduct" ("closed-ended continuity") *Id.* at 241.

T-Mobile does not seriously allege open-ended continuity. The premise of its fraud theory is that Defendants have misled it to believe that their offers to buy spectrum licenses were genuine. Given that T-Mobile has now filed a federal lawsuit alleging that the offers were bogus, there is no danger that it could be deceived going forward. It can simply call Defendants' supposed bluff and not exercise its ROFRs.

Nor has T-Mobile properly alleged closed-ended continuity. This would require showing "a series of related predicates extending over a substantial period of time." *Id.* When evaluating this element, courts in this Circuit often consider "(1) the number and variety of predicate acts; (2) the presence of separate schemes; (3) the number of victims; and (4) the occurrence of distinct injuries." *McGowan v. Weinstein,* 505 F. Supp.  3d 1000, 1012-1013 (C.D. Cal. 2020) (citations omitted). "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct." *H.J. Inc.*, 492 U.S. at 242. Although there is no bright-line rule regarding duration, "courts virtually always find that activity spanning less than one year does not satisfy the close-ended continuity requirement." *Natural Immunogenics Corp. v. Newport Trial Group,* 2016 WL 11520711 (C.D. Cal. Aug. 1, 2016).[8]

Here, based on T-Mobile's own allegations, Defendants' supposed scheme could only have extended over several months, and admittedly less than a year. The first predicate act of fraud that the Complaint alleges was on July 29, 2020, via an emailed offer letter. (Compl. Appx. B.) In December 2020—five months later—T-Mobile was already questioning whether the offers were "bona fide." (*Id.*

---

[8] *See also Relig. Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 366-367 (9th Cir. 1992) ("We have found no case in which a court has held the [close-ended continuity] requirement to be satisfied by a pattern of activity lasting less than a year"); *Eclectic Properties E, LLC v. The Marcus & Millichap Co.*, 2012 WL 713289, *10 (N.D. Cal. Mar. 5, 2012), *aff'd sub nom. Eclectic Properties E, LLC v. Marcus & Millichap Co.*, 751 F.3d 990 (9th Cir. 2014) ("[C]ourts have rarely if ever found activity lasting less than a year sufficient").

¶ 46.) In May 2021—less than ten months later—T-Mobile filed a lawsuit based in part on that skepticism. (*Id.* ¶ 47; Exhibit B.) As discussed above, by that point, T-Mobile could not have been misled about the offers, and Defendants could not have thought they could mislead T-Mobile any longer. Whichever event is used, the alleged scheme could not have continued long enough to meet the minimum for closed-ended continuity.

Moreover, in the Ninth Circuit, as in others, complaints involving "a single alleged fraud with a single victim" cannot constitute a closed-ended pattern of racketeering. *McGowan*, 505 F. Supp. 3d at 1012 (quoting *Medallion Television Enters., Inc. v. SelecTV of Cal., Inc.*, 833 F.2d 1360, 1364 (9th Cir. 1987)).[9] T-Mobile alleges only a single "scheme" in its complaint, directed exclusively at T-Mobile. (*See, e.g.*, Compl. ¶ 1) ("T-Mobile brings this action to seek redress for Defendants' nationwide criminal scheme to defraud T-Mobile US, Inc. and its subsidiaries out of an amount believed to be more than $10 million.") There is no allegation of any racketeering activity directed at anyone else. (*See generally*, Compl. ¶¶ 1-182). Even if true, these claims would not describe a pattern of racketeering.

## C.   T-Mobile Has Not Properly Pled Claims Under California Law.

The remaining claims in the Complaint are all based on state law, and in essence are all grounded in the same fraud theory as the RICO claims: that WCO had no intention of buying any spectrum licenses, and deliberately misled T-

---

[9] *See also, e.g., Sever v. Alaska Pulp Co.*, 978 F.2d 1529, 1535 (9th Cir. 1992) (affirming dismissal of RICO claims where "although plaintiff allege[d] a large number of acts, defendants' collective conduct [was] in a sense a single episode having the singular purpose of impoverishing [plaintiff], rather than a series of separate, related acts," and pointing to the importance of the fact that there was "but a single victim" involved); *Buran Equip. Co., Inc. v. Hydro Elec. Constructors, Inc.*, 645 F.Supp.864, 866 (N.D. Cal. 1987) ("It places a real strain on the language to speak of a single fraudulent effort, implemented by several fraudulent acts, as a 'pattern of racketeering activity"); *Jarvis v. Regan*, 833 F.2d 149, 153-54 (9th Cir. 1987) (affirming dismissal of RICO Claim where the alleged pattern consisted of three acts of mail and wire fraud committed by legal aid organizations in obtaining a single federal grant); *Metaxas v. Lee*, 503 F.Supp.3d 923, 941 (N.D. Cal. 2020) (citing *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 365-67 (9th Cir. 1992)).

Mobile into believing otherwise and exercising its ROFRs. As already explained, the allegations in the Complaint, when combined with judicially noticeable facts, do not allow for such an inference under either Rule 8 or Rule 9(b). This basic failure undermines each of T-Mobile's California law claims.

### 1.     T-Mobile has not properly pled common law fraud claims.

Counts 3, 4, and 5 allege fraud, aiding and abetting fraud, and conspiracy to defraud. (Compl. ¶¶ 111-130.) To prove fraud under California law, T-Mobile must show: (1) a misrepresentation (false representation, concealment, or nondisclosure) by Defendants; (2) knowledge of falsity; (3) intent to defraud; (4) justifiable reliance by T-Mobile; and (5) resulting damage. *See Kearns*, 567 F.3d at 1126 (citing *Engalla v. Permanente Med. Group, Inc.* 15 Cal. 4th 951, 974 (1997)). T-Mobile's theory appears to be that (A) WCO misrepresented that its offers were "bona fide," (B) while knowing it did not intend to consummate the offers, and (C) intending to induce T-Mobile to exercise its ROFR in reliance on those misrepresentations, and that T-Mobile (D) justifiably relied on those representations, which (E) harmed T-Mobile because it was forced to pay "more than the EBS licensees were willing to accept" to purchase the licenses under its ROFRs. The facts alleged do not support these elements.

### a.     T-Mobile's factual allegations do not support an inference that Defendants made misrepresentations or acted with intent to defraud.

As discussed above regarding the mail and wire fraud allegations underpinning the RICO claim, T-Mobile has not alleged facts that indicate Defendants misled it at all, much less that they did so deliberately. Other than the alleged words of the anonymous whistleblower—which the Court need not credit—none of the facts alleged indicates that WCO did not intend to follow through with its offers to purchase the spectrum licenses, nor that it sought to trick T-Mobile into believing that it had such intent. Rather, the Complaint describes facts that are at least as consistent with a legitimate business strategy to acquire

wireless spectrum.

### b.  T-Mobile's allegations show that it did not justifiably rely on Defendants' representations.

To sustain a fraud claim, a plaintiff must allege that it actually relied on the defendant's misrepresentations, and that its reliance was justifiable. *See, e.g.*, *Baymiller v. Guarantee Mut. Life Co.*, 2000 WL 1026565, at *4 (C.D. Cal. May 3, 2000); *Glob. Acquisitions Network v. Bank of Am. Corp.*, 2013 WL 2468386, at *2 (C.D. Cal. June 7, 2013). As discussed above in Section B.2.b, by T-Mobile's own account, it did not and could not have justifiably relied on any representation that the WCO purchase offers were "bona fide." By December 2020, it was questioning that claim, and by May 2021, it was suing at least one license holder claiming that WCO's offer was *not* bona fide. (Compl. ¶ 47.) The "whistleblower call" and other alleged indicia of fraud followed, yet T-Mobile kept buying licenses anyway. A large public company represented by sophisticated counsel[10] cannot claim that, under those circumstances, it was duped.

### c.  T-Mobile has not properly alleged harm.

T-Mobile's theory of damages is, essentially, that it paid more for the EBS licenses than the EBS license holders were "willing to accept." This falls far short of the specificity required for a fraud claim. "Damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery." *Kauai Scuba Ctr., Inc. v. PADI Americas, Inc.*, 2011 WL 13225132, at *2 (C.D. Cal. Mar. 15, 2011) (citing *Frustuck v. City of Fairfax*, 212 Cal. App. 2d 345, 367-68 (Cal. Ct. App. 1963). Non-specific damages are even less acceptable in a fraud case subject to heightened pleading requirements. *See* Fed. R. Civ. P. 9(b).

---

[10] A party's sophistication is relevant to assessing justifiable reliance. *See Glob. Acquisitions Network*, 2013 WL 2468386, at *2 (no justifiable reliance where "sophisticated parties who owned complex securities and were represented by counsel," engaged in a transaction without doing diligence).

And T-Mobile's damages theory here makes little sense. As discussed above, the only financial harm that T-Mobile describes is its allegedly "overpaying" for the licenses, as it claims that but for Defendants' scheme, the license-holders would have been willing to sell for the same prices minus the "kickback" amount. But again, that is not a viable theory of damages. T-Mobile does not allege that but for the Defendants' actions, it would have made any offer to buy the licenses, or that the license holders would have made any offer to sell. The proper comparison is thus between T-Mobile's actual position having bought the licenses and its hypothetical position having *not* bought them. There is nothing in the complaint suggesting that the former is worse than the latter.

### 2. T-Mobile has not properly alleged a claim under California Penal Code § 496.

Count 6 alleges receipt of stolen property in violation of California Penal Code § 496(c), which T-Mobile (citing § 484(a)) defines to include taking property through fraud. (Complaint ¶¶ 132-133.) To prove a § 496 violation, one must show that (1) the property was stolen; (2) the defendant knew the property was stolen; and (3) the defendant had possession of the stolen property. *Lacagnina v. Comprehend Sys., Inc.*, 25 Cal. App. 955, 970 (2018). This requires specific criminal intent, as well as causation of harm. *Siry Investment, L.P. v. Farkhondehpour*, 13 Cal. 5th 333, 361-62 (2022). Thus, the same flaws in T-Mobile's fraud claims defeat this claim as well.

### 3. T-Mobile has not properly alleged conversion.

Count 7 alleges conversion through fraudulent "coercion." (*Id.* ¶¶ 145-146.) This requires showing (1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendants' conversion by a wrongful act or disposition of plaintiffs' property rights; and (3) damages. *Tyrone Pac. Int'l, Inc. v. MV Eurychili*, 658 F.2d 664, 666 (9th Cir. 1981) (citing *Hartford Financial Corp. v. Burns*, 96 Cal. App. 3d 591, 598 (1979)). T-Mobile asserts that Defendants

took its money "wrongfully" via the alleged fraud scheme. Thus, again, the Complaint's failure to properly allege fraud undercuts this cause of action.

### 4. T-Mobile has not properly alleged violation of the Unfair Competition Law.

Count 8 alleges violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, which prohibits "unfair competition," defined as "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." (Complaint ¶¶ 152-156.) Courts analyze unlawfulness, unfairness, and fraudulence as separate and distinct theories of liability. *Pemberton v. Nationstar Mortgage,* LLC, 331 F. Supp. 3d 1018, 1047 (S.D. Cal. 2018).

T-Mobile has not adequately alleged "unlawful" conduct, which requires violation of a separate statute or common law claim. *See Jones v. Micron Technology Inc.*, 400 F. Supp. 3d 897, 923 (N.D. Cal. 2019) (citing *Cel-Tech Comm'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180, Cal.Rptr.2d 548, 973 P.2d 527 (1999)). "An unlawful prong claim is not plausible when it is premised on conduct which does not violate the borrowed law." *Pemberton*, 331 F. Supp. 3d at 1049. As discussed above, T-Mobile has not alleged conduct that amounts to violations of RICO, Penal Code § 496, or other laws.

Nor, for the reasons already addressed, has T-Mobile properly alleged "fraudulent" conduct. Moreover, "[a] business practice is fraudulent under the UCL *if members of the public* are likely to be deceived." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012). It thus requires a plaintiff to "show deception to some members of the public," "some harm to the public interest," or that "members of the public are likely to be deceived" by Defendants' conduct. *Pemberton*, 331 F. Supp. 3d at 1048 (citing *Watson Labs, Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099, 1121 (C.D. Cal. 2001)); *see also Schnall v. Hertz Corp.*, 78 Cal. App. 4th 1144 (2000). T-Mobile makes no such showing.

Finally, T-Mobile has not properly alleged "unfairness," which requires satisfying either the "public policy" test or the "balancing test." *Davis*, 691 F.3d at 1169. Under the former, a plaintiff has to show that the alleged practice violates a public policy reflected in "some specific constitutional, statutory, or regulatory provision." *Pemberton*, 331 F. Supp. 3d at 1050 (citing *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 813 (N.D. Cal. 2011). T-Mobile does not reference any public policy violated by the alleged conduct, nor allege facts suggesting violation of any law.

The "balancing" test deems a practice "unfair" when it is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Pemberton*, 331 F. Supp. 3d at 1051 (collecting cases). It requires the Court to balance the practice's "impact on its alleged victim," against the "reasons, justifications, and motives of the alleged wrongdoer" and "weigh the utility of the defendants' conduct against the gravity of the harm to the alleged victim." *Id.* As discussed above, the facts alleged in the Complaint show no harm to consumers and do not suggest that Defendants did anything "immoral" beyond attempting to buy spectrum licenses, nor that T-Mobile has suffered any harm because *it* bought the licenses instead.

### 5.     T-Mobile has not properly alleged tortious interference with contract or prospective economic relations.

Count 9 alleges tortious interference with contract and business expectancy, via "sham" offers and concealment of facts. (Complaint ¶¶ 164-166.) These claims require: (1) a contract between the plaintiff and a third party, or an economic relationship between them with the probability of future economic benefit; (2) the defendant's knowledge of the relationship; (3) defendant's intentional acts to disrupt the relationship; (4) actual disruption; and (5) proximate causation of damages. *Kasparian v. Los Angeles*, 38 Cal. App. 4th 242, 260 (1995); *Youst v. Longo*, 43 Cal. 3d 64, 71, 729 P. 2d 728 (1987). Additionally, while interfering

with an existing contract "is generally a wrong in and of itself," "intentionally interfering with prospective economic advantage requires pleading that the defendant committed an independently wrongful act." *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1142 (2020) (internal citations and quotations omitted). An act is independently wrongful if it is "proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Id.*

Again, this claim fails because it is based on T-Mobile's defective fraud theory. The Complaint does not support an inference of intentionally fraudulent or wrongful conduct and does not properly allege that Defendants harmed T-Mobile.

### 6. T-Mobile has not properly alleged unjust enrichment.

Count 10 alleges unjust enrichment through a "fraudulent" scheme involving sham offers. (Complaint ¶¶ 171-173.) The elements of unjust enrichment are (1) receipt of a benefit and (2) unjust retention of the benefit at the expense of another. *Prakashpalan v. Engstrom, Lipscomb & Lack,* 223 Cal. App. 4th 1105, 1132, 167 Cal. Rptr. 3d 832, 855 (2014), *as modified on denial of reh'g* (Feb. 27, 2014). The theory requires one who has acquired a benefit that may not "justly" be retained to return either the thing or its equivalent to the aggrieved party. *Id.* Restitution is required only if the benefits were conferred by mistake, fraud, coercion, or request. *Id.*

Here, T-Mobile claims that WCO was unjustly enriched by receiving breakup fees for EBS licenses when T-Mobile invoked its ROFR. Again, however, T-Mobile's allegations that the benefit was "unjust" turn on its defective fraud claims. T-Mobile makes no allegation that it paid these fees by mistake or at WCO's request. And any claims of "coercion" fail for the reasons discussed above.

///

///

///

1
2

**7.      T-Mobile has not properly alleged negligent misrepresentation.**

3
4
5
6
7
8
9
10
11

Count 11 alleges negligent misrepresentation, again by making "sham" offers to induce reliance. (Complaint ¶¶ 177-180.) The elements are: (1) misrepresentation of a past or existing material fact, (2) without reasonable grounds for believing it to be true, and (3) with intent to induce another's reliance on the misrepresentation, plus (4) justifiable reliance on the misrepresentation by the plaintiff, and (5) resulting damage. *Glenn K. Jackson, Inc. v. Roe*, 273 F.3d 1192, 1201 n.2 (9th Cir. 2001); *see also Fox v. Pollack*, 181 Cal. App. 3d 954 (Cal. Ct. App. 1986)). As discussed above, T-Mobile has not adequately alleged misrepresentation, intent, reliance, or damages.

12

**D.      The Court Should Dismiss Without Leave to Amend.**

13
14
15
16
17
18
19
20
21
22

When a Court dismisses a Complaint, it need not grant leave to amend when "any amendment would be an exercise in futility." *Hoang v. Bank of Am., N.A.*, 910 F.3d 1096, 1103 (9th Cir. 2018). Amendment is futile if "the pleading could not possibly be cured by the allegation of other facts." *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009) (affirming denial with prejudice where undisputed facts defeated claim). Here, T-Mobile's allegations that it continued to exercise ROFRs despite being on notice of the alleged fraud and its inability to show harm without a establishing a hypothetical market price for the EBS licenses are incurable defects rendering amendment futile. Accordingly, this action must be dismissed with prejudice.

23

**IV.      CONCLUSION**

24

For these reasons, the Court should dismiss T-Mobile's Complaint in full.

25

///

26

///

27

///

28

///

1                                  Respectfully submitted,

2    DATED:  March 6, 2024           **BUCHALTER**
A Professional Corporation

3

4

5                                 By: */s/ Joshua M. Robbins*
Joshua M. Robbins
Mark T. Cramer

6                                 Thomas J. Speiss, III
S. Ross Garrett

7

8                                 **MITTS LAW LLC**
Maurice R. Mitts (admitted *pro hac*

9                                 *vice*)

10

11                                Attorneys for Defendants WCO Spectrum
LLC, Academia Spectrum LLC, Carl
Katerndahl, Andreas Bitzarakis, Tyler

12                                Kratz, and Karen Winnick, as Trustee of
the GKW Trust and Special Administrator

13                                of the Estate of Gary Winnick

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF WORD COUNT COMPLIANCE</u>

The undersigned, counsel of record for Defendants WCO Spectrum LLC, Academia Spectrum LLC, Carl Katerndahl, Andreas Bitzarakis, Tyler Kratz, and Karen Winnick, certifies that this brief contains 8,927 words, which:

__ complies with the word limit of Local Civil Rule 11-6.1.

 <u>X</u> complies with the word limit set by court order dated March 5, 2024.

DATED:  March 6, 2024

**BUCHALTER**
A Professional Corporation

By: <u>*/s/ Joshua M. Robbins*</u>
     Joshua M. Robbins
     Mark T. Cramer
     Thomas J. Speiss, III
     S. Ross Garrett

     **MITTS LAW LLC**
     Maurice R. Mitts (admitted *pro hac vice*)

     Attorneys for Defendants WCO Spectrum LLC, Academia Spectrum LLC, Carl Katerndahl, Andreas Bitzarakis, Tyler Kratz, and Karen Winnick, as Trustee of the GKW Trust and Special Administrator of the Estate of Gary Winnick