**ALSTON & BIRD LLP**
Jeffrey A. Rosenfeld (#136896)
jeffrey.rosenfeld@alston.com
Jesse Steinbach (#278923)
jesse.steinbach@alston.com
Brooke H. Bolender (#340689)
brooke.bolender@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Telephone: (213) 576-1143

**WILLIAMS & CONNOLLY LLP**
Kenneth J. Brown*
kbrown@wc.com
William P. Ashworth*
washworth@wc.com
R. Kennon Poteat III*
kpoteat@wc.com
Kathryn E. Hoover*
khoover@wc.com
680 Maine Avenue, SW
Washington, DC 20024
Telephone: (202) 434-5000

**KLEINBARD LLC**
Steven J. Engelmyer*
sengelmyer@kleinbard.com
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Telephone: (215) 568-2000

*admitted *pro hac vice*

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| T-MOBILE US, INC., CLEARWIRE SPECTRUM HOLDINGS LLC, CLEARWIRE SPECTRUM HOLDINGS II LLC, CLEARWIRE SPECTRUM HOLDINGS III LLC, FIXED WIRELESS HOLDINGS LLC, NSAC LLC, TDI ACQUISITION SUB LLC, AND WBSY LICENSING LLC,<br><br>Plaintiffs,<br>vs.<br><br>WCO SPECTRUM LLC, SCH LLC, ACADEMIA SPECTRUM LLC, KAREN WINNICK AS TRUSTEE OF GKW TRUST, SPECIAL ADMINISTRATOR OF THE ESTATE OF GARY WINNICK AND GARY WINNICK'S SUCCESSOR-IN-INTEREST, CARL KATERNDAHL, ASHOK VASUDEVAN, ANDREAS BITZARAKIS, AND TYLER KRATZ,<br><br>Defendants. | Case No. 2:23-cv-04347-DMG-E<br><br>**NOTICE OF FILING WHISTLEBLOWER NARRATIVE DOCUMENT**<br><br>Filing Date: June 2, 2023<br>Trial Date:   None set |

1  TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF
2  RECORD:
3       PLEASE TAKE NOTICE that pursuant to the Court's Order (ECF No. 111)
4  granting the *Ex Parte* Application for Leave to File Document in Response to New
5  Exhibits Submitted with Defendants' Reply in Support of Motion to Dismiss (the
6  "Application") submitted by Plaintiffs T-Mobile US, Inc., Clearwire Spectrum
7  Holdings LLC, Clearwire Spectrum Holdings II LLC, Clearwire Spectrum
8  Holdings III LLC, Fixed Wireless Holdings LLC, NSAC LLC, TDI Acquisition
9  Sub LLC, and WBSY Licensing LLC (collectively "T-Mobile"), T-Mobile hereby
10 files the whistleblower narrative referenced in its Application, a true and correct
11 copy of which is attached hereto as **Exhibit A**.

13 Dated:  May 14, 2024            Respectfully submitted,

15                                 By: */s/ Jeffrey A. Rosenfeld*
16                                 ALSTON & BIRD LLP
                                   Jeffrey A. Rosenfeld (#136896)
17                                 jeffrey.rosenfeld@alston.com
                                   Jesse Steinbach (#278923)
18                                 jesse.steinbach@alston.com
19                                 Brooke Bolender (#340689)
                                   brooke.bolender@alston.com
20                                 350 South Grand Avenue, 51st Floor
21                                 Los Angeles, CA 90071
                                   Telephone: (213) 576-1143
22
23                                 WILLIAMS & CONNOLLY LLP
                                   Kenneth J. Brown*
24                                 kbrown@wc.com
25                                 R. Kennon Poteat III*
                                   kpoteat@wc.com
26                                 William P. Ashworth*
                                   washworth@wc.com
27                                 Kathryn E. Hoover*
28                                 khoover@wc.com

680 Maine Avenue, SW
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

KLEINBARD LLC
Steven J. Engelmyer*
sengelmyer@kleinbard.com
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Telephone: 215-568-2000

*admitted *pro hac vice*

*Attorneys for Plaintiffs*

# Exhibit A

**Introduction**

This is a story about greed that has morphed into a fraudulent scheme on a grand scale committed by a famous global financier against one of the largest public companies in the nation and its stakeholders. Gary Winnick (https://en.wikipedia.org/wiki/Gary_Winnick), his partner Carl Katerndahl, and their associate, Ash Vasudevan (https://en.wikipedia.org/wiki/Ash_Vasudevan) are at the heart of this fraudulent scheme of mass proportions. Messrs. Winnick, Katerndahl and Vasudevan are collectively hereinafter referred to as the "Individual Defendants".

The "Individual Defendants" have colluded with, and continue to attempt to collude with, a wide array of license holders of 2.5 GHz educational broadband service spectrum, granted and governed by the United States Federal Communications Commission (the "FCC"), to defraud T-Mobile (NASDAQ: TMUS) and its subsidiaries, including but not limited to Sprint.

Both Messrs. Winnick and Katerndahl formed an entity, WCO Spectrum, LLC (the "Company Defendant"). The website of the Company Defendant is located at https://www.wcospectrum.com/. The Individual Defendants advertise on the website of the Company Defendant that the Company Defendant is in the business of "investing in education" and "unlocking equity and generating value for EBS license holders".

Unfortunately, I have come to know first-hand that the primary business purpose is to illegally collude with various license holders to defraud T-Mobile of hundreds of millions of dollars. I know this as I am the former "Managing Partner, Finance" of the Company Defendant where I served for three (3) months until I immediately resigned upon learning, and obtaining original information, about the above fraud.

**Background About Wireless Spectrum and FCC Licenses**

For your convenience, it is important for me to provide some background information about spectrum. Spectrum are simply invisible airwaves that allow information to travel wirelessly. Simply put, these invisible airwaves are what cellular carriers, such as T-Mobile, use to transmit data primarily for cellular phone usage.

Several decades ago, the FCC issued licenses to over 1,100 educational entities and non-profit organizations (collectively, the "Schools") to operate 2.5 GHz educational broadband service spectrum for the purpose of transmitting educational and informative content over the radio and television mediums. However, since the advent of the internet, these license holders have found it more efficient and impactful to transmit content over the internet rather than through radio and television. As a result, the Schools have since elected to lease this spectrum to large mobile wireless carriers, primarily T-Mobile and its

subsidiary, Sprint, in exchange for lease payments. That is, the School's effectively serve as "landlord" by allowing T-Mobile to utilize the wireless spectrum to transmit data (e.g. 4G and 5G cellular service) and T-Mobile serves as tenant by making lease payments to the Schools.

In April 2020, the FCC issued a rule change (FCC Report & Order 16-32, effective April 27, 2020) allowing the School's to sell their licenses to commercial entities for the first time since they were issued. Until the newly implemented FCC rule change, only educational and non-profit organizations had previously been allowed to hold EBS licenses.

**Lease Agreements**

Prior to detailing the fraudulent scheme, it is important for me to provide some information about the aforementioned lease agreements by and between the license holders and T-Mobile since certain terms of the lease agreements are integral in understanding the fraudulent scheme.

A majority of the lease agreements by and between each School (as, effectively, the "Landlord") and each mobile carrier (as, effectively, the "Tenant") were drafted with similar terms.

The three primary terms of those lease agreements are as follows:

- School Cannot Market for Sale: The license holder (i.e. the School) must not market, or solicit, for sale the license. However, the School may be approached to sell the license. In this regard, the Defendant is actively soliciting over 1,100 of the Schools, in a fraudulent manner (as described below) to acquire the spectrum from the Schools.

- Tenant Right of First Refusal: To the extent that a third-party, such as the Defendant, offers to acquire the license from a given School, then the "tenant" (i.e. T-Mobile) has the right to pre-empt such a sale by acquiring it themselves at the same offer price.

- Must Be a Bona Fide Offer: To the extent that a School receives an offer to buy their spectrum, the offer must be a bona fide offer (e.g. the prospective purchaser must have the financial wherewithal and intent to follow-through on the purchase). That is, the "tenant" (i.e. T-Mobile) shouldn't be defrauded or coerced in a way to exercise the aforementioned "Right of First Refusal", and spend millions of dollars in doing so, if the offer submitted to the School was "bogus" (i.e. the offeror didn't have the financial wherewithal or intent to follow-through).

**Fraudulent Collusion with Schools**

The fraud being perpetrated by the Individual Defendants through the Company Defendant is to submit offers to over 1,100 license holders to acquire their spectrum for a certain price. In the several situations where a School has agreed to sell to the Company Defendant, both the Company Defendant and the respective school enter into four critical discussions and agreements:

1. Initial Discussions:  Individual Defendants enter into verbal discussions with a given School and agree on a fair value in which the School would sell their spectrum.

   For example, the Company Defendant recently entered into discussions with Intelecom Intelligent Communications ("IIT") (https://www.intelecom.org/). A fair value transaction price was agreed upon of $79,100,000.

2. Offer Letter:  In summary, the Offer Letter outlines the price that the Company Defendant states that it is willing to acquire the spectrum from a given School.

   For example, the Company Defendant recently offered to acquire spectrum from IIT. The offer price was $81,250,000 (not the above referenced $79,100,000). That is, the difference between $81,250,000 and $79,100,000 represents a fraudulent kickback of $2,150,000 to be paid to the Company Defendant at the detriment of T-Mobile.

3. Commitment Costs Agreement. In summary, the Commitment Costs Agreement provides that to the extent that the "tenant" (i.e. T-Mobile) exercises its right of first refusal and buys the spectrum instead of the Company Defendant, then the School will pay a material portion of the purchase price to the Company Defendant as a "fraudulent kickback".

   For example, the Company Defendant recently entered into a Commitment Costs Agreement with IIT. In summary, this Commitment Costs Agreement provides that the Company Defendant will receive, confidentially, $2,150,000 to the extent that someone other than the Company Defendant (i.e. the "tenant", T-Mobile) acquires the spectrum.

4. Non-Disclosure Agreement: In summary, the Non-Disclosure Agreement ("NDA") provides that none of the information exchanged or terms agreed to can be disclosed to other parties, including the "tenant", T-Mobile.

The argument of the Defendants may be that the Company Defendant is simply serving as what is commonly referred to in finance as a "stalking horse bidder". A stalking horse bidder is typically an initial bidder agreed-upon by the seller in certain sale processes. However, stalking horse bids are only appropriate and lawful if the existence of a stalking horse bidding process is made transparent and known by all parties, including T-Mobile, and if the stalking horse bid is bona fide – none of which is the case in this situation. That is, a stocking horse bidding process is not a "free pass" to collude with others to defraud another party. However, the process concocted by the Company Defendant is fraudulent given that it is devoid of transparency (i.e it is not disclosed) and the offer is not bona fide.

**Fraud with Non-Bona Fide Financing**

Given that a primary term of the lease agreement is that the Schools may only receive bona fide offers (meaning those offers that are backed by legitimate financing), the Mr. Winnick and Mr. Vasudevan perpetrated a scheme to have WCO Spectrum enter into a loan agreement with an entity owned by Mr. Vasudevan. Specifically, WCO Spectrum serves as borrower under this agreement and Mr. Vasudevan's entity serves as lender – in the amount of up to $2 billion. In exchange for "falsely" serving as the lender, Mr. Vasudevan's entity is to receive a significant amount of the cash flows from the "break-up" fees. <u>That is, Mr. Vasudevan's compensation for serving as a "fake" lender is significant per the loan agreement.</u>

Upon questioning Mr. Winnick and observing that the loan agreement was simply a document with no financial backing, it became apparent that the loan agreement was "fake" and was used solely to ensure that WCO Spectrum met the bona fide offer test, as aforementioned.

**Summary Conclusion**

In summary, the Individual Defendants and the Company Defendants have colluded with, and continue to attempt to collude with, Schools to defraud T-Mobile by fraudulently inducing them to 1) exercise their Right of First Refusal pursuant to the lease and spend millions of dollars to buy the spectrum and 2) to over-pay for the spectrum by the amount that is paid to the Company Defendant as proscribed in the Commitment Costs Agreement. That is, had the Individual Defendants and Company Defendant not colluded in a confidential manner as described above, T-Mobile would simply continue to lease the spectrum and not spend millions of precious capital to purchase the spectrum, particularly at a higher price that fair value.