**BONA LAW PC**

Aaron Gott (314264)
aaron.gott@bonalawpc.com
331 2nd Avenue South, Suite 420
Minneapolis, MN 55401
(612) 284-5001

Pat Pascarella (*phv* pending)
pat.pascarella@bonalawpc.com
100 Crescent Court, #700 – 3425
Dallas, TX 75201
(469) 296-7716

Jarod Bona (234327)
jarod.bona@bonalawpc.com
4275 Executive Square, Suite 200
La Jolla, CA 92037
(858) 964-4589

**MITTS LAW, LLC**

Maurice R. Mitts (admitted *phv*)
mmitts@mittslaw.com
1822 Spruce Street
Philadelphia, PA 19103
(215) 866-0112

*Counsel for WCO Spectrum LLC,*
*Academia Spectrum LLC, Carl Katerndahl,*
*Andreas Bitzarakis, Tyler Kratz and*
*Karen Winnick*

*[Additional counsel listed on signature page.]*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| T-MOBILE US, INC., *et al.*, <br><br> Plaintiffs, <br><br> vs. <br><br> WCO SPECTRUM LLC, *et al.*, <br><br> Defendants. | No. 2:23-cv-4347-CAS(Ex) <br> Hon. Christina A. Snyder <br><br> **Defendants WCO Spectrum LLC, Academia Spectrum LLC, Carl Katerndahl, Andreas Bitzarakis, Tyler Kratz and Karen Winnick's Answer, Affirmative Defenses and Counterclaims** <br><br> **DEMAND FOR JURY TRIAL** |

Defendants WCO Spectrum LLC, Academia Spectrum, LLC, Carl Katerndahl, Andreas Bitzarakis, Tyler Kratz, and Karen Winnick answer the June 2, 2023 complaint and assert affirmative defenses and counterclaims as follows:

### NATURE OF THE CASE

1.     Answering Defendants deny each and every allegation in Paragraph 1, including all references to a "criminal scheme," and all claims of fraud, racketeering, unfair business practices, or violations of law. T-Mobile's allegations are false, inflammatory, and designed to crush legitimate competition through intimidation and litigation.

In 2020, following the Federal Communications Commission's ("FCC") rule change permitting commercial ownership of Electronic Broadband Service ("EBS") licenses, Mr. Gary Winnick and WCO Spectrum's principals developed a forward-looking plan to improve spectrum efficiency in the 2.5 GHz band. The model was straightforward: acquire EBS licenses as a third-party investor, affirm existing leases with T-Mobile, collect rents, and ultimately take ownership when those leases expire. This mirrors the strategy used by wireless carriers themselves when selling off tower assets to neutral third parties—lowering capital costs, improving efficiency, and expanding coverage. When spectrum sharing is fully implemented in the 2.5 GHz band, consumers will benefit from better network performance at lower cost—the exact kind of innovation the FCC intended.

WCO Spectrum entered the market offering to purchase licenses leased to T-Mobile, with the express intention of becoming T-Mobile's landlord—not to interfere with its network, but to facilitate market-based

alternatives for educational institutions. As part of its standard practice, WCO Spectrum often executed Commitment Cost Agreements alongside its offers to offset legal fees and mitigate the impact of T-Mobile's anticompetitive Right of First Refusal ("ROFR") clauses embedded in the underlying lease agreements. These ROFRs were deliberately designed to lock up licenses—prohibiting competitive telecom bidders. Additionally, T-Mobile's leases included provisions that forbid the disclosure of key lease terms to would-be buyers. WCO Spectrum, recognizing the uphill battle, entered into the Commitment Cost Agreements as well as customary non-disclosure agreements with these nonprofit schools, colleges and universities to protect negotiations—standard in high-value, pre-closing deals.

Despite the structural disadvantages, WCO Spectrum was poised to renegotiate leases at fair market rates as they expired, disrupting T-Mobile's long-held monopsony over the EBS spectrum. That disruption is something that T-Mobile cannot tolerate. When WCO Spectrum entered the marketplace, T-Mobile tried to pressure WCO Spectrum into price fixing. WCO Spectrum refused. In response, T-Mobile implemented a campaign to raise substantially the costs to both WCO Spectrum and EBS license holders of transacting with each other, and to exclude WCO Spectrum from the marketplace altogether. Among the many anticompetitive actions T-Mobile pursued, it threatened and then often sued without merit any non-profit school, college or university that dared to entertain any possible sale dialogue with WCO Spectrum. That intimidation strategy escalated into this so-called RICO case when WCO refused to cease making offers to these non-profit educational institutions.

T-Mobile's allegations in this action are baseless. Contrary to T-Mobile's contentions, WCO Spectrum's offers to purchase EBS licenses were legitimate—non-binding, backed by real financing, and subject to due diligence. The Commitment Cost Agreements were not "kickbacks" as T-Mobile characterizes them, but standard deal protections. The only "scheme" here is T-Mobile's anticompetitive conduct and abuse of the legal system to maintain its market dominance.

Furthermore, as to T-Mobile's anonymous "whistleblower," the credibility is nonexistent. There is no evidence that Answering Defendants defrauded T-Mobile of "more than $10 million." T-Mobile exercised its ROFRs voluntarily and now seeks to rewrite history because it doesn't like the consequences of real competition. Finally, to the extent this paragraph contains legal conclusions, no response is required. All remaining allegations are expressly denied.

## FACTUAL BACKGROUND

2.    Answering Defendants admit that the FCC historically licensed EBS spectrum to educational institutions and that the EBS band occupies part of the 2496 to 2690 MHz range, commonly referred to as the 2.5 GHz band. Answering Defendants further admit that, prior to an FCC rule change in April 2020, EBS licenses could only be held by educational institutions, and that the FCC's rule change subsequently allowed commercial entities to acquire and hold such licenses. Answering Defendants also admit that T-Mobile has leased significant portions of EBS spectrum from educational institutions, and that those leases often include ROFR provisions. To the extent the remainder of this paragraph

contains characterizations, implications, or allegations inconsistent with the plain language of FCC rules, those are denied.

3.    Denied. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above. Furthermore, WCO Spectrum's offers were expressly non-binding and subject to due diligence—a standard and necessary condition in sophisticated transactions—particularly in situations such as this one where T-Mobile actively blocked the dissemination of any of the underlying financial information and lease/license terms. Any suggestion that WCO Spectrum's non-binding offers were improper is baseless. Moreover, the need for due diligence was directly caused by T-Mobile's own misconduct—namely, its deliberate concealment of critical economic information, which obstructed WCO Spectrum's ability to conduct full and fair evaluations.

4.    Denied. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above. Furthermore, WCO Spectrum's line of credit agreement with SCH LLC was a legitimate, enforceable financial arrangement intended to support WCO Spectrum's ability to engage in competitive transactions to acquire EBS licenses. The agreement was not fake, fraudulent, or created to deceive, but rather reflects a common and lawful business structure used to secure capital for high-value acquisitions. Furthermore, SCH's entitlement to a percentage fee was lawfully negotiated compensation—not a "kickback" or payment for fraudulent activity. Moreover, no such payment was ever made to SCH. Additionally, WCO Spectrum had established other funding channels for its intended acquisition of EBS licenses.

5.      Denied. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

6.      Denied. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above. Moreover, T-Mobile's suggestion that WCO Spectrum's potential role as a future landlord would somehow justify labeling WCO Spectrum's conduct as fraudulent is a transparent attempt to suppress competition. T-Mobile's complaint is not about fraud but rather its desire to maintain control over the EBS spectrum market and to prevent other lawful market participants like WCO Spectrum from giving license holders a fair and competitive alternative.

7.      Denied. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above. Furthermore, Answering Defendants deny that non-disclosure agreements were used to conceal any fraudulent scheme. Non-disclosure agreements are standard industry practice in competitive business transactions, particularly in high-value deals involving proprietary negotiations. The non-disclosure agreements were lawful, reasonable, and did not prevent license holders from disclosing relevant information where required. Furthermore, the non-disclosure agreements are written documents that must be referred to for their content and that speak for themselves. Answering Defendants further deny that WCO Spectrum or Academia abandoned deals to prevent alleged fraud from becoming public. WCO Spectrum has been forced to walk away from deals due to T-Mobile's own wrongful conduct—including intimidation tactics against EBS license holders and sham litigation designed to obstruct legitimate business transactions. T-

Mobile's attempt to reframe its own anticompetitive behavior as Defendants' fraud is nothing more than a desperate effort to further stifle fair market competition.

8.      Denied. The allegations in this paragraph concerning Michael Milken and Drexel Burnham Lambert are irrelevant, misleading, and improperly attempt to impugn Mr. Winnick's character. The allegations regarding events that occurred decades ago, in which Mr. Winnick was not accused of any wrongdoing, have no connection to the claims at issue and should be stricken as immaterial and prejudicial. Answering Defendants admit that in 1997, Mr. Winnick founded Global Crossing Limited. This pioneering telecommunications company significantly reshaped the data transport industry by building one of the first global fiber-optic networks. This ambitious infrastructure project, which included undersea cables connecting continents over a million fiber miles, introduced a new level of competition to a market previously dominated by a handful of incumbent carriers. Ultimately, Global Crossing filed for bankruptcy in 2002. Any allegation that Mr. Winnick engaged in improper conduct is specifically denied.

9.      Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 9 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

# PARTIES

10.    Denied. After reasonable investigation, Answering Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, and therefore deny them.

11.    Denied. After reasonable investigation, Answering Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, and therefore deny them.

12.    Denied. After reasonable investigation, Answering Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, and therefore deny them.

13.    Denied. After reasonable investigation, Answering Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, and therefore deny them.

14.    Denied. After reasonable investigation, Answering Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, and therefore deny them.

15.    Denied. After reasonable investigation, Answering Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, and therefore deny them.

16.    Denied. After reasonable investigation, Answering Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, and therefore deny them.

17.    Denied. After reasonable investigation, Answering Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, and therefore deny them.

18.    Denied. After reasonable investigation, Answering Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, and therefore deny them.

19.    Answering Defendants admit that WCO Spectrum is a Delaware limited liability company and that at all relevant times had its principal office at 9355 Wilshire Boulevard, Suite 200, Beverly Hills, California 90210. It is admitted that one of the many benefits WCO Spectrum attempted to provide, but T-Mobile thwarted, was helping license holders generate significant liquidity by selling their licenses.

20.    Answering Defendants admit that Gary Winnick was WCO Spectrum's founder. Gary Winnick has since passed away and his widow, Karen Winnick, has been substituted into this case for Mr. Winnick in her capacity as Trustee of the GKW Trust and as Special Administrator of the Estate of Gary Winnick.

21.    Answering Defendants admit that Katerndahl was WCO Spectrum's Chief Executive Officer and Chairman, and resides in Manhattan Beach, California.

22.    Answering Defendants admit that Kratz resides in San Juan, Puerto Rico. Answering Defendants deny that WCO Spectrum hired Kratz to assist in implementing any "fraudulent scheme."

23.    After reasonable investigation, Answering Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of SCH's formation and principal place of business. It is admitted only that SCH agreed to provide financing to WCO Spectrum.

24.    Denied. After reasonable investigation, Answering Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, and therefore deny them.

25.    Denied. After reasonable investigation, Answering Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and subparagraphs, and therefore deny them.

26.    Answering Defendants admit that Academia is a Virginia limited liability company with a principal office at 294 Watch Hill Road, Berlin, Connecticut 06037. Answering Defendants deny that Academia aided WCO Spectrum in any "fraudulent scheme."

27.    Answering Defendants admit that Bitzarakis resides in Berlin, Connecticut and is Academia's principal. Answering Defendants deny that Bitzarakis participated in any "fraudulent scheme" against T-Mobile.

## JURISDICTION AND VENUE

28.    The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied.

29.    The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied.

30.    The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied.

31. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied.

## STATEMENT OF THE CASE

32. Admitted.

33. Admitted.

34. Admitted.

35. Admitted that EBS spectrum licenses originally were only allowed to be held by educational institutions. FCC rules subsequently permitted educational institutions to lease their EBS spectrum rights to commercial users, and most of them did so to obtain much-needed funding for their schools.

36. Admitted.

37. Denied. After reasonable investigation, Answering Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, and therefore deny them.

38. Denied. After reasonable investigation, Answering Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, and therefore deny them.

39. Answering Defendants admit that T-Mobile's lease contracts with EBS license holders contain a ROFR lease provision. If an EBS license holder wants to sell its license, this ROFR provision grants T-Mobile the right to purchase the license on the same terms as any "*bona fide*" third-party offer received by the license holder. T-Mobile has

interpreted the term "*bona fide*" so broadly as to give itself effective veto power over proposed transactions with WCO Spectrum, and to require the production of burdensome amounts of information before it will even consider whether an offer can be deemed "*bona fide*." Furthermore, T-Mobile's lease agreements with EBS license holders are written documents that must be referred to for their content and that speak for themselves.

40.    Denied as stated. Mr. Winnick, along with other principals of WCO, conceived of a plan for efficient spectrum sharing, which contemplated WCO Spectrum purchasing significant amounts of EBS spectrum as a third-party investor. Under this plan, WCO Spectrum would implement a model that the wireless communications carriers employ: selling tower assets to third parties, thus bringing down the overall cost of capital to operate a network. By selling tower assets to neutral third parties, fewer towers are needed, creating efficiencies and superior coverage at the same time—improved network quality at a lower cost. When spectrum sharing is ultimately deployed in the 2.5 GHz band, the result will be more efficient utilization of spectrum and benefits to consumers in network quality, as well as reductions in the cost of delivering data.

41.    Answering Defendants admit only that WCO Spectrum was formed in Delaware on June 12, 2020, Mr. Winnick founded WCO Spectrum, Katerndahl served as a senior executive and Kratz served as a consultant.

42.    Denied. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above. Furthermore, WCO

Spectrum's offers were expressly non-binding and subject to due diligence—a standard and necessary condition in sophisticated transactions. Any suggestion that WCO Spectrum's non-binding offers or associated fees were improper is baseless. Moreover, the need for due diligence was directly caused by T-Mobile's own misconduct—namely, its deliberate concealment of critical economic information for the underlying leases and licenses, which substantially frustrated and obstructed WCO Spectrum's ability to conduct full and fair evaluations.

43.    Denied. WCO Spectrum lawfully obtained certain of T-Mobile's lease agreements through public records requests, a standard and legally permissible method for gathering publicly available information. The assertion that WCO Spectrum used Parkview Consulting ("Parkview") to "hide its involvement" is patently false. Parkview submitted requests in its own name as a matter of ordinary course, not to obscure WCO Spectrum's role. Furthermore, T-Mobile's claim that these lease agreements are "confidential" is disingenuous—they were publicly accessible through legitimate legal channels and in some instances had been publicly available on college and university related websites.

44.    Answering Defendants admit only that WCO Spectrum attempted to purchase Albright's EBS spectrum license. After reasonable investigation, Answering Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph concerning TDI and Albright's relationship, and therefore deny them.

45.    Denied. Answering Defendants incorporate their response to

the allegations set forth in Paragraph 1 above.

46.    Denied. The "deal memo" is a written document that must be referred to for its content and that speaks for itself.

47.    Answering Defendants admit that WCO Spectrum offered to purchase Albright's EBS license for $16,200,000—which would have funded scholarships and numerous programs for this underfunded minority-focused college. Answering Defendants further admit that TDI's lease with Albright contained a so-called "Right to Participate" provision, which in reality served as a weapon to maintain T-Mobile's monopsony power by imposing an extreme and unjustified burden on Albright. This provision forced Albright to produce an exorbitant amount of documentation whenever it received a bid, offer, or proposal for its EBS license—an onerous requirement designed to chill competition and obstruct legitimate transactions. T-Mobile's litigation against Albright was a sham—a pretext to intimidate Albright as well as other educational institutions considering deals with WCO Spectrum and to exploit third-party subpoenas for invasive competitive intelligence on WCO Spectrum and Academia. Notably, T-Mobile never even required Albright to answer the complaint, nor did it seek to compel discovery directed to Albright—further exposing the case for what it was: a calculated intimidation tactic. By way of further response, the non-binding term sheet, ROFR notice and the agreement between TDI and Albright are written documents that must be referred to for their content and that speak for themselves.

48.    Admitted only that while T-Mobile's action against Albright (the "Albright Case") was pending, T-Mobile conveniently claimed that an anonymous "whistleblower" suddenly emerged—out of nowhere—calling

T-Mobile's counsel on his personal cell phone and spinning a tale about WCO Spectrum's alleged fraudulent "scheme."

49.    Denied. Answering Defendants expressly deny the existence of any fraudulent "scheme" as alleged. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

50.    Denied. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1 and 4 above.

51.    Denied. Answering Defendants incorporate their response to the allegations set forth in Paragraph 49 above. Furthermore, the four-page narrative is a written document that must be referred to for its content and that speaks for itself.

52.    Denied. Answering Defendants deny each and every allegation in this paragraph and its subparts (a) through (f), including the unsupported claim that WCO Spectrum, Academia, or any of their affiliates engaged in fraud, obstruction, or the presentation of sham offers. The communications and documents produced in the Albright Case do not corroborate the so-called "whistleblower's" narrative; rather, they reflect lawful, well-documented business practices surrounding WCO Spectrum's efforts to acquire EBS licenses through competitive, market-based offers. Academia, through its principal, Bitzarakis, acted as a legitimate broker, facilitating initial outreach to license holders on behalf of WCO Spectrum. There was nothing deceptive or improper about these communications.

      a. Answering Defendants admit that Bitzarakis, on behalf of WCO Spectrum, contacted Albright regarding a potential sale of its EBS licenses. These communications were transparent,

professional, and lawful—not fraudulent.

b. Answering Defendants deny that any negotiations were improper. Like any sophisticated commercial transaction, WCO Spectrum and its representatives engaged in standard back-and-forth communications with Albright and its counsel.

c. The non-disclosure agreement at issue was a lawful, narrowly tailored confidentiality agreement that explicitly permitted disclosure to T-Mobile where contractually required. The non-disclosure agreement speaks for itself and undermines T-Mobile's allegation that any material information was concealed.

d. Answering Defendants deny the existence of any supposed "kickback." The "DD & Costs Fee" referenced in internal communications refers to a Commitment Cost Agreement—a common, risk-mitigation mechanism designed to protect WCO Spectrum from losing its investment of time and resources if T-Mobile exercised its ROFR after WCO Spectrum initiated and advanced a deal.

e. WCO Spectrum's offer to Albright was a legitimate, non-binding offer, clearly marked as such and supported by real financing. The fact that the offer exceeded an earlier internal valuation is not evidence of fraud—it reflects a dynamic negotiation process. All disclosures in the offer letter and Commitment Cost Agreement were clear, and the documents expressly allowed disclosure to T-Mobile as required under the lease.

f.    Answering Defendants deny that the offer presented to T-Mobile was false or misleading. WCO Spectrum was fully prepared to consummate the transaction if T-Mobile declined to exercise its ROFR. The offer was backed by legitimate financing, and the 10% commitment fee was not a "kickback," but a lawfully negotiated term designed to prevent opportunistic interference by T-Mobile after WCO Spectrum had advanced the deal.

53.    Denied. Answering Defendants expressly deny WCO Spectrum engaged in any alleged fraudulent scheme. Furthermore, WCO Spectrum's website is a written document that must be referred to for its content and that speaks for itself.

54.    Denied. Answering Defendants deny the allegations in this paragraph in their entirety, including the false and misleading characterization of WCO Spectrum's business strategy and the statements made by its counsel during the Albright Case. WCO Spectrum has never acted as a "stalking horse" in any improper or deceptive sense, nor has it engaged in any scheme to coerce T-Mobile into action through "sham" offers. The reference to a stalking horse analogy was made to illustrate a well-accepted commercial concept: that parties who expend substantial time and resources conducting due diligence and negotiating potential transactions may, in certain cases, be entitled to compensation if another party—here, T-Mobile—steps in and acquires the asset after the groundwork has been laid.

Furthermore, WCO Spectrum's use of Commitment Cost Agreements was lawful, reasonable, and designed to mitigate risk—not

to extort or deceive. The 10% commitment fee reflects the considerable effort WCO Spectrum invested in each transaction. The assertion that WCO Spectrum made non-binding offers to "coerce" T-Mobile, while bearing no risk, is false and unsupported. WCO Spectrum's offers were legitimate and subject to customary due diligence conditions because T-Mobile routinely withholds critical economic information necessary to fully evaluate the transactions.

55.    Denied. Defendants specifically deny the existence of any "scheme" and reject the characterization that their business activities are fraudulent or improper. WCO Spectrum's offers to acquire EBS licenses were made in good faith, in the ordinary course of legitimate competitive business conduct, and reflect the value of the underlying spectrum assets—not any fraudulent intent. The total value of offers extended is not evidence of wrongdoing, but rather a reflection of WCO Spectrum's commitment to building a robust portfolio of EBS licenses nationwide. Moreover, WCO Spectrum's financing was and is legitimate, and the suggestion that WCO Spectrum cannot follow through on its offers is baseless and intentionally misleading. WCO Spectrum was backed by a bona fide line of credit and fully intended to complete any transactions accepted by license holders.

56.    Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 56 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1 and 4 above.

57.    Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained there are deemed denied. To the extent, if any, Paragraph 57 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraph 1 above. By way of further response, the offer letters are written documents that must be referred to for their content and that speak for themselves.

58.    Admitted only that WCO Spectrum was interested in acquiring La Roche's EBS license. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 40 and 41 above.

59.    Denied. After reasonable investigation, Answering Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, and therefore deny them. Furthermore, the lease agreement between T-Mobile and La Roche is a written document that must be referred to for its content and that speaks for itself.

60.    Denied. Answering Defendants expressly deny WCO Spectrum had no intention of honoring the offer to La Roche if T-Mobile chose not to exercise its ROFR. Moreover, the October 27, 2020, email from Katerndahl to La Roche is a written document that must be referred to for its content, and that speaks for itself.

61.    Denied. The November 12, 2020 email from La Roche to T-Mobile, November 13, 2020 email from La Roche to T-Mobile, ROFR notice, and WCO Spectrum's offer letter are written documents that must be referred to for their content and that speak for themselves.

62. Denied. After reasonable investigation, Answering Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph concerning the information exchanged between T-Mobile and La Roche, and therefore deny them. Answering Defendants specifically deny Mr. Winnick made false statements to T-Mobile's representatives. Rather, Mr. Winnick's statements accurately reflect WCO Spectrum's mission. Furthermore, the December 17, 2020, email from T-Mobile to La Roche's counsel and the December 24, 2020, email from La Roche's counsel to T-Mobile are written documents that must be referred to for their content and that speak for themselves.

63. Denied. The allegations in this paragraph mischaracterize lawful business negotiations as fraudulent and incorrectly attribute T-Mobile's own independent business decisions to supposed coercion. T-Mobile was not "coerced" into exercising its ROFR for the La Roche license or any other license. Rather, T-Mobile had full discretion to evaluate WCO Spectrum's offer and either match or decline it based on its own assessment of the value of the license. T-Mobile voluntarily chose to exercise its ROFR. Furthermore, Answering Defendants categorically deny the baseless claim that they received a $1.3 million "kickback" or any other improper payment. All payments received by WCO Spectrum were structured to mitigate the risk that, after WCO Spectrum invested significant time and resources in securing a deal, another entity—such as T-Mobile—could exploit WCO Spectrum's efforts and outbid it at the last moment. Such risk-mitigation mechanisms are standard in competitive business transactions and do not constitute wrongful conduct.

64.    Denied. Answering Defendants incorporate their response to the allegations set forth in Paragraph 63 above.

65.    Denied. Answering Defendants deny that non-disclosure agreements were used to conceal fraud. Non-disclosure agreements are standard industry practice in competitive business transactions, particularly in high-value deals involving proprietary negotiations. The non-disclosure agreements were lawful, reasonable, and did not prevent license holders from disclosing relevant information where required. Furthermore, the non-disclosure agreements are written documents that must be referred to for their content and that speak for themselves.

66.    Denied. T-Mobile's allegations are a gross misrepresentation of the events surrounding the Albright Case and yet another example of T-Mobile's campaign to weaponize litigation and discovery in an effort to stifle competition. Tellingly, T-Mobile never even required Albright—the *only* named defendant—to answer the complaint. Nor did T-Mobile move to compel discovery from Albright. The lawsuit was never about enforcing contractual rights—it was a transparent intimidation tactic designed to punish Albright for engaging with WCO Spectrum, to scare off other EBS license holders, and to use the court system as a fishing expedition to extract proprietary business information from WCO Spectrum and Academia.

To stop T-Mobile's abusive and anticompetitive discovery campaign, Albright and WCO Spectrum made binding representations to the Berks County court that the transaction would not be completed, thereby rendering the case moot. But even after the deal was off the table, T-Mobile persisted, pressing its multi-jurisdictional subpoenas in Delaware and

Virginia to continue its intrusive and irrelevant discovery efforts—not to litigate the mooted claims, but to gather intelligence about WCO Spectrum's business model, acquisition strategy, and financing. T-Mobile initiated and dragged out multiple hearings in Delaware and Virginia solely to drive up litigation costs and interfere with WCO Spectrum's operating ability. Despite this, WCO Spectrum and Academia successfully limited the discovery scope to documents relevant to the underlying transaction. They nevertheless ultimately produced over 11,000 pages of documents related to WCO Spectrum's potential acquisition of Albright College's EBS license.

67. Denied as stated. Answering Defendants admit that WCO Spectrum made a bona fide offer to purchase the St. Lucie County School Board's two EBS licenses for $7,550,000. This offer was legitimate, made in good faith, and reflected WCO Spectrum's continued efforts to provide EBS license holders with competitive alternatives to T-Mobile's longstanding market dominance. In response, T-Mobile predictably resorted to litigation threats and obstruction tactics, ultimately filing a lawsuit to block the transaction under the guise of enforcing lease provisions. By then, WCO Spectrum was already defending itself in the Albright Case—another baseless action orchestrated by T-Mobile to suppress competition and harass EBS license holders considering deals with WCO Spectrum. Faced with yet another transparent attempt by T-Mobile to misuse the judicial system by imposing costs and a direct anticompetitive restraint on WCO Spectrum, WCO Spectrum withdrew its offer, thereby rendering the St. Lucie case moot.

68. Denied. T-Mobile's allegations are nothing more than a

convoluted, baseless narrative designed to distort the facts and discredit WCO Spectrum's legitimate business activities. WCO Spectrum's purchase of the Owasso Public School system's EBS license was a bona fide, arms-length transaction—not a "cover-up." In reality, WCO Spectrum would have acquired significantly more EBS licenses had T-Mobile not engaged in anticompetitive, monopsonistic conduct and a campaign of intimidation and litigation warfare—a calculated effort to deter license holders from working with WCO Spectrum. T-Mobile's claims are nothing more than a desperate attempt to obscure their own anticompetitive conduct by fabricating a "fraud" where none exists. WCO Spectrum's transaction with Owasso reflects its genuine intent and ability to acquire spectrum licenses, which directly contradicts the false claims made by T-Mobile.

69.    Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 69 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

70.    Denied. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1 and 4 above.

71.    Answering Defendants admit only that Mr. Winnick founded WCO and Katerndahl served as WCO Spectrum's Chief Executive Officer and Chairman. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above. Furthermore, the Commitment Cost Agreements and offer letters are written documents that must be referred to for their content and that speak for themselves.

72.    Denied. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above. Furthermore, WCO Spectrum's "Investment Committee" was never formalized, and Kratz never attended any meetings.

73.    Denied. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above. Furthermore, the Commitment Cost Agreements and non-disclosure agreements are written documents that must be referred to for their content and that speak for themselves.

74.    Denied. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1 and 4 above. Furthermore, the credit agreement is a written document that must be referred to for its content and that speaks for itself.

75.    Denied. The allegations in this paragraph are irrelevant, misleading, and improperly attempt to impugn Mr. Winnick's character. The allegations regarding events that occurred decades ago, in which Mr. Winnick was not accused of any wrongdoing, have no connection to the claims at issue and should be stricken as immaterial and prejudicial.

76.    Answering Defendants admit that in 1997, Mr. Winnick founded Global Crossing Limited. This pioneering telecommunications company significantly reshaped the data transport industry by building one of the first global fiber-optic networks. This ambitious infrastructure project, which included undersea cables connecting continents over a million fiber miles, introduced a new level of competition to a market previously dominated by a handful of incumbent carriers. Ultimately, Global Crossing filed for bankruptcy in 2002. Any allegation that Mr.

Winnick engaged in improper conduct is specifically denied.

77.    Answering Defendants admit only that these two cases were settled, and Mr. Winnick offered to contribute to the settlement. Answering Defendants incorporate their response to the allegations set forth in Paragraph 76 above. Furthermore, the complaints are written documents that must be referred to for their content and that speak for themselves.

78.    Answering Defendants admit only that Mr. Winnick has been a party to other lawsuits. Answering Defendants expressly deny any wrongdoing by Mr. Winnick.

79.    Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 79 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1, 48 and 49 above.

80.    Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 80 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1, 7 and 66 above.

81.    Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 81 is deemed to contain allegations of fact, Answering Defendants deny all such

factual allegations.

## CLAIMS FOR RELIEF
## COUNT I
### (Violations of RICO, 18 U.S.C. § 1962(c) – Against All Defendants)

82.    Answering Defendants repeat and incorporate their responses to the allegations set forth in Paragraphs 1 through 81 above as if fully set forth herein.

83.    Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied.

84.    Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied.

85.    Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 85 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

86.    Answering Defendants admit that WCO Spectrum, SCH and Academia are distinct entities, with their own independent existence and functions.

87.    Answering Defendants admit that WCO Spectrum is organized under the laws of Delaware and conducts business in California, and that its mission is to create maximum value for EBS spectrum license holders. Answering Defendants further admit that Gary Winnick was WCO Spectrum's founder, Katerndahl was its CEO and Chairman, and Kratz provides consulting services to WCO Spectrum.

Answering Defendants deny T-Mobile's misleading characterizations and omissions. Academia is a legitimate and respected participant in the spectrum market, not merely a "middleman," but an entity that works to facilitate fair market transactions for EBS license holders. Academia is organized under the laws of Virginia and operates lawfully in multiple jurisdictions, including Connecticut. Further, SCH maintains a bona fide revolving line of credit to WCO Spectrum—a fact that T-Mobile deliberately misrepresents in an attempt to cast unwarranted suspicion on lawful business activities. Moreover, WCO Spectrum had established other funding channels for its intended acquisition of EBS licenses.

88. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 88 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraph 1 above.

89. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 89 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

90. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 90 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the

allegations set forth in Paragraphs 1 and 41 above.

91.    Denied. Answering Defendants deny each and every allegation in Paragraph 91 and its subparts (a) through (h). The allegations are a baseless and inflammatory narrative constructed to mischaracterize lawful business practices as a "fraudulent scheme." Answering Defendants specifically deny that there is or ever was an "Enterprise" as defined or described in this paragraph. The individuals and entities referenced—including WCO Spectrum and its officers, its consultant Kratz, Academia and its principal Bitzarakis, SCH and its principal Vasudevan—operate as independent, legitimate business actors, each engaged in lawful commercial activity within the EBS spectrum market.

    a. Mr. Winnick, as founder of WCO Spectrum, did not maintain "command and control" of any so-called "Enterprise." His role was to support WCO Spectrum's lawful business mission: to acquire EBS licenses through legitimate, market-based offers—not to participate in or orchestrate fraud. The allegation that he has received "kickbacks" is false and unsupported by any credible evidence.

    b. Katerndahl, as CEO and Chairman of WCO Spectrum, acted solely within the scope of his corporate responsibilities to advance WCO Spectrum's legal business objectives. He has never engaged in or directed fraudulent conduct. The allegation that he has received "kickbacks" is false and unsupported by any credible evidence.

    c. Kratz is not, and never was, a principal of WCO Spectrum and did not serve on any "Investment Committee" as such

committee was never formalized. Moreover, Kratz had no role in securing financing or attending any meetings with financiers. Kratz did not direct any conspirators, and his consulting work for WCO Spectrum was lawful and unrelated to any alleged fraud. The allegation that he has received "kickbacks" is false and unsupported by any credible evidence.

d.  WCO Spectrum has conducted its business openly and lawfully, engaging in bona fide negotiations with EBS license holders and pursuing legitimate transactions to acquire licenses. WCO Spectrum denies that it has made "sham offers," entered into any unlawful agreements, or concealed information from T-Mobile. All agreements and negotiations were market-based, transparent to counterparties, and subject to standard confidentiality protocols.

e.–f.  Academia and its principal, Bitzarakis, have not participated in any scheme to defraud T-Mobile. They act as legitimate brokers in the spectrum market and have merely facilitated lawful introductions and negotiations between WCO Spectrum and license holders. The suggestion that they "negotiated kickbacks" or concealed information is categorically false.

g.–h.  The line of credit provided to WCO Spectrum was legitimate and properly documented. The allegation that the credit agreement was a sham or used to further a criminal scheme is false, and unsupported by any factual basis.

92.  Denied. The allegations in this paragraph constitute legal

conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 92 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

93.    Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 93 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

94.    Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 94 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1 and 41 above.

95.    Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 95 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

96.    Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 96 is deemed

to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1 and 4 above.

97.    Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 97 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1 and 4 above.

98.    Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 98 and its subparts (a) through (e) are deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraph 1 above.

99.    Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 99 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

100.    Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. Furthermore, T-Mobile's lease agreements with EBS license holders are written documents that must be referred to for their content and that speak for themselves. To the extent, if any,

Paragraph 100 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

101. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 101 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

102. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 102 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

103. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 103 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

### COUNT II
### (Conspiracy to Violate RICO, 18 U.S.C. § 1962(d) Against All Defendants)

104. Answering Defendants repeat and incorporate their responses to the allegations set forth in Paragraphs 1 through 103 above as if fully set forth herein.

105. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 105 is deemed to contain allegations of fact, Answering Defendants deny all such

factual allegations.

106. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 106 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

107. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 107 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

108. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 108 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

109. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 109 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

110. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 110 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

## COUNT III
### (Fraud – Against All Defendants)

111.  Answering Defendants repeat and incorporate their responses to the allegations set forth in Paragraphs 1 through 110 above as if fully set forth herein.

112.  Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 112 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1 and 4 above. Additionally, Answering Defendants deny that Academia, its principal Bitzarakis, or Kratz were principals of WCO Spectrum or had any role in WCO Spectrum's financing arrangements. None of these parties attended calls or meetings with any potential financiers or played any role in WCO Spectrum's financing.

113.  Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 113 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1, 4 and 112 above.

114.  Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 114 is deemed to contain allegations of fact, Answering Defendants deny all such

factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1, 4 and 112 above.

115.   Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 115 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1, 4 and 112 above.

116.   Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 116 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1, 4 and 112 above.

117.   Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 117 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1, 4 and 112 above.

118.   Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 118 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1, 4 and 112 above.

## COUNT IV

### (Aiding and Abetting Fraud – Against Defendants Winnick, Katerndahl, Kratz, Academia, Bitzarakis, SCH, and Vasudevan)

119.  Answering Defendants repeat and incorporate their responses to the allegations set forth in Paragraphs 1 through 118 above as if fully set forth herein.

120.  Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. Answering Defendants specifically deny that Winnick, Katerndahl, or Kratz were involved in any scheme to defraud T-Mobile or that they knowingly submitted false offers. Answering Defendants further deny that any offers made by WCO Spectrum were fraudulent or improper in any way. Moreover, Answering Defendants deny that Kratz was a principal of WCO Spectrum or had any decision-making authority over WCO Spectrum's operations. Answering Defendants incorporate their responses to the allegations set forth in Paragraph 1 above.

121.  Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 121 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1 and 120 above. Furthermore, the non-disclosure agreements are written documents that must be referred to for their content and that speak for themselves.

122.  Denied. The allegations in this paragraph constitute legal

conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 122 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1 and 4 above.

123. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 123 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

124. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 124 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

## COUNT V
### (Conspiracy to Commit Fraud – Against All Defendants)

125. Answering Defendants repeat and incorporate their responses to the allegations set forth in Paragraphs 1 through 124 above as if fully set forth herein.

126. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 126 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

127. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. Answering Defendants specifically deny that they engaged in any conspiracy, agreement, or combination to submit fraudulent offers to EBS license holders. The assertion that Defendants acted solely for "personal financial gain" distorts the reality of competitive market participation and ignores T-Mobile's own strategic interests in these transactions. By way of further response, Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

128. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 128 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1, 4 and 127 above.

129. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 129 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1, 4 and 127 above.

130. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 130 is deemed to contain allegations of fact, Answering Defendants deny all such

factual allegations.

## COUNT VI
### (Cal. Penal Code § 496(c) – Against All Defendants)

131.   Answering Defendants repeat and incorporate their responses to the allegations set forth in Paragraphs 1 through 130 above as if fully set forth herein.

132.   Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied.

133.   Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied.

134.   Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 134 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

135.   Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 135 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

136.   Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained

therein are deemed denied. To the extent, if any, Paragraph 136 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

137. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 137 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

138. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 138 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

139. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 139 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1, 7 and 66 above. Furthermore, the non-disclosure agreements are written documents that must be referred to for their content and that speak for themselves.

140. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained

therein are deemed denied. To the extent, if any, Paragraph 140 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

141. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 141 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

142. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 142 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

## COUNT VII
### (Conversion – Against All Defendants)

143. Answering Defendants repeat and incorporate their responses to the allegations set forth in Paragraphs 1 through 142 above as if fully set forth herein.

144. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. T-Mobile exercised its ROFR voluntarily and, in doing so, chose to spend money to acquire EBS licenses. Answering Defendants had no control over T-Mobile's decision-making, nor did they interfere with any alleged "right to possess" funds that T-Mobile elected to use in its business dealings. Further, Answering Defendants dispute

that the prices T-Mobile paid to exercise its ROFR were "improperly inflated." The offers made to EBS license holders reflected fair market value for such licenses. T-Mobile, a sophisticated entity with vast resources, independently determined that the prices it paid were acceptable. Its attempt to recast ordinary market competition as wrongful conduct is nothing more than an effort to shield itself from the consequences of its own business decisions. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

145. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1 and 144 above.

146. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 146 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1 and 144 above.

147. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 147 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1 and 144 above.

148. Denied. The allegations in this paragraph constitute legal

conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 148 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1 and 144 above.

149. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 149 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

### COUNT VIII
### (Violation of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 – Against All Defendants)

150. Answering Defendants repeat and incorporate their responses to the allegations set forth in Paragraphs 1 through 149 above as if fully set forth herein.

151. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied.

152. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied.

153. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 153 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

154. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 103 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

155. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

156. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. Furthermore, Answering Defendants deny that their business acts and practices were "unfair."

   a. Answering Defendants engaged in lawful, good-faith competition. The assertion that Defendants' offers were "shams" is baseless. The fact that T-Mobile may have been forced to pay market-driven prices for EBS licenses does not make Defendants' conduct unlawful—it simply reflects the reality of fair market competition. Furthermore, the offers were non-binding subject to due diligence, which was necessary due to T-Mobile concealing essential economic information.

   b. Answering Defendants deny that their conduct caused any harm to T-Mobile, let alone harm that outweighs the legitimate utility of fair market negotiations. If T-Mobile suffered any financial impact, it was due to its own decision to exercise its ROFR in a competitive environment, not because of any wrongful conduct by

Answering Defendants.

157. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. Furthermore, Answering Defendants deny that T-Mobile has suffered any "ascertainable loss" due to their actions. Answering Defendants did not "siphon off" any amounts from T-Mobile, nor did they engage in any so-called "kickback" scheme. Any claim that T-Mobile overpaid for EBS licenses is a direct consequence of competitive bidding, not any unlawful conduct by Answering Defendants. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

158. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 158 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1 and 155 above.

159. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 159 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1 and 155 above.

160. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 160 is

deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

## COUNT IX
### (Tortious Interference with Business Expectancy and Contractual Relationship – Against All Defendants)

161.  Answering Defendants repeat and incorporate their responses to the allegations set forth in Paragraphs 1 through 160 above as if fully set forth herein.

162.  Denied. T-Mobile's lease agreements with EBS license holders are written documents that must be referred to for their content and that speak for themselves. Moreover, Answering Defendants deny the accuracy and completeness of T-Mobile's attempt to paraphrase the content of the lease agreements. To the extent this Paragraph contains a legal conclusion, no response is required and all allegations contained therein are deemed denied.

163. Admitted only that Answering Defendants knew that T-Mobile's lease agreements with EBS license holders cover most of EBS licenses. It is specifically denied that Answering Defendants knew the specific terms of every lease agreement between T-Mobile and the EBS license holder.

164. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

165. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. Furthermore, Answering Defendants

categorically deny that they disrupted T-Mobile's contracts with EBS license holders or "artificially inflated" offers. Answering Defendants further deny the existence of any "10% kickback scheme." The terms of WCO's agreements with EBS license holders were lawful, transparent, and designed to ensure fair market transactions. If T-Mobile paid more to exercise its ROFR, it did so because of legitimate competitive bidding— something T-Mobile seeks to eliminate through its anticompetitive conduct and litigation rather than fair competition. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1 and 7 above.

166. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. Answering Defendants deny that they caused any disruption to T-Mobile's lease arrangements. T-Mobile's own decision to exercise its ROFR rather than allow EBS license holders to accept WCO's offer is the sole reason any lease agreements ended. Answering Defendants engaged in lawful, competitive market transactions, while T-Mobile's claims reflect an attempt to stifle competition and suppress fair market value for EBS licenses. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

167. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 167 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

168. Denied. The allegations in this paragraph constitute legal

conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 168 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

169. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 169 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

### COUNT X
### (Unjust Enrichment – Against All Defendants)

170. Answering Defendants repeat and incorporate their responses to the allegations set forth in Paragraphs 1 through 169 above as if fully set forth herein.

171. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. Furthermore, T-Mobile's lease agreements with EBS license holders are written documents that must be referred to for their content and that speak for themselves. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

172. Denied. WCO Spectrum received payments from EBS license holders under the Commitment Cost Agreements *only* when T-Mobile exercised its ROFR. Answering Defendants categorically deny the claim that these payments were "material." These payments merely served to mitigate the risk that, after WCO Spectrum invested substantial time and

resources into securing a deal, another entity could exploit its efforts and outbid it at the last moment. Furthermore, the Commitment Cost Agreements are written documents that must be referred to for their content and that speak for themselves. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1 and 7 above.

173. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 173 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their responses to the allegations set forth in Paragraphs 1 and 172 above.

174. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 174 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

175. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 175 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations.

## COUNT XI
### (Negligent Misrepresentation – Against All Defendants)

176. Answering Defendants repeat and incorporate their responses to the allegations set forth in Paragraphs 1 through 175 above as if fully

set forth herein.

177. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. Furthermore, T-Mobile's lease agreements with EBS license holders are written documents that must be referred to for their content and that speak for themselves. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

178. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 178 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

179. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 179 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

180. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 180 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

181. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 181 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

182. Denied. The allegations in this paragraph constitute legal conclusions to which no response is required and all allegations contained therein are deemed denied. To the extent, if any, Paragraph 182 is deemed to contain allegations of fact, Answering Defendants deny all such factual allegations. Answering Defendants incorporate their response to the allegations set forth in Paragraph 1 above.

## REQUEST FOR RELIEF

Answering Defendants deny the allegations in T-Mobile's Prayer for Relief and further deny that T-Mobile is entitled to any of the relief requested therein.

## **AFFIRMATIVE DEFENSES**

1. Answering Defendants repeat, replead and incorporate by reference each of their responses to the previous paragraphs as if they had been fully set forth herein.

2. Plaintiffs' Complaint fails to state a claim upon which relief can be granted.

3. Some or all claims are barred by the applicable statute(s) of limitations.

4. Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver.

5.    Plaintiffs are estopped from asserting their claims by their own conduct, representations, or omissions.

6.    Plaintiffs' claims are barred under the doctrine of unclean hands due to their own anticompetitive and bad-faith conduct.

7.    To the extent Plaintiffs exercised their Right of First Refusal under contractual agreements, they did so voluntarily and with full knowledge, thereby consenting to the conduct they now challenge.

8.    Plaintiffs did not reasonably or actually rely on any alleged misrepresentation or omission by Answering Defendants.

9.    No act or omission by Answering Defendants was the proximate or actual cause of any injury to Plaintiffs.

10.    Any alleged harm suffered by Plaintiffs was caused by independent, intervening, or superseding actions of third parties or by Plaintiffs' own conduct.

11.    Plaintiffs failed to take reasonable steps to mitigate any alleged damages.

12.    Any alleged conduct by Answering Defendants was justified by legitimate business purposes and competitive market behavior.

13.    All actions taken by Answering Defendants were lawful, made in good faith, and consistent with recognized business practices and applicable regulations.

14.    Plaintiffs' alleged damages are speculative, uncertain, and not recoverable under the law.

15.    To the extent Plaintiffs seek punitive or exemplary damages, such relief is barred under applicable law and/or due process principles.

16.    Plaintiffs' claims are barred for failure to join necessary and indispensable parties.

17.    Plaintiffs' claims are part of an illegal anticompetitive campaign and are unenforceable as a matter of law.

18.    Plaintiffs unreasonably delayed in asserting their claims, and such delay has prejudiced Answering Defendants.

19.    To the extent Plaintiffs are entitled to any relief (which is denied), such recovery must be offset or reduced by Plaintiffs' own conduct and/or benefits received.

20.    Defendants Kratz, Academia, and Bitzarakis were not agents, officers, directors, or principals of WCO Spectrum and exercised no control over its financing arrangements or internal governance. They cannot be held liable for the alleged conduct of WCO or other parties under agency, respondeat superior, or any theory of control.

21.    Defendants Kratz, Academia, and Bitzarakis lacked the requisite knowledge and intent to support any claim based on fraud, conspiracy, or racketeering. They did not knowingly participate in or further any alleged fraudulent scheme and cannot be held liable under theories requiring scienter or willful misconduct.

22.    Plaintiffs' claims impermissibly lump Defendants Kratz, Academia, and Bitzarakis together with other unrelated parties and fail to allege specific facts as to each Defendant's conduct. As such, the claims are barred by the doctrines of improper group pleading and failure to plead fraud with particularity under Fed. R. Civ. P. 9(b).

23.    Answering Defendants reserve the right to assert additional affirmative defenses that may become available or apparent through discovery or further proceedings.

## ANTITRUST COUNTERCLAIMS

Counterclaim-Plaintiff WCO Spectrum alleges as follows with personal knowledge as to itself and on information and belief as to all other matters.

## NATURE OF THE ACTION

T-Mobile is a monopsonist in the market for 2.5 GHz spectrum, a unique and valuable mid-band wireless spectrum. A monopsony is the mirror image of a monopoly on the buying side. T-Mobile controls about 90% of this spectrum through a combination of direct ownership of licenses and restrictive lease agreements with license holders.

These antitrust counterclaims expose how, after WCO Spectrum rejected T-Mobile's illegal bid-rigging proposal—presented quite literally in a smoke-filled room—T-Mobile embarked on a campaign of exclusionary tactics to crush competition and block WCO Spectrum from competing for these spectrum licenses, thereby protecting and maintaining its monopsony power.

T-Mobile has maintained and extended its monopsony power primarily by engaging in three anticompetitive acts:

- Restrictive lease terms designed to foil competitive bids;
- Defensively buying up licenses that could have gone to a competitive bidder; and
- Engaging in lawfare designed to intimidate and discourage the sellers of the licenses.

T-Mobile's strategy has driven up costs for WCO Spectrum, prevented its entry into the below-defined relevant markets, discouraged

sellers (non-profit schools, colleges and universities) from negotiating competitive deals, and suppressed prices below competitive levels for this unique and valuable spectrum—all in violation of federal antitrust laws. We describe the details of T-Mobile's anticompetitive scheme below.

## JURISDICTION AND VENUE

1.      Counterclaim-Plaintiff asserts antitrust violations under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 and seeks monetary and equitable relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

2.      Counterclaim-Plaintiff asserts California state law violations under the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 et seq., and California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq., as well as Intentional Interference with Prospective Economic Advantage.

3.      This Court has primary subject-matter jurisdiction over this action under 28 U.S.C. § 1331, 1337, and supplemental jurisdiction over the state claims under 28 U.S.C. § 1367.

4.      Venue is proper in the Central District of California under 15 U.S.C. §§ 15, 22 because Counterclaim-Defendants can be found in this district. Venue is also proper under 28 U.S.C. 1391 because a substantial part of the events giving rise to this complaint occurred in this district.

5.      Counterclaim-Defendants have submitted to the personal jurisdiction of this Court as to the same activities giving rise to the counterclaims.

## THE PARTIES

6.    Counterclaim-Plaintiff WCO Spectrum is a limited liability company organized and existing under the laws of the state of Delaware and doing business in the state of California with its principal office located at 9903 Wilshire Boulevard, Beverly Hills, California 90212.

7.    Counterclaim-Defendant T-Mobile US, Inc. ("T-Mobile") is a Delaware corporation with a principal office at 12920 SE 38th Street, Bellevue, Washington, 98006.

8.    Counterclaim-Defendant Clearwire Spectrum Holdings LLC ("Clearwire") is a limited liability company organized under the laws of Delaware, with a principal office at 12920 SE 38th Street, Bellevue, Washington, 98006. Its ultimate parent is T-Mobile.

9.    Counterclaim-Defendant Clearwire Spectrum Holdings II LLC ("Clearwire II") is a limited liability company organized under the laws of Delaware, with a principal office at 12920 SE 38th Street, Bellevue, Washington, 98006. Its ultimate parent is T-Mobile.

10.    Counterclaim-Defendant Clearwire Spectrum Holdings III LLC ("Clearwire III") is a limited liability company organized under the laws of Delaware, with a principal office at 12920 SE 38th Street, Bellevue, Washington, 98006. Its ultimate parent is T-Mobile.

11.    Counterclaim-Defendant Fixed Wireless Holdings LLC ("Fixed Wireless") is a limited liability company organized under the laws of Delaware, with a principal office at 12920 SE 38th Street, Bellevue, Washington, 98006. Its ultimate parent is T-Mobile.

12.    Counterclaim-Defendant NSAC LLC ("NSAC") is a limited liability company organized under the laws of Delaware, with a principal

office at 12920 SE 38th Street, Bellevue, Washington, 98006. Its ultimate parent is T-Mobile.

13.    Counterclaim-Defendant TDI Acquisition Sub LLC ("TDI") is a limited liability company organized under the laws of Delaware, with a principal office at 12920 SE 38th Street, Bellevue, Washington, 98006. Its ultimate parent is T-Mobile.

14.    Counterclaim-Defendant WBSY Licensing LLC ("WBSY") is a limited liability company organized under the laws of Delaware, with a principal office at 12920 SE 38th Street, Bellevue, Washington, 98006. Its ultimate parent is T-Mobile.

15.    Counterclaim-Defendants Clearwire, Clearwire II, Clearwire III, Fixed Wireless, NSAC, TDI, and WBSY are T-Mobile subsidiaries that lease EBS spectrum from educational institutions. *See* Complaint ¶ 18. Counterclaim-Defendants' leases are a primary subject of these Counterclaims.

16.    Counterclaim-Defendants are hereinafter referred to collectively as "T-Mobile."

## BACKGROUND

### Wireless Spectrum and WCO Spectrum

17.    The FCC issues licenses to operate on wireless spectrum. Each FCC license grants an entity permission to operate on a specific frequency or frequencies within a particular radio band in a specific geographic area. The "2.5 GHz band" extends from 2496 MHz to 2690 MHz, and comprises frequencies assigned by the FCC through "Educational Broadband Service" (EBS) and "Broadband Radio Service" (BRS) licenses. In the 2.5 GHz band, there are 20 EBS frequency channels and 13 BRS frequency

57

channels, in addition to a number of small "guard-band," or buffer, channels associated with certain of the EBS and BRS channels.

18.    EBS and BRS spectrum are functionally interchangeable, the only difference being that while BRS spectrum has always been available for commercial use, EBS spectrum licenses originally were only allowed to be held by educational institutions. FCC rules subsequently permitted educational institutions to lease their EBS spectrum rights to commercial users, and most of them did so to obtain much-needed funding for their schools. Then, in 2020, the FCC again changed its EBS rules, this time to allow EBS license holders to sell their license rights to commercial entities.[1] Through a combination of its ownership of BRS and EBS licenses and its long-term leases from EBS license holders, T-Mobile presently controls about 90% of EBS and BRS spectrum usage rights (referred to collectively as "2.5 GHz spectrum" or "EBS/BRS spectrum").

19.    WCO Spectrum was formed in 2020 in response to the FCC rule change allowing private commercial entities to acquire EBS licenses. WCO Spectrum conceived an innovative business model to ultimately lower costs and increase efficiency of the limited 2.5 GHz spectrum. By purchasing significant amounts of EBS spectrum as a third-party investor, WCO Spectrum would implement a model similar to that employed by the wireless communications carriers themselves to sell tower assets to third parties and lease them back on shared basis, thus bringing down the overall cost of capital to operate a network.

---

1.    Technically, this entails an assignment of the license, as the FCC actually owns the license itself. They are nevertheless commonly referred to as "sales" in the industry.

20.    By selling tower assets to neutral third parties, fewer towers were needed, which not only lowered costs, but also created efficiencies and improved coverage. The end result was superior network quality at a lower cost. Similar technologies that allow dynamic sharing of wireless spectrum, such as Citizens Broadband Radio Service (CBRS),[2] have already been deployed. When spectrum sharing is ultimately deployed in the 2.5 GHz band as planned, the result will be more efficient utilization of spectrum, benefits to consumers in network quality and reductions in the cost of delivering wireless services. This is the business WCO Spectrum intends to drive.

21.    Such dynamic spectrum sharing will enhance network efficiency in the 2.5 GHz band by optimizing spectrum use, reducing congestion, and enabling flexible spectrum deployments. As with CBRS, this will happen by at least the following means under WCO Spectrum's plan:

    a. *Dynamic spectrum sharing.* Unlike traditional spectrum allocation, where frequencies are statically assigned, WCO Spectrum's plan will use an SAS to allocate spectrum dynamically based on demand and availability. This will ensure the 194 MHz of bandwidth in the 2.5

---

2.    Introduced in 2015, CBRS operates in the 3.55 GHz band (specifically 3550–3700 MHz), which was previously reserved primarily for Department of Defense radar systems and some commercial satellite operations. CBRS allows a mix of federal, licensed, and unlicensed users to access this spectrum dynamically, making it a groundbreaking approach to spectrum management. CBRS uses a tiered access model for different categories of users that is managed by a Spectrum Access System (SAS). The SAS, an automated system, coordinates spectrum use in real time, ensuring no interference occurs between tiers while maximizing availability.

GHz band is used efficiently, minimizing wasted capacity;

b. *Boosting 5G and all subsequent wireless generations*. 2.5 GHz spectrum aligns much better with 5G's spectrum needs than do other spectrum bands (see infra). The sharing model contemplated by WCO Spectrum will lower the cost of spectrum access, accelerating 5G deployment and making high-efficiency networks more widespread; and

c. *Interference mitigation*. The SAS will actively monitor and adjust spectrum use to prevent interference among users, ensuring all 2.5 GHz band users will operate efficiently.

WCO Spectrum's plan is to implement a spectrum sharing concept similar to the one already in use in CBRS, and to use spectrum sharing to lease its acquired EBS licenses to T-Mobile, AT&T, Verizon, or others when the leases covering those licenses expire. This plan will expand network efficiency by making spectrum use more flexible, reducing costs, alleviating congestion, and supporting innovative applications.

22.    Third-party ownership of spectrum by WCO Spectrum (and potentially others) also allows sophisticated financing arrangements new to the spectrum class that will serve to facilitate a transition to spectrum-sharing in the 2.5 GHz band, resulting in lower operating costs for wireless carriers that will benefit consumers.

23.    Although the benefits from dynamic spectrum sharing are clear, the wireless carriers have an historical bias for holding total control

of their spectrum assets. Of course, the wireless carriers also historically owned their tower assets as well, but their ballooning balance sheets demanded that they dispose of them to third parties, thereby creating a separate tower industry. The operating efficiency benefits to the wireless carriers and ultimately consumers of moving to the tower industry model are plain, but the carriers have not yet adapted to the dispossession of spectrum assets as they did with towers. Similar to the tower industry, third party ownership by companies like WCO Spectrum will expedite the coordination and cooperation necessary for efficient use of spectrum.

24.    Gary Winnick, the late founder of WCO Spectrum, conceived this plan for efficient spectrum sharing, together with the other principals of WCO Spectrum, in the same way that he had revolutionized other industries. In contrast with T-Mobile's absurd calumnies targeted at Mr. Winnick, he has introduced business plans that that have infused competition into other telecommunications markets. For example, in 1997 he founded Global Crossing, a pioneering telecommunications company that significantly reshaped the data transport industry by building one of the first global fiber-optic networks. This ambitious infrastructure project, which included undersea cables connecting continents over a million fiber miles, introduced a new level of competition to a market previously dominated by a handful of incumbent carriers. Global Crossing opened the market to greater competition, driving down costs by breaking the incumbent oligopoly and dramatically increasing the available bandwidth for data transport for transatlantic and transpacific routes. Ultimately, the heightened competition introduced by Global Crossing led to lower prices for internet access, international calling, and business

data services. Global Crossing's competitive entry into the global data transport market thus drastically shifted the paradigm of data transport in a manner analogous to the benefits to be reaped from the innovative, dynamic spectrum sharing planned by WCO Spectrum.

25.   After developing its current 2.5 GHz business plan, WCO Spectrum sought and obtained significant commitments and financial backing. It then began a broad initiative to negotiate the purchase of rights from educational license holders. WCO Spectrum's entrance into the markets immediately introduced competition to the market and changed the status quo. And T-Mobile noticed.

### T-Mobile's Invitation to Collude

26.   When T-Mobile first began opposing WCO Spectrum's efforts to bid for EBS licenses, WCO Spectrum sought a meeting with T-Mobile to allay any concerns T-Mobile might have regarding WCO Spectrum's intent to honor the terms of any leases that were held by T-Mobile—what WCO Spectrum naively thought was the cause of T-Mobile's objection to its entry into the marketplace. In or around March 2021, Carl Katerndahl of WCO Spectrum met with Paul McCarthy, Sr. Director Spectrum Portfolio Management and Strategy at T-Mobile, in Chicago. The meeting started at The Clayton, a cigar lounge, at 212 N. Canal Street, and then continued nearby at Gibsons Italia, a restaurant at 233 N. Canal Street.

27.   It was at this meeting that T-Mobile invited WCO Spectrum to engage in a criminal antitrust conspiracy. More specifically, Mr. McCarthy advised Mr. Katerndahl that WCO Spectrum's bid prices for licenses *were too high*. Mr. McCarthy stated that, for T-Mobile and WCO Spectrum to "work together," WCO Spectrum would have to agree to

adjust its pricing downward to a level acceptable to T-Mobile. Mr. McCarthy asked Mr. Katerndahl to come back with ideas for "concessions" in any future leases, so that T-Mobile could consider "letting WCO buy the licenses." Mr. McCarthy further explained that T-Mobile considered EBS license holders to be "captives."

28.    Mr. Katerndahl rejected Mr. McCarthy's invitation-to-collude on purchase prices for the wireless spectrum. Indeed, he refused to discuss pricing at all with Mr. McCarthy. In response, T-Mobile mounted a campaign to raise substantially the costs to both WCO Spectrum and EBS license holders of transacting with each other, and indeed to exclude WCO Spectrum from the market altogether. T-Mobile's efforts are described below.

## RELEVANT MARKET

## Product Market Definition

29.    The relevant product market for assessing WCO Spectrum's claims against T-Mobile is the market for EBS/BRS spectrum rights. (Because the 2.5 GHz band is composed entirely of EBS and BRS spectrum—with certain small amounts of buffer spectrum attributable to either—the relevant product market can also be expressed as the market for 2.5 GHz spectrum rights.) 2.5 GHz spectrum rights include the right to operate wireless spectrum on the frequencies authorized by the FCC license. The market for 2.5 GHz spectrum rights includes both the sale/purchase and lease of EBS or BRS spectrum licenses issued by the FCC.

30.    2.5 GHz spectrum lies in the "mid-band" of the wireless spectrum. 2.5 GHz spectrum is not reasonably interchangeable with other

bands of spectrum, including other "mid-band" spectrum, for several reasons:

> a. *Superior coverage and propagation.* The 2.5 GHz frequency band offers better signal propagation than higher mid-band frequencies like C-band or 3.45 GHz, meaning it travels farther and penetrates obstacles like walls more effectively. This reduces the number of cell sites needed for coverage, making it significantly more cost-efficient. As T-Mobile itself has explained: "[S]pectrum obeys the immutable laws of physics. The higher the frequency, the shorter the distance it can travel and the more easily it is blocked by objects. C-band is 3.7 to 3.98 GHz. T-Mobile's existing mid-band 5G network uses 2.5 GHz spectrum. Higher banded spectrum cannot travel as far . . . resulting in [2.5 GHz spectrum's] superior coverage compared to C-Band. . . . Now, Verizon is trying to convince the world it can bend the laws of physics and make C-band work similarly to 2.5 GHz."[3] T-Mobile again has stated: "Mid-band 2.5 GHz 5G delivers blazing fast speeds that can rival [high-band] millimeter wave, but unlike mmWave, [2.5 GHz] mid-band can blanket large areas with needed coverage and go through walls, windows, and trees. Which means it's

---

3.    Neville Ray, T-Mobile President of Technology, "Network Blog: The Current State of 5G" (April 19, 2021), https://www.t-mobile.com/news/network/the-current-state-of-5g.

a more practical 5G technology."[4] Research has found that 2.5 GHz deployments can cover an area several times greater than 3.45 GHz or C-Band at the same power level and antenna height, highlighting its superior range.

b. *High capacity for speed.* The 2.5 GHz band provides significant bandwidth, allowing for high data throughput. This capacity supports faster download speeds and accommodates more users, making it ideal for urban and suburban areas. 2.5 GHz spectrum brings together the best of both worlds: long range for broad coverage with high capacity and speed.

c. *Cost effective deployment.* Lower frequency mid-band like 2.5 GHz requires fewer cell sites than higher bands like C-band, reducing infrastructure costs substantially. 2.5 GHz spectrum is thus the most efficient spectrum for use in 5G applications. As T-Mobile explains with regard to these other bands: "We estimate C-band will require 50% more cell sites for meaningful and continuous coverage, and in some areas, for example in-building, the required densification can be 4x higher than 2.5 GHz. The inescapable fact is that delivering seamless mid-

_____

4.    T-Mobile Press Release, "T-Mobile Nearly Doubles its Supercharged Mid-Band 5G in Just One Month," (October 28, 2020), https://www.5gamericas.org/t%E2%80%91mobile-nearly-doubles-its-supercharged-mid%E2%80%91band-5g-in-just-one-month/.

band 5G coverage with C-band alone requires extensive network densification and updates to all 5G sites. That's both time-consuming and expensive outside of urban areas. So Verizon and AT&T, following their failed business strategies to date, now have a choice: spend more to provide contiguous coverage with C-band, or leave their customers with performance and quality holes in their 5G coverage."[5]

d. *Versatility across 5G uses.* In contrast with other spectrum bands, the 2.5 GHz spectrum band supports all three 5G use case categories—enhanced mobile broadband (eMBB), ultra-reliable low-latency communication (URLLC), and massive machine-type communication (mMTC)—due to its blend of speed, capacity, and reach.

e. *Regulatory technology rules make other mid-band spectrum a poor substitute for 2.5 GHz spectrum.* As T-Mobile has explained: "[T]he maximum allowed output power levels are different and significantly larger for 2.5 GHz where it matters the most and where more than 83% of the population lives. The chipset and mobile device specifications are the same, but 2.5 GHz rules allow twice as high maximum power than C-band, which

---

[5]    Neville Ray, T-Mobile President of Technology, "Network Blog: The Current State of 5G" (April 19, 2021), https://www.t-mobile.com/news/network/the-current-state-of-5g.

is particularly beneficial in the context of in-home broadband to support improved uplink coverage. The same is true for operating margins and cell edge performance."[6]

31.    Thus, T-Mobile itself admits that, due to its unique combination of characteristics, 2.5 GHz spectrum is not reasonably interchangeable with other bands of spectrum, especially for 5G applications. Due to its combination of superior coverage, high capacity, cost efficiency, and versatility, the 2.5 GHz (EBS/BRS) spectrum band constitutes a separate relevant product market, separate even from other spectrum in the "mid-band."

32.    A hypothetical monopolist of EBS/BRS spectrum rights profitably could raise price by at least a small but significant, non-transitory amount. Conversely, a hypothetical monopsonist of EBS/BRS spectrum rights profitably could reduce price by at least a small but significant, non-transitory amount.

## Geographic Market Definition

33.    The relevant geographic markets for assessing WCO Spectrum's claims against T-Mobile are the geographic service areas ("GSAs") in which licensees are authorized by the FCC to operate their licenses.

34.    An EBS or BRS licensee operates within the GSA authorized by the FCC for operation of the license.[7] A GSA is generally a circular area

---

6.    *Id.*
7.    Some BRS licenses operate under GSAs and some under "Basic Trading Area" (BTAs) authorized by the FCC license. In both cases, the FCC specifies the service

with a 35-mile radius around an FCC licensee's station coordinates.[8] In those instances where two co-channel stations have overlapping protected GSAs, the GSA of each license may be reduced by the FCC's "splitting the football" approach to divide the overlap area between the licensees. The FCC also recently auctioned off county-sized "overlay" EBS licenses, which allow the overlay license holders to employ previously unassigned spectrum, and to operate within previously authorized geographic areas, as long as they do not interfere with the signals of incumbent EBS license holders. The GSA for such an overlay license is the county for which the license is issued, subject to the exclusion of overlapping, co-channel incumbent GSAs. T-Mobile purchased the vast majority of EBS overlay licenses in the FCC's recent auction.[9]

35.    There are typically multiple licenses for different frequency channels issued by the FCC for any given GSA. But a single entity can hold multiple, or even all, of the EBS and BRS licenses for different frequency channels in a GSA.

36.    Because EBS/BRS spectrum is specific to an FCC-designated local GSA, spectrum rights associated with one GSA are not reasonably

---

area in which the holder of the license may operate. "GSA" will be used in these Counterclaims to refer to the FCC-authorized geographic scope of an EBS or BRS license.

8.    Due to a license modification process that the FCC adopted in 2005, some EBS licenses have smaller, irregular GSAs.

9.    There are also BRS "overlay" licenses, auctioned off by the FCC in 1996 and 2009, which operate in a manner similar to EBS overlay licenses, carving out the license frequencies and geographies previously covered by incumbent licenses. As of November 2022, T-Mobile owned 853 of 915 BRS overlay licenses. Morningstar, "Communication Services Observer" (November 2022), at 30.

interchangeable with spectrum rights associated with a different GSA. Purchasers of spectrum rights such as T-Mobile, Verizon and AT&T need spectrum in each of these local areas to provide the necessary coverage for their wireless communications networks. Because these carriers are in turn WCO Spectrum's prospective customers through leases of the licenses WCO Spectrum purchases, EBS/BRS spectrum rights for different GSAs are likewise not reasonably interchangeable—either by WCO Spectrum or other prospective purchasers.

37. The value of EBS/BRS spectrum licenses can vary considerably between different GSAs, as valued in MHz-POPs.[10] The difference in EBS/BRS spectrum rights prices between different GSAs evidences that they are separate relevant geographic markets.

38. A hypothetical monopolist of EBS/BRS spectrum rights could profitably raise price by at least a small but significant, non-transitory amount in any authorized GSA. Conversely, a hypothetical monopsonist of EBS/BRS spectrum rights could profitably reduce price by at least a small but significant, non-transitory amount in any authorized GSA.

39. The relevant geographic markets in which to evaluate WCO Spectrum's antitrust claims are the GSAs affected by T-Mobile's anticompetitive and exclusionary conduct.[11] The relevant markets are thus the markets for EBS/BRS spectrum rights in each such GSA.

_____

10. "MHz-POPs" with respect to any FCC license is the number of megahertz of wireless spectrum covered by the FCC license multiplied by the population in the FCC-authorized geographic area for operation of the license.

11. Local market areas thus affected include, inter alia: Los Angeles, CA; Sacramento, CA; San Diego, CA; Pasadena, CA; Pittsburgh, PA; Ft. Pierce, FL; Globe, AZ; Memphis, TN; New Orleans, LA; Mobile, AL, Harrisburg, PA; Norfolk, VA;

**T-Mobile's Monopsony Power**

40.    T-Mobile owns or leases about 90% of the FCC licenses to operate EBS/BRS spectrum. In November 2022, T-Mobile owned 87% of the active BRS licenses and controlled about 90% of EBS licenses by purchase or lease.[12] Since then T-Mobile's ownership of EBS/BRS spectrum rights has only increased.

41.    T-Mobile possesses monopsony power in every relevant market. In some relevant markets T-Mobile's purchases of EBS/BRS spectrum rights amount to 100%.[13]

42.    Entry barriers in the relevant markets are extremely high, including at least:

   a. *FCC regulation.* The FCC regulates the allocation of
      wireless spectrum by (1) issuing licenses and (2)

---

Syracuse, NY; New York, NY; Bullhead City, AZ; Dayton, OH; Providence, RI; Nashville, TN; Las Vegas, NV; Seattle, WA; Wenatchee, WA; Raleigh, NC; Tulsa, OK; Buffalo, NY; Cincinnati, OH; Rochester, NY; Jacksonville, FL; San Antonio, TX; Riverside, CA; Oklahoma City, OK; Fresno, CA; Philadelphia, PA; Hartford, CT; Tucson, AZ; Phoenix, AZ; Albuquerque, NM; Albany, NY; Casper, WY; Long Island, NY; Kansas City, MO; Charlotte, NC; Salt Lake City, UT; Portland, OR; Houston, TX; Delta (Grand Junction), CO; Albany, NY; Key West, FL; Colorado Springs, CO; Las Cruces, NM; Corpus Christi, TX; Orlando, FL; El Paso, TX; Lansing, MI; San Antonio, TX; Evansville, IN; Amarillo, TX; Knoxville, TN; Nashville, TN; Rochester, NY; Rutland, VT; Greeley, CO; Houston, TX; Reading, PA; St. Lucie County, FL; Lorain County, Ohio; Athens, GA; and Waco, TX. *See, e.g.*, T-Mobile Complaint Appendix A.

12.    Morningstar, "Communication Services Observer" (November 2022), at 30, 46 (lease figure is on a MHz-Pops basis).

13.    T-Mobile effectively admits its historic dominance in the purchase of EBS spectrum rights in its Complaint in this case: "Until an FCC rule change in April 2020, EBS licenses could be held only by educational institutions (and not commercial entities). To build its nationwide cellular and data network, T-Mobile leased much of that wireless spectrum from the educational institutions that hold the licenses. . . . At the time of this complaint, TMobile holds leases on more than 1,500 licenses for 2.5 GHz spectrum." T-Mobile Complaint at 2–3, 13.

reviewing and approving spectrum license sales and leases. Only the FCC can issue a new wireless spectrum license. 2.5 GHz spectrum is an extremely scarce, finite resource.

b. *Information costs.* Successful entry by a purchaser of an EBS license in a relevant market requires access to any existing lease terms that it will assume under the license. Without knowing the terms of the leases that will apply, license purchasers are unable to value the license accurately and determine a competitive price for it. T-Mobile has increased these barriers to entry significantly through its tight restrictions on disclosure of the terms of its leases, refusing to permit its license lessors to share critical information with prospective license purchasers such as WCO Spectrum. Because T-Mobile controls almost all EBS leases, its refusal to permit this information to be shared raises information cost barriers in the relevant markets to an extremely high level.

c. *Access to Capital.* The capital costs necessary to become an entrant in any relevant market are substantial, and economies of scale in the cost of capital cannot be reached without purchasing a nucleus of spectrum rights across multiple relevant markets. Certainly, WCO Spectrum is not able to implement its revolutionary vision described

above, which requires a critical mass of spectrum, apart
from access to extremely significant amounts of capital.

## T-MOBILE'S EXCLUSIONARY
## AND ANTICOMPETITIVE CONDUCT

43.    T-Mobile has willfully maintained its monopsony power in the
relevant markets in at least three anticompetitive and exclusionary ways:
(a) restrictive lease terms with EBS license holders designed to foil
competitive bidding; (b) defensive acquisitions of EBS licenses that
strengthen its monopsony; and (c) a campaign of lawfare and threats
designed to intimidate its EBS license lessors from seeking competitive
bids including selling competitively to WCO Spectrum. These actions
have allowed T-Mobile to suppress competition and maintain the
anticompetitively depressed prices it pays to license holders by blocking
competitive offers from at least WCO Spectrum.

### T-Mobile's Anticompetitive and Exclusionary Lease Provisions

44.    T-Mobile's lease contracts with EBS license holders have had
the effect of significantly raising its rival WCO Spectrum's costs and/or
excluding WCO Spectrum from the relevant markets, thereby insulating
and maintaining T-Mobile's monopsony pricing, through at least the
following lease terms:

a. *Exclusivity*.    T-Mobile's    EBS    leases    include    an
"Exclusivity" term providing that its FCC license lessors
"will not negotiate or contract with any third party to
lease, sell, assign, transfer or use any of the capacity of
the [license frequency] Channels." T-Mobile admits that

the effect of this "Exclusivity" term is to exclude WCO Spectrum from the relevant markets. For example, in an August 11, 2021 letter from T-Mobile's Senior Counsel to an attorney for the Christian College of Georgia, T-Mobile asserted that this provision prohibits its lessors from "[s]elling the [FCC] license to WCO . . . Selling the License to WCO obviously would constitute '[c]ontracting with [a] third party to . . . sell . . . any of the capacity of the Channels,' and therefore is not permitted under the exclusivity provision. . . . In short, the Lease does not permit the College to sell or assign the License to WCO."[14]

b. *Rights to receive information.* T-Mobile's leases also contain provisions, including a "Right to Participate," that require its lessors to produce extremely burdensome, unnecessary, and costly amounts of information in the event that the lessor receives a bid, offer, or proposal for the sale of its FCC license. T-Mobile's correspondence with its license lessors in response to WCO Spectrum purchase offers explains that these lease provisions require the production of large amounts of information to T-Mobile and asserts in effect that the terms of the lease grant to T-Mobile plenary

---

14.   August 11, 2021 Letter from Heather Brown, T-Mobile Senior Counsel, to James Johnston, Attorney for Christian College of Georgia.

control of the lessor-WCO Spectrum transaction.[15] These lease requirements have made (and make) it extremely difficult and costly for WCO Spectrum and EBS license holders to conclude the purchase and sale of EBS licenses that are under lease to T-Mobile. These leases have had the effect of discouraging the license lessor's efforts to seek competitive bids, raising significantly its rival WCO Spectrum's costs of completing procompetitive purchases of EBS licenses in the relevant markets, and raising barriers to entry in the relevant markets.

c. *Right of first refusal*. T-Mobile's leases also contain a right of first refusal (ROFR). This right permits T-Mobile to purchase the license and thereby maintain its monopsony position by foreclosing its sale to a competitor.[16] Furthermore, the ROFRs exist not only for the pendency of these long-term leases, but extend an additional 12 to 24 months beyond the term of the lease. Almost unbelievably, the ROFR thus gives T-Mobile the right to make a license purchase even after it is no longer leasing and using the licensed EBS spectrum. The effect of this perverse provision is to extend T-Mobile's

---

15.   *See* May 11, 2021 Letter from Heather Brown, T-Mobile Director of Legal Affairs, to Jeffrey L. Strader, Vice President for Finance and Strategic Partnerships, Albright College; March 17, 2022 Letter from Kenneth J. Brown of T-Mobile counsel Williams & Connolly, to Todd D. Gray, counsel for School Board of St. Lucie County, Florida (attaching 22 information requests).

16.   *See* T-Mobile Complaint Appendix A for a list of T-Mobile's exercises of its ROFR in response to license purchase offers from WCO Spectrum.

monopsony power to exclude competition even after it has ceased to derive any conceivable procompetitive benefit from utilizing the spectrum. The obvious benefit of the ROFR provisions rather is to further T-Mobile's ability to maintain and perpetuate its monopsony power. They have raised substantially the costs to WCO Spectrum and EBS licenses owners of completing purchases and sales that would increase competition in the relevant markets by wresting EBS licenses from T-Mobile's monopsonistic control.

45.    The above-described T-Mobile leases from FCC license holders cover the vast majority of EBS licenses. Furthermore, the leases are exceedingly long: typically, 30 years. The breadth and length of anticompetitive foreclosure in the relevant markets is extreme and act to lock-in the license holders.

46.    The T-Mobile leases foreclose WCO Spectrum and others from purchasing EBS licenses or, at the very least, significantly raise the costs of purchasing EBS licenses. Either way, the prices that EBS licensees can obtain for their spectrum rights remain suppressed well below competitive levels. Transactions in which WCO Spectrum has made an offer to a T-Mobile license owner have yielded 2–5 times the relative price to the EBS holder when compared to transactions in which T-Mobile is the sole offeror.

47.    One victim of T-Mobile anticompetitive lease provisions, Christian College of Georgia, explained to the FCC in 2021:

> T-Mobile has made the stunning claim [under its lease] that as mere lessee it controls to whom its lessor, licensee Christian College, can sell: it can only sell to T-Mobile. T-Mobile first made this claim after learning that the college had received an unsolicited offer for its license of $5.526 million from the private investment company WCO Spectrum. T-Mobile's counteroffer was $1 million or 18% of WCO Spectrum's offer. Although the Commission has clearly ruled EBS licensees are free to sell, T-Mobile, which holds a majority position in the 2,046 EBS leases, ignores the precedent. . . . The $5.526 million offered by WCO will advance the college's educational needs far more than having that money tied up in a wireless broadband system, the annual rent from which is but a fraction of what the college can realize from an outright sale . . . T-Mobile claims [its EBS] leases contain a Hobson['s] Choice for licensees. Either sell to T-Mobile, or don't sell at all.[17]

Despite the attractive nature of WCO Spectrum's offer, the tiny Christian College of Georgia ultimately withdrew from the offer.

48.    Additional examples of the anticompetitive effect on EBS license prices flowing from T-Mobile's exclusionary lease provisions include, inter alia: (a) WCO Spectrum made an offer to purchase La Roche University's EBS license for $13,000,000, in response to which T-Mobile offered between $3,000,000 and $4,000,000. T-Mobile ultimately

---

17.    Petition for Declaratory Ruling of Christian College of Georgia, Inc., *In The Matter of the Right of EBS Licensees To Sell* (November 3, 2021), at 3, 14, 16.

exercised its ROFR, matching WCO Spectrum's offer and evidencing that the competitive market price was only reached because of competition from WCO Spectrum; and (b) WCO Spectrum offered Albright College $16,200,000 for its EBS license, in response to which T-Mobile, perched in its lease-insulated monopsony position, offered only about $4,000,000. While the exact amount is unknown to WCO Spectrum, Albright ended up selling its license to T-Mobile at a much lower price than that offered by WCO Spectrum.

49.    In sum, the effect of the provisions in T-Mobile's leases with EBS license holders is to protect and enhance T-Mobile's monopsony power by unreasonably restraining competition in the relevant markets. T-Mobile's leases: (a) preclude outright the sale of EBS licenses to anyone but T-Mobile; (b) impose substantial costs on WCO Spectrum and the license seller to bring any transaction to completion; and are backstopped by (c) T-Mobile's right of first refusal—which permits it ultimately to block the acquisition of its lessor's EBS license by any competitor. The effect of these anticompetitive lease provisions in the relevant markets is to allow T-Mobile to maintain its monopsony to the concurrent detriment of EBS license holders and competitors like WCO Spectrum. T-Mobile's anticompetitive actions significantly drop the spectrum rights purchase prices received by EBS license holders, and block companies including WCO Spectrum from entry into the marketplace.

### T-Mobile's Anticompetitive License Purchases

50.    T-Mobile's second anticompetitive course of conduct involves anticompetitive license purchases. Since the FCC changed its rules in 2020 to allow commercial entities to hold EBS licenses, T-Mobile has

defensively purchased over 500 EBS licenses of the roughly 2200 that exist. These acquisitions have insulated and enhanced T-Mobile's existing monopsony power in the relevant markets by raising entry barriers and foreclosing competitive purchases by WCO Spectrum and any other competitors.

51.    Each time T-Mobile exercised its ROFR to block an EBS license purchase by WCO Spectrum and made that purchase itself, it foreclosed competition from WCO Spectrum in that relevant market. Even though competition from WCO Spectrum had forced T-Mobile to pay a higher price for the EBS license than the monopsonistic price it would have paid, the competitive presence of WCO Spectrum in the relevant market was reduced or eliminated by T-Mobile's purchase.

## T-Mobile's Intimidation of EBS License Holders and Sham Litigation

52.    Finally, T-Mobile's third tactic: Commencing shortly after WCO Spectrum refused to accept T-Mobile's invitation to rig bids, T-Mobile began a blitzkrieg of threats and intimidation of its mostly small, underfunded EBS lessors that had the effect of substantially raising WCO Spectrum's costs of competing in, and/or excluding altogether, WCO Spectrum from the relevant markets, as well as significantly raising entry barriers for all potential competitors in the relevant markets.

53.    On May 27, 2021, TDI Acquisition Sub, LLC, a holding company subsidiary of T-Mobile, sued its lessor Albright College in the Berks County Court of Common Pleas, Pennsylvania in response to WCO Spectrum's offer to purchase Albright's EBS license in Reading, PA, for $16,200,000. This was a vast sum that would have funded scholarships

and numerous programs for this underfunded minority-focused college. T-Mobile filed a baseless complaint without regard to its merits for declaratory relief against Albright, alleging that WCO Spectrum's offer was not "*bona fide*" under T-Mobile's lease terms (see infra). In this case T-Mobile succeeded in using the process (as opposed to any outcome) to thwart the sale. Albright College and WCO Spectrum never completed a deal for Albright's EBS license. A small liberal arts college, Albright lacked the financial resources and appetite to litigate with T-Mobile. Instead, Albright abandoned the transaction with WCO, and T-Mobile withdrew its complaint—settling so long as Albright agreed not to sell its EBS license to WCO Spectrum.

54.    T-Mobile used the *Albright* case also to impose substantial costs on WCO Spectrum by pursuing extraordinarily invasive competitive research into WCO Spectrum via non-party subpoenas. The issued subpoenas were broad in scope, seeking sensitive information pertinent to WCO Spectrum's strategies that bore no relevance to the transaction with Albright College.[18] The case was an abuse-of-process vehicle not only to use the process to torment Albright, but to make an example for other

_____

18.    In fact, to stop the abusive and anticompetitive discovery by T-Mobile, Albright and WCO Spectrum made binding representations to the Berks County court that they would not complete a transaction, rendering the Albright Case moot. Nevertheless, T-Mobile continued to press its multijurisdictional subpoenas seeking intrusive and irrelevant discovery to a now-mooted action. T-Mobile abused the judicial process by instigating numerous hearings in Delaware and Virginia to enforce the subpoenas designed to learn everything about WCO Spectrum's business, its acquisition strategy, its market models, and financing – all while creating enormous litigation expense for WCO Spectrum. WCO Spectrum succeeded in limiting the scope of T-Mobile's subpoenas to only those documents pertinent to the transaction underlying its cause of action: WCO Spectrum's possible purchase of Albright College's EBS License. WCO Spectrum nevertheless had to produce 11,448 pages of documents to T-Mobile concerning the potential transaction between WCO Spectrum and Albright College.

educational institutions that might consider doing a deal with WCO Spectrum.

55.    Apparently not all educators got the message. So, on March 25, 2022, NSAC, LLC (another subsidiary of T-Mobile) sued its lessor the School Board of St. Lucie County, Florida. WCO Spectrum had made an offer to purchase St Lucie's two EBS licenses for $7,550,000. After threatening litigation, T-Mobile filed a baseless complaint nearly identical to its complaint in the Albright matter, seeking to block the sale of the license under the parties' lease. Faced with a lawsuit that could bankrupt the school district, St. Lucie withdrew from the agreement to sell its EBS licenses to WCO Spectrum.

56.    On April 14, 2023, T-Mobile filed a third baseless lawsuit against Lorain County Community College ("LCCC"), another of its lessors that proposed to sell its EBS license to WCO Spectrum. LCCC declared that it would accept WCO Spectrum's offer if T-Mobile did not match it. As a result of the tremendous costs imposed on WCO Spectrum and LCCC by the lawsuit, the sale to WCO Spectrum was abandoned, and T-Mobile withdrew its complaint.[19]

57.    T-Mobile also threatened dozens of other lawsuits, verbally or in writing, against its lessors in cases where WCO Spectrum had made offers to purchase EBS licenses and circulated copies of the Albright

---

19.    In addition, on May 6, 2022, T-Mobile commenced another lawsuit in Philadelphia County, this one against WCO Spectrum itself. But it did not file a complaint. Instead, T-Mobile petitioned the Philadelphia court to permit it pre-complaint discovery. After a lengthy hearing, the Philadelphia court rejected T-Mobile's request and entered a protective order against T-Mobile. Unable to further pursue its cost-imposing discovery through the Philadelphia lawsuit, T-Mobile eventually dismissed its lawsuit without ever filing a complaint.

complaint. Word spread quickly in the educational community, and WCO Spectrum's efforts to solicit bids were met with timid and fearful responses from EBS license holders, who were extremely reluctant to incur the huge costs of battling their behemoth lessee T-Mobile in court. As stated by Christian College of Georgia to the FCC: "Christian College viewed the letter [from TMO Senior Counsel Heather Brown regarding a proposed license sale to WCO Spectrum] as a threat of court litigation if it negotiated with WCO. It couldn't afford a court fight with T-Mobile. It did not desire to play David to T-Mobile's Goliath."[20]

58.    License holders that T-Mobile threatened with lawsuits include, inter alia: Christian College of Georgia; La Roche University; Pasadena Unified School District; Education Service Center Region 12, Texas; New Trier High School; and Radio Training Network (RTN). RTN, for example, accepted a $4.5 million offer for its EBS license from WCO Spectrum. After being threatened by T-Mobile's counsel in a phone call, and being sent T-Mobile's Albright College complaint, RTN withdrew from its agreement to sell to WCO Spectrum.

59.    T-Mobile's many lawsuits and threatened lawsuits were all objectively baseless. T-Mobile's lawsuits and threats included misrepresenting to its EBS license holders applicable law, FCC rules, and the meaning of contractual provisions. For example, T-Mobile's ROFR lease provisions state that it has the right to acquire the holder's EBS license on the same terms as any "*bona fide*" third party offer received by the license holder. T-Mobile, however, has interpreted the term "*bona*

---

20.    Petition for Declaratory Ruling of Christian College of Georgia, Inc., *In The Matter of the Right of EBS Licensees To Sell* (November 3, 2021), at 6.

*fide*" so broadly as to give itself effective veto power over proposed transactions with WCO Spectrum, and to require the production of burdensome amounts of information before it will even consider whether an offer can be deemed "*bona fide*." T-Mobile's lawsuits and threats of lawsuits did not constitute genuine petitioning, but instead sought to use the process as an anticompetitive weapon that would interfere directly with the business relationships of a competitor, WCO Spectrum.

60.    T-Mobile's pattern of lawsuits and threats of lawsuits were brought under a T-Mobile policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival, WCO Spectrum. They were made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings and threats of filings undertaken essentially for purposes of harassment. That T-Mobile has acted without regard to the success of its lawsuits against lessors proposing license sales to WCO Spectrum is evidenced by the fact that it has never followed through on them. T-Mobile has never litigated one of these cases to finality or a damages award. Instead, it has withdrawn each baseless lawsuit after the license holder's transaction with WCO Spectrum has fallen through due to the costs imposed on the license holder and WCO Spectrum by the lawsuit.

61.    The purpose and effect of T-Mobile's lawsuits and threatened lawsuits has been to impose direct restraints in the relevant markets and on its rival WCO Spectrum by raising substantially the costs to T-Mobile's lessors and rivals of overcoming its monopsony maintenance scheme. T-Mobile's lawsuits and numerous threats have created a reputation across the relevant markets that it will sue lessors that deal with WCO

Spectrum, which in itself has imposed significant costs on WCO Spectrum in dealing with any of T-Mobile's lessors, without T-Mobile having to incur the additional costs of litigating with each lessor. T-Mobile's campaign of intimidation of license holders approached by WCO Spectrum has thereby also raised entry barriers in the relevant markets substantially.

62.    The effect of T-Mobile's monopsonistic campaign to frighten its license holders through lawfare is to foreclose WCO Spectrum or others from purchasing EBS licenses and/or to raise significantly their costs of doing so, with the result that the prices EBS license holders can obtain for their spectrum rights are suppressed well below competitive levels. Again, transactions in which WCO Spectrum has made an offer to a T-Mobile license owner have yielded 2–5 times the relative price to the EBS license holder when compared to transactions in which T-Mobile is the sole offeror.

### ANTITRUST INJURY

63.    Sellers in a monopsony case have the same antitrust protections as buyers in a monopoly case. One key harm of monopsonistic conduct is price suppression: forcing sellers to accept prices ***below*** competitive levels.

64.    T-Mobile's actions excluded WCO Spectrum from the marketplace and forced EBS license sellers to accept lower prices. In other words, the same conduct that harmed "consumers" (or, in this case, sellers) also harmed the competitive process and WCO Spectrum. T-Mobile's exclusionary leases and other conduct thus have harmed both EBS/BRS spectrum rights sellers and WCO Spectrum.

65.     Because T-Mobile's exclusion of WCO Spectrum from the market is what suppresses and maintains the prices sellers can obtain below competitive levels, and WCO's injury arises from that same conduct, WCO Spectrum's injury is the type of injury the antitrust laws were intended to prevent, and it flows from that which makes T-Mobile's acts unlawful.

## CAUSATION/INJURY-IN-FACT

66.     As a result of T-Mobile's anticompetitive conduct and contracts, the relevant markets have been unlawfully affected, leading to and maintaining sub-competitive, monopsonistic prices for EBS/BRS spectrum rights, and to the exclusion of competing purchasers such as WCO Spectrum from, and/or to the significantly raised costs of competing purchasers such as WCO Spectrum in, the relevant markets.

67.     As a result of T-Mobile's anticompetitive conduct and exclusionary practices, WCO Spectrum has suffered threatened and actual antitrust injury by being excluded from purchasing EBS/BRS spectrum rights, thereby suffering actual losses, lost license purchases, and lost profits.

68.     WCO Spectrum therefore seeks an award of damages in an amount to be proven at trial, as well as injunctive relief precluding T-Mobile from continuing its exclusionary practices, including injunctive relief against the anticompetitive and exclusionary provisions contained in its leases with EBS license holders.

**INTERSTATE COMMERCE**

69.    The activities of the parties that are the subject of these Counterclaims are within the flow of, and have substantially affected, interstate trade and commerce.

70.    The various activities and conduct that are the subject of these Counterclaims occurred and are occurring across state lines.

**COUNTERCLAIM I**
**Monopsonization**
**15 U.S.C. § 2**

71.    WCO Spectrum realleges and incorporates all previous paragraphs of its counterclaim.

72.    T-Mobile has monopsony power in the relevant markets for EBS/BRS spectrum rights. T-Mobile is actively excluding competition and controlling price at sub-competitive levels as described throughout this counterclaim complaint. In addition to its monopsony market shares and significant barriers to entry, this demonstrates T-Mobile's monopsony power.

73.    Through its anticompetitive and exclusionary conduct, T-Mobile has unlawfully maintained its monopsony power in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

74.    T-Mobile could not maintain its substantial monopsony power in the relevant markets for EBS/BRS spectrum rights but for its anticompetitive and exclusionary agreements with EBS license holders, its anticompetitive purchases of EBS licenses, its sham lawsuits and threats of lawsuits, and its other anticompetitive conduct.

75.     T-Mobile's conduct maintaining and enhancing its monopsony power has harmed competition in the relevant markets by causing sub-competitive, monopsonistic purchase prices for EBS/BRS spectrum rights and by excluding and/or raising substantially the costs of WCO Spectrum, a competitor bidding purchase prices to EBS license holders up to competitive levels. Among other things, T-Mobile's conduct has harmed competition by reducing EBS license-holder choice, suppressing prices below competitive levels, and curtailing and/or blocking introduction of new competition in the relevant markets by WCO Spectrum.

76.     There is no legitimate business justification for T-Mobile's exclusionary and anticompetitive conduct that has caused antitrust injury, and continues to cause antitrust injury, to WCO Spectrum, and no purported justification would outweigh the considerable harm to competition in the relevant markets from T-Mobile's conduct.

77.     T-Mobile's monopsony maintenance, and the effects of that conduct in the relevant markets, have directly caused antitrust injury and damage, and continue to cause antitrust injury and damage, to WCO Spectrum's business and property by, among other things, blocking WCO Spectrum's purchases of EBS spectrum rights and raising WCO Spectrum's costs of pursuing and completing transactions that are beneficial to EBS spectrum license holders. WCO Spectrum will suffer additional damage in the future if T-Mobile is permitted to continue its monopsonistic conduct. WCO Spectrum has thereby suffered lost license sales to it by license holders and lost profits in the relevant markets. T-Mobile's conduct continues to threaten injury to WCO Spectrum's business and property, thereby justifying permanent injunctive relief.

## COUNTERCLAIM II
### Attempted Monopsonization
### 15 U.S.C. § 2

78. WCO Spectrum realleges and incorporates all previous paragraphs of its counterclaim.

79. Through its anticompetitive and exclusionary conduct, T-Mobile has unlawfully attempted to monopsonize the relevant markets for EBS/BRS spectrum rights in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

80. T-Mobile's conduct establishes a specific intent to destroy competition or build monopsony in the relevant markets for EBS/BRS spectrum rights. T-Mobile's specific intent to monopsonize is also evidenced in that much of its exclusionary conduct followed its rejected invitation to WCO Spectrum to cartelize bid prices in the relevant markets.

81. Because of T-Mobile's significant market power in the relevant markets for EBS/BRS spectrum rights, its exclusionary conduct creates a dangerous probability that T-Mobile will obtain monopsony power in the relevant markets, including the power to unilaterally exclude competition, eliminate innovation, and/or suppress EBS/BRS spectrum rights purchase prices.

82. T-Mobile's attempted monopsonization has harmed competition in the relevant markets by causing sub-competitive purchase prices for EBS/BRS spectrum rights and by excluding and/or raising substantially the costs of WCO Spectrum, a competitor bidding purchase prices to EBS license holders up to competitive levels. Among other things, T-Mobile's conduct has harmed competition by reducing EBS

license holder choice, suppressing prices below competitive levels, and curtailing and/or blocking introduction of new competition in the relevant markets by WCO Spectrum.

83.     There is no legitimate business justification for T-Mobile's exclusionary and anticompetitive conduct that has caused antitrust injury, and continues to cause antitrust injury, to WCO Spectrum, and no purported justification would outweigh the considerable harm to competition in the relevant markets from T-Mobile's conduct.

84.     T-Mobile's attempted monopsonization, and the effects of that conduct in the relevant markets, have directly caused antitrust injury and damage, and continue to cause antitrust injury and damage, to WCO Spectrum's business and property by, among other things, blocking WCO Spectrum's purchases of EBS spectrum rights and raising WCO Spectrum's costs of pursuing and completing transactions that are beneficial to EBS spectrum license holders. WCO Spectrum will suffer additional damage in the future if T-Mobile is permitted to continue its monopsonistic conduct. WCO Spectrum has thereby suffered lost license sales to it by license holders and lost profits in the relevant markets. T-Mobile's conduct continues to threaten injury to WCO Spectrum's business and property, thereby justifying permanent injunctive relief.

## COUNTERCLAIM III
### Agreement in Restraint of Trade
### 15 U.S.C. § 1

85.     WCO Spectrum realleges and incorporates all previous paragraphs of its counterclaim.

86. T-Mobile entered into anticompetitive, exclusionary lease agreements with EBS spectrum license holders. Each lease agreement constitutes a "contract, combination . . . or conspiracy" within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

87. T-Mobile's monopsony power alleged above constitutes "market power" under Section 1 of the Sherman Act, 15 U.S.C. § 1.

88. T-Mobile's anticompetitive, exclusionary lease agreements affect a substantial amount of commerce in the relevant markets for EBS/BRS spectrum rights.

89. T-Mobile's anticompetitive, exclusionary lease agreements have unreasonably restrained trade and harmed competition in the relevant markets for EBS/BRS spectrum rights in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by causing sub-competitive purchase prices for EBS/BRS spectrum rights and by excluding and/or raising substantially the costs of WCO Spectrum, a competitor bidding purchase prices to EBS license holders up to competitive levels. Among other things, T-Mobile's lease contracts have harmed competition by reducing EBS license holder choice, suppressing prices below competitive levels, and curtailing and/or blocking introduction of new competition in the relevant markets by WCO Spectrum.

90. There is no legitimate business justification for T-Mobile's exclusionary and anticompetitive lease provisions that have caused antitrust injury, and continue to cause antitrust injury, to WCO Spectrum, and no purported justification would outweigh the considerable harm to competition in the relevant markets from the restraints contained in T-Mobile's leases with EBS license holders.

91.    T-Mobile's anticompetitive and exclusionary lease agreements have directly caused antitrust injury and damage, and continue to cause antitrust injury and damage, to WCO Spectrum's business and property by, among other things, blocking WCO Spectrum's purchases of EBS spectrum rights and raising WCO Spectrum's costs of pursuing and completing transactions that are beneficial to EBS spectrum license holders. WCO Spectrum will suffer additional damage in the future if T-Mobile is permitted to maintain its anticompetitive lease terms with EBS license holders. WCO Spectrum has thereby suffered lost license sales to it by license holders and lost profits in the relevant markets. T-Mobile's conduct continues to threaten injury to WCO Spectrum's business and property, thereby justifying permanent injunctive relief.

## COUNTERCLAIM IV
### Agreement in Violation of California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 et seq.

92.    WCO Spectrum realleges and incorporates all previous paragraphs of its counterclaim.

93.    T-Mobile's lease agreements with its license holder lessors, as alleged above, constitute concerted action that is an unreasonable restraint of trade or commerce throughout California and the United States in violation of the Cartwright Act, §§ 16720 et seq. of the California Business and Professions Code. The leases had and have the effect of eliminating competition in the relevant markets and ensuring that T-Mobile maintained and continues to maintain its monopsony power in the relevant markets.

94.    WCO Spectrum has been injured as a direct and proximate result of the T-Mobile lease agreements and surrounding conduct. In

addition, sellers in the relevant markets have been harmed by the actions of T-Mobile, and that harm is ongoing. The lease agreements have had the effect of decreasing sales prices in the relevant markets below competitive levels, as well as reducing market innovation.

95.    As a result of T-Mobile's conduct, and the harm to competition caused by it, WCO Spectrum has suffered substantial injuries to its business and property in an amount to be proven at trial and automatically trebled, as provided by the Cartwright Act.

96.    WCO Spectrum is also entitled to recover from T-Mobile the costs of suit, including reasonable attorneys' fees, as provided by § 16750(a) of the California Business and Professions Code.

## COUNTERCLAIM V
### Unfair Competition in Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq.

97.    WCO Spectrum realleges and incorporates all previous paragraphs of its counterclaim.

98.    By the acts alleged above, T-Mobile has engaged, and continues to engage, in unlawful and unfair business acts or practices in violation of California Business and Professions Code §§ 17200 et seq. ("California's Unfair Competition Law").

99.    T-Mobile has violated the Sherman Act and the Cartwright Act, and thus T-Mobile has violated California's Unfair Competition Law.

100. T-Mobile's acts and business practices, whether or not in violation of the Sherman Act or Cartwright Act, constitute unfair methods of competition in violation of California's Unfair Competition Law.

101.  T-Mobile's acts and business practices are otherwise unfair within the meaning of California's Unfair Competition Law, and thus T-Mobile has violated California's Unfair Competition Law.

102.  T-Mobile's unlawful and unfair business acts and practices significantly threaten and harm competition in the relevant markets alleged above.

103.  WCO Spectrum seeks, and is entitled to, all forms of relief available under California's Unfair Competition Law. Pursuant to § 17203, WCO Spectrum seeks from T-Mobile restitution and disgorgement of all earnings, profits, compensation, benefits, and other ill-gotten gains obtained by T-Mobile as a result of its conduct in violation of Cal. Bus. & Prof. Code §§ 17200 et seq.

104.  T-Mobile should also be permanently enjoined from continuing its violations of California Business and Professions Code § 17200, as provided by § 17203 of the California Business and Professions Code. Without injunctive relief, WCO Spectrum will continue to suffer irreparable injury as a result of T-Mobile's unlawful conduct. WCO Spectrum's remedy at law is not by itself adequate to compensate WCO Spectrum for the harm inflicted and threatened by T-Mobile.

**COUNTERCLAIM VI**
**Intentional Interference with**
**Prospective Economic Advantage Under California Law**

105. WCO Spectrum realleges and incorporates all previous paragraphs of its counterclaim.

106. At the time of WCO Spectrum's anticompetitive and exclusionary conduct, WCO Spectrum was engaged in negotiations with T-Mobile EBS license holders, as described above, and WCO Spectrum

also anticipated engaging in similar negotiations with other T-Mobile EBS license holders. The combined value of that business to WCO Spectrum, while subject to proof at trial, was at least tens of millions of dollars.

107. T-Mobile was aware of WCO Spectrum's negotiations with EBS license holders, and its prospective negotiations with other EBS license holders, and undertook the anticompetitive and unlawful scheme described above to undermine WCO Spectrum's negotiations and ensure that WCO Spectrum was not awarded contracts for purchase of the licenses.

108. Through its conduct, T-Mobile intended to, and did, disrupt WCO Spectrum's relationships with EBS license holders.

109. WCO Spectrum's relationships with EBS license holders were ultimately disrupted by T-Mobile's scheme, as such license holders informed WCO Spectrum that they could not award WCO Spectrum their business because of the tremendous costs imposed on them and threats levied at them by T-Mobile.

110. WCO Spectrum has been injured in its business or property by the loss of profits, by the loss of license sellers and potential sellers, by the loss of goodwill and business image, and by the prospective destruction of its business. T-Mobile's conduct was a substantial factor in causing this harm.

111. T-Mobile's conduct was intentional and deprived WCO Spectrum of business opportunities in violation of the law, and otherwise caused injury and was despicable conduct that subjected WCO Spectrum

to cruel and unjust hardship and oppression in conscious disregard of its

rights, so as to justify an award of exemplary and punitive damages.

112.   Unless enjoined, T-Mobile's conduct is likely to persist and will

continue to cause irreparable loss and damage to WCO Spectrum for

which WCO Spectrum has no adequate remedy at law.

## REQUEST FOR RELIEF

WHEREFORE, WCO Spectrum requests that this Court:

A.    Enter judgment against T-Mobile;

B.    Declare that T-Mobile's conduct violates 15 U.S.C. §§ 1
& 2;

C.    Declare that T-Mobile's conduct violates the California
Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 et seq., the
California Unfair Competition Law, Cal. Bus. & Prof. Code
§§ 17200 et seq., and California Law governing Intentional
Interference with Prospective Economic Advantage.

D.    Enjoin T-Mobile from continuing its unlawful acts;

E.    Award WCO Spectrum three times its actual damages
under 15 U.S.C. § 15 in an amount to be determined at trial;

F.    Award WCO Spectrum its costs and expenses of this
action, including its reasonable attorneys' fees necessarily
incurred in bringing and pressing this case, as provided in 15
U.S.C. §§ 15, 26;

G.    Award WCO Spectrum its pre- and post- judgment
interest at the applicable rates on all amounts awarded;

H.     Enjoin T-Mobile from enforcing the anticompetitive and exclusionary lease provisions with EBS lease holders described above;

I.      Grant permanent injunctive relief to prevent the recurrence of the violations for which redress is sought in this complaint;

J.     Award WCO Spectrum all the relief to which it is entitled under the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 et seq., the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq., and California Law governing Intentional Interference with Prospective Economic Advantage; and

K.     Order any other such relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

WCO Spectrum demands a trial by jury of all issues in this action so triable.


DATED: March 31, 2025

                                                    */s/ Aaron Gott*
                                                    AARON GOTT

                                                    **BONA LAW PC**
                                                    Aaron Gott (314264)
                                                    331 2nd Avenue South, Suite 420
                                                    Minneapolis, MN 55401
                                                    (612) 284-5001
                                                    aaron.gott@bonalawpc.com

                                                    Jarod Bona (234327)
                                                    4275 Executive Square, Suite 200
                                                    La Jolla, CA 92037

(858) 964-4589
jarod.bona@bonalawpc.com

Pat Pascarella (*phv* pending)
100 Crescent Court, #700 – 3425
Dallas, TX 75201
(469) 296-7716
pat.pascarella@bonalawpc.com

**JAMES LYNCH, ESQ.**
James Lynch (*phv* pending)
1101 S Arlington Ridge Rd., #804
Arlington, VA 22202
(571) 212-5519
jmlynch@antitrustassociates.com

**MITTS LAW, LLC**
Maurice R. Mitts (admitted *phv*)
1822 Spruce Street
Philadelphia, PA 19103
(215) 866-0112
mmitts@mittslaw.com

**WINNICK LAW, PC**
Alexander H. Winnick, Esq.
2450 Colorado Ave., Suite 100E
Santa Monica, CA 90404
p: (424) 317-7411
c: (310) 415-5594
aw@winlawpc.com

*Counsel for WCO Spectrum LLC,
Academia Spectrum LLC, Carl
Katerndahl, Andreas Bitzarakis,
Tyler Kratz and Karen Winnick*