UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES – GENERAL

| Case No. | 2:23-cv-04347-AH-(Ex) | Date | October 31, 2025 |
| --- | --- | --- | --- |
| Title | *T-Mobile US, Inc. et al. v. WCO Spectrum LLC et al.* | | |

Present: The Honorable   Anne Hwang, United States District Judge

| Yolanda Skipper | Not Reported |
| --- | --- |
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
| --- | --- |
| None Present | None Present |

**Proceedings:   (IN CHAMBERS) ORDER GRANTING PLAINTIFFS' MOTION TO DISMISS COUNTERCLAIMS (DKT. NO. 149)**

Before the Court is a Motion to Dismiss Counterclaims ("Motion") filed by Plaintiffs and Counter-Defendants T-Mobile US, Inc.; Clearwire Spectrum Holdings LLC; Clearwire Spectrum Holdings II LLC; Clearwire Spectrum Holdings III LLC; Fixed Wireless Holdings LLC; NSAC LLC; TDI Acquisition Sub LLC; and WBSY Licensing LLC (collectively, "T-Mobile"), Dkt. No. 149. Defendant and Counter-Claimant WCO Spectrum LLC ("WCO") opposed, Dkt. No. 167, and T-Mobile replied, Dkt. No. 173. WCO then applied ex parte for leave to file a Sur-reply, Dkt. No. 176, which T-Mobile opposed, Dkt. No. 178.[1] The Court heard oral argument on October 29, 2025. For the following reasons, the Court GRANTS the Motion.

---

[1] The Court has reviewed and considered the proposed Sur-reply in the interest of judicial economy and efficiency, and therefore GRANTS the ex parte application, without reaching whether good cause exists.

## I.   BACKGROUND[2]

On June 2, 2023, T-Mobile filed a complaint against Defendants alleging that they engaged in a scheme to defraud T-Mobile in connection with Educational Broadband Service licenses.  Dkt. No. 1.  The Court denied WCO's motion to dismiss, Dkt. No. 117, and WCO filed its Answer with Counterclaims, alleging that "T-Mobile is a monopsonist in the market for 2.5 GHz spectrum."  Answer, Affirmative Defenses, & Counterclaims ("Countercl."), Dkt. No. 132, at 55.  T-Mobile moves to dismiss these antitrust Counterclaims.  The Court summarizes the relevant facts from WCO's Counterclaims for purposes of this Motion.

The Federal Communications Commission ("FCC") issued "Educational Broadband Service" ("EBS") licenses and "Broadband Radio Service" ("BRS") licenses for radio frequencies in the "2.5 GHz band" of wireless spectrum.  Countercl. ¶ 17.  There are 20 EBS frequency channels and 13 BRS frequency channels, in addition to a number of small buffer channels.  *Id.*  BRS spectrum has always been available for commercial use.  *Id.* ¶ 18.  EBS licenses originally were only allowed to be held by educational institutions, but the FCC permitted educational institutions to lease their EBS spectrum rights to commercial users, and then in 2020, allowed EBS license holders to sell their license rights to commercial entities.  *Id.*

Formed in 2020 in response to the FCC rule change, WCO developed a business model of purchasing and leasing EBS licenses as a third-party investor.  *Id.* ¶ 19.  WCO's intended spectrum sharing business would result in more efficient utilization of spectrum, benefits to consumers in network quality, and reductions in the cost of delivering wireless services.  *Id.* ¶ 20.  WCO's plan was to use spectrum sharing to lease its acquired EBS licenses to T-Mobile, AT&T, Verizon, or others when the leases covering those licenses expire.[3]  *Id.* ¶ 21.  WCO alleges that "[t]hird-party ownership of spectrum by WCO Spectrum (and potentially others) . . . allows sophisticated financial arrangements new to the spectrum class that will serve to facilitate a transition to spectrum-sharing in the 2.5 GHz band, resulting in lower operating costs for wireless carriers that will benefit consumers."  *Id.* ¶ 22.

---

[2] All facts stated herein are taken from the allegations in WCO's Counterclaims unless otherwise indicated.  The Court assumes the truth of the factual allegations in the Counterclaims solely for the purpose of deciding this Motion.
[3] WCO's plan is the subject of T-Mobile's complaint.

Since 2020, T-Mobile has purchased over 500 of the 2,200 existing EBS licenses. *Id.* ¶ 50. T-Mobile presently owns or leases about 90% of licenses in the 2.5 GHz band. *Id.* ¶¶ 18, 40. WCO alleges the following conduct used by T-Mobile "to suppress competition and maintain the anticompetitively depressed prices it pays to license holders by blocking competitive offers from at least WCO Spectrum," *id.* ¶ 43:

(1) T-Mobile's EBS leases include an "exclusivity" term providing that lessors "will not negotiate or contract with any third party to lease, sell, assign, transfer or use any of the capacity of the [license frequency] Channels." *Id.* ¶ 44(a). WCO provides as an example a 2021 T-Mobile letter to Christian College of Georgia asserting that the provision prohibits it from selling the FCC license to WCO. *Id.* ¶¶ 44(a), 47. According to WCO, the leases "preclude outright the sale of EBS licenses to anyone but T-Mobile." *Id.* ¶ 49.

(2) T-Mobile's leases contain a "right to participate" provision that requires lessors to produce costly amounts of information in the event the lessor receives a bid. *Id.* ¶ 44b.

(3) T-Mobile's leases contain a right-of-first-refusal ("ROFR") provision permitting T-Mobile to match a bona fide offer and purchase the license, which extends beyond the pendency of the lease. *Id.* ¶ 44(c). Transactions in which WCO made an offer have yielded two to five times the price to the license holder when compared to transactions in which T-Mobile was the sole offeror. *Id.* ¶¶ 46, 62. WCO provides as examples T-Mobile exercising its ROFR and matching WCO's offer for La Roche University's EBS license, as well as purchasing Albright College's EBS license "at a much lower price than that offered by WCO Spectrum," although the "exact amount is unknown to WCO Spectrum." *Id.* ¶ 48.

(4) T-Mobile defensively purchased over 500 EBS licenses of the roughly 2,200 that exist. *Id.* ¶ 50.

(5) T-Mobile engaged in "threats and intimidation of its mostly small, underfunded EBS lessors that had the effect of substantially raising WCO Spectrum's costs of competing in, and/or excluding altogether, WCO Spectrum from the relevant markets, as well as significantly raising entry barriers for all potential competitors in the relevant markets." *Id.* ¶ 52. WCO provides as examples litigation with Albright College, *id.* ¶ 53, the School Board of St. Lucie County, Florida, *id.* ¶ 55, Lorain County Community College, *id.* ¶ 56, as well as threatened lawsuits to several other institutions, *id.* ¶ 58.

WCO brings Counterclaim I for monopsonization under 15 U.S.C. § 2; Counterclaim II for attempted monopsonization under 15 U.S.C. § 2; Counterclaim III for agreement in restraint of trade under 15 U.S.C. § 1; Counterclaim IV for agreement in violation of California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, *et seq.*; Counterclaim V for unfair competition in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; and Counterclaim VI for intentional interference with prospective economic advantage under California law. *See generally* Countercl.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed because of a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A dismissal under a 12(b)(6) motion can be based on either a "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (internal quotation marks and citation omitted). On a 12(b)(6) motion, courts accept as true all well-pleaded allegations of material fact and construe them in a light most favorable to the non-moving party. *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1030–31 (9th Cir. 2008). To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not" suffice. *Id.* (internal quotation marks and citation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 545. A court may consider the allegations contained in the pleadings, as well as exhibits attached to or referenced in the complaint, and matters properly subject to judicial notice in ruling on a motion to dismiss. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

Leave to amend a dismissed complaint should be granted unless it is clear the complaint cannot be saved by any amendment. Fed. R. Civ P. 15(a); *see Manzarek*, 519 F.3d at 1031. A "district court may dismiss without leave where a plaintiff's proposed amendments would fail to cure the pleading deficiencies and amendment would be futile." *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011). Otherwise, leave to amend shall be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2).

## III.    DISCUSSION

### A.    Requests for Judicial Notice

"As a general rule, [courts] may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *U.S. v. Corinthian Colleges,* 655 F.3d 984, 998 (9th Cir. 2011) (citation and quotation marks omitted). "[Courts] may, however, consider materials that are submitted with and attached to the Complaint," as well as "unattached evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." *Id.* at 999 (citation omitted). Courts may also take judicial notice of information "not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see, e.g.*, *Bhatia v. Silvergate Bank*, 725 F. Supp. 3d 1079, 1101 (S.D. Cal. 2024) ("[A] court may consider documents properly subject to judicial notice, including the existence of court dockets and filings in related proceedings, . . . [but] cannot take judicial notice of those documents for the truth of any matter asserted therein.").

T-Mobile requests that the Court take judicial notice of various court filings and orders in prior lawsuits it filed against lessor schools, such as Albright College. T-Mobile's Request for Judicial Notice ("RJN"), Dkt. No. 149-2. WCO opposes, Dkt. No. 168, and itself requests that the Court take judicial notice of court filings from the bankruptcy case *In re: The Roman Catholic Diocese of Rockville Centre, New York*, No. 20-12345 (S.D.N.Y. Bankr.). WCO's RJN, Dkt. No. 169. T-Mobile replied in support of its own RJN, Dkt. No. 173-1, and did not oppose judicial notice of WCO's documents strictly "for the fact of their filing and contents." Dkt. No. 173-2.

These documents pertain to the parties' arguments on sham litigation and the relevant market. The Court takes judicial notice of the filings, but not of the truth of the matters asserted in them.

### B.    Sherman Act Claims

WCO brings counterclaims for monopsonization and attempted monopsonization under 15 U.S.C. § 2 and for agreement in restraint of trade under

15 U.S.C. § 1.  WCO seeks damages under 15 U.S.C. § 15.  T-Mobile argues that
WCO's Sherman Act claims fail to adequately plead antitrust injury,
anticompetitive conduct, and a relevant market.  Mot. at 5–6.

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the
form of trust or otherwise, or conspiracy, in restraint of trade or commerce among
the several States."  15 U.S.C. § 1.  To state a claim under Section 1, a plaintiff
must plausibly allege an "unreasonable" restraint of trade.  *See State Oil v. Khan*,
522 U.S. 3, 10 (1997) ("Although the Sherman Act, by its terms, prohibits every
agreement 'in restraint of trade,' this Court has long recognized that Congress
intended to outlaw only unreasonable restraints.").  To determine whether a
practice unreasonably restrains trade, courts presumptively apply the "rule of
reason" analysis, "under which antitrust plaintiffs must demonstrate that a
particular contract or combination is in fact unreasonable and anticompetitive."[4]
*Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).  "In order to state a Section 1 claim
under the rule of reason, plaintiffs must plead four separate elements. First,
plaintiffs must plead facts which, if true, will prove (1) a contract, combination or
conspiracy among two or more persons or distinct business entities; (2) by which
the persons or entities intended to harm or restrain trade or commerce among the
several States, or with foreign nations; (3) which actually injures competition."
*Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1997 (9th Cir. 2012) (internal
quotation marks and citations omitted).  "In addition to these elements, plaintiffs
must also plead (4) that they were harmed by the defendant's anti-competitive
contract, combination, or conspiracy, and that this harm flowed from an anti-
competitive aspect of the practice under scrutiny. This fourth element is generally

---

[4]A restraint is "unreasonable" if "its anticompetitive effects outweigh its
procompetitive effects."  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328,
342 (1990); *see also CoStar Grp., Inc. v. Com. Real Estate Exch., Inc.*, 150 F.4th
1056, 1066 (9th Cir. 2025) (asking whether, under the "rule of reason," the
challenged conduct has "a substantial anticompetitive effect that harms consumers
in the relevant market").  In some cases, restraints that "have such predictable and
pernicious anticompetitive effect, and such limited potential for procompetitive
benefit," are deemed "unlawful *per se*."  *State Oil*, 522 U.S. at 10.  Courts are
reluctant to apply the *per se* analysis "where the economic impact of certain
practices is not immediately obvious."  *Texaco*, 547 U.S. at 5 (citation omitted).
"*Per se* and rule-of-reason analysis are but two methods of determining whether a
restraint is 'unreasonable.'"  *Atl. Richfield*, 495 U.S. at 342.

referred to as 'antitrust injury' or 'antitrust standing.'"[5]  *Id*. (internal quotation
marks and citation omitted).

Section 2 of the Sherman Act prohibits "monopoliz[ing], or attempt[ing] to
monopolize, . . . any part of the trade or commerce among the several States."  15
U.S.C. § 2.  To state a claim under Section 2, a plaintiff must plead facts showing:
"(a) the possession of monopoly power in the relevant market; (b) the willful
acquisition or maintenance of that power; and (c) causal antitrust injury."  *Somers
v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) (citation omitted).  A "causal
antitrust injury is a substantive element of an antitrust claim [under Section 2], and
the fact of injury or damage must be alleged at the pleading stage."  *Id*.  For the
second element, a "plaintiff must show that the defendant acquired or maintained
its monopoly through 'anticompetitive conduct.'"  *Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946, 998 (9th Cir. 2023).  "This anticompetitive-conduct requirement is
essentially the same as the Rule of Reason inquiry applicable to Section 1 claims."
*Id*. (internal quotation marks and citation omitted).  The Sherman Act also applies
to monopsonies, or "market power on the buy side of the market."  *See
Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320
(2007) ("[A] monopsony is to the buy side of the market what a monopoly is to the
sell side and is sometimes colloquially called a 'buyer's monopoly.'"); *Mandeville
Island Farms, Inc. v. Am. Crystal Sugar Co*., 334 U.S. 219, 235–36 (1948) ("It is
clear that the agreement is the sort of combination condemned by the Act, even
though the price-fixing was by purchasers, and the persons specially injured under
the treble damage claim are sellers, not customers or consumers.").  "The kinship
between monopoly and monopsony suggests that similar legal standards should
apply to claims of monopolization and to claims of monopsonization."
*Weyerhaeuser*, 549 U.S. at 322.

---

[5] "Antitrust standing is distinct from Article III standing. A plaintiff who satisfies
the constitutional requirement of injury in fact is not necessarily a proper party to
bring a private antitrust action."  *Am. Ad Mgmt. Inc. v. Gen. Tel. Co.*, 190 F.3d
1051, 1054 n.3 (9th Cir. 1999).

### 1.    <u>Antitrust Injury</u>[6]

"The antitrust laws do not provide a remedy to every party injured by unlawful economic conduct. It is well established that the antitrust laws are only intended to preserve competition for the benefit of consumers." *Am. Ad Mgmt.*, 190 F.3d at 1055. An antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* at 1054–55 (quoting *Atlantic Richfield*, 495 U.S. at 334). There are "four requirements for antitrust injury: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Id.* at 1055. A fifth element requires that "the injured party be a participant in the same market as the alleged malefactors, meaning the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." *Somers*, 729 F.3d at 963 (internal quotation marks and citation omitted). This "antitrust injury" requirement "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs." *Atl. Richfield*, 495 U.S. at

---

[6] "Section 4 of the Clayton Act authorizes the award of damages under the antitrust laws." *Am. Ad Mgmt.*, 190 F.3d at 1054. "[C]ourts have constructed the concept of antitrust standing, under which they evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them, to determine whether a plaintiff is a proper party to bring an antitrust claim." *Id.* (internal quotation marks and citations omitted). "[T]he Supreme Court . . . identified certain factors for determining whether a plaintiff who has borne an injury has antitrust standing. These factors include: (1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages." *Id.* (citations omitted). "A showing of antitrust injury is necessary, but not always sufficient, to establish standing under § 4, because a party may have suffered antitrust injury but may not be a proper plaintiff under § 4 for other reasons." *Cargill v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 n.5 (1986). The parties here only address the element of antitrust injury and not the broader inquiry of antitrust standing, although many of their arguments overlap with causation, injury-in-fact, and anticompetitive conduct. As discussed above, all of WCO's Sherman Act claims require a sufficient allegation of antitrust injury.

342; *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (noting that antitrust laws "were enacted for the protection of *competition*, not *competitors*") (emphasis in original) (internal quotation marks and citation omitted).

"[T]he antitrust injury analysis must begin with the identification of the defendant's specific unlawful conduct." *Am. Ad Mgmt.*, 190 F.3d 1055. "The Supreme Court has made clear that injuries which result from *increased* competition or lower (but non-predatory) prices are not encompassed by the antitrust laws." *Id*. at 1057 (citation omitted). "To show antitrust injury, a plaintiff must prove that his loss flows from an anticompetitive aspect or effect of the defendant's behavior, since it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition." *Rebel Oil Co., v. Atl. Richfield Co*., 51 F.3d 1421, 1433 (9th Cir. 1995). "[T]o state a plausible antitrust injury, [a plaintiff] must allege facts that rise beyond mere conceivability or possibility." *Somers*, 729 F.3d at 965.

Here, WCO's alleged antitrust injuries are that "T-Mobile's actions excluded WCO Spectrum from the marketplace and forced EBS license sellers to accept lower prices." Countercl. ¶ 64. WCO alleges "sub-competitive, monopsonistic prices for EBS/BRS spectrum rights, . . . the exclusion of competing purchasers such as WCO Spectrum . . . , [and] significantly raised costs of competing purchasers such as WCO Spectrum." *Id.* ¶ 66. Specifically, WCO claims it suffered antitrust injury by "being excluded from purchasing EBS/BRS spectrum rights." *Id.* ¶ 67.

In its Opposition to the Motion, WCO clarifies: "[T]hat it could not be **awarded** (i.e., complete purchases of) licenses is precisely what WCO alleges." Opp'n at 10 (emphasis in original). WCO also notes in a footnote that a separate injury is that its costs have been raised by T-Mobile's conduct.[7] *Id.* at 11 n.12.

---

[7] The Counterclaims do not expressly allege increased costs as an antitrust injury, Countercl. ¶¶ 63–64, and because the parties do not sufficiently address this theory, the Court does not reach it at this time. Moreover, although the parties briefly address WCO's related allegation of anticompetitive conduct involving the "right to participate" provision, the parties do not sufficiently address the alleged resulting injury, namely increased costs. *See* Mot. at 14. The Court also does not address WCO's allegations regarding T-Mobile's defensive purchase of 500 EBS licenses because WCO does not explain why WCO suffered an antitrust injury.

WCO disclaims a price suppression theory as its own antitrust injury.[8]  *Id*. at 13–
14.

> ### i.    Market Exclusion

"[L]oss incurred because of an unlawful acquisition that would also have
been incurred had the acquisition been lawful is not antitrust injury because it does
not flow from that which makes the defendant's conduct unlawful." *Lucas Auto.
Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1233 (citing *Brunswick*,
429 U.S. at 487–88).  In *Lucas*, Lucas Automotive and Coker Tires sold vintage
automobile tires and were invited to submit bids for an exclusive license to
manufacture Bridgestone/ Firestone's tires; Bridgestone/ Firestone selected Coker
Tire, finding that its bid proposal was superior to Lucas Automotive's.  *Id*. 1230–
31.  The injury alleged was that Lucas Automotive had been foreclosed from
serving as a primary-line supplier of vintage tires.  *Id*. at 1233.  The Ninth Circuit
concluded that Lucas Automotive failed to allege antitrust injury because it "would
have suffered the same injury had a small business acquired the exclusive right to
manufacture and to distribute Firestone tires." *Id*.  The Ninth Circuit distinguished
*Lucas* in *Glen Holly Entm't, Inc. v. Tektronix, Inc*., where the "injury alleged
flowed from the discontinuation of the only competing product on the market by
agreement between the only two competitors in the market." 352 F.3d 367, 374
(9th Cir. 2003).  In *Glen Holly*, it was "a case where the plaintiff has alleged an
unlawful agreement, dressed up as a competitor collaboration, to kill off a product
in order to end competition, and a case where the plaintiffs' business which used
that product was directly and intentionally strangled in the consummation of that
agreement." *Id*. at 377.

Here, WCO does not allege an agreement between competitors, as in *Glen
Holly*, or the group boycott cases on which it relies.[9]  Rather, WCO's primary

---

WCO does not allege that it participated in any of the auctions or bidded on those
licenses and expressly disavows a predatory bidding theory.  *See* Opp'n at 23 n.16.
[8] WCO broadly claims that the suppression of prices T-Mobile paid to schools is
"inseparable from" its own injury.  Opp'n at 13.  But here, WCO does not explain
why schools accepting a lower bid harms WCO, other than its having been
excluded from the market.  WCO expressly disclaims a predatory bidding theory.
*See id.* at 23 n.16.  The Court addresses this claim in greater detail below.
[9] WCO cites to *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824 (9th Cir.
2022), to argue that its "submission of competitive bids in relevant markets does

argument is that it (i.e., a potential buyer) was not able to complete its purchases
with the educational institutions (i.e., the suppliers) due to the ROFR provision of
its competitor buyer. However, WCO does not explain why a higher or matching
bid by a competitor buyer, T-Mobile, resulting in the loss of a sale to WCO, is an
injury of the type the antitrust laws were intended to prevent. WCO's only
response to T-Mobile's separate argument that the ROFR is not anticompetitive is
that the ROFR, which extended one to two years beyond the 30-year lease term,
"sent a clear message to rival bidders that even if they overcame all other barriers
such efforts would be futile because T-Mobile could veto any purchase attempt and
match the bid to maintain its monopsony." Opp'n at 17. But just because
T-Mobile could match a bona fide offer does not mean that it would. Here, WCO
seems to allege antitrust injury because it lost sales due to a competitor bid, but
"the antitrust laws' prohibitions focus on protecting the competitive process and
not on the success or failure of individual competitors." *Malheur Forest Fairness
Coalition v. Iron Triangle, LLC*, 699 F. Supp. 3d 1086, 1116 (D. Or. 2023) (quoting
*Cascade Health Sols. v. Peacehealth*, 515 F.3d 883, 902 (9th Cir. 2008)); *see also,*

---

not bar it from demonstrating antitrust injury," Opp'n at 11, but that case involved
the plaintiff's competitors agreeing amongst themselves to take anticompetitive
measures to prevent the plaintiff from gaining a foothold in the market. WCO also
cites to *Full Draw Productions v. Easton Sports, Inc.*, 182 F.3d 745 (10th Cir.
1999), contending that it has alleged harm to competition generally rather than
merely exclusion of a single competitor. Opp'n at 12. "Classic group boycotts
involving conspirators whose market position are horizontal to each other and who
cut off access to a supply, facility, or market necessary to enable the boycotted firm
to compete, are generally per se illegal under § 1." *Full Draw*, 182 F.3d at 750
(internal quotation marks and citation omitted). In *Full Draw*, "defendants' alleged
boycott of the BTS involved an agreement among, inter alia, members of
AMMO—archery manufacturers and distributors—whose market positions are
horizontal to each other as buyers of exhibition space at archery trade shows
competing for dealer business." *Id.* at 751. WCO does not allege a group boycott
theory here, but instead alleges that T-Mobile entered into many separate
agreements with individual educational institutions, which it alleges each
separately harmed itself as a competitor. "A restraint among competitors—called
'horizontal,' as opposed to 'vertical' restraints on market participants at different
points in a product's supply chain—is more rigorously scrutinized for an antitrust
violation because it could more easily facilitate competitive harms, such as the
exclusion of rivals, price fixing, or the consolidation of market power." *Lifewatch
Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 335 (3d Cir. 2018).

*e.g.*, *Curtin Maritime Corp. v. Santa Catalina Island Co.*, 2017 WL 5634996, at \*2
(C.D. Cal. Feb. 17, 2017) (rejecting a plaintiff's alleged injury of being
"foreclosed" from serving as a services provider when it was not chosen for an
exclusive contract following a bidding process), *aff'd in part*, 786 F. App'x 675,
677 (9th Cir. 2019) ("Curtin Maritime would have suffered the same injury had the
Island Company leased the facility to multiple companies, but not Curtin
Maritime.").

WCO's argument regarding the exclusivity provision presents a closer
question.  WCO alleges Christian College as an example.  Countercl. ¶ 47.  WCO's
argument appears to be akin to an exclusive dealing claim.  "Section 1 supports
several theories of antitrust liability, including [a] theory of exclusive dealing. To
state an exclusive dealing claim under § 1, a plaintiff must plausibly allege (1) the
existence of an exclusive agreement that (2) forecloses competition in a substantial
share of the relevant market." *CoStar Grp.*, 150 F.4th at 1066.  "[A] § 2
monopolization claim requires monopoly power, while a § 1 exclusive dealing
claim does not. But a § 1 exclusive dealing claim requires a substantial foreclosure
of competition." *Id*. at 1067.  "By their nature, exclusive agreements can prevent a
contracting party's competitors from doing business with respect to the contracted
goods or services. Often these agreements have pro-competitive benefits. So §
1 only prohibits exclusive agreements if they substantially foreclose competition,
that is exclude competitors from so much of the market that they cannot gain a
solid foothold to compete." *Id*. (citations omitted).  "[A] § 1 exclusive dealing
claim requires an exclusive agreement, while a § 2 monopolization claim does not.
But a § 2 monopolization claim requires anticompetitive conduct, and exclusive
agreements are an example of anticompetitive conduct." *Id.*  "Under the rule of
reason, an exclusive dealing arrangement is anticompetitive only if its 'probable
effect' is to substantially lessen competition in the relevant market, rather than
merely disadvantage rivals." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 281
(3d Cir. 2012).

Significantly, WCO does not allege that it was excluded from bidding.  As T-
Mobile points out, WCO's own admissions in response to T-Mobile's Complaint
demonstrate that it was "*not* excluded from the market."  *See* Mot. at 7 (emphasis
in original) (quoting Answer ¶¶ 127, 165 (WCO's discussion of its "competitive
market participation" and "legitimate competitive bidding")).  T-Mobile quotes
WCO's Answer to establish that WCO "engaged in lawful, competitive market
transactions" and made offers for EBS licenses in "the ordinary course of
legitimate competitive business conduct." *Id.* (quoting Answer ¶¶ 55, 166).

Indeed, WCO did purchase at least one EBS license in a "bona fide, arms-length transaction." *Id.* (quoting Answer ¶ 68).

In light of WCO's admissions regarding its competitive bidding activities, WCO has not pled facts establishing that it was barred from *entering* the market.[10] *See, e.g.*, *GSI Tech. v. United Memories, Inc.*, 2014 WL 1572358, at *3 (N.D. Cal. April 18, 2014) (rejecting claim of market exclusion where the plaintiff's "claimed injury is undermined by its own complaint, which alleges that [the plaintiff] had already entered the market" and had been considered for and awarded contracts). As T-Mobile argues, "WCO's true complaint is that it was prevented 'from *purchasing* EBS/BRS spectrum rights' when T-Mobile matched its offers." Mot. at 7 (emphasis in original) (quoting Countercl. ¶ 67). Indeed, WCO claims it "cannot enter the markets because it cannot *close purchases* with license holders— T-Mobile's conduct prevents WCO from ever consummating a deal." Opp'n at 20 (emphasis added). What is missing from WCO's Counterclaims, however, are facts that T-Mobile's exclusivity provision,[11] rather than the ROFR provision pursuant to which T-Mobile simply offered to pay the same or more than WCO, plausibly prevented WCO from consummating deals in the relevant market.

---

[10] In its Sur-reply, WCO argues for the first time that it has alleged that "many more sellers" "walk[ed] away from or refuse[d] to entertain WCO's bids, instead accepting much lower offers from T-Mobile." Sur-reply at 4. WCO then asserts that there was "harm to hundreds of potential sellers." *Id.* It is not clear what WCO is referring to within its Counterclaims, and the Court was not able to locate facts supporting such conclusory assertions. The only possible allegation appears to be related to Albright College, but those allegations only assert that "[w]hile the exact amount is unknown to WCO Spectrum, Albright ended up selling its license to T-Mobile at a much lower price than that offered by WCO Spectrum." Countercl. ¶ 48. This does not allege that WCO was barred from bidding.
[11] T-Mobile argues that "WCO's 'injury' would have been avoided had WCO offered more than T-Mobile was willing to pay, as it did with Owasso County." Mot. at 8. However, whether an educational institution was not willing to sell the license no matter what WCO was willing to pay because of an exclusivity provision is a different question than the ROFR. *Cf. ZF Meritor*, 696 F.3d at 277 ("Therefore, because price itself was not the clearly predominant mechanism of exclusion, the price-cost test cases are inapposite, and the rule of reason is the proper framework within which to evaluate Plaintiffs' claims.").

WCO appears to allege only one express example of such ever happening –
Christian College.[12]  Countercl. ¶ 47.  However, WCO has not explained why an
injury in a very small share of the market would be of the type that the antitrust
laws are intended to prevent or that it sufficiently constitutes actionable
anticompetitive conduct.  Instead, WCO argues that because the exclusivity
provision exists in the "vast majority" of the leases, it has sufficiently pled
"substantial foreclosure."  Opp'n at 20.  But WCO then conflates entering the
market with closing a purchase: "WCO cannot enter the markets because it cannot
close purchases with license holders – T-Mobile's conduct prevents WCO from
ever consummating a deal."  *Id*.  WCO has simultaneously alleged that it can enter
the market, so it is unclear why the exclusivity provision substantially forecloses
competition here.  In this context, the Court agrees with T-Mobile that WCO has
insufficiently alleged a substantial foreclosure of competition when it has only
alleged one or two examples of an institution refusing to consummate a deal with
WCO due to the exclusivity provision.

At the hearing on this Motion, WCO focused on the Section 2 claims and
allegations in T-Mobile's complaint.  "The basic prudential concerns relevant
to §§ 1 and 2 are admittedly the same: exclusive contracts are commonplace—
particularly in the field of distribution—in our competitive, market economy, and
imposing upon a firm with market power the risk of an antitrust suit every time it
enters into such a contract, no matter how small the effect, would create an
unacceptable and unjustified burden upon any such firm."  *United States v.
Microsoft Corp*., 253 F.3d 34, 70 (D.C. Cir. 2001).  "At the same time, however,
. . . a monopolist's use of exclusive contracts, in certain circumstances, may give
rise to a § 2 violation even though the contracts foreclose less than the roughly
40% or 50% share usually required in order to establish a § 1 violation."  *Id*.  Here,
WCO does not claim that T-Mobile acquired its alleged monopsony power by a
bidding process in which it participated; WCO's current allegations are that T-
Mobile maintained or attempted to maintain that power by matching WCO's offers
pursuant to the ROFR.  Although at the hearing WCO argued that T-Mobile did so
by conduct other than exercising its right under the ROFR, pointing to allegations
in T-Mobile's Complaint, the Counterclaims do not currently allege any such facts.

---

[12] At the hearing on this Motion, WCO also pointed to its allegations regarding
Albright College selling its license to T-Mobile at a much lower price than that
offered by WCO to demonstrate that something other than the ROFR was the basis
for the sale.

Accordingly, WCO has not sufficiently alleged a substantial anticompetitive effect of this provision.

WCO's remaining argument supporting its market exclusion theory relates to T-Mobile's litigation conduct. The parties do not specifically address an antitrust injury due to T-Mobile's litigation conduct, and the Court does not further address it here. The Court addresses the parties' arguments regarding whether this is actionable anticompetitive conduct below.

ii.    *Price Suppression*

WCO also alleges antitrust injury based on price suppression. WCO claims that T-Mobile's lease provisions enable the "depressed prices it pays to license holders by blocking competitive offers from at least WCO Spectrum." Countercl. ¶ 43. WCO has clarified that it does not allege that WCO itself was harmed by T-Mobile's pricing. Opp'n at 13. As T-Mobile noted, "WCO *benefits* from low prices" as an "alleged buyer of EBS licenses." Reply at 3 (emphasis in original). Instead, WCO characterizes its own alleged injury as "inseparable from" a purported injury to competition — i.e., the "anticompetitively suppress[ed] prices paid to schools." Opp'n at 13.

However, the Ninth Circuit has clarified that an antitrust plaintiff "must plead 'antitrust injury' . . . *in addition to, rather than in lieu of,* injury to competition." *Brantley*, 675 F.3d at 1200 (emphasis added). WCO thus collapses two distinct requirements here. Additionally, "allegations that an agreement has the effect of reducing consumers' choices or increasing prices to consumers does not sufficiently allege an injury to competition. Both effects are fully consistent with a free, competitive market." *Id.* at 1201. Allegations that "show only that plaintiffs have been harmed as a result of the practices at issue, not that those practices are anticompetitive," do not "allege an injury to competition 'that is plausible on its face.'" *Id.* at 1202 (quoting *Twombly*, 550 U.S. at 570). And although losing a competitor in any market "necessarily has an effect on competitive conditions within that market," the "removal of one or a few competitors need not equate with injury to competition." *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989).

To suggest T-Mobile suppressed prices, WCO alleges that transactions in which WCO made an offer "yielded 2–5 times the relative price to the EBS holder when compared to transactions in which T-Mobile [was] the sole offeror."

Countercl. ¶¶ 46, 62.  But T-Mobile seeking lower prices in the absence of
competing bidders while bidding higher prices to beat competitors is rational
behavior "consistent with a free, competitive market."  *See Brantley*, 675 F.3d at
1201; *see also, e.g.*, *Malheur*, 699 F. Supp. 3d at 1116 ("Seeking the lowest
possible price for subcontracts is pro-competitive behavior, which in the end,
should lower the costs of the product for consumers.").  And when T-Mobile
matches WCO's bids, the license-holding schools theoretically make the same
amount of money regardless of whether T-Mobile or WCO ultimately purchases
the license.  WCO does not allege predatory bidding here, but simply that the
prices T-Mobile pays to educational institutions are lower absent a competitor.  "A
firm that has substantial power on the buy side of the market (i.e., monopsony
power) is generally free to bargain aggressively when negotiating the prices it will
pay for goods and services."  *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627
F.3d 85, 103 (3d Cir. 2010).

## 2.    Anticompetitive Conduct

Where the "plaintiff challenges the same conduct pursuant to Sections
1 and 2, [the court] can review claims under each section simultaneously.  And if a
court finds that the conduct in question is not anticompetitive under § 1, the court
need not separately analyze the conduct under § 2."  *CoStar Grp.*, 150 F.4th at
1066 (internal quotation marks and citations omitted).  WCO alleges three types of
anticompetitive conduct: T-Mobile's "restrictive lease terms," "defensive
acquisitions" of EBS licenses, and "campaign of lawfare and threats designed to
intimidate its EBS license lessors from seeking competitive bids."  Countercl. ¶ 43.
For the purposes of this Motion, the Court only addresses T-Mobile's litigation
conduct as allegedly anticompetitive.[13]  And as to this question, the parties only
address whether *Noerr-Pennington* immunity applies.

---

[13] For purposes of reviewing the sufficiency of the allegations of antitrust injury,
the Court assumes that the lease terms constitute actionable anticompetitive
conduct, subject to the issues discussed regarding the exclusivity provision, but, as
discussed above, has concluded that WCO has not sufficiently alleged antitrust
injury.  Accordingly, the Court only addresses the parties' arguments regarding T-
Mobile's litigation conduct.  Although WCO argues that the Court should consider
T-Mobile's conduct in its totality, WCO's theories regarding why T-Mobile's
conduct is allegedly anticompetitive are different.  Moreover, although WCO cites
to *City of Anaheim v. Southern Cal. Edison, Co.*, 955 F.2d 1373, 1376 (9th Cir.
1992), Opp'n at 15, decisions such as *City of Anaheim* "that do allow for 'course of

WCO identifies three specific lawsuits filed by T-Mobile against its lessors — Albright College; the School Board of St. Lucie County, Florida; and Lorain County Community College — as well as two subpoena enforcement proceedings related to the Albright suit and a pre-complaint discovery request against WCO. Countercl. ¶¶ 53–56. In addition, WCO refers to "dozens" of threatened lawsuits against other lessors, of which six are named. *Id.* ¶¶ 57–58. WCO provides two examples of these threats: Christian College of Georgia, which viewed a letter from T-Mobile counsel "as a threat of court litigation if it negotiated with WCO," and Radio Training Network, which was allegedly "threatened by T-Mobile's counsel in a phone call" and "sent T-Mobile's Albright College complaint." *Id.*

"Under the *Noerr–Pennington* doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006). This doctrine "arose in the antitrust context and initially reflected the Supreme Court's effort to reconcile the Sherman Act with the First Amendment Petition Clause." *Id.* "Recognizing the constitutional foundation of the doctrine, the Supreme Court has applied *Noerr–Pennington* principles outside the antitrust field," and "the *Noerr–Pennington* doctrine stands for a generic rule of statutory construction, applicable to any statutory interpretation that could implicate the rights protected by the Petition Clause." *Id.* at 930–31. "In determining whether the burdened conduct falls under the protection of the Petition Clause, [courts] must give adequate 'breathing space' to the right of petition." *Id.* at 931–32.

---

conduct' Section 2 liability, which is itself controversial, usually explain that the doctrine is necessary in cases involving individual acts that are lawful in themselves only because, when evaluated in a vacuum, those acts lack the requisite substantial effect on competition." *New York v. Facebook, Inc*., 549 F. Supp. 3d 6, 46–47 (D.D.C. 2021). "'[T]here can be no synergistic result' from 'a number of acts none of which show causal antitrust injury' to the plaintiff." *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1142 (9th Cir. 2022) (quoting *Cal. Comput. Prods., Inc. v. Int'l Bus. Machs. Corp.*, 613 F.2d 727, 746 (9th Cir. 1979)). "Because each individual action alleged by [plaintiff] does not rise to anticompetitive conduct in the relevant market, their collective sum likewise does not." *Id.*

However, *Noerr–Pennington* immunity does not apply to "sham petitions."
*Id.* at 932. There are two types of "sham litigation" that are relevant in this case:
"[F]irst, where the lawsuit is objectively baseless and the defendant's motive in
bringing it was unlawful, *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus.,
Inc.*, 508 U.S. 49, 54 (1993) (*PREI*); [and] second, where the conduct involves a
series of lawsuits 'brought pursuant to a policy of starting legal proceedings
without regard to the merits' and for an unlawful purpose, *USS–POSCO Indus. v.
Contra Costa Cnty. Bldg. & Constr. Trades Council*, 31 F.3d 800, 810–11 (9th Cir.
1994) (*POSCO*)." *Relevant Grp., LLC v. Nourmand*, 116 F.4th 917, 928 (9th Cir.
2024).

Here, the parties dispute whether the *PREI* framework or the *POSCO*
framework applies. In *Relevant*, the Ninth Circuit recognized that it had not
defined how many lawsuits constitutes a "series" of lawsuits under *POSCO*. *Id.* at
929. The court reasoned that while *POSCO* involved twenty-nine lawsuits, the
case at hand "only involve[d] four actions resembling 'lawsuits' in the traditional
sense," and therefore applied the *PREI* framework rather than the *POSCO*
framework. *Id.* at 931 (noting that while this "counting exercise might seem
elementary," "a review of our precedent shows that it is not unreasonable"). This
case involves three alleged lawsuits "in the traditional sense,"[14] plus six
specifically alleged threats, which is closer to the four in *PREI* than the twenty-
nine in *POSCO*. *See id.* Further, three filed lawsuits and six threatened lawsuits in
the context of more than sixty instances of T-Mobile exercising its ROFR
following an offer from WCO does not establish a "policy of starting legal
proceedings without regard to the merits" as required by *POSCO*. *See* 31 F.3d at
810–11; Countercl. ¶ 44(c) n.16 (referencing T-Mobile's Complaint Appendix A,

---

[14] WCO claims it has alleged "at least five filed and dozens of threatened lawsuits."
Opp'n at 22. As WCO included only three examples of lawsuits in its
Counterclaim, WCO appears to be including in its total the two subpoena
enforcement proceedings related to the Albright College. *See* Countercl. ¶ 54.
However, the Ninth Circuit rejected the strategy of "counting each discrete
litigation activity as a 'proceeding' that together can constitute a 'series of
proceedings' for purposes of the *POSCO* test." *Relevant*, 116 F.4th at 931. In any
event, both three and five filed lawsuits are still closer to the four in *Relevant* than
the twenty-nine in *POSCO*.

Dkt. No. 1-1, a list of T-Mobile's exercises of its ROFR in response to license purchase offers from WCO).[15]   The Court therefore applies the *PREI* framework.

Under *PREI*, a proceeding is a "sham" when it is (1) "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and if so, the litigant's subjective motivation is (2) an "attempt to interfere *directly* with the business relationships of a competitor through the use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *PREI*, 508 U.S. at 60–61 (emphasis in original) (internal quotation marks and citations omitted).   "Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation." *Id.* at 60.   "The existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham litigation." *Id.* at 62. Probable cause "requires no more than a reasonable belief that there is a chance that a claim may be held valid upon adjudication." *Id.* at 62–63 (cleaned up and citation omitted).   And where "there is no dispute over the predicate facts of the underlying legal proceeding, a court may decide probable cause as a matter of law." *Id.* at 63; *see also Relevant*, 116 F.4th at 932 (holding that the district court properly decided objective baselessness as a matter of law where there were no factual disputes about the underlying proceedings).

WCO argues that T-Mobile's lawsuits and threatened lawsuits were "all objectively baseless" and used as an "anticompetitive weapon" to interfere with WCO's business relationships.[16]   Countercl. ¶ 59.   Aside from reciting the language from *PREI*, however, WCO does not provide reasons to believe that "no reasonable litigant could realistically expect success on the merits," as required to show objective baselessness under *PREI*.   508 U.S. at 60.   As WCO recognizes, T-Mobile's lawsuits were grounded on alleged breaches of the leases' ROFR provisions, which require offers to be "bona fide."[17]   Countercl. ¶ 53.   WCO points

---

[15] Although the Counterclaims also allege "dozens" of threatened lawsuits, no facts are alleged to support this conclusory assertion, other than the six actually named.

[16] The Court has considered threatened litigation, in addition to actual litigation, under the *Noerr–Pennington* doctrine. *See Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007–08 (9th Cir. 2008) ("Conduct incidental to a lawsuit, including a pre-suit demand letter, falls within the protection of the *Noerr–Pennington* doctrine.").

[17] WCO alleges that T-Mobile "misrepresent[ed] to its EBS license holders applicable law, FCC rules, and meaning of contractual provisions," such as by

to the fact that "T-Mobile never pursued a final judgment against Albright, Saint Lucie, or Lorain" as evidence of baselessness, Opp'n at 26, but that is because T-Mobile's claims became moot when the sued lessors abandoned their sales to WCO. *See* Countercl. ¶¶ 53, 55–56. If anything, these concessions might indicate there was a "reasonable belief that there is a chance that [T-Mobile's claims] may be held valid upon adjudication." *See PREI*, 508 U.S. at 62–63; *see also Relevant*, 116 F.4th at 932 ("[S]ettlement indicates a lawsuit is not objectively baseless."). WCO also claims that T-Mobile's conduct of circulating the Albright complaint indicates baseless threats because that complaint "says nothing about the rights or liabilities of a second license holder or the circumstances surrounding any potential deal between WCO and a threatened school." Opp'n at 27. However, WCO has not plead any facts distinguishing circumstances in other deals such that the Albright complaint would be irrelevant; to the contrary, WCO has alleged that the T-Mobile leases with the alleged exclusionary provisions "cover the vast majority of EBS licenses." Countercl. ¶ 45. If the underlying litigation threatened is not objectively baseless, neither is the threat. *See Theme Promotions*, 546 F.3d at 1008 (holding that because a suit to enforce a ROFR agreement was "potentially meritorious," the threatened litigation was not objectively baseless). Because WCO has not plausibly alleged that the actual or threatened litigation was objectively baseless, the Court need not consider the T-Mobile's subjective motivation. *See PREI*, 508 U.S. at 60. Applying the *Noerr–Pennington* doctrine, the Court finds that T-Mobile's litigation activity is immune and cannot support WCO's claims of anticompetitive conduct.

### 3.  <u>Relevant Market</u>

To state a valid claim under both Sections 1 and 2 of the Sherman Act, "a plaintiff must allege that the defendant has market power within a 'relevant market.'" *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008). Because the validity of an alleged "relevant market" is "typically a factual element rather than a legal element," an antitrust claim survives a motion to

---

interpreting the term "bona fide" "so broadly as to give itself effective veto power over proposed transactions" with WCO. Countercl. ¶ 59. But this legal argument about the merits of the lawsuits does not include facts showing that they were *objectively* baseless. WCO also argues the suits were baseless because they were based on "invalid and unenforceable" exclusivity provisions that "violate federal antitrust law," Opp'n at 27, but again relies on unsupported legal arguments rather than pleading facts showing objective baselessness.

dismiss "unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." *Id.* at 1045. In other words, an antitrust complaint "may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable." *Id.*

In determining whether a relevant market definition is facially sustainable, courts consider the following legal principles. First, "[a]ntitrust law requires allegation of both a product market and a geographic market." *Id.* at 1045 n.4. "The consumers do not define the boundaries of the market; the products or producers do." *Id.* at 1045 (citing *Brown Shoe v. United States,* 370 U.S. 294, 325 (1962)). Second, the market must "encompass the product at issue as well as all economic substitutes for the product," which are "determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Id.* (quoting *Brown Shoe,* 370 U.S. at 325). Third, "it is legally permissible to premise antitrust allegations on a submarket," meaning a "small part of the general market of substitutable products." *Id.* To establish a submarket, an antitrust plaintiff "must be able to show (but need not necessarily establish in the complaint) that the alleged submarket is economically distinct from the general product market." *Id.* "Practical indicia" of an economically distinct submarket include: "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325.

"Critically, in a buyer-side conspiracy case, seller rather than consumer or purchaser behavior is the focus. [The] market is comprised of buyers who are seen by sellers as being reasonably good substitutes." *Lifewatch Servs.*, 902 F.3d at 337 (internal quotation marks and citations omitted); *see also, e.g.*, *Cascades Comp. Innovation LLC v. RPX Corp.*, 2013 WL 6247594, at *14 (N.D. Cal. Dec. 3, 2013) ("[P]roper focus of the market analysis in monopsony cases is the commonality and interchangeability of the buyers, not the commonality or interchangeability of the sellers.") (internal quotation marks and citation omitted). A "case involv[ing] a buyer-side conspiracy affects how the market is defined. Normally, the market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *Todd v. Exxon Corp.*, 275 F.3d 191, 201 (2d Cir. 2001) (internal quotation marks and citation omitted). "There is a danger in applying these factors mechanically in the context of monopsony or oligopsony. These factors are *reversed* in the context of a buyer-

side conspiracy." *Id*. at 202. "A greater availability of substitute buyers indicates a smaller quantum of market power on the part of the buyers in question." *Id*.

Here, WCO defines the relevant product market[18] as "the market for EBS/BRS spectrum rights" or "the market for 2.5 GHz spectrum rights," including "both the sale/purchase and lease" of EBS/BRS spectrum licenses issued by the FCC. Countercl. ¶ 29. WCO points to, among other things, T-Mobile's conduct and sworn testimony, including that when WCO entered a bid for a 2.5 GHz license that was 300% more than T-Mobile's bid, T-Mobile "did not turn to its purportedly substitutable spectrum but instead paid the 300% higher price." Opp'n at 3. T-Mobile argues this relevant market definition fails because it does not accurately account for reasonably interchangeable economic substitutes. Mot. at 20. T-Mobile argues that WCO's arguments distinguishing the 2.5 GHz spectrum from other mid-band spectra focus on downstream concerns relevant to carriers, even though WCO intends to participate in an upstream market by acquiring and leasing licenses. *Id*. at 21.

T-Mobile's objections are premature on this motion to dismiss, at which the inquiry is only whether the market definition is "facially unsustainable." *See Newcal. Indus.*, 513 F.3d at 1045; *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992) ("The proper market definition . . . can be determined only after a factual inquiry into the commercial realities faced by consumers.") (internal quotation marks and citation omitted). On a motion to dismiss, courts "need not engage in extensive analyses of reasonable interchangeability and cross elasticity of demand." *In re Webkins Antitrust Litigation*, 695 F. Supp. 2d 987, 995 (N.D. Cal. 2010) (citation omitted). Moreover, T-Mobile relies on cases and analysis involving monopoly claims, not monopsony. Here, WCO plausibly addresses the interchangeability of buyers for licenses in the 2.5 GHz band and has alleged that T-Mobile owns or leases about 90% of licenses in the 2.5 GHz band. Countercl. ¶ 18. This definition suffices to survive a Rule 12(b)(6) motion, but WCO's Sherman Act claims must be dismissed for failure to allege antitrust injury or actionable anticompetitive conduct as discussed above.

## C.    California Law Claims

WCO also brings counterclaims for violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, *et seq*.; violation of California's UCL, Cal.

---

[18] T-Mobile does not challenge the relevant geographic market.

Bus. & Prof. Code §§ 17200, *et seq.*; and intentional interference with prospective economic advantage under California law.  The parties appear to agree that the state law claims turn on the federal law claims and did not extensively brief the state law claims.  *See* Mot. at 23–24 (arguing that WCO's California law claims fail for the same reasons as its Sherman Act claims); Opp'n at 28 (arguing that WCO's California law claims survive because WCO sufficiently alleged claims under the Sherman Act).  The Court therefore dismisses the state law claims on the same grounds as the Sherman Act claims.[19]

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS T-Mobile's Motion to Dismiss Counterclaims with leave to amend.  Any amended counterclaims must be filed within 30 days.

**IT IS SO ORDERED.**

---

[19] At the hearing on this Motion, WCO argued that the state law claims are broader than the Sherman Act claims.  The Court will address the state law claims after the parties sufficiently address them.