Brandon Baum-Zepeda (SBN 352698)
bbaum-zepeda@edelson.com
**EDELSON PC**
1255 Union St NE, Suite 850
Washington, DC 20002
Tel: 202.270.4777

Patrick F. Madden (*pro hac vice*)
pmadden@bergermontague.com
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: 215-875-3035

Natasha Fernández-Silber (*pro hac vice*)
nfernandezsilber@edelson.com
**EDELSON PC**
200 South 1st Street
Ann Arbor, MI 48104
Tel: 312-589-6370

*Attorneys for WCO Spectrum LLC*
*[Additional Counsel on Signature Page]*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

T-MOBILE US, INC., *et al.*,
        Plaintiffs,

        vs.

WCO SPECTRUM LLC, *et al.*,
        Defendants.

No. 2:23-cv-04347-AH-E
Hon. Anne Hwang

**WCO SPECTRUM LLC'S FIRST AMENDED COUNTERCLAIMS**

Complaint Filed: June 2, 2023
Counterclaims Filed: March 31, 2025

Defendant/Counterclaim Plaintiff WCO Spectrum LLC (hereinafter "Counterclaim-Plaintiff" or "WCO") files its First Amended Counterclaims in this antitrust action, by and through its undersigned attorneys, for damages and injunctive relief pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 *et seq.*, and California law governing Intentional Interference with Prospective Economic Advantage against Plaintiffs/Counterclaim Defendants T-Mobile US, Inc. ("T-

- 1 -

Mobile"), Clearwire Spectrum Holdings LLC ("Clearwire"), Clearwire Spectrum Holdings II LLC ("Clearwire II"), Clearwire Spectrum Holdings III LLC ("Clearwire III"), Fixed Wireless Holdings LLC ("Fixed Wireless"); NSAC LLC ("NSAC"); TDI Acquisition Sub LLC ("TDI"); WBSY Licensing LLC ("WBSY") (collectively "Counterclaim-Defendants" or "T-Mobile"), demanding a trial by jury. WCO alleges the following on information and belief:

## I.    INTRODUCTION

1.      WCO's counterclaims challenge T-Mobile's unlawful scheme to monopsonize[1] the market for 2.5 gigahertz ("GHz") spectrum rights (the "Scheme"). 2.5 GHz spectrum is a key input for the deployment of high-quality, nationwide 5G mobile wireless networks, as well as fixed wireless networks.

2.      As part of the Scheme, which is ongoing, T-Mobile has engaged in multiple forms of related exclusionary conduct, which have the synergistic effect of suppressing competition. Such conduct includes: (1) entering into long-term (30-year) exclusive leases with 2.5 GHz spectrum license holders; (2) exercising provisions in those leases designed to ensure T-Mobile's exclusivity can be extended far beyond the 30-year lease terms (e.g., bans and restrictions on license sales and future lease transactions, and Rights of First Refusal ("ROFRs")); (3) pursuing and threatening sham litigation against 2.5 GHz spectrum license holders to deter them from selling their license rights; and (4) directly acquiring hundreds of 2.5 GHz spectrum licenses for T-Mobile's exclusive use.

3.      T-Mobile's Scheme has substantially foreclosed actual and potential

---

[1] "Monopsonization" is the process by which a firm gains market power as a buyer, allowing it to push prices paid to suppliers below competitive levels, whereas monopolization allows a firm to gain market power as a seller and push prices charged to customers above competitive levels. Both forms of conduct are barred by the antitrust laws.

rivals' access to and use of 2.5 GHz spectrum. Through the Scheme, T-Mobile has prevented any actual or potential rival from accessing the critical mass of 2.5 GHz spectrum licenses necessary to put spectrum rights to their highest value uses (broad network deployment).

4.     As a result, the Scheme has eliminated competition in the market for 2.5 GHz spectrum license rights (i.e., the sale or lease of licenses), resulting in artificially suppressed prices for 2.5 GHz spectrum rights for license holders. The Scheme has also impaired competition in the downstream markets for nationwide 5G mobile and fixed wireless service (by preventing rival providers from accessing spectrum that could significantly enhance their networks), resulting in reduced wireless service quality and increased prices for consumers.

5.     Absent T-Mobile's Scheme, 2.5 GHz spectrum would be utilized by multiple wireless carriers, who would buy the rights to adjacent 2.5 GHz spectrum across the country to supplement their networks and compete for wireless users. But as a result of the Scheme, T-Mobile has successfully prevented actual or potential rivals from accessing the 2.5 GHz spectrum rights necessary to do so. Instead, T-Mobile maintains nearly exclusive control of the 2.5 GHz spectrum band and offers the *only* national 5G wireless network utilizing 2.5 GHz spectrum.

6.     When measured in terms of "MHz-POPs"—a metric that reflects both spectrum bandwidth and population coverage of the license rights—T-Mobile controls an overwhelming share (approximately 85%) of the available 2.5 GHz spectrum nationwide. T-Mobile has achieved and maintained its dominance (and is poised to continue to maintain it for the foreseeable future absent Court intervention) through the Scheme.

7.     At the heart of T-Mobile's Scheme are its exclusive access to and use of the vast majority of 2.5 GHz spectrum, both through direct ownership of 2.5 GHz licenses and exclusive lease agreements with the holders of 2.5 GHz licenses.

8.     T-Mobile's long-term, exclusive leases with 2.5 GHz license holders

- 3 -

are designed to lock up 2.5 GHz spectrum rights under T-Mobile's exclusive control and foreclose competition well beyond the formal expiration dates of those agreements (roughly 2035), and potentially in perpetuity.

9.      Beginning in 2005, T-Mobile (or its predecessors in interest) entered into long-term (30-year) exclusive agreements to lease the vast majority of so-called "Educational Broadband Service" ("EBS") 2.5 GHz spectrum licenses.[2] These leases also contain a number of far-reaching, anticompetitive provisions that restrict the license holder's ability to sell the underlying licenses to anyone other than T-Mobile—even where such sales would not affect T-Mobile's lease rights—enabling T-Mobile to maintain its exclusive control over EBS spectrum well beyond the term of the leases.

10.     These anticompetitive lease provisions include: (1) express prohibitions against the license holder selling the license to any third party other than T-Mobile or, in some cases, to any company that offers competing telecommunications services (thereby preventing market entry by competitors like AT&T or Verizon); and (2) ROFR provisions that give T-Mobile the ability to match any offer from another prospective buyer or lessee, enabling T-Mobile to block any sale or future lease transaction that could threaten its monopsony. Together, these provisions severely impair EBS license holders' ability to obtain competitive prices for their licenses.

---

[2] Historically, the Federal Communications Commission ("FCC") granted EBS licenses to educational institutions and other non-profits to use 2.5 GHz spectrum for educational broadcasting. In 2020, the FCC amended its rules to permit these license holders to sell or lease their spectrum rights to commercial entities for commercial use. The remaining 2.5 GHz spectrum is allocated to Broadband Radio Service ("BRS") licenses. T-Mobile acquired control over the vast majority of BRS spectrum through its 2020 merger with Sprint, which consolidated the 2.5 GHz spectrum rights owned by T-Mobile and Sprint (as well as Sprint's predecessors, Clearwire and Nextel).

11.     T-Mobile has also directly acquired approximately 600 additional EBS licenses, foreclosing access to such licenses for any actual or potential rival. Today, T-Mobile has exclusive access to and control over 1,700 of approximately 2,200 total EBS licenses (through leases or outright ownership), giving T-Mobile exclusive control over the vast majority of the 2.5 GHz spectrum band.

12.     WCO was formed in 2020 following the FCC rule change that permitted commercial entities to purchase EBS licenses. WCO's business model was to acquire a critical mass of 2.5 GHz spectrum licenses and make them available in the aggregate for lease or sale, thereby attracting bids from multiple wireless carriers seeking to supplement their 5G and/or fixed wireless networks. WCO understood that building out or supplementing a wireless network with 2.5 GHz spectrum requires significant investment, and that wireless carriers would only seek to supplement their networks with 2.5 GHz spectrum if they could access rights to a critical mass of licenses across the country. After all, if the rights to just a single 2.5 GHz license became available in Orange County, CA, for example, the rights would provide little additional spectral coverage and would not be sufficient to induce a wireless carrier to make the substantial investments required to build out or supplement their networks with a new spectrum band. WCO's approach of aggregating a portfolio of licenses so that the rights could be auctioned to wireless carriers in the aggregate directly threatened T-Mobile's monopsony in the 2.5 GHz spectrum rights market because, with such a critical mass of 2.5 GHz spectrum rights, wireless carriers would be willing to make the investments necessary to build out or supplement their 5G networks and thereby create the competition T-Mobile's Scheme seeks to stomp out.

13.     To effectuate its business plan, WCO targeted key EBS license holders across the country. WCO entered into negotiations with these license holders and engaged in substantial due diligence to determine the value of their licenses. Through the course of these negotiations, WCO placed well over $6 billion worth

- 5 -

of bona fide offers on some 936 EBS licenses, with an investment pipeline in place to make additional offers on still more licenses.

14.     However, WCO's efforts to acquire a critical mass of EBS licenses across the country were stymied by T-Mobile's Scheme. T-Mobile filed or threatened lawsuits against WCO's counterparties to enforce the exclusivity provisions and sales restrictions in T-Mobile's lease agreements with EBS license holders. T-Mobile also exercised its ROFRs to prevent sales to WCO, including in key geographies that would have given WCO a foothold in such significant markets as New York City, Los Angeles, Phoenix, Houston, Seattle, Portland (Oregon), Philadelphia, Memphis, Raleigh, Salt Lake City, Tucson, San Antonio, and Las Vegas. T-Mobile also brought or threatened to bring lawsuits against WCO's counterparties asserting objectively baseless, sham claims designed to coerce EBS license holders into abandoning deals with WCO. As small educational institutions facing the prospect of costly litigation against a multi-billion-dollar corporation, many of these schools abandoned proposed transactions with WCO based on these baseless suits. T-Mobile's threats of litigation caused still others to withdraw from negotiations or refuse to enter any negotiations in the first place.

15.     WCO's business model would have restored competitive bidding for 2.5 GHz spectrum rights by expanding the pool of purchasers beyond T-Mobile, thereby driving lease and sale prices toward market levels, to the benefit of schools that hold EBS licenses. Moreover, WCO's plan would have promoted competition in the downstream markets for 5G mobile and fixed wireless services, as carriers would have competed to supplement their networks with the newly accessible, highly favorable 2.5 GHz spectrum, likely resulting in improved quality and lower prices for wireless consumers.

16.     Without the ability to access a critical mass of 2.5 GHz spectrum rights—which the Scheme prevented—other would-be purchasers and lessees (telecommunications companies with nationwide networks) have little ability to

- 6 -

enter the market and therefore little incentive to try. And without new demand from such buyers—which the Scheme will continue to prevent absent Court intervention—once T-Mobile's existing exclusive leases begin to expire in 2035, T-Mobile will be the only bidder for these lease rights or the underlying licenses. As a result, EBS license holders will continue to face suppressed lease payments and sales prices unless and until T-Mobile's monopsony is curbed. Moreover, consumers will not realize the benefits of enhanced 5G mobile and fixed wireless service, additional carrier options, or the associated competitive price effects.

17.    As a direct result of T-Mobile's Scheme—through the same mechanism as the injury incurred by license holders (suppressed lease and sale prices) and wireless consumers (lower quality services rendered at supracompetitive prices)—WCO has suffered lost profits that it would have earned through lawful, competitive business activity. Absent the Scheme, WCO would have acquired all or most of the 2.5 GHz licenses on which it bid, as well as additional licenses in its investment pipeline. WCO would then have been able to either (1) hold those licenses and generate enhanced revenues through competitive leasing, or (2) sell the licenses as an aggregated portfolio through a competitive bidding process, which would have increased their value well beyond the *ad hoc* process that T-Mobile's exclusionary Scheme takes advantage of. In either scenario, WCO's participation would have introduced the competition that T-Mobile's Scheme suppressed, creating procompetitive benefits to all license holders (including WCO) and consumers.

18.    With these counterclaims, WCO seeks (1) an injunction to prevent T-Mobile from continuing its Scheme, thereby generating the competition T-Mobile has impaired to date and (2) a recovery of lost profits (subject to mandatory trebling) that T-Mobile's Scheme has inflicted upon WCO.

## II.    THE PARTIES

19.    Counterclaim-Plaintiff WCO is a limited liability company organized and existing under the laws of the state of Delaware and doing business in the state of California with its principal office located at 9903 Wilshire Boulevard, Beverly Hills, Suite 200, California 90210.

20.    Counterclaim-Defendant T-Mobile US, Inc. ("T-Mobile") is a Delaware corporation with a principal office at 12920 SE 38th Street, Bellevue, Washington, 98006.

21.    Counterclaim-Defendant Clearwire Spectrum Holdings LLC ("Clearwire") is a limited liability company organized under the laws of Delaware, with a principal office at 12920 SE 38th Street, Bellevue, Washington, 98006. Its ultimate parent is T-Mobile.

22.    Counterclaim-Defendant Clearwire Spectrum Holdings II LLC ("Clearwire II") is a limited liability company organized under the laws of Delaware, with a principal office at 12920 SE 38th Street, Bellevue, Washington, 98006. Its ultimate parent is T-Mobile.

23.    Counterclaim-Defendant Clearwire Spectrum Holdings III LLC ("Clearwire III") is a limited liability company organized under the laws of Delaware, with a principal office at 12920 SE 38th Street, Bellevue, Washington, 98006. Its ultimate parent is T-Mobile.

24.    Counterclaim-Defendant Fixed Wireless Holdings LLC ("Fixed Wireless") is a limited liability company organized under the laws of Delaware, with a principal office at 12920 SE 38th Street, Bellevue, Washington, 98006. Its ultimate parent is T-Mobile.

25.    Counterclaim-Defendant NSAC LLC ("NSAC") is a limited liability company organized under the laws of Delaware, with a principal office at 12920 SE 38th Street, Bellevue, Washington, 98006. Its ultimate parent is T-Mobile.

26.    Counterclaim-Defendant TDI Acquisition Sub LLC ("TDI") is a limited liability company organized under the laws of Delaware, with a principal office at 12920 SE 38th Street, Bellevue, Washington, 98006. Its ultimate parent is T-Mobile.

27.    Counterclaim-Defendant WBSY Licensing LLC ("WBSY") is a limited liability company organized under the laws of Delaware, with a principal office at 12920 SE 38th Street, Bellevue, Washington, 98006. Its ultimate parent is T-Mobile.

28.    Counterclaim-Defendants Clearwire, Clearwire II, Clearwire III, Fixed Wireless, NSAC, TDI, and WBSY are T-Mobile subsidiaries that lease EBS spectrum from educational institutions. Counterclaim-Defendants' leases are a primary subject of these Counterclaims.

## III.    JURISDICTION AND VENUE

29.    WCO asserts antitrust violations under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 and seeks damages, including treble damages, cost of suit, and reasonable attorneys' fees, as well as injunctive relief. WCO has standing to bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

30.    WCO also asserts claims under California state law, including a claim under the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 *et seq.*, and a claim for Intentional Interference with Prospective Economic Advantage.

31.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation). The Court has subject matter jurisdiction over WCO's pendent state law claims pursuant to 28 U.S.C. § 1367.

32.    Venue is proper in the Central District of California under 15 U.S.C. §§ 15, 22 because Counterclaim-Defendants can be found in this District. Venue is

also proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this complaint occurred in this District.

33.     This Court has personal jurisdiction over the Counterclaim-Defendants, as they have submitted to the personal jurisdiction of this Court as to the same activities giving rise to the counterclaims.

34.     Counterclaim-Defendants are engaged in, and their activities substantially affect, interstate trade and commerce.

## IV.   BACKGROUND

### A. The Use of Spectrum for Mobile Wireless Networks

35.     Wireless networks utilize multiple spectrum bands for their networks. In evaluating spectrum utility, wireless carriers consider several factors: *Coverage* refers to how far the spectrum can carry a signal. *Penetration* refers to the ability of the spectrum to permeate barriers, such as building walls. *Capacity* refers to the amount of data that can be transported via a signal at one time. *Speed* refers to how quickly data can be delivered to users. Carriers also consider the network infrastructure required by each spectrum band, the cost of building it, and whether the investment is justified.

36.     These characteristics are often interrelated: For example, as spectrum capacity increases, coverage tends to decrease. As coverage decreases, carriers must deploy more cell sites and other network infrastructure to achieve comparable coverage.

37.     National 5G wireless networks utilize multiple radio-frequency spectrum bands to deliver service, each of which involves a trade-off between signal coverage and capacity. "Low Band" frequencies (below 1 GHz) travel long distances with minimal signal interruption, providing a larger coverage area and excellent building penetration. However, they offer low speeds and capacity.

38.     "High Band" frequencies (above 24 GHz and above) provide ultra-

- 10 -

high speed and capacity but cover far shorter distances. To achieve broad coverage
with High Band, carriers must invest in costly infrastructure upgrades, such as the
construction of new cell towers. High Band coverage is thus concentrated in major
urban centers like New York City and Los Angeles, where major upfront
investments can be justified by dense customer bases.

39.    "Mid Band" frequencies (1 to 6 GHz) combine key characteristics of
both Low Band and High Band spectrum, offering a balance of coverage and
capacity. Compared to Low Band spectrum, Mid Band frequencies support higher
data speeds and greater network capacity, while still providing broader coverage
and better signal penetration than High Band spectrum, with fewer infrastructure
requirements. This balance makes Mid Band spectrum particularly effective for
delivering wide-area, high-quality 5G service.

40.    Wireless networks rely on layered spectrum—from High, Low and
Mid Bands—to balance capacity and coverage across different geographic areas. As
shown in the below WCO investor presentation, High Band coverage is largely
restricted to densely populated urban areas due to its infrastructure demands,
whereas Mid Band is relied upon for coverage in suburban areas, and Low Band for
rural areas:

- 11 -



41.    The 2.5 GHz spectrum band (2.5 to 2.69 GHz) is a Mid Band frequency with the ideal blend of characteristics for the deployment in 5G networks, as well as other applications, including in fixed wireless networks. This spectrum has high capacity and travels well across distances and through obstructions.

42.    2.5 GHz spectrum also has relatively minimal infrastructure requirements, even as compared with other Mid Band spectrum such as the C-Band (3.7-3.9 MHz Band). C-Band requires 1.5 times more cell sites than 2.5 GHz spectrum to achieve the same coverage. Fewer cell sites means lower capital expenditures required to build or supplement a wireless network, along with lower maintenance costs.

43.    2.5 GHz spectrum is thus uniquely suited for delivering quality 5G service in suburban and less densely populated metropolitan areas, where over half of Americans reside.[3] However, due to the Scheme, only T-Mobile's wireless

_____

[3] In the 50 largest U.S. metropolitan areas, roughly 79% of the population lives in suburbs.

1  network currently utilizes 2.5 GHz spectrum.

2  ### B. The History of 2.5 GHz Spectrum Band Licenses

3

4      44.     The 2.5 GHz spectrum band is divided into discrete, channelized

5  frequency blocks licensed by the FCC, such that each channel can be used without

6  interfering with other channels.

7      45.     Each FCC license grants an entity permission to operate on a specific

8  frequency or frequencies within a particular radio band in a specific geographic

9  area. Historically, these licenses were issued under two frameworks: Educational

10 Broadband Service ("EBS") licenses, which were originally reserved for non-profit

11 educational institutions for educational uses only, and Broadband Radio Service

12 ("BRS") licenses, which were issued for commercial broadband use.

13     46.     In the 2.5 GHz band, there are 20 EBS frequency channels and 13 BRS

14 frequency channels, in addition to a number of small "guard-band," or buffer,

15 channels associated with certain of the EBS and BRS channels. Each license is

16 generally comprised of one or more channels.

17     47.     Beginning in the 1960s and up until the 1980s, the FCC allocated EBS

18 spectrum licenses to schools, colleges, and non-profit organizations for use in

19 broadcasting instructional television programming only. However, over time,

20 instructional video content largely transitioned to online broadcasting.

21     48.     On January 10, 2005, the FCC instituted a rule change that permitted

22 EBS license holders to lease their licenses to wireless operators, such as T-Mobile

23 and its predecessor companies (*e.g.*, Sprint and Clearwire). Following the rule

24 change, most EBS license holders did lease their licenses to wireless companies to

25 generate income for their schools.

26     49.     In 2020, the FCC again changed its EBS license rules, this time to

27 allow EBS license holders to sell their licenses outright to commercial entities.

28 Technically, this entails an assignment of the license, as the FCC actually owns the

- 13 -

license itself. They are nevertheless commonly referred to as "sales" in the industry.

50.    The FCC's 2020 rule change has not had a major impact on the competitive landscape for the purchase of EBS licenses, because, as discussed below, T-Mobile, through its Scheme, has been able to prevent competitive bidding on licenses and to maintain exclusive control over roughly 85% of all 2.5 GHz spectrum.

51.    Notwithstanding these rule changes, EBS licenses today remain largely "owned" by educational institutions due to the FCC's historical use and ownership restrictions.

## C. The Rise of 5G and the Importance of Mid Band Spectrum

52.    Fifth-generation ("5G") wireless technology is the successor to fourth-generation ("4G LTE") wireless technology and is deployed through carrier-operated networks. 5G was developed to support substantially higher data speeds, lower latency, and far greater network capacity than 4G, enabling the use of more demanding applications, high-definition video, real-time services, and large-scale device connectivity.

53.    To achieve these performance gains, 5G networks rely on access to a wider range of radio-frequency spectrum than 4G—particularly Mid Band spectrum—which provides a balance of coverage and capacity. Indeed, the FCC found in 2020 that Mid Band spectrum is "essential" to providers' "5G buildout due to its desirable coverage, capacity and propagation characteristics."

54.    As 5G technology emerged, the nation's largest wireless carriers—including T-Mobile, AT&T, and Verizon—moved to secure access to Mid Band spectrum capable of supporting large-scale 5G deployment.

55.    The history of 2.5 GHz spectrum's broad initial allocation to non-profit entities for educational uses—and the later obsolescence of the spectrum for its original educational purposes—meant that the 2.5 GHz band was underutilized

when 5G technology first rose to prominence just prior to 2020. Indeed, in the United States, unlike in Europe, the 2.5 GHz spectrum band was not congested with Bluetooth and WiFi uses, making it largely available for the efficient propagation of 5G networks. Consumers were also poised to take advantage of 5G's advantages—substantially less power usage, increased connection speeds, lower latency, and higher capacity.

56.    Yet, only T-Mobile has succeeded in utilizing 2.5 GHz spectrum for its 5G network. Following its acquisition of Sprint in 2020, T-Mobile obtained control over the vast majority of available BRS spectrum licenses. And T-Mobile has locked up the vast majority of EBS licenses through its exclusive lease provisions and other unlawful activities that comprise the Scheme.

57.    Competitors such as AT&T, Verizon, and others have thereby been foreclosed from meaningful access to 2.5 GHz spectrum and thus have turned to purchasing large quantities of (inferior) C-Band spectrum (at more competitive prices due to the higher number of buyers of C-Band spectrum) to remain somewhat competitive with T-Mobile among 5G consumers.[4] But T-Mobile's exclusive control of the 2.5 GHz spectrum gives it an enormous competitive advantage over its rivals—an advantage that will only grow in the future as consumers increasingly rely of 5G service for their wireless service.

### D. Fixed Wireless Networks and the Importance of 2.5 GHz Spectrum

58.    Fixed wireless networks use cellular technology to provide broadband internet service to stationary locations such as homes and businesses, eliminating the need for traditional wired connections like cable or fiber. Unlike mobile

---

[4] Because T-Mobile built its 5G network principally on 2.5 GHz spectrum, it has purchased only limited numbers of C-Band licenses, and generally in strategic areas (i.e., highly dense, urban areas) to increase spectral depth.

networks that serve devices moving between cell towers, fixed wireless serves a single location with a receiver that connects wirelessly to nearby cell towers.

59.     Fixed wireless has emerged as a significant and rapidly growing market for wireless carriers, offering a faster and more cost-effective alternative to deploying physical infrastructure, particularly in underserved rural areas and as competition to incumbent cable and fiber providers.

60.     As of the third quarter of 2025, the three major carriers—T-Mobile, Verizon, and AT&T—served approximately 14.7 million fixed wireless subscribers, representing about 12.5% of all U.S. broadband households. T-Mobile leads the market with over 6.4 million fixed wireless subscribers, followed by Verizon with 4.6 million and AT&T with 635,000 customers. The carriers now have capacity to serve up to 32 million fixed wireless subscribers, roughly double their assessed capacity from mid-2024. Both T-Mobile and Verizon have set ambitious targets to reach 12 million and 8-9 million fixed wireless subscribers respectively by 2028. The fixed wireless market has experienced explosive growth, with the major carriers adding over a million new subscribers per quarter throughout 2024 and 2025.

61.     Mid Band spectrum, including and especially 2.5 GHz, is particularly valuable for fixed wireless deployments. The 2.5 GHz band offers an optimal balance of coverage range and capacity, allowing carriers to serve residential and business customers over meaningful distances while delivering the high data speeds necessary for modern broadband applications. This makes 2.5 GHz spectrum essential for carriers seeking to deploy competitive fixed wireless networks at scale.

62.     Access to sufficient 2.5 GHz spectrum across multiple markets is critical for any carrier attempting to launch a nationwide fixed wireless service capable of competing with T-Mobile, Verizon, and AT&T, all of whom have leveraged their extensive spectrum holdings to rapidly expand their fixed wireless subscriber bases and capture significant market share.

- 16 -

### E.  WCO's Business Model

63.     Following the FCC's 2020 rule change—which allowed EBS licenses to be sold to commercial parties—Gary Winnick,[5] the late founder of WCO, conceived of an innovative business plan: WCO would set up an investment pipeline to acquire a critical mass of 2.5 GHz license rights from educational institutions; it would then entice wireless carriers to bid on the aggregated rights (or "portfolio") to develop and/or supplement their mobile and fixed wireless networks with valuable 2.5 GHz spectrum.

64.     When EBS license holders first leased their spectrum via 30-year leases starting in or around 2005 and 2006, there were multiple significant buyers operating in the market, including Sprint, Clearwire, and Nextel. But after EBS license holders executed those leases, T-Mobile acquired substantially all of those companies (or their parents or successors), leaving T-Mobile as the only remaining buyer/lessee option for EBS license holders.

65.     Winnick recognized that, following the T-Mobile-Sprint merger, EBS license holders had little chance of realizing competitive market values for

---

[5] Winnick had a proven track record of successfully introducing competition into concentrated telecommunications markets. In 1997, he founded Global Crossing, a pioneering telecommunications company that significantly reshaped the data transport industry by building one of the first global fiber-optic networks. This ambitious infrastructure project, which included undersea cables connecting continents over a million fiber miles, introduced a new level of competition to a market previously dominated by a handful of incumbent carriers. Global Crossing opened the market to greater competition, driving down costs by breaking the incumbent oligopoly and dramatically increasing the available bandwidth for data transport for transatlantic and transpacific routes. Ultimately, the heightened competition introduced by Global Crossing led to lower prices for internet access, international calling, and business data services. Global Crossing's competitive entry into the global data transport market thus drastically shifted the paradigm of data transport in a manner analogous to the benefits to be reaped from WCO's innovative, spectrum aggregation plan.

- 17 -

spectrum rights; even after their existing long-term leases with T-Mobile expired, T-Mobile would still be the only purchaser in the market. By bidding on a large number of EBS licenses, WCO would introduce competition that has not existed since T-Mobile (and Sprint before it) rolled up the vast majority of 2.5 GHz license rights across the country.

66.    The timing of Winnick's venture was favorable: In 2020, many educational institutions were experiencing significant financial disruption caused by the COVID-19 pandemic, along with rising interest rates, inflationary pressures, and declining enrollment. Offers from WCO to purchase EBS licenses at competitive rates would provide necessary liquidity to educational institutions at a critical juncture.

67.    Building out or supplementing mobile and fixed wireless networks with new spectrum requires substantial investment in infrastructure and integration. New entrants into the market for 2.5 GHz license rights would thus need access to far more spectrum licenses than any individual license holder (other than T-Mobile) possessed to justify such investments.

68.    WCO sought to address this market inefficiency by acquiring EBS license rights in the aggregate to create a portfolio that could enable market entry and expansion by mobile and fixed wireless carriers. WCO's strategy was to acquire licenses at prices above the depressed values created by T-Mobile's monopsony power as the dominant buyer and lessee in the market, then assemble a portfolio that could command competitive market pricing for sale as T-Mobile's leases approached expiration. Through this strategy, WCO aimed to provide potential entrants and expanding carriers with access to the critical mass of licenses necessary to justify investment in building, expanding, or supplementing their 5G or fixed wireless networks.

69.    Because WCO's acquisition and portfolio plan was a medium-term strategy, there could be significant technological advancement in the interim, and

- 18 -

WCO was continuously evaluating ways to enhance the value of its planned portfolio of 2.5 GHz spectrum rights. In particular, WCO was actively monitoring emerging technologies for efficient 2.5 GHz "spectrum sharing" similar to the spectrum sharing technology that debuted in 2020 for another mid-band spectrum: Citizens Broadband Radio Service ("CBRS").

70.    Spectrum sharing that could optimize spectrum use, reduce congestion, and enable, potentially, multiple lessees (i.e., non-exclusive leasing arrangements) would enhance network efficiency in the 2.5 GHz band, and could dramatically increase the value of EBS licenses. But such sharing arrangements (and the attendant competition they would engender) would only be possible if WCO (and/or some other buyer(s) not beholden to T-Mobile or restricted by its Scheme) was able to aggregate a critical mass of 2.5 GHz spectrum rights.

71.    If WCO (or some other non-T-Mobile competitor or group of competitors) could aggregate a critical mass of 2.5 GHz rights sufficient to warrant investment into devising an efficient spectrum sharing plan similar to what was implemented for CBRS,[6] the following potential advantages could have been realized:

    a. *Dynamic spectrum sharing.* Unlike traditional spectrum allocation, where frequencies are statically assigned, spectrum sharing technology allocates spectrum dynamically based on demand and availability.

_____

[6] Introduced in 2015, CBRS operates in the 3.55 GHz band (specifically 3550–3700 MHz), which was previously reserved primarily for the Department of Defense radar systems and some commercial satellite operations. CBRS allows a mix of federal, licensed, and unlicensed users to access this spectrum dynamically, making it a groundbreaking approach to spectrum management. CBRS uses a tiered access model for different categories of users that is managed by a Spectrum Access System ("SAS"). The SAS, an automated system, coordinates spectrum use in real time, ensuring no interference occurs between tiers while maximizing availability.

b. *Boosting 5G and all subsequent wireless generations*. 2.5 GHz spectrum aligns much better with 5G's spectrum needs than do other spectrum bands. Spectrum sharing on the 2.5 GHz band would lower the cost of spectrum access, accelerating 5G deployment and making high-efficiency networks more widespread.

c. *Interference mitigation*. Spectrum sharing technology allows for the active monitoring and adjustment of spectrum use to prevent interference among users, ensuring all 2.5 GHz band users will operate efficiently.

72.    This sort of spectrum sharing model is similar to the model employed by wireless communications carriers themselves when they previously sold tower assets to third parties, which were then leased back to the carriers on a shared basis, thus bringing down the overall cost of capital to operate a network. When the carriers sold their tower assets to neutral third parties (who then leased those towers on a non-exclusive basis), fewer towers were needed. Thus, neutral tower ownership not only lowered costs, but also created efficiencies and improved coverage. The end result was superior network quality at a lower cost for consumers.

73.    WCO sought and obtained significant commitments and financial backing for its plan to aggregate EBS licenses. It then began a broad initiative to negotiate the purchase of rights from EBS license holders, approaching hundreds of educational institutions across the country. Indeed, WCO reached out to virtually all EBS license-holding educational institutions to inform them of WCO's intent to purchase EBS licenses, utilizing e-mail, phone contacts, and webinars in the process. It then targeted licenses in the most populated parts of the country, which would be most valuable to establishing a desirable portfolio of spectrum rights.

74.    WCO focused its initial acquisition efforts on the largest 250 EBS licenses holders in operation across the country. WCO entered into negotiations with these license holders and engaged in substantial due diligence to determine the

- 20 -

value of the licenses, despite the fact that the leases required the license holders to keep the lease terms confidential. All told, WCO eventually placed well over $6 billion worth of bona fide offers on some 936 EBS licenses, with an investment pipeline in place to make additional offers on still more licenses.

75.    WCO's entrance into 2.5 GHz spectrum markets immediately introduced a new competitive threat that changed the status quo, and T-Mobile noticed, almost immediately targeting WCO with its exclusionary Scheme (as described further below).

76.    Soon after T-Mobile first began opposing WCO's efforts to acquire EBS licenses, WCO sought to meet with T-Mobile in an effort to allay any concerns T-Mobile might have had regarding WCO's intent to honor the terms of any leases that were held by T-Mobile. At the time, WCO believed this may have been the cause of T-Mobile's objection to WCO's entry into the marketplace. In March 2021, Carl Katerndahl of WCO met with T-Mobile's Senior Director of Spectrum Portfolio Management and Strategy, Paul McCarthy. During the meeting, McCarthy revealed T-Mobile's real concerns. McCarthy told Katerndahl that WCO's bid prices for EBS licenses simply were too high, and that WCO would have to agree to adjust its pricing downward to a level acceptable to T-Mobile in order for the companies to "work together." In other words, T-Mobile was concerned that WCO's market entry was pushing prices toward competitive levels, and invited WCO to collude on prices paid to EBS license holders, a criminal antitrust conspiracy if WCO had agreed. WCO rejected T-Mobile's offer, and T-Mobile continued to carry out its unlawful Scheme to exclude WCO from the market.

V.    **RELEVANT MARKET**

A.    **The Relevant Product Market: 2.5 GHz Spectrum License Rights**

77.    The Relevant Market is the market for 2.5 GHz spectrum license rights.

- 21 -

78.     2.5 GHz spectrum—a Mid Band frequency—offers a distinct combination of propagation characteristics, capacity, and infrastructure efficiency that is not available in other spectrum bands. As such, 2.5 GHz spectrum is not reasonably interchangeable with other bands of spectrum, including other Mid Band spectrum.

79.     The 2.5 GHz frequency band offers better signal propagation than higher Mid Band frequencies like C-Band or 3.45 GHz, meaning it travels farther and penetrates obstacles like walls more effectively. This reduces the number of cell sites needed for coverage, making it significantly more cost-efficient.

80.     T-Mobile has acknowledged 2.5 GHz spectrum's unique characteristics and suitability for 5G applications on numerous occasions. For example, it stated publicly in 2021 that "spectrum obeys the immutable laws of physics. The higher the frequency, the shorter the distance it can travel and the more easily it is blocked by objects. C-band is 3.7 to 3.98 GHz. T-Mobile's existing mid-band 5G network uses 2.5 GHz spectrum. Higher banded spectrum [(i.e., C-Band)] cannot travel as far . . . resulting in [2.5 GHz spectrum's] superior coverage compared to C-Band . . . . Now, Verizon is trying to convince the world it can bend the laws of physics and make C-band work similarly to 2.5 GHz."

81.     In a 2020 press release, T-Mobile announced: "Mid-band 2.5 GHz 5G delivers blazing fast speeds that can rival [high-band] millimeter wave, but unlike mmWave, [2.5 GHz] mid-band can blanket large areas with needed coverage and go through walls, windows, and trees. Which means it's a more practical 5G technology."

82.     Moreover, T-Mobile has stated under penalty of perjury in legal proceedings that its 2.5 GHz spectrum licenses are "inherently unique" and "impossible to replace" and that T-Mobile's 2.5 GHz spectrum "could not be replaced with other mobile wireless bands."

83.     Research has also found that 2.5 GHz spectrum deployments can cover

- 22 -

an area several times greater than 3.45 GHz or C-Band at the same power level and antenna height, highlighting its superior range. The 2.5 GHz band provides significant bandwidth, allowing for high data throughput. This capacity supports faster download speeds and accommodates more users, making it ideal for urban and suburban areas. 2.5 GHz spectrum brings together the best of both worlds: long range for broad coverage with high capacity and speed.

84.     2.5 GHz spectrum also requires fewer cell sites than higher bands like C-Band, reducing infrastructure costs substantially. 2.5 GHz spectrum is thus the most efficient spectrum for use in 5G applications. As T-Mobile explains with regard to these other bands: "We estimate C-band will require 50% more cell sites for meaningful and continuous coverage, and in some areas, for example in-building, the required densification can be 4x higher than 2.5 GHz . . . . The inescapable fact is that delivering seamless mid-band 5G coverage with C-band alone requires extensive network densification and updates to all 5G sites. That's both time-consuming and expensive outside of urban areas. So, Verizon and AT&T, following their failed business strategies to date, now have a choice: spend more to provide contiguous coverage with C-band, or leave their customers with performance and quality holes in their 5G coverage."

85.     2.5 GHz spectrum is also more versatile. In contrast with other spectrum bands, the 2.5 GHz spectrum band supports all three 5G use case categories—enhanced mobile broadband (eMBB), ultra-reliable low-latency communication (URLLC), and massive machine-type communication (mMTC)— due to its blend of speed, capacity, and reach.

86.     Regulatory technology rules also make other Mid Band spectrum a poor substitute for 2.5 GHz spectrum. As T-Mobile has explained: "[T]he maximum allowed output power levels are different and significantly larger for 2.5 GHz where it matters the most and where more than 83% of the population lives. The chipset and mobile device specifications are the same, but 2.5 GHz rules allow

- 23 -

1    twice as high maximum power than C-band, which is particularly beneficial in the

2    context of in-home broadband to support improved uplink coverage. The same is

3    true for operating margins and cell edge performance."

4         87.    Mid Band spectrum licenses are generally a critical input to 5G mobile

5    and fixed wireless networks, as 2.5 GHz spectrum is uniquely well-suited to those

6    uses, particularly in suburban and more rural areas. 2.5 GHz spectrum cannot be

7    reasonably substituted with other Mid Band frequencies because of its unique

8    properties, including its superior capacity and propagation in suburban and more

9    rural areas.

10         88.    Moreover, using 2.5 GHz spectrum licenses in a wireless network

11    requires the licensee to have access to other components that are compatible with

12    2.5 GHz spectrum. Indeed, 5G networks built on other Mid Band frequencies like

13    C-band or 3.45 GHz require different hardware to utilize those frequencies than can

14    be used for 2.5 GHz spectrum. Thus, potential purchasers and lessees of other Mid

15    Band spectrum would have to also acquire and implement new hardware to make

16    use of the 2.5 GHz spectrum (which they would only do if sufficient 2.5 GHz

17    spectrum licenses were available to make such investment worthwhile), making 2.5

18    GHz spectrum not interchangeable with other Mid Band spectrum.

19         89.    Additionally, sellers and lessors of 2.5 GHz spectrum licenses are

20    predominantly educational institutions and non-profits who were granted 2.5 GHz

21    spectrum licenses by the FCC and hold *only* 2.5 GHz spectrum licenses.

22    Accordingly, the Relevant Market is limited to purchasers and lessees of 2.5 GHz

23    spectrum because these institutions do not sell or lease other frequencies.

24    **B. The Relevant Geographic Market: Nationwide**

25

26         90.    The relevant geographic market for 2.5 GHz spectrum license rights is

27    the United States.

28         91.    The geographic market here is defined by the area in which buyers

- 24 -

compete for the acquisition of license rights and in which sellers can reasonably turn for alternative purchasers. For 2.5 GHz spectrum license rights, the scope of competition for both buyers and sellers is national.

92.    From the perspective of buyers, competition for 2.5 GHz spectrum license rights occurs on a nationwide basis. Buyers evaluate, negotiate for, and acquire 2.5 GHz spectrum as part of nationwide or multi-market network deployment strategies. Pricing and acquisition decisions are made centrally and reflect national demand for spectrum used in 5G mobile or fixed wireless networks. National wireless carriers, including T-Mobile, are the dominant purchasers of spectrum license rights used in wireless networks, and the market for 2.5 GHz spectrum license rights is no exception.

93.    From the perspective of sellers, the geographic market is likewise national. License holders across the United States face the same set of potential buyers, who operate nationally, regardless of the geographic location of a particular license. A buyer dominant in one region alone cannot exercise buying power because sellers can turn to purchasers in other regions of the United States. On the other hand, a seller cannot avoid buyer power by turning to purchasers outside the United States market. Accordingly, geographic substitution outside the United States market does not meaningfully constrain buyer conduct.

94.    Although individual 2.5 GHz spectrum licenses are geographically bounded, they are valued and acquired based on their role in broader spectrum portfolios. The principal and highest-value use of 2.5 GHz spectrum is to form or supplement nationwide wireless networks, which requires the aggregation of licenses across large portions of the country.

95.    Because competition for 2.5 GHz spectrum license rights occurs on a national basis, and because neither buyers nor sellers are meaningfully constrained by local or regional boundaries when competing for or offering such rights, the relevant geographic market is national.

- 25 -

96.     Even if competition for 2.5 GHz spectrum license rights occurs on a sub-national basis, the relevant geographic markets are regional in scope, and competition would occur within discrete regions in which buyers seek to acquire sufficient aggregations of 2.5 GHz spectrum licenses to deploy or supplement wireless networks. Within each such regional market, sellers face the same limited set of potential buyers, buyers compete for license rights based on regional network deployment needs, and competitive conditions are sufficiently homogeneous to constitute relevant geographic markets for antitrust analysis.

97.     A hypothetical monopsonist of 2.5 GHz spectrum rights in the United States (or any regional market) could profitably lower prices by a small, but significant, non-transitory amount.

## VI.    T-MOBILE'S MONOPSONY POWER

98.     At all relevant times, T-Mobile has had monopsony power in the Relevant Market for 2.5 GHz spectrum rights. Such monopsony power is apparent through both direct and indirect evidence.

99.     T-Mobile exclusively controls around 85% of 2.5 GHz spectrum in the United States (measured in "MHz-POP" terms) through either direct ownership or long-term exclusive leases. When measured as a percentage of available 2.5 GHz licenses, T-Mobile's share of the Relevant Market is 78%.

100.    As a result, T-Mobile is the only cellular service provider offering a 5G wireless network that utilizes 2.5 GHz spectrum, though other cellular service providers would develop 5G wireless networks or supplement their existing 5G wireless networks with 2.5 GHz spectrum if a critical mass of 2.5 GHz spectrum licenses across the country became available for sale or lease.

101.    As a result of the Scheme, T-Mobile is the only viable buyer or lessee of 2.5 GHz licenses because it is the only cellular service provider with access to the critical mass of 2.5 GHz licenses required to develop and maintain a 5G

- 26 -

wireless network utilizing the 2.5 GHz spectrum.

102.    T-Mobile has the ability to reduce the demand and compensation available to 2.5 GHz spectrum license owners for the use of 2.5 GHz spectrum without losing so much revenue as to make their conduct unprofitable. As a result of T-Mobile's monopsony power in the Relevant Market, 2.5 GHz spectrum license owners do not have the ability to turn to alternative buyers or lessees to earn competitive compensation in response to T-Mobile's artificial suppression of demand and compensation for license holders below competitive levels.

103.    T-Mobile's control of the Relevant Market affords it the ability to, *inter alia*, (i) purchase or lease 2.5 GHz spectrum at below-competitive levels (including in the future when their existing leases expire and renew); (ii) suppress prices and demand for 2.5 GHz spectrum licenses and leases below competitive levels; (iv) require 2.5 GHz spectrum license owners to enter into long-term, exclusive leases or to sell their licenses to T-Mobile; and (v) impair or preclude 2.5 GHz spectrum owners from leasing or selling their license rights to other actual or potential rivals to T-Mobile.

104.    T-Mobile is capable of artificially suppressing compensation for license rights (in terms of both lease payments and purchase prices)—and has, in fact, artificially reduced compensation—to 2.5 GHz spectrum license holders without causing so many 2.5 GHz spectrum license holders to sell or lease to other buyers or lessees so as to make that reduction in compensation unprofitable.

105.    Barriers to entry in the Relevant Market are high. Allocable spectrum in the 2.5 GHz band has already been parceled out by the FCC, meaning that for an actual or potential entrant to acquire 2.5 GHz licenses, the entrant would need to approach current license holders—whose licenses are nearly all encumbered by leases to T-Mobile.

106.    As discussed herein, the best and highest use for 2.5 GHz licenses since approximately 2019, has been for broadcasting and propagating a nationwide

5G or fixed wireless network. To become a successful cellular company with a 5G
or fixed wireless network, the company must acquire the rights to sufficient
spectrum across the country on which to build its network.

107.    However, to utilize 2.5 GHz spectrum in a 5G mobile or fixed wireless
network, a service provider would need access to a critical mass of 2.5 GHz
spectrum licenses (via either ownership or lease) across the country (or at least
across critical regions dispersed across the country) in order to justify the
investment and expense required to build out a network or supplement an existing
network. 2.5 GHz spectrum requires different hardware to be utilized in a 5G
wireless network than other frequencies. As a result, sufficient 2.5 GHz spectrum
license availability must exist to entice cellular service providers to invest in
building out networks or supplementing their existing networks to utilize these
frequencies. Without sufficient 2.5 GHz spectrum licenses available (*i.e.*, a critical
mass)—particularly in key geographic regions—these cellular service
providers/potential competitors for the purchase and/or lease of 2.5 GHz license
rights will not enter the market.

108.    Other than the licenses owned directly by T-Mobile, existing 2.5 GHz
license ownership is dispersed across over a thousand individual educational and/or
non-profit institutions nationwide. Collecting access to the requisite critical mass of
2.5 GHz licenses to build out or meaningfully supplement a 5G or fixed wireless
network requires substantial diligence to identify licenses in critical geographies
with potentially willing sellers and to identify appropriate pricing, substantial
capital to acquire the licenses from such sellers, and the ability (and financing) to
wait for the expiration of T-Mobile's exclusive lease rights. Because T-Mobile's
exclusive lease agreements contain a number of anticompetitive provisions that
restrict sales and future lease transactions, including ROFRs, T-Mobile is
effectively able to maintain that exclusivity well beyond the formal terms of the
agreements, and potentially indefinitely.

109.   The need for a critical mass of licenses to compete with T-Mobile (which no firm can obtain because of the Scheme) means that T-Mobile has and can maintain monopsony power over the market for 2.5 GHz spectrum license rights even without possessing 100% of those rights. To attract 5G wireless service providers to invest in developing or supplementing their competing wireless networks on or with 2.5 GHz spectrum, a critical mass of rights to 2.5 GHz spectrum across the country (or at least across critical regions dispersed across the country) must be available (or there must be sufficient promise of their imminent availability) for these providers to enter the market. Indeed, even where a purchaser of 2.5 GHz license rights is able to acquire one or a handful of 2.5 GHz spectrum licenses, it would do little to reduce T-Mobile's monopsony power because such available licenses are *de minimis* in terms of the spectrum they account for and thus cannot supply the geographic 2.5 GHz coverage required to meaningfully attract these competitors to the market.

110.   T-Mobile recognizes the high barriers to entry here. For example, in a June 2020 investor presentation, T-Mobile boasted that it has "such a material [spectrum] advantage right now against AT&T and Verizon" that those competitors do not even "have a path to match" T-Mobile. T-Mobile further claimed in that same presentation that AT&T and Verizon could not hope to "close the mid-band spectrum gap despite massive spending." In March 2021, T-Mobile also told investors that its spectrum "advantage will last for the entirety of the 5G era and translate into extraordinary shareholder returns."

111.   T-Mobile's dominant 85% market share and the high barriers to entry, made even higher by T-Mobile's exclusionary Scheme, are a separate and independently sufficient basis (distinct from T-Mobile's demonstrated pricing power) for finding that T-Mobile possesses monopsony power in the Relevant Market.

## VII.  T-MOBILE'S EXCLUSIONARY SCHEME

112.   T-Mobile has willfully acquired and maintained monopsony power in
the Relevant Market through an exclusionary Scheme with several components
operating synergistically, including: (1) long-term exclusive lease agreements with
EBS license holders that include anticompetitive provisions designed to restrict
sales to third parties and foil competitive bidding; (2) T-Mobile's direct acquisition
of 2.5 GHz licenses that strengthen its monopsony by intercepting purchases of
those licenses by actual or potential competitors such as WCO, and otherwise
foreclosing access from actual or potential competitors for these critical spectrum
assets; and (3) a campaign of sham litigation and threats of such litigation designed
to intimidate EBS license holders from seeking competitive bids, including from
WCO. This Scheme, described below, has allowed T-Mobile to substantially
foreclose competition for 2.5 GHz spectrum license rights and suppress prices for
those rights below competitive levels.

### A.    T-Mobile's Anticompetitive and Exclusionary Long-Term Leases

113.   The first element of the Scheme consists of T-Mobile's roughly 1,700
long-term, exclusive lease contracts with EBS license holders. These leases contain
multiple provisions that work synergistically to protect and reinforce T-Mobile's
exclusive control over the vast majority of 2.5 GHz spectrum license rights in the
United States. These provisions include 30-year terms, far-reaching exclusivity
clauses, and restrictions on the transferability and sale of the underlying spectrum
assets, including exclusive purchase rights and ROFRs. Together with the other
elements of the Scheme, these provisions constrain license holders' ability to
solicit, consider, or consummate transactions with potential buyers other than T-
Mobile and foreclose potential buyers other than T-Mobile from entry and
expansion within the Relevant Market.

i.     *30-Year Exclusive Lease Terms*

114.   T-Mobile's EBS leases are exclusive. They give T-Mobile the "exclusive right to operate and use" the license-holder's channels for the duration of the lease.[7] They also prevent the license-holder from leasing to or allowing any third party to use any of the channels for the duration of the lease.

115.   T-Mobile's leases are also long term in nature, with an effective exclusive period of around 30 years. They generally are structured so as to have an initial term of five years, with five automatic renewal terms. T-Mobile (but not the license holder) has the unilateral right not to renew the lease for any interim renewal term (with advance notice to the license holder). The leases thus functionally give T-Mobile effectively 30 years of exclusivity over the license holder's 2.5 GHz channels. Most of these 30-year terms do not lapse until at least least 2035.[8]

116.   Through T-Mobile's 30-year exclusive EBS leases (and its ownership over other 2.5 GHz license rights), T-Mobile has had exclusive rights, access, and control over the vast majority of 2.5 GHz spectrum licenses both at present and

---

[7] The leases reserve a small amount of capacity (5%) for the license-holder to use in order to meet the FCC's "minimum educational programming requirements" that were previously in effect.

[8] The FCC generally prohibits EBS license holders from leasing their facilities for longer than 30 years. *See* 47 C.F.R. § 27.1214 (e) (2008). But many of T-Mobile's EBS leases also include a "covenant not to compete" that prohibits the license holder from leasing their spectrum to any T-Mobile competitor for up to a year after the expiration of the agreement, effectively making the exclusivity period even longer. Moreover, as set forth below, T-Mobile's leases include provisions that effectively extend the term of the lease beyond this 30-year limit, including the ROFR provisions that give T-Mobile the unilateral right to match a lease offer for 12 to 36 months after the expiration of the nominal 30-year lease term, extending T-Mobile's control over the leased spectrum asset to at least 31 to 33 years, if not far longer.

throughout the relevant time period.

ii.    _Exclusionary Sales Restrictions_

117.    T-Mobile's EBS leases also include several clauses that either (a) outright bar EBS license holders from selling the licenses underlying the lease, or (b) significantly restrict the license holders' ability to do so. In either case, such restrictions apply regardless of whether a sale could or would affect T-Mobile's rights during the term of the lease. Collectively, these clauses operate to extend T-Mobile's exclusive control of the license rights beyond the 30-year term of the lease.

118.    **First**, many of T-Mobile's leases contain an "Exclusivity" clause that expressly prohibits the license holder from negotiating with or selling their license to a third party before the last six to twelve months of the effective term of the agreement (i.e., the last year of the lease after all automatic renewals). This provision expressly  bars EBS license holders from selling their licenses to anyone but T-Mobile.

119.    WCO and other would-be buyers are functionally excluded from bidding for any EBS licenses subject to this express Exclusivity clause. EBS license holders could not consider any purchase offer from WCO, and WCO could not purchase any such licenses, under the plain text of this provision.

120.    T-Mobile admits as much. In an August 11, 2021 letter from T-Mobile's Senior Counsel to an attorney for the Christian College of Georgia, an EBS license-holder, T-Mobile asserted that "[s]elling the [FCC 2.5 GHz band] License to WCO" would violate the lease's exclusivity provision. T-Mobile concluded, "In short, the Lease does not permit the College to sell or assign the License to WCO."

121.    Nor has T-Mobile hesitated to enforce this provision in court. In April 2023, T-Mobile filed suit against Lorain County Community College alleging that

- 32 -

the license holder had violated the express Exclusivity clause in its EBS lease by
"negotiat[ing] to sell, and threaten[ing] to sell" its EBS license to WCO.

122.   **Second**, in other T-Mobile EBS leases, the Exclusivity clause permits
some sales or assignment transactions (subject to T-Mobile's Right of First Refusal
("ROFR"), described below) so long as the purchaser is not a competitor to T-
Mobile in providing telecommunications services (or an entity affiliated with such a
competitor or who has granted such a competitor the right, option, or preemptive
right to use or acquire 2.5 GHz spectrum license rights in the future).

123.   This requirement reflects T-Mobile's anticompetitive intent and
purpose: T-Mobile includes such language in its EBS leases to prevent market entry
by potential spectrum buyers like AT&T or Verizon, who might seek to purchase
EBS licenses to access the spectrum after T-Mobile's current leases expire and
thereby compete with T-Mobile's telecommunications services.[9]

124.   But, as discussed further below, T-Mobile has used this provision as
the basis for suing EBS license holders who considered selling their licenses to
WCO, which has never provided a telecommunications service and thus is
unquestionably outside the scope of this particular sale prohibition.

125.   **Third**, all of T-Mobile's leases contain a right of first refusal
("ROFR"). The ROFR gives T-Mobile the right to purchase[10] the license at the
price offered by any potential purchaser and thereby maintain its exclusivity over
its leased 2.5 GHz spectrum license rights even after its long-term exclusive lease
expires.

---

[9] The language of these sales restrictions, however, is not limited to 5G wireless
service providers, and instead refers to providers of any "commercially available
telecommunications service using EBS or BRS spectrum within the United States,"
which reasonably includes fixed wireless networks and other services.

[10] T-Mobile's ROFR also permits T-Mobile to lease or use the license on any terms
offered by a third party as well.

126.   T-Mobile's ROFRs remain in effect for an additional 12 to 36 months beyond the term of the lease. The ROFR thus gives T-Mobile the right to make a license purchase years after it is no longer leasing and using the licensed EBS spectrum.

127.   T-Mobile can and has used its ROFRs to block actual and potential competitors (including WCO) from acquiring access to a critical mass of 2.5 GHz spectrum licenses needed to enable a mobile carrier to build out or supplement a 5G wireless network.

128.   T-Mobile does not need to exercise every ROFR it possesses to maintain its monopsony power, but rather, it can selectively invoke the right for particular purchasers and particular licenses to ensure that it maintains sufficient exclusivity over the 2.5 GHz spectrum nationally to substantially foreclose the Relevant Market. The ROFR thus serves as a backstop that T-Mobile can rely on if its other anticompetitive tactics fail.

129.   Indeed, as discussed further below, although T-Mobile has selectively exercised its ROFRs to exclude WCO from the market, most of WCO's efforts to acquire 2.5 GHz spectrum rights (i.e., the hundreds of other bids it submitted) were thwarted by other elements in the Scheme.

130.   The threat that T-Mobile will selectively exercise its ROFRs to deny access to critical spectrum rights also deters would-be purchasers from even attempting to enter the market in the first place. Thus, through such selective exercise, T-Mobile can continue to suppress the value of 2.5 GHz leases and suppress its lease payment obligations now and in the future.

131.   **Fourth,** many of T-Mobile's EBS leases also contain a "Right to Participate" provision, which is triggered if a license holder decides to solicit bids for the sale, assignment, transfer, or use of the license anytime during the lease term or between one to three years *after* it expires. Once triggered, the Right to Participate requires license holders to offer T-Mobile, *inter alia*, the ability to

- 34 -

submit bids, receive information concerning other bids and counters, and counter other bids.

132.    T-Mobile has interpreted this provision extremely broadly, asserting that it is entitled to all correspondence between the license holder and any competing buyers. The Right to Participate thus subjects EBS license holders to extremely burdensome and costly information requests from T-Mobile, which discourage them from entertaining offers like those submitted by WCO.

133.    The provision also gives T-Mobile extensive insight into competing buyers' willingness to pay, negotiation tactics, and strategic planning. This competitively sensitive information can be used not only to outbid a competing buyer for the license in question, but also to undercut them across the market. Indeed, knowing that such information will be shared with T-Mobile may deter many buyers from submitting bids at all.

134.    **Fifth,** T-Mobile's leases with EBS license holders contain a strict prohibition on disclosure of lease terms to third parties including potential license purchasers. Because successful entry or expansion in the Relevant Market by a purchaser of EBS licenses requires access to any existing lease terms that it will assume under the license,[11] T-Mobile's confidentiality clauses impair purchasers' ability to value the license accurately and determine a true competitive price for it.

135.    T-Mobile's prohibition on sharing such information with potential purchasers thus impairs license holders' ability to obtain competitive bids for 2.5 GHz licenses because they cannot share the existing income streams—which would be the only income a purchaser could realize until the exclusive leases with T-Mobile expire, and which would also inform the forward-looking income streams

_____

[11] In the versions of the lease that allow for sales, the purchaser must certify that they will honor the existing lease with T-Mobile in order for the license holder to sell.

- 35 -

1    that could be expected in future years.

2    136.   T-Mobile interprets its confidentiality provisions broadly and has

3    repeatedly taken the position that its leases are even exempt from state-level

4    freedom of information and transparency laws that apply to the many public

5    educational institutions that hold EBS licenses. Counsel for T-Mobile has pointed

6    to these provisions to demand that EBS license holders withhold key information

7    about the leases from public disclosure, threatening litigation even when this

8    information is subject to mandatory disclosure.

9    137.   These restrictive provisions (and T-Mobile's vigorous enforcement of

10   them) significantly raise costs for WCO and other would-be buyers of EBS

11   licenses, who must expend significant time and money seeking information about

12   these leases and fighting for lease information through public information laws,

13   including in litigation.

14   138.   For example, on February 9, 2021, WCO filed a California public

15   records request seeking Pasadena Unified School District's EBS lease with T-

16   Mobile. Outside counsel for T-Mobile, Kenneth J. Brown of Williams & Connolly

17   LLP, demanded that the Pasadena Unified School District withhold payment and

18   pricing data from disclosure on the basis that such "disclosure would be

19   inconsistent with the District's obligations under the Lease Agreement." WCO was

20   then forced to file a writ of mandate in Los Angeles County Superior Court to

21   enforce its public records request. WCO eventually settled with T-Mobile, but it

22   expended considerable resources to do so.

23         iii.   *Exclusionary Terms in T-Mobile EBS Leases Effectively Block
24                Sales and Future Lease Transactions*

25   139.   The combined effect of T-Mobile's EBS lease provisions was to

26   impose increased burdens, costs, and risks on EBS license holders if they chose to

27   deal with any potential buyer of 2.5 GHz spectrum rights other than T-Mobile.

28

- 36 -

140.   Collectively, T-Mobile can and has exercised these exclusionary lease provisions to maintain and extend its exclusive spectrum rights. T-Mobile admits its exclusive EBS leases are designed to foreclose competition, noting that its leases "include extensive provisions such as rights of first refusal, no-shop clauses, and exclusivity, all of which were designed to maintain [T-Mobile's] contractual rights with respect to the FCC Licenses, including, but not limited to, utilization of the Spectrum." T-Mobile has made clear that these exclusionary contract terms are a core component of its "national growth strategy." Thus, T-Mobile admits that the purpose and effect of its leases is to implement exclusive dealing agreements with suppliers of spectrum rights and to limit their ability to deal with rivals.

141.   License holders likewise understand T-Mobile's lease terms to effectively prohibit them from selling or leasing 2.5 GHz spectrum to T-Mobile's competitors—even when those transactions would preserve T-Mobile's contractual rights to utilize the spectrum (as WCO planned to do).

142.   For example, EBS license holder Point Park University turned down a lump sum offer of almost $12 million from WCO because, in the words of the school, it was not permitted to sell its spectrum to WCO because of "the restrictions in the lease between Point Park and T-Mobile."

143.   Another license holder, Willwoods, expressed initial interest in selling its license rights to WCO but soon pulled out of negotiations, stating that, upon advice of counsel, it could not sell the spectrum license to WCO pursuant its lease agreement.

144.   St. Louis Community College advised WCO that it could not even speak to WCO about the sale of its 2.5 GHz spectrum license due to contractual obligations.

145.   After evaluating WCO's purchase offer, Lackawanna College stated that it "should let [WCO] [k]now now that, for now, the College has put its process on hold given the heightened risk opposed by T-Mobile's public position on its

- 37 -

interpretation of certain lease provisions."

146.   South Suburban College informed WCO that it was "quite likely" to get sued by T-Mobile if it transacted with WCO, expressing concerns about the terms of its lease with T-Mobile. South Suburban College explained that "[o]ne of the key issues for us is the possibility of being sued by a large telecom company if we try to sell."

147.   Two license holders in the Cincinnati area, the University of Cincinnati and the Board of Education of the Cincinnati City School District also informed WCO that they would not move forward with a sale to WCO due to their adversity to litigation.

148.   Another license holder, Views on Learning, advised WCO that its attorney had informed them that they could "end up being a test case for T-Mobile, something we don't want to do. So, we are going to continue waiting for a possible sale of our licenses."

149.   Counsel for Sinclair Community College ("Sinclair") indicated that Sinclair, Wright State University, and Dayton Educational TV would go together in any sale of 2.5 GHz spectrum rights to a purchaser, but that the Lorraine County Community College litigation (another T-Mobile lawsuit) had a significant impact on their risk analyses for whether they would even communicate with WCO about such a transaction.

150.   Mitchell Steidl of QHS, LLC, which represents license holders possessing 76 combined 2.5 GHz licenses, including Bishop Kelly High School (which had received offers from WCO), expressed concern that T-Mobile would consider merely signing an NDA in connection with sales negotiations to be a violation of the lease. Steidl sought an opinion from T-Mobile on that issue, to which T-Mobile responded only that it would "strictly enforce all aspects of the leases." That led Mr. Steidl to conclude that continuing to negotiate with WCO would put the license holders "at risk of running afoul of the terms of" their leases.

- 38 -

151.   Terry Marak, the CFO of Educational Service Center Region 12 ("Region 12"), emailed WCO that it had hired an attorney "to see if we could potentially sell our two EBS frequencies without violating our lease agreement with T-Mobile." Ultimately, they declined to pursue a sale because "T-Mobile informed [them] they would take [them] to court if [they] proceeded with a sale of the frequencies."

152.   Upon information and belief, Clark County School District and California Human Development Corporation also withdrew from negotiations with WCO and sold to T-Mobile due to concerns about their lease terms with T-Mobile, being threatened with litigation, and/or being advised by counsel that proceeding with WCO risked ruinous legal costs.

153.   Even for license-holders that may be formally permitted to sell their license, other restrictions on sales make them de facto exclusive. For example, Northwest Florida State College's Board issued a memorandum that discussed its "limited options for sale under the existing leases. The leases prohibit soliciting an offer for the licenses and require disclosure of any unsolicited offer submitted to T-Mobile. T-Mobile has the right to challenge whether an offer from a competitor is bona fide as well as the first right to purchase." It further advised that, because it "ha[s] no options for a competitive sale, we requested that T-Mobile present an offer to purchase."

154.   Similarly, Wilkes University thanked WCO for presenting an offer for its EBS spectrum rights, but stated that it was in a "long term defacto lease with T-Mobil [sic]. Per the lease terms, [T-Mobile] have first rights to any sale of this spectrum," and therefore, it would not engage with WCO.

## B. T-Mobile's Acquisition of 2.5 GHz Spectrum Licenses

155.   The second component of the Scheme consists of T-Mobile's efforts to buy available 2.5 GHz licenses outright, buying BRS licenses (and/or

- 39 -

telecommunication companies that own such licenses) and preemptively acquiring EBS licenses.

156.    These acquisitions were "offensive" in that they secure T-Mobile's exclusive rights to 2.5 GHz spectrum and "defensive" in the sense that many were designed to prevent WCO (or any other actual or potential competitor) from acquiring them and aggregating them into the critical mass required to generate true competition in the Relevant Market.

157.    Since the FCC changed its rules in 2020 to allow commercial entities to hold EBS licenses, T-Mobile has purchased nearly 600 of the roughly 2,200 incumbent EBS licenses that exist.

158.    These acquisitions have insulated and enhanced T-Mobile's existing monopsony power in the Relevant Market by raising entry barriers and foreclosing competitive purchases by WCO and any other competitors. As discussed *supra*, some of these acquisitions occurred in circumstances where WCO had already made *bona fide* offers and placed concrete purchase terms on the table, as described above. In many other instances, however, T-Mobile acquired licenses that WCO had not yet reached in its acquisition process.

## C.  **T-Mobile's Use of Threats and Coercion**

159.    Finally, T-Mobile's Scheme involves the use of threats and intimidation to coerce license holders not to deal with WCO (or anyone else). T-Mobile's threats and intimidation tactics were effective, in no small part because word spread quickly in the educational community even among those not targeted by T-Mobile's threats and lawsuits.

160.    Many of T-Mobile's actual and threatened lawsuits, including those described herein, *infra*, were and are objectively baseless. T-Mobile's lawsuits and threats included misrepresenting to EBS license holders applicable law, FCC rules, and the meaning of contractual provisions.

- 40 -

161.   For example, T-Mobile's ROFR lease provisions state that it has the right to acquire the holder's EBS license on the same terms as any "*bona fide*" third party offer received by the license holder. T-Mobile, however, has taken the position (including in actual and threatened litigation) that the term "*bona fide*" gives it effective veto power over proposed transactions with WCO, and to require the production of burdensome amounts of information before it will even consider whether an offer can be deemed "*bona fide*."

162.   T-Mobile's actual and threatened lawsuits did not constitute genuine petitioning but instead sought to use the legal process as an anticompetitive weapon to prevent anyone who might threaten T-Mobile's monopsony from acquiring 2.5 GHz license rights. This litigation was pursued and threatened not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings and threats of filings undertaken to intimidate small educational and non-profit institutions into acquiescing to T-Mobile's market power and to further T-Mobile's Scheme.

163.   Notably, T-Mobile has never followed through on its lawsuits against EBS license holders, instead abandoning each one after the license holder succumbed to the prospect of substantial litigation costs and made clear that it would not sell to T-Mobile's actual or potential rivals (including WCO). Indeed, T-Mobile has never litigated one of these cases to finality or a damages award.

## D. <u>T-Mobile Targeted WCO With Its Scheme</u>

164.   WCO's innovative business plan, its access to financing, diligence activities, and active bidding for key 2.5 GHz licenses threatened T-Mobile's 2.5 GHz dominance and the substantial advantage such dominance conferred on T-Mobile's 5G and fixed wireless networks.

165.   As WCO began approaching license holders with *bona fide* acquisition interest, it quickly became apparent that T-Mobile viewed WCO's entry as a

competitive threat.[12] Shortly after WCO began targeting higher-value licenses, T-Mobile embarked on an anticompetitive campaign designed to prevent WCO from acquiring licenses in the market.

          i.        *T-Mobile Targets WCO and its EBS Counterparties with Sham Litigation.*

166.   ***Albright College Sham Lawsuit.*** On May 28, 2021, TDI Acquisition Sub, LLC, a holding company subsidiary of T-Mobile, sued EBS license holder Albright College in the Berks County Court of Common Pleas, Pennsylvania in response to WCO's offer to purchase Albright's EBS license in Reading, PA, for $16,200,000. *TDI Acquisition Sub LLC v. Albright College*, No. 21-04881 (Berks County, Ct. of Common Pleas May 28, 2021) (the "*Albright* lawsuit"). This was a vast sum that would have funded scholarships and numerous programs for Albright, an underfunded college.

167.   Under the terms of Albright's EBS lease with T-Mobile, Albright was permitted to sell its EBS license, provided that it complied with T-Mobile's ROFR and that it did not sell to a "Competing Entity." The term "Competing Entity" is defined in Albright's lease as a party that "offers, provides or delivers a commercially available telecommunications service using EBS or BRS spectrum within the United States of America."[13]

168.   WCO is plainly not a "Competing Entity" within the meaning of the

---

[12] WCO did attempt to meet with T-Mobile to allay any concerns that WCO would not honor T-Mobile's leases for the licenses that WCO endeavored to purchase, but T-Mobile was uninterested in that conversation.

[13] The lease offers alternative definitions of "Competing Entity" that are just as inapplicable to WCO. WCO does not own any interest in a company that offers such a "telecommunications service," nor has (or had) WCO been granted nor been affiliated with a party that had granted a Competing Entity the option or preemptive right to use or otherwise acquire Albright's 2.5 GHz license rights.

lease as it has never offered or provided telecommunications services. And T-Mobile did not have any reasonable basis to believe it did.

169.   Nevertheless, in its complaint against Albright, T-Mobile alleged that Albright violated the Exclusivity clause in its lease with T-Mobile when it engaged in negotiations with WCO leading to a purchase offer because Albright had not established to T-Mobile's subjective satisfaction "that WCO is not a Competing Entity." T-Mobile also claimed that WCO's offer was not "*bona fide*" for the same reason, and thus, that it had no obligation to exercise its ROFR to match WCO's $16 million offer in order to halt the transaction.

170.   T-Mobile had no objectively reasonable basis for either assertion: Albright and WCO had both provided T-Mobile with written assurances that WCO was not a Competing Entity, WCO was not registered as a telecommunications or broadband provider, and WCO did not even hold any 2.5 GHz licenses or leases—a matter of public record that a sophisticated entity like T-Mobile (and the owner or lessor of the vast majority of 2.5 GHz licenses) surely was aware of.

171.   These litigation claims were also undermined by the fact that T-Mobile did exercise its ROFRs to acquire other leases WCO bid on *during the same period* and *that involved the same sales restrictions*. In August 2021, just one month after T-Mobile filed an amended complaint in *Albright*, Grand Ledge Public Schools and Palomar Community College District informed T-Mobile that they had received *bona fide* offers from WCO. T-Mobile exercised its ROFR shortly thereafter. Both leases contain identical prohibitions on sales to Competing Entities as the Albright lease. T-Mobile's actions make clear it held no genuine concern that WCO was a "Competing Entity." If T-Mobile really believed that WCO was a "Competing Entity," it could have blocked the sale by suing for breach of the lease agreement (as it did in *Albright*), without the need to exercise the ROFR.

172.   T-Mobile exploited the *Albright* lawsuit to impose substantial costs on WCO by pursuing invasive competitive research through overly broad non-party

subpoenas. These subpoenas sought sensitive information about WCO's business strategies, acquisition plans, market models, and financing—none of which had any relevance to the Albright College transaction. T-Mobile abused the judicial process by initiating numerous enforcement hearings in Delaware and Virginia, using discovery as a pretext to extract confidential competitive intelligence while burdening WCO with enormous litigation expenses. WCO ultimately succeeded in limiting the subpoenas' scope to documents actually pertinent to the Albright transaction.

173.    While aggressively pursuing discovery into WCO's broader business plan, T-Mobile made no effort to litigate its clams against Albright. T-Mobile never even pressed Albright for a response to the complaint. Yet, ultimately, Albright College and WCO never completed a deal for Albright's EBS license. A small liberal arts college, Albright lacked the financial resources and appetite to litigate with T-Mobile and ceased pursuing any transaction with WCO.

174.    Since Albright lacked the capacity and wherewithal to litigate against T-Mobile, Albright abandoned the transaction, and T-Mobile withdrew its complaint and agreed with Albright not to proceed further so long as Albright agreed not to sell its EBS license to WCO.

175.    The case was an abuse of process designed not only to torment Albright and WCO, but also to deter other educational institutions from doing business with WCO (or similar entities).

176.    ***The St. Lucie School Board Sham Lawsuit.*** On March 25, 2022, NSAC, LLC (another subsidiary of T-Mobile) sued the School Board of St. Lucie County, Florida, an EBS license holder. WCO had made an offer to purchase St. Lucie's two EBS licenses for $7,550,000. After threatening litigation, T-Mobile filed a baseless complaint nearly identical to the complaint asserted in the *Albright* lawsuit, seeking to block the sale of the license under the parties' lease. These allegations were equally baseless given that WCO still was not a Competing Entity

- 44 -

under the St. Lucie lease agreement, and it had made a *bona fide* offer.

177.    Because the lawsuit could bankrupt the school district regardless of its lack of merit, St. Lucie withdrew from the agreement to sell its EBS licenses to WCO. The case was dismissed as moot shortly thereafter.

178.    ***Intimidation and Threatened Sham Litigation.*** T-Mobile used its sham *Albright* litigation to intimidate other potential sellers of 2.5 GHz licenses. T-Mobile forwarded the complaint to numerous institutions as a warning of what would happen if they dealt with WCO or similar entities. As detailed herein, numerous institutions declined to deal with WCO as a result of these threats.

179.    EBS license holders that T-Mobile threatened with frivolous lawsuits (but that were never filed) include La Roche University; Education Service Center Region 12, Texas; and the Radio Training Network ("RTN").

180.    As a result of such threats, EBS license holders often responded to WCO's acquisition efforts with reluctance. For example, RTN accepted a $5 million offer from WCO for its EBS license. However, after T-Mobile's counsel implicitly threatened RTN in a phone call and sent RTN the sham complaint from *Albright*, RTN withdrew from the agreement.

181.    As small, dispersed education institutions and non-profits, EBS license holders were and are reluctant to incur the tremendous costs associated with litigating against T-Mobile—even in the case of frivolous lawsuits. As Christian College of Georgia told the FCC: "Christian College viewed the letter [from TMO Senior Counsel Heather Brown regarding a proposed license sale to WCO] as a threat of court litigation if it negotiated with WCO. It couldn't afford a court fight with T-Mobile. It did not desire to play David to T-Mobile's Goliath."

ii.    *T-Mobile's Exercise of ROFRs*

182.    T-Mobile exercised its ROFRs to block WCO's acquisition of 69 EBS licenses.  In each of these cases, the license holder provided notice to T-Mobile that

- 45 -

it had received an offer from WCO, and T-Mobile exercised its ROFR to acquire the licenses.

183.    While T-Mobile's exercise of its ROFRs followed the formal mechanics of the lease provisions, they further reinforced the exclusionary effect of the overall Scheme. T-Mobile's ROFR exercises confirmed to schools and market participants that WCO's acquisition efforts would be blocked, which discouraged further bidding and increased the costs and risks of competing for licenses.

184.    T-Mobile's ROFRs cut off the bidding process after an initial offer was made by WCO in an effort to compete with T-Mobile. In a bidding market free of T-Mobile's monopsonistic ROFR, the bidding process would go on until a final, truly competitive price was reached based on the bidder's ability to make unrestricted bids and counter-bids. The ROFR provision allows T-Mobile to match WCO's bid without going through a typical competitive bidding process.

185.    Because the leases gave T-Mobile the ability to intercept WCO's offers before they could become completed purchases and convert those licenses into T-Mobile's owned, exclusive portfolio, each transaction enhanced T-Mobile's monopsony power. As a result, WCO was not able to gain the critical mass required to generate competition in the Relevant Market.

186.    Although the ROFRs provided T-Mobile with a valuable tool to exclude WCO and other would-be rivals when other tactics failed, T-Mobile exercised its ROFR selectively. Indeed, T-Mobile used its ROFRs to block just 69 of WCO's 936 proposed EBS license acquisitions. T-Mobile blocked some 857 proposed sales (the vast majority) using the other anticompetitive tactics comprising the Scheme.

       *iii.*    *<u>T-Mobile's Targeted Acquisition of EBS Licenses Pursued By WCO.</u>*

187.    Even without exercising its ROFRs, T-Mobile used its Scheme to

- 46 -

coerce the sale of dozens of additional licenses to T-Mobile that WCO sought to
acquire. WCO made *bona fide* offers to acquire EBS licenses and placed concrete
purchase terms on the table. In these cases, T-Mobile ultimately acquired the
licenses without exercising a ROFR and without returning to WCO or engaging in a
competitive bidding process. Instead, on information and belief, T-Mobile coerced
these sales as part of the Scheme. These transactions include the several licenses
held by EBS institutions that WCO made offers to purchase, many of which were
far along in the negotiation process,[14] but which WCO later learned were sold to T-
Mobile without any additional engagement with WCO.

188.    Thus, even where WCO affirmatively sought to transact and offered
competitive terms, T-Mobile's lease position allowed it to obtain licenses without
competition, effectively cutting off WCO's opportunity to compete on the merits.

189.    T-Mobile's targeted acquisitions captured dozens of additional licenses
that WCO had pursued acquiring.

>    *iv.    License-Holders Refused to Engage with WCO as a Result of the
>    Scheme.*

190.    Still more additional license holders declined to engage with WCO

---

[14] These EBS institutions include: Albright College; Scola, Inc.; Christian College
of Georgia; Association for Continuing Education; Dallas College; Catholic
Diocese of El Paso; Illinois Institute of Technology; University of Southern
California; Greater Dayton Public TV; Northeastern University; St. Louis Regional
Public Media; California State University Northridge; Ideastream; Hartford
Educational Broadband Inc.; Clark County School District; Valley Lutheran High
School; Public Television 19, Inc.; Duval County School Board; Johnson and
Wales University; The District Board of Trustees of Florida Southwestern; Troy
University; Mission Consolidated Independent School District; City University of
Seattle; California Human Development Corp; Radio Training Network Inc.;
California State University Bakersfield; Jacksonville University; Oceanside Unified
School District; University of North Carolina System Office; South Suburban;
University of Maryland; University of Southern Florida; and the School Board of
Manatee County.

- 47 -

because of T-Mobile's Scheme, including T-Mobile's threats of sham litigation.

191.   WCO's bidding efforts offered license holders significantly higher sales prices than those T-Mobile acquired defensively without WCO's (or anyone else's) competing offers.

192.   Despite the higher prices that license holders would have received from WCO, many schools declined to even engage with WCO out of fear of T-Mobile. As discussed *supra*, many of these license holders explained to WCO that their lease obligations with T-Mobile prevented them from discussing a potential sale or even entertaining offers from alternative buyers. License holders cited exclusivity provisions, ROFR notice requirements, confidentiality obligations, threats and concerns over litigation, and related lease terms as reasons they could not even entertain an offer from WCO.

193.   In case after case, 2.5 GHz license holders declined to engage in negotiations with WCO over a potential sale or pulled out of negotiations because of T-Mobile's Scheme.

194.   T-Mobile's Scheme, in particular its long-term, exclusionary leases and its threats of sham litigation, excluded WCO and prevented it (or anyone else) from expanding in (or entering) the Relevant Market. The leases deterred negotiations and prevented competitive bidding.

## VIII.   T-MOBILE'S SCHEME SUBSTANTIALLY FORECLOSED THE RELEVANT MARKET

195.   T-Mobile's Scheme has foreclosed 85% of the Relevant Market for 2.5 GHz spectrum rights as measured by MHz-POPs, and 78% of the Relevant Market as measured by available 2.5 GHz spectrum licenses.

196.   T-Mobile's Scheme has substantially foreclosed actual and potential competitors' access to the Relevant Market by restricting the use of the vast majority of 2.5 GHz spectrum licenses exclusively to T-Mobile.

- 48 -

197.   T-Mobile bragged to investors in 2021 that its substantial foreclosure of the market for 2.5 GHz spectrum was locked in indefinitely, stating "this spectrum and network lead isn't just a head start. We're well positioned to keep the 5G advantage that will last the entirety of the 5G era. … [W]e'll remain ahead in this race with low cost and a strong and flexible balance sheet, so we're able to defend our leading position if we choose to."

198.   To contextualize these statements, there is no new 5G spectrum that will come available for generalized purchase; thus, unless T-Mobile is relieved of its exclusive control over 85% of the 2.5 GHz spectrum assets in the country on a GHz-POPs basis, there will not and cannot be any competition in the market. It is and will remain substantially foreclosed for "the entirety of the 5G era."

199.   WCO sought to create exactly the competition that T-Mobile's Scheme has prevented. But T-Mobile's Scheme foreclosed WCO's access to the 2.5 GHz licenses needed to generate competition across the market.

## IX.   ANTICOMPETITIVE EFFECTS OF THE SCHEME

200.   T-Mobile's Scheme causes and has caused anticompetitive effects in the Relevant Market and adjacent markets.

201.   **First**, T-Mobile has artificially suppressed demand for 2.5 GHz spectrum license uses. By preventing anyone from aggregating a critical mass of 2.5 GHz spectrum licenses across the country (or at least in key regional areas across the country), T-Mobile's foreclosure has prevented additional potential lessees from entering the market and thereby has suppressed the future income-generating potential of these rights. Indeed, when T-Mobile's existing exclusive leases for 2.5 GHz EBS spectrum expire in the coming years, T-Mobile will be the only viable lessee or purchaser because of its Scheme. When T-Mobile and its predecessors signed the original leases, the market was substantially more competitive, with multiple bidders competing for the rights in question. But when

- 49 -

these leases expire, because of the Scheme, license holders will not have a similar opportunity to obtain competitive bids because T-Mobile's Scheme forecloses entities such as AT&T, Verizon, other telecommunications providers, and more potential bidders from sufficient spectrum access to enter and expand in the Relevant Market. T-Mobile's Scheme has thus far prevented any license holders from aggregating the 2.5 GHz spectrum required to foment that competition. Thus, T-Mobile's Scheme, by reducing the demand of potential market entrants, has artificially suppressed the income potential of these licenses. In fact, T-Mobile maintains ROFR control over a lease even if it decides not to renew its lease.

202.   **Second**, T-Mobile's Scheme suppresses the present-day value of 2.5 GHz license rights for those license owners who may want to sell those rights. By suppressing the income-generating potential of these licenses, T-Mobile impairs the present value of the license rights on the open market. Indeed, the ROFRs reinforce T-Mobile's exclusive control over these license rights and ensure that T-Mobile's Scheme can prevent entry of actual and potential rivals into the market for 2.5 GHz spectrum rights.

203.   In numerous cases, T-Mobile was able to coerce license holders to sell licenses to T-Mobile for less than what WCO had offered those license holders. These decisions were contrary to the license holders' economic self-interest and cannot be explained by ordinary market forces. Rather, they demonstrate that T-Mobile's exclusivity, ROFR, confidentiality, and litigation threats functioned as coercive restraints that eliminated meaningful choice and foreclosed competition.

204.   For example, WCO offered Christian College of Georgia $5.5 million for its EBS license. After informing the school that its lease prohibited them from selling to WCO, T-Mobile offered to buy the license for just $1 million, a small fraction of what WCO offered. Ultimately, Christian College took T-Mobile's low-ball offer, explaining that its choices were "[e]ither sell to T-Mobile, or don't sell at all."

- 50 -

205.    WCO offered the Duval County School Board approximately $10.86 million for its EBS licenses. Despite this substantially higher offer, Duval ultimately sold to T-Mobile for approximately $2.7 million, less than one-quarter of WCO's offer.

206.    WCO offered the University of South Florida ("USF") approximately $55.8 million for its EBS licenses. USF instead sold to T-Mobile for approximately $30 million, sacrificing more than $25 million in value. USF's decision to accept a materially lower price reflects the chilling effect of T-Mobile's lease restrictions and the absence of a competitive bidding process.

207.    WCO offered Florida Southwestern State College approximately $7.4 million for its EBS license, which Florida Southwestern sold to T-Mobile for approximately $6.33 million. Once again, this demonstrates that the lease provisions suppressed competition and distorted pricing.

208.    WCO offered Albright College approximately $16.2 million for its EBS license. After T-Mobile initiated litigation against Albright, the transaction with WCO was abandoned. Albright ultimately sold to T-Mobile at a materially lower price.

209.    On information and belief, after WCO stopped making offers for EBS licenses, the few transactions that have occurred have been at lower prices on a MHz-POP basis than the transactions that occurred when WCO was actively bidding.

210.    **Third**, T-Mobile's Scheme harms consumer customers of other 5G service providers, such as AT&T and Verizon, because T-Mobile's foreclosure of the 2.5 GHz market has prevented these other 5G service providers from supplementing (or building out) their 5G networks to make use of the superior 2.5 GHz spectrum. The artificial scarcity of 2.5 GHz spectrum created by T-Mobile's Scheme leads to poorer network coverage, slower speeds, and higher prices for consumers.

211.  **Fourth**, T-Mobile's Scheme has excluded WCO and other actual and potential competitors from the market, and impaired the value of what few licenses they have been able to acquire by preventing the flourishing of competition and the associated increase of demand for licenses.

212.  In sum, T-Mobile's Scheme prevents potential competitors from accessing a critical mass of 2.5 GHz spectrum rights, resulting in significantly reduced competition for these rights and depressed values. This loss of competition and its impact on the market are on stark display in the outcome of "Auction 108," the FCC's final auction of 2.5 GHz spectrum rights, which occurred in 2022. There, the FCC auctioned off thousands of so-called "overlay" licenses, licenses which covered the residual, less-populated "white spaces" between incumbent EBS licenses (which were initially issued to educational institutions, and each covered a 35-degree radius surrounding the school). Although Auction 108 was the last opportunity to access 2.5 GHz spectrum, no wireless carriers participated meaningfully in the auction (other than T-Mobile). As AT&T explained in subsequent filings with the FCC, residual licenses could not—on their own—support meaningful 2.5 GHz spectrum deployment or justify the investments associated with supplementing existing networks. According to AT&T, because T-Mobile had already achieved control of the overwhelming majority of 2.5 GHz spectrum, "[n]o provider other than T-Mobile . . . could use these overlay licenses" to bolster their networks "so long as T-Mobile retains rights to the [previously allocated] incumbent license areas." That is, as a result of T-Mobile's exclusive control over the vast majority of EBS licenses, other buyers had little incentive or ability to get even a foothold in the market. Consequently, T-Mobile won nearly all the licenses available in Auction 108, at prices constituting a mere fraction of the cost of less attractive C-Band licenses, and far below the prices 2.5 GHz spectrum would sell for in a competitive market.

# X.    WCO'S ANTITRUST INJURY

213.    Antitrust injury is injury of the type the antitrust laws were intended to prevent and that flows from that which makes a defendant's acts unlawful.

214.    But for T-Mobile's unlawful Scheme, WCO (and others) would have been able to acquire and aggregate 2.5 GHz spectrum that would have become available to new market entrants for use in 5G mobile or fixed wireless networks via lease or sale. Thus, the Scheme has caused WCO (and other actual and potential competitors) to lose profits they would have earned by introducing the very competition T-Mobile's Scheme was designed to thwart.

215.    T-Mobile's actions impaired competition by excluding WCO and any other potential buyers of spectrum from the marketplace. EBS license holders were thus forced to accept lower prices, and rival wireless carriers were not able to supplement their networks with 2.5 GHz spectrum. In other words, the same anticompetitive conduct that harmed spectrum suppliers (i.e., EBS license holders) and consumers (wireless users) also harmed WCO.

216.    Because T-Mobile's exclusion of WCO (and other buyers) from the Relevant Market is what suppresses and maintains the prices sellers can obtain to below-competitive levels, and since WCO's injury arises from that same conduct, WCO's injury is the type of injury the antitrust laws were intended to prevent, and it flows from that which makes T-Mobile's acts unlawful.

217.    T-Mobile's exclusionary Scheme and related conduct designed to substantially foreclose access to the Relevant Market was targeted specifically at WCO, and thereby prevented competition and caused WCO to suffer substantial lost profits. Thus, WCO's injuries were not caused by WCO's failure to beat the competition, but rather by a monopsonists' Scheme to prevent WCO from introducing competition; WCO was harmed by competition-suppressing conduct, and was not just the loser in a competitive environment.

218.    T-Mobile's Scheme limited 2.5 GHz license holders' ability to generate competitive bids for their license rights, and suppressed their lease payments and income generation potential. WCO's business model sought to break the T-Mobile monopsony that had enabled these suppressed lease payments and sale prices by introducing real, durable competition to the Relevant Market. But T-Mobile turned its Scheme to targeting WCO and preventing the competition WCO sought to introduce from coming to fruition.

219.    T-Mobile's Scheme simultaneously harmed license holders (suppressing their income and the value of their sale prices) and WCO in the Relevant Market by excluding WCO and thereby artificially maintaining or suppressing the prices it paid to license holders as lease payments and/or purchase prices for 2.5 GHz spectrum. Thus, T-Mobile's Scheme caused injury to WCO and license holders through the same mechanism: substantially foreclosing competitors' access to the Relevant Market.

220.    The injury T-Mobile inflicted on WCO (foreclosing it from accessing the Relevant Market and thereby causing substantial lost profits) was the direct, foreseeable, and indeed intended result of T-Mobile's Scheme.

221.    Although the mechanism of injury to WCO and license holders (and ultimately to consumers) is the same—that is, stemming from the same Scheme— the damages caused by T-Mobile's Scheme to license holders (suppressed prices and lease payments) are distinct from, and not duplicative of, the damages caused to WCO (in the form of lost profits).

222.    WCO is the most direct victim of T-Mobile's Scheme.

223.    Critically, the intent and purpose of T-Mobile's Scheme was to maintain its monopsony power via substantial foreclosure of the market. In other words, T-Mobile Scheme was about exclusivity and preventing anyone from breaking that exclusivity. T-Mobile used long-term, exclusive leases loaded with additional terms that T-Mobile could and did weaponize to entrench its exclusivity

- 54 -

and therefore its monopsony power. And it was through that Scheme that T-Mobile inflicted antitrust injuries on, among others, WCO (in the form of lost profits) and license holders (in the form of suppressed lease payments and sales values).

224.    Had a hypothetical non-monopsonist (or several smaller entities) purchased 2.5 GHz licenses and thereby prevented WCO from acquiring such licenses via competitive bidding, WCO would not have suffered the same injury. T-Mobile thwarted WCO's acquisition efforts to maintain T-Mobile's exclusivity and foreclosure of the market. As a result, when T-Mobile blocked WCO's acquisition efforts, it did so to maintain T-Mobile's monopsony and attendant price suppression. By contrast, a hypothetical non-monopsonist who beat WCO's acquisition efforts through competitive bidding would have had similar incentives to WCO to generate competition that would thereby increase the income generation potential and the sales value of licenses market-wide. Such acquisitions would increase the value of all licenses, including any licenses that WCO could successfully acquire absent T-Mobile's substantial foreclosure of the market. T-Mobile's incentives, by contrast, are to consolidate control and/or maintain and extend its exclusivity. T-Mobile's acquisitions thus enhance the substantial foreclosure of the market and suppress lease payments and license values.

225.    Likewise, WCO's injury does not flow from the purchase of a handful of licenses by T-Mobile. WCO's injury flows from a far-reaching, multi-faceted Scheme designed to maintain market dominance and substantially foreclose rivals—a Scheme made possible by T-Mobile's monopsony power in the first instance.

## XI.    EFFECT ON INTERSTATE COMMERCE

226.    The activities of the parties that are the subject of these Counterclaims are within the flow of, and have substantially affected, interstate trade and commerce.

227.    The various activities and conduct that are the subject of these
Counterclaims occurred and are occurring across state lines.

## XII.    CAUSATION/INJURY-IN-FACT

228.    As a result of T-Mobile's anticompetitive conduct and agreements,
competition in the Relevant Market has been impaired, leading to the imposition of
sub-competitive, monopsonistic prices for 2.5 GHz spectrum rights, to the
exclusion of competing purchasers (such as WCO) from the Relevant Market,
and/or to the significantly raised costs of competing purchasers such as WCO in the
Relevant Market.

229.    As a result of T-Mobile's anticompetitive conduct and exclusionary
practices, WCO has suffered threatened and actual antitrust injury by being
excluded from purchasing 2.5 GHz spectrum rights, thereby suffering actual losses,
lost license purchases, and lost profits.

230.    WCO therefore seeks an award of damages in an amount to be proven
at trial, as well as injunctive relief precluding T-Mobile from continuing its
exclusionary practices, including injunctive relief against the anticompetitive and
exclusionary provisions contained in its leases with EBS license holders.

## XIII.    WCO'S CLAIMS FOR RELIEF

### A.    <u>COUNTERCLAIM I – Monopsonization - 15 U.S.C. § 2</u>

231.    WCO incorporates by reference and realleges all preceding paragraphs
as if fully set forth herein. T-Mobile's conduct constitutes the intentional and
unlawful maintenance of monopsony power in the market for 2.5 GHz spectrum
licenses, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

232.    T-Mobile holds monopsony power in the United States 2.5 GHz
spectrum license rights market. T-Mobile also holds monopsony power in any
smaller regional 2.5 GHz spectrum license rights markets.

233.    The market for 2.5 GHz spectrum license rights constitutes a relevant

product market. The relevant geographic market is the United States.

234.   T-Mobile has a dominant market share in the market for 2.5 GHz spectrum license rights, and this market has significant barriers to entry.

235.   T-Mobile has also excluded competitors and suppressed prices below competitive levels, constituting direct evidence of T-Mobile's monopsony power.

236.   T-Mobile unlawfully maintains its monopsony power in the 2.5 GHz spectrum license rights market through the anticompetitive acts and Scheme described herein, including:

237.   Entering long-term, exclusive EBS lease agreements that give T-Mobile exclusive rights, access, and control over the vast majority of EBS licenses;

238.   Imposing anticompetitive and exclusionary agreements on EBS license holders that effectively prevent them from selling to other buyers, such as WCO;

239.   Anticompetitive, defensive acquisitions of 2.5 GHz spectrum licenses; and

240.   Sham lawsuits and threats of lawsuits against EBS license holders intended to intimidate and prevent them from selling 2.5 GHz spectrum licenses to competing buyers, including WCO.

241.   T-Mobile's unlawful conduct has harmed competition in the Relevant Market by excluding potential competitors, including WCO, and thus depriving license holders the benefits of competition among multiple buyers of 2.5 GHz spectrum licenses.

242.   T-Mobile's Scheme has had substantial anticompetitive effects, including reduced prices, lower output (i.e., fewer sales), and reduced choice for sellers.

243.   There is no legitimate business justification for T-Mobile's exclusionary and anticompetitive conduct, and no purported justification would outweigh the considerable harm to competition in the Relevant Market from T-Mobile's conduct.

244.    As a direct, material, and proximate result of T-Mobile's anticompetitive conduct, WCO has been harmed in a manner that the antitrust laws are intended to protect against.

245.    Without limitation, WCO has suffered harm in the form of preventing WCO from purchasing EBS spectrum licenses, raising WCO's costs of pursuing and completing transactions that are beneficial to EBS spectrum license holders, and lost profits. T-Mobile's conduct continues to threaten injury to WCO's business and property, thereby justifying permanent injunctive relief.

## B. <u>COUNTERCLAIM II – Exclusionary Agreements in Violation of Section 1 of the Sherman Act - 15 U.S.C. § 1</u>

246.    WCO incorporates by reference and realleges all preceding paragraphs as if fully set forth herein. T-Mobile entered into anticompetitive, exclusionary lease agreements with EBS spectrum license holders that unreasonably restrained trade in the Relevant Market for 2.5 GHz spectrum license rights in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

247.    T-Mobile's lease agreements constitute exclusive agreements that prevent EBS license holders from leasing, or in many cases selling, their EBS licenses to any party other than T-Mobile.

248.    T-Mobile's exclusive lease agreements cover the vast majority of 2.5 GHz spectrum licenses, and thus have foreclosed competition in a substantial share of the Relevant Market.

249.    T-Mobile's anticompetitive, exclusionary lease agreements have resulted in significant harm to competition, including reduced prices for 2.5 GHz spectrum licenses, lower output (i.e., fewer sales), and reduced choice for sellers.

250.    WCO's injuries, including lost profits, flow from these harms to competition.

### C. **COUNTERCLAIM III – Agreement in Violation of California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 *et seq.***

251.    WCO incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.

252.    T-Mobile's anticompetitive, exclusionary lease agreements with EBS license holders, as alleged above, constitute concerted action that is an unreasonable restraint of trade or commerce throughout California and the United States in violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 *et seq.*

### D. **COUNTERCLAIM IV – Intentional Interference with Prospective Economic Advantage Under California Law**

253.    WCO realleges and incorporates all previous paragraphs of its counterclaim.

254.    As detailed above, WCO engaged in negotiations with numerous EBS license holders and made numerous bids for the purchase of EBS licenses. If WCO had successfully purchased these EBS licenses, it would have received the economic benefit of future lease payments by T-Mobile (or other potential lessors in the future).

255.    T-Mobile was aware of WCO's negotiations with EBS license holders, as well as its prospective negotiations with other EBS license holders, and undertook the anticompetitive and unlawful scheme described above to undermine WCO's negotiations and ensure that WCO was not awarded contracts for purchase of the licenses.

256.    Through its conduct, T-Mobile intended to, and did, disrupt WCO's relationships with EBS license holders.

257.    WCO's relationships with EBS license holders were ultimately disrupted by T-Mobile's scheme, as such license holders informed WCO that they could not award WCO their business because of the tremendous costs imposed on

them and threats levied at them by T-Mobile.

258.   WCO has been injured in its business or property by the loss of profits, by the loss of license sellers and potential sellers, by the loss of goodwill and business image, and by the prospective destruction of its business. T-Mobile's conduct was a substantial factor in causing this harm.

259.   T-Mobile's conduct was intentional and deprived WCO of business opportunities in violation of the law, and otherwise caused injury and was despicable conduct that subjected WCO to cruel and unjust hardship and oppression in conscious disregard of its rights, so as to justify an award of exemplary and punitive damages.

260.   Unless enjoined, T-Mobile's conduct is likely to persist and will continue to cause irreparable loss and damage to WCO for which WCO has no adequate remedy at law.

## XIV.  REQUEST FOR RELIEF

WHEREFORE, WCO requests that this Court:

A.   Enter judgment against T-Mobile;

B.   Declare that T-Mobile's conduct violates 15 U.S.C. §§ 1 & 2;

C.   Declare that T-Mobile's conduct violates the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 *et seq.*, and California Law governing Intentional Interference with Prospective Economic Advantage.

D.   Enjoin T-Mobile from continuing its unlawful acts;

E.   Award WCO its actual damages with mandatory trebling under 15 U.S.C. § 15 in an amount to be determined at trial;

F.   Award WCO its costs and expenses of this action, including its reasonable attorneys' fees necessarily incurred in bringing and pressing this case, as provided in 15 U.S.C. §§ 15, 26;

G.    Award WCO its pre- and post-judgment interest at the applicable rates on all amounts awarded;

H.    Enjoin T-Mobile from enforcing the anticompetitive and exclusionary lease provisions with EBS lease holders described above;

I.    Grant permanent injunctive relief to prevent the recurrence of the violations for which redress is sought in this complaint;

J.    Award WCO all the relief to which it is entitled under the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 et seq., and California Law governing Intentional Interference with Prospective Economic Advantage; and

K.    Order any other such relief as the Court deems appropriate.

## XV.    DEMAND FOR JURY TRIAL

WCO demands a trial by jury of all issues in this action so triable.


DATED: January 7, 2026                    Respectfully Submitted,

*/s/ Brandon Baum-Zepeda*
**EDELSON PC**
Brandon Baum-Zepeda* (SBN 352698)
1255 Union St NE, Suite 850
Washington, DC 20002
Tel: 202-270-4777
Email: bbaum-zepeda@edelson.com
*Barred only in California. Practice limited to matters authorized by D.C. Rule 49(c)(3)

Natasha Fernández-Silber (*pro hac vice*)
200 South 1st Street
Ann Arbor, MI 48104
Tel: 312-589-6370
Email: nfernandezsilber@edelson.com

- 61 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BERGER MONTAGUE PC**
Patrick F. Madden (*pro hac vice*)
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: 215-875-3035
Email: pmadden@bergermontague.com

**MITTS LAW, LLC**
Maurice R. Mitts (*pro hac vice*)
1822 Spruce Street
Philadelphia, PA 19103
Tel: 215-866-0112
Email: mmitts@mittslaw.com

*Counsel for WCO Spectrum LLC*

WCO's First Amended Counterclaims                    Case No. 2:23-cv-04347-AH-E