**ALSTON & BIRD LLP**
Jeffrey A. Rosenfeld (#136896)
jeffrey.rosenfeld@alston.com
Jesse Steinbach (#278923)
jesse.steinbach@alston.com
Brooke Bolender (#340689)
brooke.bolender@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Telephone: (213) 576-1143

**WILLIAMS & CONNOLLY LLP**
Kenneth J. Brown*
kbrown@wc.com
Jonathan B. Pitt*
jpitt@wc.com
William P. Ashworth*
washworth@wc.com
R. Kennon Poteat III*
kpoteat@wc.com
Kathryn E. Hoover*
khoover@wc.com
680 Maine Avenue, SW
Washington, DC 20024
Telephone: (202) 434-5000

**KLEINBARD LLC**
Steven J. Engelmyer*
sengelmyer@kleinbard.com
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Telephone: (215) 568-2000

*admitted *pro hac vice*

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| T-MOBILE US, INC., CLEARWIRE SPECTRUM HOLDINGS LLC, CLEARWIRE SPECTRUM HOLDINGS II LLC, CLEARWIRE SPECTRUM HOLDINGS III LLC, FIXED WIRELESS HOLDINGS LLC, NSAC LLC, TDI ACQUISITION SUB LLC, AND WBSY LICENSING LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> WCO SPECTRUM LLC, SCH LLC, ACADEMIA SPECTRUM LLC, KAREN WINNICK AS TRUSTEE OF GKW TRUST, EXECUTOR OF THE ESTATE OF GARY WINNICK AND GARY WINNICK'S SUCCESSOR-IN-INTEREST, CARL KATERNDAHL, ASHOK VASUDEVAN, ANDREAS BITZARAKIS, AND TYLER KRATZ, <br><br> Defendants. | Case No. 2:23-CV-4347-AH(Ex) <br><br> Hon. Anne Hwang, Ctrm 9C <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO DISMISS FIRST AMENDED COUNTERCLAIMS** <br><br> Complaint Filed: June 2, 2023 <br> Counterclaim Filed: January 7, 2026 <br> Hearing Date: June 17, 2026 <br> Time: 1:30 p.m. <br> Courtroom: 9C |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

FACTUAL BACKGROUND ............................................................... 2

ARGUMENT ....................................................................................... 7

I.  WCO Fails To Plead Anticompetitive Conduct That Caused It Antitrust Injury ............................................................................................. 7

  A.  WCO Does Not Adequately Plead Market Exclusion ..................... 8

    1.  ROFR Provisions .................................................................... 9

    2.  Exclusivity Provisions ......................................................... 12

    3.  Other Lease Provisions ........................................................ 17

    4.  Acquisition of Licenses ....................................................... 19

    5.  Threats and Coercion ........................................................... 20

  B.  Alleged Harm to License Holders and Consumers Does Not Demonstrate That WCO Suffered Antitrust Injury ....................... 20

II.  T-Mobile's Constitutionally Protected Litigation Conduct Is Immune from Antitrust Scrutiny ......................................................... 21

III.  WCO's New Allegations Demonstrate that WCO Fails To Plead a Relevant Market ............................................................................. 25

IV.  WCO's State Law Claims Should Be Dismissed ................................ 28

CONCLUSION ................................................................................... 29

# TABLE OF AUTHORITIES

## CASES

*Arcell v. Google LLC,*
  2024 WL 1090009 (N.D. Cal. Feb. 5, 2024) ...............................................13, 17

*Ascon Properties Inc. v. Mobil Oil Co..,*
  866 F.2d 1149 (9th Cir. 1989)...................................................................29

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009).................................................................................12

*Atencio v. TuneCore, Inc.,*
  843 F. App'x 42 (9th Cir. 2021)..................................................................4

*Atl. Richfield Co. v. USA Petroleum Co.,*
  495 U.S. 328 (1990)...................................................................................8

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.,*
  166 F. Supp. 3d 988 (N.D. Cal. 2015)......................................................29

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)............................................................................8, 12

*Big Bear Lodging Ass'n v. Snow Summit, Inc.,*
  182 F.3d 1096 (9th Cir. 1999)..................................................................21

*Blantz v. Cal. Dep't of Corrs. & Rehab., Div. of Corr. Health Care Servs.,*
  727 F.3d 917 (9th Cir. 2013)....................................................................12

*Brantley v. NBC Universal, Inc.,*
  675 F.3d 1192 (9th Cir. 2012)..................................................................21

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
  509 U.S. 209 (1993)...................................................................................7

*Campfield v. State Farm Mut. Auto Ins. Co.,*
  532 F.3d 1111 (10th Cir. 2008)................................................................27

*Cogent Healthcare of Ariz. PC v. Blue Cross & Blue Shield of Ariz. Inc.,*
  2024 WL 4347772 (D. Ariz. Sept. 30, 2024)..............................................8

*Cont'l Airlines, Inc. v. United Airlines, Inc.*,
  277 F.3d 499 (4th Cir. 2002)...................................................................19

*CoStar Grp., Inc. v. Com. Real Estate Exch., Inc.*,
  150 F.4th 1056 (9th Cir. 2025)...............................................................16

*Curtin Maritime Corp. v. Santa Catalina Island Co.*,
  786 F. App'x 675 (9th Cir. 2019)...........................................................11

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,
  902 P.2d 740 (Cal. 1995) .......................................................................29

*DIJ Catheter Corp. v. Critikon, Inc.*,
  1994 WL 683424 (S.D.N.Y. Dec. 6, 1994) .............................................9

*Dreamstime.com LLC v. Google LLC*,
  54 F.4th 1130,1142 (9th Cir. 2022) .........................................................9

*Eastman v. Quest Diagnostics Inc.*,
  724 F. App'x 556 (9th Cir. 2018)..........................................8, 12, 17, 20

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ..................................................................13

*Farhan v. 2715 NMA LLC*,
  161 F.4th 475 (7th Cir. 2025)................................................................26

*Flaa v. Hollywood Foreign Press Ass'n*,
  55 F.4th 680 (9th Cir. 2022)..................................................................13

*GSI Tech v. United Memories, Inc.*,
  2014 WL 1572358 (N.D. Cal. Apr. 18, 2014) ........................................10

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018)................................................................27

*In re EpiPen Marketing, Sales Practices & Antitrust Litig.*,
  44 F.4th 959 (10th Cir. 2022).................................................................13

*Kartell v. Blue Shield of Mass., Inc.*,
  749 F.2d 922 (1st Cir. 1984) ..................................................................19

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION TO DISMISS FIRST AMENDED COUNTERCLAIMS

*Kelsey K. v. NFL Enters., LLC,*
  757 F. App'x 524 (9th Cir. 2018)....................................................................28

*Korea Supply Co. v. Lockheed Martin Corp.,*
  63 P.3d 937 (Cal. 2003) ................................................................................29

*Lifewatch Servs. Inc. v. Highmark Inc.,*
  902 F.3d 323 (3d Cir. 2018)...........................................................................25

*Malheur Forest Fairness Coalition v. Iron Triangle, LLC,*
  164 F.4th 710 (9th Cir. 2026) ..................................................................10, 11

*Morton & Bassett, LLC v. Organic Spices, Inc.,*
  2016 WL 4608213 (N.D. Cal. Sept. 6, 2016) ...................................................4

*Nat'l Flood Servs., Inc. v. Torrent Technologies., Inc.,*
  2006 WL 1518886 (W.D. Wash May 26, 2006).............................................18

*Newport Controls, LLC v. Balboa Instruments, Inc.,*
  2010 WL 11509295 (C.D. Cal. Sept. 27, 2010)................................................9

*Novation Ventures LLC v. J.G. Wentworth Co.,*
  156 F. Supp. 3d 1094 (C.D. Cal. 2015) ..........................................................10

*Omega Env't, Inc. v. Gilbarco, Inc.,*
  127 F.3d 1157 (9th Cir. 1997)...................................................................8, 13

*Or. Nat. Res. Council v. Mohla,*
  944 F.2d 531 (9th Cir. 1991).........................................................................22

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.,*
  939 F. Supp. 2d 1002 (N.D. Cal. 2013)..........................................................28

*Power Analytics Corp. v. Operation Tech. Inc.,*
  2018 WL 10231437 (C.D. Cal. July 24, 2018).................................................8

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.* (*PREI*),
  508 U.S. 49 (1993) ...................................................................21, 22, 23, 24

*Queen City Pizza v. Domino's Pizza, Inc.,*
  124 F.3d 430 (3d Cir. 1997)....................................................................26, 28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION TO DISMISS FIRST AMENDED COUNTERCLAIMS

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995)..................................................................7

*Reilly v. Apple Inc.*,
    578 F. Supp. 3d 1098 (N.D. Cal. 2022)..................................................20, 21

*Relevant Grp., LLC v. Nourmand*,
    116 F.4th 917 (9th Cir. 2024).............................................................22, 24

*Rutman Wine Co. v. E. & J. Gallo Winery*,
    829 F.2d 729 (9th Cir. 1987)..................................................................7

*Satellite Fin. Plan. Corp. v. First Nat'l Bank*,
    633 F. Supp. 386 (D. Del. 1986) ..............................................................9

*Sec. Fire Door Co. v. County of Los Angeles*,
    484 F.2d 1028 (9th Cir. 1973)................................................................11

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013)..................................................................7

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006).................................................................22

*Starlight Cinemas v. Regal Entm't Grp.*,
    691 F. App'x 404 (9th Cir. 2017)............................................................29

*Streamcast Networks, Inc. v. Skype Technologies, S.A.*,
    547 F. Supp. 2d 1086 (C.D. Cal. 2007) .......................................................27

*Subscription Television, Inc. v. S. Cal. Theatre Owners Ass'n*,
    576 F.2d 230 (9th Cir. 1978).................................................................24

*Tamayo v. Blagojevich*,
    526 F.3d 1074 (7th Cir. 2008)................................................................26

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961)......................................................................17, 18

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)..........................................................................12

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION TO DISMISS FIRST AMENDED COUNTERCLAIMS

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,

    549 U.S. 312 (2007)........................................................................................19

*White v. Lee*,

    227 F.3d 1214 (9th Cir. 2000)......................................................................22

*Zucco Partners, LLC v. Digimarc Corp*,

    552 F.3d 981 (9th Cir. 2009)........................................................................30

# REGULATIONS

47 C.F.R. § 1.9030(a).........................................................................................3

47 C.F.R. § 1.9030(e).........................................................................................3

47 C.F.R. § 27.1214(e).......................................................................................3

# OTHER AUTHORITIES

25 Williston on Contracts § 67:89 (4th ed)......................................................9

*Ord. on Recons. & Fifth Mem. Op. & Ord. & Third Mem. Op. & Ord. &*

    *Second Report & Ord.*,

    WT Dkt. No. 03-66, 21 FCC Rcd. 5606 (Apr. 27, 2006)...................................9

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION TO DISMISS FIRST AMENDED COUNTERCLAIMS

## INTRODUCTION

WCO's recrafted pleading suffers from the same fundamental defect as its prior one: the absence of a viable antitrust theory.  The fatal flaws in WCO's counterclaims the Court identified last October remain unremedied and, in many cases, are exacerbated.

WCO still fails to plead anticompetitive conduct that caused it antitrust injury. The same judicial admissions the Court previously found to be dispositive, coupled with new admissions in the amended counterclaims, show that the conduct at issue reflects only the operation of competition, not its subversion.  In addition, WCO alleges exclusionary conduct with respect to fewer than 30 licenses in a market that, as defined by WCO, contains more than 2,200 licenses.  This does not approach "substantial foreclosure" of the relevant market, as required to state a claim.

WCO's allegations about "sham litigation" have only weakened in its amended counterclaims, and dismissal under the *Noerr-Pennington* doctrine remains appropriate.

Notably, WCO now claims it had an entirely different business plan than the one it previously told the Court it planned to pursue—this new plan apparently having been developed since the Court's October ruling—but this shift does not help WCO.  To the contrary, its allegations about that business plan now focus squarely on the question previously identified by the Court as to how the relevant market must be defined, and show that WCO's proffered definition fails as a matter of law.

For these reasons, and because WCO agrees that its pared-down state law claims rise or fall with its Sherman Act claims, the Court should dismiss all of WCO's counterclaims with prejudice.

## FACTUAL BACKGROUND

To construct and operate a wireless network, telecommunications carriers must "layer[]" wireless spectrum from different bands (low-, mid-, and high-band).[1] ECF 218 ¶ 40 ("Am. Countercl."); *id.* ¶¶ 37-39. National carriers like T-Mobile need significant amounts of contiguous spectrum in each layer to justify the massive investment required to build a nationwide network. *See id.* ¶¶ 62, 35, 107. For example, no carrier would acquire "the rights to just a single 2.5 GHz license . . . in Orange County, CA" because it "would provide little additional spectral coverage and would not be sufficient to induce a wireless carrier to make the substantial investments required" to utilize that spectrum in a nationwide network. *Id.* ¶ 12. This is especially true given that different infrastructure is required to use spectrum in different bands. *Id.* ¶¶ 35, 67. Specifically, using 2.5 GHz spectrum in a wireless network "requires the licensee to have access to other components that are compatible with 2.5 GHz spectrum," and "5G networks built on other Mid Band frequencies like C-band or 3.45 GHz spectrum require different hardware to utilize those frequencies than can be used for 2.5 GHz spectrum." *Id.* ¶ 88. Accordingly, once a carrier "buil[ds] its network . . . principally" using one band (like 2.5 GHz) for a given layer, it will continue to invest in that same band. *Id.* ¶ 57 & n.4.

Of equal importance, whichever spectrum band a carrier chooses, it cannot build a nationwide wireless network without assurance that it will be able to use that spectrum for a significant period of time. Put differently, no rational telecommunications company would invest billions of dollars in building out a nationwide network if there were a significant likelihood that it would lose access to the spectrum on which it built that network in the near or even medium term. *See*

---

[1] Each "layer" includes "bands" of spectrum that are comprised of ranges of frequencies. For example, the 2.5 GHz "band"—which is also known as Educational Broadcast Service ("EBS") spectrum—includes frequencies between 2496 and 2690 MHZ. Am. Countercl. ¶ 41. The "mid-band" spectrum layer includes the 2.5 GHz band, as well as other bands like C-Band and 3.45 GHz. *Id.* ¶¶ 39, 79.

*id.* ¶¶ 12, 67, 88.

Since at least 2005—long before "5G technology emerged"—T-Mobile has made the significant investments in 2.5 GHz spectrum necessary to construct the mid-band tier of its nationwide wireless network. *Id.* ¶ 54. For their mid-band "layer," T-Mobile's largest competitors, Verizon and AT&T, use C-band and 3.45 GHz spectrum. *Id.* ¶¶ 57, 79, 83, 88.

These competitors have a significant advantage over T-Mobile in that they "purchas[ed]" their mid-band spectrum licenses in "large quantities" outright, and thus enjoy virtually guaranteed access to this spectrum in perpetuity. *Id.* ¶ 57. EBS spectrum, by contrast, historically was subject to unique ownership eligibility requirements that barred commercial entities from owning licenses, a situation that persisted until a 2020 FCC rule change. *Id.* ¶¶ 47-48, 51. As a result, the approximately 2,200 EBS licenses in the United States were "dispersed across over a thousand individual educational and/or non-profit institutions nationwide." *Id.* ¶¶ 12, 108. Unable to own the rights to its mid-band spectrum layer like its competitors, T-Mobile turned to the next best thing—30-year leases for roughly 1,700 licenses in dispersed geographic regions, *id.* ¶ 113, which FCC regulations expressly permitted (and continue to permit), *see* 47 C.F.R. § 1.9030(a) (authorizing "long-term *de facto* transfer leasing arrangement[s] in which the licensee retains *de jure* control of the license while *de facto* control of the leased spectrum is transferred to the spectrum lessee"); Am. Countercl. ¶ 115 n.8 (citing 47 C.F.R. § 27.1214(e) (2008) (authorizing 30-year EBS leases)). As is legally required, each of T-Mobile's leasing arrangements was approved by the FCC. *See* 47 C.F.R. § 1.9030(e). Although these long-term leases have not eliminated the advantage Verizon and AT&T enjoy from owning their mid-band spectrum rights, they have lessened it to some extent.

WCO emerged in 2020 after the FCC changed its rules to permit commercial entities to own EBS licenses. Contrary to the spectrum-sharing business plan

described in its Answer and original counterclaims, ECF 132 ¶¶ 1, 20-24, 40 ("Ans.")[2]; *id.* ¶¶ 21-22 ("Countercl."), WCO now claims it planned to collect a "critical mass of 2.5 GHz spectrum licenses" and sell that portfolio to a carrier like AT&T or Verizon for that carrier's exclusive use in its wireless network, Am. Countercl. ¶¶ 12, 63-68.

Regardless of its purported business model (which actually was to defraud T-Mobile),[3] WCO judicially admits that it competed for EBS licenses. WCO acknowledges it engaged in "competitive bidding," Ans. ¶¶ 157, 165, and "competitive business transactions," Ans. ¶¶ 7, 63, 65. It also admits to "competitive market participation" in "a competitive environment." Ans. ¶¶ 127, 156b. WCO further concedes that its bids—which T-Mobile matched when exercising a Right of First Refusal ("ROFR")—were "competitive, market-based offers," Ans. ¶ 52, that "reflected fair market value," Ans. ¶ 144; *see also* Ans. ¶¶ 55, 144, 156a. WCO also admits that, when T-Mobile declined to exercise its ROFR and purchase an EBS license owned by the Owasso Public School System in Oklahoma, WCO "purchase[d]" the license, Ans. ¶ 68, though it later backed out of that deal and does not purport to own the Owasso license.

---

[2] "Factual assertions in pleadings are considered judicial admissions," which are properly considered on a motion to dismiss. *Atencio v. TuneCore, Inc.*, 843 F. App'x 42, 44 (9th Cir. 2021) (alterations and citation omitted); *Morton & Bassett, LLC v. Organic Spices, Inc.*, 2016 WL 4608213, at *5 (N.D. Cal. Sept. 6, 2016) (considering admissions in an answer to counterclaims on a motion to dismiss affirmative claims); Ord. 12-13 (relying on WCO's admissions in Answer).

[3] That WCO tries to establish the bona fides of its founder Gary Winnick by pointing to Global Crossing, a massive fraud that caused thousands of employees to lose their pensions and resulted in one of the largest bankruptcies of all time, is beyond telling. Am. Countercl. ¶ 63 n.5; *see also Global Crossing: The Next Enron?*, CBS News (Feb. 9, 2002), https://www.cbsnews.com/news/global-crossing-the-next-enron/; *How Executives Prospered as Global Crossing Collapsed*, N.Y. Times (Feb. 11, 2002), http://www.nytimes.com/2002/02/11/business/how-executives-prospered-as-global-crossing-collapsed.html.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION TO DISMISS FIRST AMENDED COUNTERCLAIMS

Although WCO claims it was foreclosed from competing for licenses, it does not allege that it participated in any FCC auctions for 2.5 GHz spectrum licenses despite acknowledging that such licenses were available at public auction. Am. Countercl. ¶ 212. WCO also does not claim it sought to acquire any Broadband Radio Service ("BRS") licenses, *see id.* ¶ 68, despite acknowledging that the 2.5 GHz spectrum band includes BRS licenses, *id.* ¶¶ 44-46. Nor does WCO assert that it sought to acquire any of the approximately 500 EBS licenses that T-Mobile does not own or lease. *Id.* ¶ 11. Rather, WCO sought only to buy licenses leased to T-Mobile, "all" of which had ROFR provisions. *Id.* ¶ 125.

In its Amended Counterclaims, WCO continues to allege that T-Mobile's lease terms, acquisition of EBS licenses, and certain litigations are anticompetitive. As before, WCO claims the ROFRs in "all" leases, and the exclusivity terms and "Right to Participate" provisions in "many" leases, are anticompetitive. Am. Countercl. ¶¶ 118, 125, 131. WCO also adds new claims that the leases' 30-year terms and confidentiality provisions are anticompetitive. *Id.* ¶¶ 8, 134.

WCO complains that exclusivity clauses in certain of T-Mobile's leases interfered with its purchase of licenses from 19 entities, *id.* ¶¶ 120-21, 141-54, but it identifies only two instances in which T-Mobile enforced an exclusivity clause—Christian College and Lorain County Community College, *id.* ¶¶ 120-21. WCO alleges that the other 17 licensees "underst[ood]" their leases "to effectively prohibit them" from selling, without citing the leases' exclusivity terms (many of which permit sales, *infra* pp. 13-15), and without alleging that T-Mobile enforced exclusivity terms against any of these licensees. *Id.* ¶¶ 141-54. As discussed below, accepting WCO's allegations as true, T-Mobile typically did *not* exercise whatever exclusivity rights it had. *Infra* pp. 15-16.

As for litigation conduct, WCO has jettisoned most of its original allegations. Where its initial counterclaim challenged three lawsuits, two subpoena enforcement proceedings, a request for pre-complaint discovery, and "dozens" of alleged threats,

Ord. 17, WCO now claims only two lawsuits (Albright and St. Lucie) and four "threatened" lawsuits are "shams," *id.* ¶¶ 166-81, and it no longer pursues a "*POSCO*" theory of serial petitioning.

WCO asserts that it suffered antitrust injury because "T-Mobile's actions . . . exclude[ed] WCO . . . from the marketplace," "EBS license holders were thus forced to accept lower prices, and rival wireless carriers were not able to supplement their networks with 2.5 GHz spectrum." *Id.* ¶ 215. WCO further claims it would have profited by aggregating and selling 2.5 GHz spectrum rights to another wireless carrier. *Id.* ¶¶ 214, 218-19.

As for damages, WCO now alleges that it "placed well over *$6 billion* worth of bona fide offers on some 936 EBS licenses," with plans "to make additional offers on still more licenses." *Id.* ¶ 74 (emphasis added). It claims that, absent the alleged "scheme," "WCO would have acquired all or most of the 2.5 GHz licenses on which it bid" and "additional licenses in its investment pipeline." *Id.* ¶ 17. Of WCO's alleged 936 offers, T-Mobile exercised its ROFR 69 times. *Id.* ¶ 182.

WCO continues to allege that the relevant market is for 2.5 GHz spectrum rights, claiming this market is unique. *Id.* ¶¶ 77-78. WCO now admits, however, that other carriers have purchased different mid-band spectrum (such as C-Band and 3.45 GHz) to substitute for 2.5 GHz spectrum, which is an admission that 2.5 GHz spectrum is interchangeable with those other bands. *Id.* ¶¶ 54, 57, 62, 88.

WCO filed its original antitrust counterclaims in March 2025, ECF 132, which the Court dismissed after a hearing in October 2025, ECF 187. WCO's second set of antitrust counsel withdrew in November, ECF 194, and new counsel appeared thereafter, ECF 212-215. In January 2026, WCO filed its Amended Counterclaims. ECF 218. In addition to the changes to WCO's allegations described above, the Amended Counterclaims no longer plead attempted monopsonization under the Sherman Act (original Counterclaim II) or violations of California's Unfair Competition Law (original Counterclaim V). *Compare* ECF 218 *with* ECF 132.

**ARGUMENT**

## I.    WCO Fails To Plead Anticompetitive Conduct That Caused It

Antitrust Injury

Like its first pleading, WCO's Amended Counterclaims allege only the operation of competition, not its subversion.  It is well-established that the antitrust laws protect "*competition*, not *competitors*."  *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) (citation omitted).  Accordingly, they do not "guarantee every competitor tenure in the marketplace." *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 735 (9th Cir. 1987) (citation omitted).  As this Court already has observed, "[t]he antitrust laws do not provide a remedy to every party injured by unlawful economic conduct.  It is well established that the antitrust laws are only intended to preserve competition for the benefit of consumers."  ECF 187, Order Granting Plaintiffs' Motion to Dismiss Counterclaims at 8 ("Ord.") (citation omitted).

To ensure that an injury is one the antitrust laws were intended to remedy, a plaintiff must identify an antitrust injury.  "[A]ntitrust injury consists of four elements: '(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent.'"  *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013) (citation omitted); Ord. 8.   A plaintiff's loss must flow "from an anticompetitive aspect or effect of the defendant's behavior, since it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition."  Ord. 9 (quoting *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995)); *see also Somers*, 729 F.3d at 967 (where conduct "harms the plaintiff without adversely affecting competition generally, there is no antitrust injury" (citation omitted)).

The "antitrust injury" requirement "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in

the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs." Ord. 8 (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990)). "Although 'injury to competition can occur by monopsony just as it may result from monopoly,' the circumstances under which this plausibly can occur are far narrower." *Cogent Healthcare of Ariz. PC v. Blue Cross & Blue Shield of Ariz. Inc.*, 2024 WL 4347772, at *4 (D. Ariz. Sept. 30, 2024) (alterations and citation omitted). Moreover, in the antitrust context especially, "[f]actual allegations must be enough to raise a right to relief above the speculative level," given the heavy burdens of antitrust discovery. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 558-59 (2007).

WCO alleges two types of antitrust injury—that T-Mobile's actions substantially foreclosed WCO from participating in the relevant market, Am. Countercl. ¶¶ 215, 225, and that injuries to third-party licensees and consumers also harmed WCO, *id*. ¶¶ 218-19.[4] Neither withstands scrutiny.

## A.    WCO Does Not Adequately Plead Market Exclusion

WCO's core theory of antitrust injury is that T-Mobile "exclude[ed] WCO and any other potential buyers of spectrum from the marketplace." *Id.* ¶ 215. Under such a theory, conduct cannot violate the antitrust laws—and the plaintiff cannot establish antitrust injury—unless the conduct "foreclosed a substantial share" of the market. *Eastman v. Quest Diagnostics Inc.*, 724 F. App'x 556, 558 (9th Cir. 2018); *see also Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997) (finding that 38% of the market was not substantial); *Power Analytics Corp. v. Operation Tech. Inc.*, 2018 WL 10231437, at *18 (C.D. Cal. July 24, 2018) ("'Substantial share' has been quantified as foreclosure of 40% to 50% of the

---

[4] WCO also makes conclusory allegations of raised costs for itself in connection with the confidentiality provisions of T-Mobile's leases, Am. Countercl. ¶ 137, and for license holders in connection with the Right to Participate provisions, *id.* ¶ 132. Those allegations fail to allege antitrust injury for the reasons discussed below. *See infra* §§ I.A.3, I.B.

relevant market." (citation omitted)), *aff'd*, 820 F. App'x 1005 (Fed. Cir. 2020); *Newport Controls, LLC v. Balboa Instruments, Inc.*, 2010 WL 11509295, at *8 (C.D. Cal. Sept. 27, 2010) ("foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent." (citations omitted)).

In support of its theory, WCO alleges a laundry-list of conduct it claims formed an anticompetitive "Scheme": lease terms (ROFRs, exclusivity provisions, participation rights, lease length, and confidentiality terms); license acquisitions; litigation; and threatened litigation.  But none of that conduct is anticompetitive, and none of it came anywhere close to foreclosing competition in a substantial share of the market.  Moreover, "[b]ecause each individual action alleged by [WCO] does not rise to anticompetitive conduct in the relevant market" or "show causal antitrust injury" to WCO, WCO cannot claim the conduct collectively does so. *Dreamstime.com LLC v. Google LLC*, 54 F.4th 1130,1142 (9th Cir. 2022); Ord. 16-17 n.13.

### 1.    ROFR Provisions

WCO alleges that T-Mobile's ROFR provisions "block[ed]" it from acquiring spectrum licenses it otherwise would have acquired.  Am. Countercl. ¶ 127.  Just as the Court previously found, this claim remains foreclosed by, *inter alia*, WCO's judicial admissions to the contrary.

ROFRs are ubiquitous in commercial contracts, *see* 25 Williston on Contracts § 67:89 (4th ed), and expressly permitted in EBS leases, *Ord. on Recons. & Fifth Mem. Op. & Ord. & Third Mem. Op. & Ord. & Second Report & Ord.*, WT Dkt. No. 03-66 ¶ 270, 21 FCC Rcd. 5606, 5716 (Apr. 27, 2006) ("[W]e will maintain the Commission's existing policy of allowing EBS licensees to afford lessees a right of first refusal.").  As a general matter, ROFRs do not violate the antitrust laws, *e.g.*, *DIJ Catheter Corp. v. Critikon, Inc.*, 1994 WL 683424, at *4-5 (S.D.N.Y. Dec. 6, 1994), because other buyers remain able to submit bids, preserving the "potential for competition," *Satellite Fin. Plan. Corp. v. First Nat'l Bank*, 633 F. Supp. 386, 397

1  (D. Del. 1986), *aff'd on reconsideration*, 643 F. Supp. 449 (D. Del. 1986); *see* Ord.

2  11-12.

3      As WCO judicially admits, that is exactly what happened here. WCO made

4  "competitive, market-based offers" for EBS licenses leased to T-Mobile. Ans. ¶ 52;

5  ¶ 166 (WCO "engaged in lawful, competitive market transactions"); *see also* Ans.

6  ¶¶ 157, 165 (WCO engaged in "competitive bidding" for licenses subject to T-

7  Mobile's ROFR); ¶ 63 ("competitive business transactions"); ¶ 127 ("competitive

8  market participation"); ¶ 144 ("ordinary market competition"); *see also* Am.

9  Countercl. ¶ 254 (WCO "made numerous bids for the purchase of EBS licenses"); ¶

10 74 (WCO made $6 billion worth of offers for 936 licenses). WCO even admits to

11 purchasing the Owasso Public School system's EBS license, Ans. ¶ 68, though it

12 ultimately backed out of that transaction. WCO also acknowledges that those bids—

13 and thus the prices T-Mobile paid for licenses when it matched WCO's offers—

14 "reflected fair market value." Ans. ¶ 144; Ans. ¶¶ 52, 55, 144, 156a. Accordingly,

15 when T-Mobile exercised ROFRs, licensees received exactly the same amounts they

16 would have received from WCO had it won the bids.

17      In sum, each time T-Mobile exercised a ROFR, WCO had the opportunity

18 to—and did—compete by submitting a bid. If it had bid more than T-Mobile was

19 willing to pay, it would have won the license, and vice versa. As the Court

20 previously found, these binding admissions undermine WCO's allegations of market

21 exclusion. *See* Ord. 10-12; *Novation Ventures LLC v. J.G. Wentworth Co.*, 156 F.

22 Supp. 3d 1094, 1102 (C.D. Cal. 2015) (plaintiff did not allege market foreclosure

23 because it failed "to plead any facts demonstrating that it ha[d] actually been

24 foreclosed from the opportunity of competing"); *GSI Tech v. United Memories, Inc.*,

25 2014 WL 1572358, at *3 (N.D. Cal. Apr. 18, 2014) (allegation of foreclosure "not

26 plausible" where plaintiff was "considered for" and "awarded contracts"). Indeed,

27 participating unsuccessfully in competition is not an antitrust injury. *Malheur Forest*

28 *Fairness Coalition v. Iron Triangle, LLC*, 164 F.4th 710, 735 (9th Cir. 2026) ("[T]he

antitrust laws' prohibitions 'focus on protecting the competitive process and not on the success or failure of individual competitors.'"); *Curtin Maritime Corp. v. Santa Catalina Island Co.*, 786 F. App'x 675, 677 (9th Cir. 2019) (affirming dismissal where competitor alleged it was foreclosed after it bid on an exclusive lease and lost). Or, as the Court put it: "WCO does not explain why a higher or matching bid by a competitor buyer, T-Mobile, resulting in the loss of a sale to WCO, is an injury of the type the antitrust laws were intended to prevent." Ord. 11.

None of WCO's new allegations alter that conclusion. To the contrary, WCO asserts that, aside from instances of ROFR exercises, it made many more offers, "plac[ing] concrete purchase terms on the table" after going "far along in the negotiation process." Am. Countercl. ¶ 187. WCO cites dozens of schools that engaged with WCO and received its bids before ultimately deciding to sell to T-Mobile independent of the ROFR. *Id.* ¶ 187 n.14. The alleged harm therefore remains that WCO purportedly could not *purchase* licenses, which, if true, would be harm to a competitor, not harm to competition. Ord. 11.

In an effort to escape its dispositive admissions and the Court's prior ruling, WCO asserts that bidding in a ROFR-free market would continue "until a final, truly competitive price was reached." Am. Countercl. ¶ 184. This allegation is belied by WCO's binding admissions that its bids *were* at fair market value, as were the prices paid to sellers when T-Mobile matched those bids. *Supra* pp. 4, 10. In any event, this assertion is a mere restatement of WCO's now-discredited argument that ROFRs on their own violate the antitrust laws. But the antitrust laws do not require competitive bidding at all, much less the absence of ROFRs. *See supra* pp. 9-10; *Sec. Fire Door Co. v. County of Los Angeles*, 484 F.2d 1028, 1031 (9th Cir. 1973) ("Even a direct contract for the Guilbert system, without any pretense of putting the job out to bid . . . would not in itself have constituted a restraint of trade under the Sherman Act."). "[B]usinesses may choose the manner in which they do business absent an injury to competition." *Malheur*, 164 F.4th at 737 (citation omitted); *see*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION TO DISMISS FIRST AMENDED COUNTERCLAIMS

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415-16 (2004) ("[The Sherman Act] does not give judges *carte blanche* to insist that a monopolist alter its way of doing business whenever some other approach might yield greater competition.").

Finally, nowhere does WCO allege (nor could it allege) that T-Mobile's ROFR exercises substantially foreclosed it from participating in a purported market for 2.5 GHz licenses. To the contrary, WCO claims T-Mobile "selectively" exercised its ROFR for 69 licenses in total. Am. Countercl. ¶ 186. Accepting *arguendo* all of WCO's allegations as true, 69 out of 2,200 EBS licenses—plus the unpleaded number of BRS licenses that also comprise 2.5 GHz spectrum—does not remotely constitute substantial foreclosure. *Eastman*, 724 F. App'x at 558-59.[5]

## 2. Exclusivity Provisions

WCO asserts that the exclusivity provisions in certain T-Mobile leases are part of a scheme that "has substantially foreclosed actual and potential rivals' access to and use of 2.5 GHz spectrum." Am. Countercl. ¶¶ 3, 112. This, however, is contradicted by the Amended Counterclaims' factual allegations, WCO's judicial admissions, and the lease provisions themselves.

Because there are "well-recognized economic benefits to exclusive dealing arrangements," courts "analyze challenges to exclusive dealing arrangements under

---

[5] WCO vaguely alleges that T-Mobile "blocked some 857 proposed sales" using "other anticompetitive tactics comprising the Scheme" besides ROFR exercises, and it pleads "on information and belief" that T-Mobile "coerced" sales "as part of the Scheme." Am. Countercl. ¶¶ 186-87. These allegations are not well-pleaded because they are wholly devoid of facts to suggest *what* T-Mobile supposedly did to "block" 857 sales, let alone how that unidentified conduct was anticompetitive or caused WCO antitrust injury. *See Twombly*, 550 U.S. at 555-56, 558 (well-pleaded allegations especially important in antitrust context); *Blantz v. Cal. Dep't of Corrs. & Rehab., Div. of Corr. Health Care Servs.*, 727 F.3d 917, 926-27 (9th Cir. 2013) (conclusory allegations made on information and belief that are "devoid of further factual enhancement" are insufficient to state a claim (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009)).

the antitrust rule of reason." *Omega*, 127 F.3d at 1162; *see In re EpiPen Marketing, Sales Practices & Antitrust Litig.*, 44 F.4th 959, 983 (10th Cir. 2022) ("'[E]xclusive dealing contracts are not disfavored by the antitrust laws.' Courts repeatedly explain that exclusive dealing agreements are often entered into for entirely procompetitive reasons and pose very little threat to competition even when utilized by a monopolist." (citation omitted)).

Here, WCO brings claims under both Section 1 and Section 2 of the Sherman Act. Am. Countercl. ¶¶ 231, 246. For exclusive dealing in particular, "[w]hile some courts have required a showing of a higher degree of market foreclosure under Section 1, whether bringing claims under section 1 or section 2, a plaintiff still must plead facts that support a plausible inference that the exclusive dealing arrangement forecloses a substantial share of the relevant market." *Arcell v. Google LLC*, 2024 WL 1090009, at *3 (N.D. Cal. Feb. 5, 2024) (internal quotation marks and citations omitted); *see also Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680, 688 (9th Cir. 2022) (The "legal tests used for sections 1 and 2 of the Sherman Act are similar," so the Court "can review claims under each section simultaneously."); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) (if conduct is not anticompetitive under Section 1 the court need not analyze it under Section 2).

WCO complains that T-Mobile's leases contain clauses "that either (a) outright bar EBS license holders from selling the licenses . . . , or (b) significantly restrict the license holders' ability to do so." Am. Countercl. ¶ 117. WCO identifies only 16 licensees (which collectively owned 25 licenses) that it claims "understand T-Mobile's lease terms to effectively prohibit them from selling or leasing 2.5 GHz spectrum to T-Mobile's competitors." Am. Countercl. ¶ 141; *id.* ¶¶ 120-21, 142-54.[6]

---

[6] WCO references 19 licensees in its discussion of allegedly exclusionary lease terms, but as to three, it makes no allegations that those licensees chose not to sell to WCO because of any lease terms (as opposed to a generalized adversity to potential litigation). *See* Am. Countercl. ¶ 147 (alleging that the University of Cincinnati and

Of those 25 licenses, WCO identifies only *two* instances in which T-Mobile enforced an exclusivity provision: Christian College of Georgia and Lorain County Community College. *Id.* ¶¶ 120-121, 204. As to these two, as the Court previously recognized, alleging "one or two examples of an institution refusing to consummate a deal with WCO due to the exclusivity provision" is not sufficient. Ord. 14.

As to the remaining 14 institutions (which collectively owned 23 licenses), WCO does not bother to describe any of these licensees' lease provisions or explain how they allegedly prevented WCO from purchasing the licenses. In fact, while the "exclusivity" provisions in these leases varied, none of them supports the assertion that they prevented the licensees from selling to WCO.

For 10 of the 23 licenses, the leases had a particular form of exclusivity provision that used "Competing Entity" language, as in the case of Albright College.[7] As WCO explains, those provisions apply only to "a party that 'offers, provides or delivers a commercially available telecommunications service using EBS or BRS spectrum within the United States of America." *Id.* ¶ 167. WCO emphasizes that it was not a Competing Entity. *Id.* ¶ 168. It alleges, however, that T-Mobile argued in the *Albright* case that "Albright violated the Exclusivity clause

_____

the Board of Education of the Cincinnati City School District "would not move forward with a sale to WCO due to their adversity to litigation"); *id.* ¶ 148 (alleging that Views on Learning told WCO it would "continue waiting for a sale of our licenses" so it would not "end up being a test case for T-Mobile"). To the extent these allegations describe cognizable conduct at all, they (at most) allude to concerns about potential litigation by T-Mobile and thus fall within the *Noerr-Pennington* doctrine for the reasons described further in Section II, *infra*.

[7] *See* Ex. 3A § 10(b) (St. Louis Community College); Ex. 3B § 12(c) (Clark County School District); Ex. 3C §10(b) (California Human Development Corp.); Exs. 3D-3E § 10(c) (Northwest Florida State College); Ex. 3F § 9(b) (Wilkes University); and All Exhibits are attached to the Declaration of William P. Ashworth filed herewith; notice should be taken of them for the reasons explained in the accompanied Request for Judicial Notice.

in its lease with T-Mobile when it engaged in negotiations with WCO," *id*. ¶ 169. The judicially noticeable facts demonstrate otherwise.

T-Mobile alleged in its lawsuit against Albright *not* that the "Competing Entity" provision applied to WCO, but rather that, because Albright had refused to provide certain information to which T-Mobile was entitled under its lease, it had not yet carried its burden of showing that the provision did not apply to WCO.  Ex. 1 (Albright Complaint) ¶ 6 ("[U]nless and until Albright establishes that the exception to exclusivity applies—including, most significantly, that WCO is not a 'Competing Entity'—it should not be permitted to sell or assign the License to WCO"); *See* Ex. 2 §§ 3(a), 10(c) (Albright Lease).  That distinction is critical:  Even accepting WCO's allegations as true, had the school (or WCO) provided the required information, Albright could have sold its license to WCO, subject to T-Mobile's ROFR.  The same is true for all schools with similar exclusivity language.

For four other licenses, the leases provide that the "[l]icensee *may* offer the License to commercial entities for sale," subject to the ROFR.[8]  WCO does not acknowledge these lease terms at all.

As to the other nine, WCO does not allege that T-Mobile enforced any exclusivity provision in the leases.

Plainly, other than for Christian College and Lorain County Community College, any exclusivity provisions in T-Mobile's leases did not prevent WCO from entering the market.  Nor can the Court infer, from the two instances of exclusivity enforcement WCO identifies, that T-Mobile enforced all identical exclusivity provisions; the facts properly considered on this motion show the opposite.  In the case of the Owasso, Oklahoma Public School system—an institution with a lease containing identical exclusivity language to the language in the Christian College and Lorain leases, *compare* Ex. 5 § 4(a) (Owasso) *to* Ex. 6 § 3(a) (Christian College);

---

[8] *See* Ex. 4A § 21(a) (Sinclair Community College); Ex. 4B § 21(a) (Wright State University); and Ex. 4C § 21(a) (Greater Dayton Public TV).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION TO DISMISS FIRST AMENDED COUNTERCLAIMS

Ex. 7 § 3(a) (Lorain)—T-Mobile did not enforce the provision.  Instead, T-Mobile declined to exercise its ROFR, leaving WCO to buy the license if it saw fit to do so.

WCO's allegations regarding ROFRs further undercut its claim that exclusivity provisions in leases deprived it of the opportunity to compete for spectrum licenses.  WCO asserts that T-Mobile exercised ROFRs to purchase 69 licenses.  Am. Countercl. ¶¶ 182, 186.  At least 60 of those 69 licenses were subject to an exclusivity provision that T-Mobile did not invoke and that did not dissuade the lease holders from entertaining WCO's offer.  *See id*. (holders of 69 licenses provided "notice to T-Mobile that [they] had received an offer from WCO"); Ex. 8 (exclusivity provisions).  For those 60 licenses, WCO was not "excluded from bidding," and it was not "T-Mobile's exclusivity provision, rather than the ROFR provision" that "prevented WCO from consummating deals in the relevant market." Ord. 12-13; Am. Countercl. ¶ 186 (describing ROFRs blocking 69 acquisitions).[9]

In any event, even if WCO could adequately allege that exclusivity provisions prevented it from buying all 25 licenses about which it specifically makes allegations (it cannot), that would not come close to alleging substantial foreclosure from the market.  As WCO explains, "existing 2.5 GHz license ownership is dispersed across

_____

[9] In opposing T-Mobile's prior motion to dismiss, WCO relied heavily on the 9th Circuit's decision in *CoStar Grp., Inc. v. Com. Real Estate Exch., Inc.*, 150 F.4th 1056 (9th Cir. 2025).  *See, e.g.*, ECF 167 (WCO opposition) at 18, 19, 27, 28; ECF 176-1 (WCO sur-reply) at 8, and the Court considered Costar in dismissing WCO's initial counterclaims, Ord. 6 n. 4, 12, 16.  The *Costar* opinion provides no more basis to allow WCO's Amended Counterclaims to proceed than it did the first time around.  First, the *CoStar* court did not consider antitrust injury at all because "CoStar [did] not dispute that CREXi plausibly alleged that it . . . caused antitrust injury."  *CoStar*, 150 F.4th at 1067.  Second, the *CoStar* opinion did not address anything like the extensive judicial admissions of competition present here (*see supra* pp. 4, 10); indeed, it did not consider judicial admissions at all.  Finally, *CoStar* involved extensive allegations of anticompetitive conduct that are entirely absent here, including "particularly problematic" allegations of anticompetitive conduct through the construction of "deceptive" technological barriers to competition.  150 F. 4th at 1074-75.

over a thousand individual educational and/or non-profit institutions nationwide," Am. Countercl. ¶ 108, and there are "approximately 2,200 total EBS licenses," *id.* ¶ 12. Twenty-five out of 2,200 EBS licenses (which does not include any BRS licenses, which also comprise WCO's alleged relevant market of 2.5 GHz spectrum, *id.* ¶ 77; *id.* ¶ 46) is 1.1%. No definition of "substantial foreclosure" even remotely embraces a situation in which roughly 1% of available licenses were unavailable for purchase due to the existence of exclusivity clauses. *See supra* § I.A. (foreclosure of 30-40% of the market is insufficient); *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 333 (1961) ("[L]ess than 1% [foreclosure], is, conservatively speaking, quite insubstantial.").

In sum, to adequately plead an anticompetitive effect of the exclusivity provision, WCO must plead facts showing that T-Mobile's exclusivity provisions "actually affected" a substantial share of the relevant market. *Arcell*, 2024 WL 1090009, at *3-4 (citation omitted). In other words, it is not sufficient to allege that a defendant possesses a large market share and uses exclusive agreements; a plaintiff must explain how the exclusive agreements actually and "substantially foreclosed competition" in the relevant market. *Id.* at *3-4 ("coverage is not necessarily the same as foreclosure"); *see also Eastman*, 724 F. App'x at 558 (plaintiffs must "plead facts sufficient to support the inference that the exclusive dealing arrangements have some appreciable impact on the market"). For the reasons discussed, WCO has failed to do so here.

### 3. Other Lease Provisions

WCO also takes aim at the 30-year lease term, the Right to Participate clause, and the confidentiality terms in T-Mobile's leases. *See* Am. Countercl. ¶¶ 114-16, 131-138. None of those provisions is anticompetitive, and WCO does not allege antitrust injury from any of them.

*First*, 30-year leases are expressly permitted under FCC regulation. *Id.* ¶ 115 n.8. And, as a matter of law, that a lease is long-term does not mean it is

anticompetitive. *See, e.g.*, *Tampa Elec. Co.*, 365 U.S. at 334 ("20-year period" of contract was "necessary in the public interest"). As WCO expressly alleges, no carrier could justify investing billions of dollars in building its network without certainty that it would have access to this spectrum for an extended period, "either via ownership or lease." Am. Countercl. ¶ 107; *id.* ¶¶ 12, 35, 67.

*Second*, WCO asserts that the Right to Participate provision "subjects EBS license holders to extremely burdensome and costly information requests from T-Mobile, which discourage them from entertaining offers like those submitted by WCO." *Id.* ¶ 132. WCO conspicuously omits the actual language of the provision, however, which belies its allegations. The Right to Participate provision simply requires that, in the event the licensee "decides to solicit bids . . . for the sale . . . of the Channels" before a certain period, the licensee must provide T-Mobile "with an opportunity *no less favorable in timing or substance than the opportunity provided to any other entity*" to bid, receive, and discuss information with the licensee. *E.g.*, Ex. 2 § 3(f) (Albright Lease). That language is explicitly *pro*-competitive, as it merely places T-Mobile on equal footing as its competitors in the bidding process. The Right to Participate provision does not limit or restrict the bidding process in any way. WCO also does not identify a single example of a license holder that was discouraged by a Right to Participate provision from considering WCO's offers.

*Third*, WCO alleges that T-Mobile's leases "contain a strict prohibition on disclosure of lease terms to third parties including potential license purchasers." Am. Countercl. ¶ 134. WCO admits that non-disclosure terms are "standard industry practice in competitive business transactions, particularly in high-value deals involving proprietary negotiations." Ans. ¶ 7. This admission is unsurprising given that WCO itself regularly entered into non-disclosure agreements with license holders. *See* Ans. ¶ 1. Indeed, "non-disclosure agreements do not injure competition as a matter of law." *See Nat'l Flood Servs., Inc. v. Torrent Technologies., Inc.*, 2006 WL 1518886, at *10 (W.D. Wash May 26, 2006). Nonetheless, WCO claims the

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION TO DISMISS FIRST AMENDED COUNTERCLAIMS

non-disclosure provisions raised its costs.  *See* Am. Countercl. ¶ 137.  If that is true to any extent, it is a common byproduct of the confidentiality provisions that permeate commercial contracts of all kinds.  More relevant here, WCO does not explain how those supposed increased costs foreclosed it from entering the relevant market.  *See Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 515-16 (4th Cir. 2002) (increased costs faced by a competitor do not constitute antitrust injury if the competitor is not prevented from competing).  In any event, WCO identifies only one example of a confidentiality provision that allegedly increased WCO's costs, Am. Countercl. ¶ 138, which does not begin to show substantial foreclosure or any non-marginal effect on competition.

### 4.    Acquisition of Licenses

WCO still has not explained how it could have suffered antitrust injury from T-Mobile's purchase of EBS licenses.  "There is nothing illicit about" a buyer "acquir[ing] the inputs necessary for its [business]," "acquir[ing] more inputs as a part of a procompetitive strategy to gain market share in the output market," or "acquir[ing] excess inputs as a hedge against the risk of future rises in input costs or future input shortages."  *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 323 (2007); *see Kartell v. Blue Shield of Mass., Inc.,* 749 F.2d 922, 928 (1st Cir. 1984) (Breyer, J.) ("[T]here is no law forbidding a . . . company from itself buying the goods or services [it] need[s].").  Here, WCO makes no allegation that T-Mobile purchased licenses it did not use.  In fact, WCO does not even allege that T-Mobile purchased any license it was not already leasing, the result of which would be to affect no change in the number of licenses T-Mobile is using. WCO confirms that the "aggregation of licenses across large portions of the country" is standard practice for any national wireless carrier, like T-Mobile.  Am. Countercl. ¶¶ 94, 96.  In fact, WCO's new purported business model is predicated on doing exactly what it claims is anticompetitive when done by T-Mobile—acquiring a "critical mass" of 2.5 GHz spectrum licenses.  *Id.* ¶ 12.  WCO claims it would have

bought more than 936 licenses, *id.* ¶ 74, which far exceeds the 600 licenses allegedly acquired by T-Mobile, *id.* ¶ 157. Despite having an opportunity to replead, WCO still does not claim it participated in any auctions in which T-Mobile purchased licenses. Ord. 9 n.7. Nor does it allege a predatory bidding or overbuying theory. *Id.* WCO simply complains that it could not purchase for itself licenses acquired by T-Mobile. That is not anticompetitive harm.

WCO's offhand reference to T-Mobile "buying BRS licenses (and/or telecommunication companies that own such licenses)" does not save this deficient theory of harm. Am. Countercl. ¶ 155. WCO does not allege it ever tried to buy BRS licenses, much less does it allege "how the[se] acquisitions unreasonably restricted competition." *Eastman*, 724 F. App'x at 559.

### 5. Threats and Coercion

Finally, WCO claims T-Mobile used "threats and intimidation to coerce license holders not to deal with WCO (or anyone else)." Am. Countercl. ¶ 159. WCO alleges no threat or other coercive tactic apart from "T-Mobile's actual and threatened lawsuits," *id.* ¶ 160, which are the same unsupported and inactionable allegations that underlie its sham litigation claim, *see id.* ¶¶ 160-63; *infra* § III.

### B. Alleged Harm to License Holders and Consumers Does Not Demonstrate That WCO Suffered Antitrust Injury

Unable to plausibly allege antitrust injury on account of market exclusion or any other theory, WCO claims T-Mobile's conduct had "anticompetitive effects" on third parties. It asserts that (1) license holders experienced lower demand/prices or increased costs; and (2) wireless consumers paid higher prices for lower quality service. Am. Countercl. ¶¶ 201-02, 210. Neither theory demonstrates that *WCO* suffered an antitrust injury.

First, WCO is not a license holder. *Id.* ¶¶ 63, 199. It "cannot demonstrate antitrust injury . . . through reference to alleged anticompetitive acts that have no relation to [WCO] or the harm that [it] experienced." *Reilly v. Apple Inc.*, 578 F.

Supp. 3d 1098, 1110 (N.D. Cal. 2022). It is undisputed that WCO was not harmed by allegedly suppressed prices or demand for 2.5 GHz spectrum licenses; it admitted as much in prior briefing. *See* ECF No. 167 at 13-14. As the Court put it, WCO expressly "disclaim[ed] a price suppression theory as its own antitrust injury." Ord. 10. That makes sense—as a potential buyer of 2.5 GHz spectrum, WCO stood to *benefit* from lower demand and prices. *See, e.g.*, *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1102 (9th Cir. 1999) (plaintiffs failed to allege antitrust injury where they "stand to benefit"). This theory also is entirely at odds with WCO's repeated judicial admissions that T-Mobile paid license holders fair market value. *E.g.*, Ans. ¶¶ 144, 156a. But even if T-Mobile had paid license holders less than market value, that would not mean that T-Mobile acted anticompetitively. "T-Mobile seeking lower prices in the absence of competing bidders while bidding higher prices to beat competitors is rational behavior 'consistent with a free, competitive market.'" Ord. 16 (quoting *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1201 (9th Cir. 2012)).

*Second*, WCO's claim that T-Mobile's conduct harmed *consumers* by forcing them to pay higher prices for lower quality 5G networks, is likewise insufficient. Am. Countercl. ¶ 210. Allegations about injuries sustained by unrelated customers in a different market, but not by WCO in the market at issue here, are insufficient to allege antitrust injury to WCO. *See Reilly*, 578 F. Supp. 3d at 1110.

## II.    T-Mobile's Constitutionally Protected Litigation Conduct Is Immune from Antitrust Scrutiny

Under the *Noerr-Pennington* doctrine, petitioning the government for redress, including by filing lawsuits, is immune from antitrust scrutiny as protected First Amendment conduct. *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 61-62 (1993) ("*PREI*"); Ord. 18-19. The exception WCO invokes is exceedingly narrow and applies only when a litigation is a "sham"—that is, both objectively baseless (in that "no reasonable litigant could . . . expect success on the

merits") and subjectively baseless. *PREI*, 508 U.S. at 60-61. Courts may not examine a litigant's subjective motivation unless the lawsuit is objectively baseless. *Id.* at 60. "The existence of probable cause to institute legal proceedings precludes a finding" of sham litigation. *Id.* at 62. Probable cause is a low bar, requiring only "a reasonable belief that there is a *chance* that a claim *may* be held valid upon adjudication." *Id.* at 62-63 (cleaned up & emphases added). Courts "may decide probable cause as a matter of law" where "there is no dispute over the predicate facts of the underlying" lawsuit. *Id.* at 63; *see Relevant Grp., LLC v. Nourmand*, 116 F.4th 917, 932 (9th Cir. 2024) (affirming district court's ruling on objective baselessness as a matter of law); Ord. 19. "In determining whether the burdened conduct falls under the protection of the Petition Clause, [courts] must give adequate 'breathing space' to the right of petition." Ord. 17 (quoting *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 931-32 (9th Cir. 2006)). To "avoid 'a chilling effect on the exercise of this fundamental First Amendment right,'" courts apply a heightened pleading standard. *Or. Nat. Res. Council v. Mohla*, 944 F.2d 531, 533 (9th Cir. 1991) (citation omitted). To that end, courts in the Ninth Circuit find that a lawsuit is objectively baseless "only with great reluctance." *White v. Lee*, 227 F.3d 1214, 1232 (9th Cir. 2000).

In its original counterclaims, WCO challenged three lawsuits, two subpoena enforcement proceedings, a request for pre-complaint discovery and "dozens" of alleged threats, which WCO argued met the "*POSCO*" exception to *Noerr-Pennington* for "serial" litigation. Ord. 17. The Court found *POSCO* inapplicable and that WCO failed to allege any sham lawsuits or threats under the applicable *PREI* analysis. Ord. 18-20. Now, WCO challenges only two of those same lawsuits, *Albright* and *St. Lucie*, and four of those same alleged threats. Predictably, its allegations suffer from the same defects the Court previously found. Ord. 20.

WCO's allegations as to why the litigations were objectively baseless still consist of legal argument about the merits of the lawsuits, not facts showing they

were *objectively* baseless such that *no reasonable litigant* would believe there was even a *chance* of success.  Ord. 19-20 n.17; *PREI*, 508 U.S. at 60.  WCO also continues to ignore the pleadings in those cases and what actually was alleged.  As to *Albright*, WCO claims T-Mobile had no basis to believe WCO was a "Competing Entity" as defined in Albright's lease.  Am. Countercl. ¶¶ 167-68.  But a review of the complaint in that case shows that T-Mobile did *not* take the position that WCO was a Competing Entity.  Instead, T-Mobile alleged that WCO and Albright had refused to provide information regarding *whether* WCO met the definition of Competing Entity, and Albright therefore failed to carry its burden of showing that WCO was an eligible buyer.  Ex. 1 ¶¶ 2-5, 69-88 (Albright Complaint).  Given that WCO was a newly formed entity, T-Mobile had no reason to know its business plan. (This seems to be a subject on which WCO itself is confused, as evidenced by its shifting descriptions.)  As such, T-Mobile asserted that "unless and until Albright establishes that the ['Competing Entity'] exception to exclusivity applies . . . it should not be permitted to sell or assign the License to WCO."  *Id.* ¶ 6.

WCO's allegation that its offer qualified as "bona fide" under the terms of the *Albright* lease is another irrelevant legal merits argument.  *See* Ord. 19-20.  It fails because T-Mobile's claims in the *Albright* litigation about the "bona fide" offer issue were identical to its claims about the "Competing Entity" provision.  Ex. 1 ¶¶ 124-25 (Albright Complaint).  As to *St. Lucie*, Ex. 17 (St. Lucie Complaint), WCO conclusorily alleges that (i) WCO was "still not a Competing Entity under the St. Lucie lease"; and (ii) it made a "bona fide offer."  Am. Countercl. ¶ 177.  Those arguments fail for the same reasons.  *See* Ex. 17 ¶¶ 5-12 (St. Lucie Complaint).

WCO seeks to infer objective baselessness from the resolutions of the litigations, namely, that T-Mobile did not pursue either to final judgment.  *Id.* ¶ 163. But as the Court previously recognized, those lawsuits ended because WCO and the lessors *mooted the suits*.  Ord. 20; Ans. ¶ 67 ("[WCO] withdrew its offer, thereby rendering the St. Lucie case moot"); Ans. ¶ 66 ("To stop" discovery, "Albright and

WCO" abandoned the transaction "thereby rendering the case moot"); Am.
Countercl. ¶¶ 174, 177; Exs. 16 & 18.   Those concessions suggest that T-Mobile's
lawsuits were meritorious.  Ord. 20; *see PREI*, 508 U.S. at 62-63; *see also Relevant*,
116 F.4th at 932 ("[S]ettlement indicates a lawsuit is not objectively baseless.").

WCO continues to assert "abuse of process" during discovery in the *Albright*
case.  Am. Countercl. ¶ 172.  But WCO concedes that T-Mobile *prevailed* in its
effort to obtain discovery in *Albright*.  Ans. ¶ 66 (admitting WCO and Academia
"ultimately produced over 11,000 pages related to [WCO's] potential acquisition of
Albright College's EBS license"); Am. Countercl. ¶ 172 (similar); Exs. 9-15.  When
a litigant "obtain[s] the desired [judicial] action," a litigation is not a sham.  *See
Subscription Television, Inc. v. S. Cal. Theatre Owners Ass'n*, 576 F.2d 230, 233
(9th Cir. 1978); *PREI*, 508 U.S. at 60 n.5 ("A winning lawsuit is by definition a
reasonable effort at petitioning for redress and therefore not a sham.").

As a last-ditch effort to conjure something new to say about *Albright* and *St.
Lucie*, WCO now faults T-Mobile for not bringing *more* lawsuits (as opposed to
exercising ROFRs and purchasing licenses).  Am. Countercl. ¶ 171.  There is no law
requiring T-Mobile to sue *other* lessors to establish the objective merit of its
lawsuits.  Had T-Mobile brought those suits, WCO no doubt would allege they were
likewise baseless, even "serial."  Indeed, WCO dropped its allegations as to other
lawsuits and threats and no longer invokes the *POSCO* exception for "serial
petitioning" that this Court rejected.  Ord. 17-19.

Because WCO has not plausibly pleaded facts showing why no reasonable
litigant would believe there was a chance of success in either lawsuit, allegations
about T-Mobile's subjective intent are irrelevant.  Am. Countercl. ¶¶ 172, 175; Ord.
19 (citing *PREI*, 508 U.S. at 60).

Finally, WCO rehashes the same allegations of "threats"—that T-Mobile sent
the *Albright* complaint to "numerous" entities (only one is identified, Radio Training
Network) and threatened four institutions with "frivolous lawsuits."  Am. Countercl.

¶¶ 178-180.   These bare bones allegations provide no *facts* to support that the supposed threats were "frivolous."  Ord. 20.  And WCO still fails to "plead any facts distinguishing the circumstances in other deals such that the Albright complaint would be irrelevant."  *Id.*  As the Court found, "if the underlying litigation threatened is not baseless, neither is the threat."  *Id.* (citation omitted).

## III.   WCO's New Allegations Demonstrate that WCO Fails To Plead a Relevant Market

In briefing its motion to dismiss WCO's original counterclaims, T-Mobile asked the Court to dismiss WCO's counterclaims on the ground that WCO failed to allege an adequate product market.  T-Mobile argued that WCO's proposed market, which included only 2.5 GHz spectrum, failed to account for reasonably interchangeable substitutes.  ECF 149-1 at 20-23; ECF 173 at 14-17.  The Court declined to dismiss on that ground, noting that WCO's original allegations were not "facially unsustainable" at the pleading stage, and that the pertinent analysis should rest upon cases involving monopsony rather than monopoly, and should recognize that "in a buyer-side conspiracy case, . . . [the] market is comprised of buyers who are seen by sellers as being reasonably good substitutes."  Ord. 21-22 (quoting *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 337 (3d Cir. 2018)).  Since that ruling, WCO has amended its market-definition allegations.  In so doing, WCO focused precisely upon the question the Court identified—and it has clearly alleged that from a seller's perspective, ***all*** telecommunications carriers, including not only T-Mobile, but also Verizon and AT&T, are interchangeable as buyers; and that such carriers deem licenses in multiple mid-spectrum bands as substitutes for the 2.5 GHz band.  In light of these new allegations, WCO's proposed market, which continues to include only 2.5 GHz spectrum, is fatally underinclusive and has become "facially

unsustainable."[10]  *See, e.g.*, *Farhan v. 2715 NMA LLC*, 161 F.4th 475, 483-84 (7th Cir. 2025) ("A plaintiff pleads himself out of court when it would be necessary to contradict the complaint in order to prevail on the merits." (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008)).

WCO now alleges that "other 5G service providers, such as AT&T and Verizon," which typically use C-Band and 3.45 GHz spectrum, are *also* potential purchasers of 2.5 GHz spectrum licenses, and *would* purchase or lease 2.5 GHz spectrum licenses to supplement their networks.   Am. Countercl. ¶¶ 210, 214. Indeed, WCO's new purported business plan depends on that very fact:  According to WCO, its plan was to acquire a "critical mass" of licenses and to make them available for aggregate lease or sale not only to T-Mobile, but to ***other*** wireless carriers (AT&T and Verizon), which WCO alleges would use those licenses "to build out or supplement their networks."  *Id.* ¶¶ 12, 15, 63-76.

But WCO goes further:  It now also explicitly alleges that 2.5 GHz spectrum *is* interchangeable with other forms of mid-band spectrum.  In WCO's words, "[a]s

---

[10] We note that the case law cited in the Order for the proposition that market definition in monopsony cases should be assessed from sellers' perspective involved the question of whether horizontal buy-side conspirators comprised enough of the market to pose a problem for competition, or whether there were adequate substitutes from the perspective of a seller to those buyers.  *See* Ord. 21-22 *and cases cited therein*.  WCO's amended counterclaims are different.  They allege single-firm conduct and vertical agreements that allegedly foreclosed competition for the sale or lease of spectrum licenses.  Regardless, even if the Court focuses only on the sellers' perspective, it must consider the question from the perspective of ***all*** potential sellers of ***all*** interchangeable products.  That is, just as market definition from the buyers' perspective is not defined by looking at what one set of consumers with unique tastes (e.g., Coca-Cola fanatics) view as interchangeable, market definition from the sellers' perspective cannot be assessed by looking at one set of sellers with particular, but interchangeable, products.  *See Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437-38 (3d Cir. 1997) (citations omitted) ("A court making a relevant market determination looks not to the contractual restraints assumed by a particular plaintiff when determining whether a product is interchangeable, but to the uses to which the product is put by consumers in general.").

5G technology emerged, the nation's largest carriers—including T-Mobile, AT&T, and Verizon—moved to secure access to Mid Band spectrum capable of supporting large-scale 5G deployment." *Id.* ¶ 54. Allegedly precluded from purchasing 2.5 GHz, AT&T and Verizon turned to a mid-band substitute: "purchasing large quantities" of C-Band and 3.45 GHz spectrum. *Id.* ¶¶ 57, 62, 88. As WCO explains, those carriers have spent considerable time and resources building out the infrastructure for their competing 5G networks using C-Band spectrum or 3.45 GHz spectrum, just as T-Mobile has done using 2.5 GHz spectrum. *Id.* ¶ 67.[11]

These new allegations make clear that T-Mobile's market share cannot be calculated based on T-Mobile's holdings of 2.5 GHz alone. To the contrary, the relevant market here must encompass *all* prospective buyers and *all* products those buyers regard as reasonable substitutes. *Supra* note 10; *see, e.g.*, *Campfield v. State Farm Mut. Auto Ins. Co.*, 532 F.3d 1111, 1118-19 (10th Cir. 2008) (dismissing monopsony claims on basis of underinclusive relevant market and holding that "[w]hen there are numerous sources of interchangeable demand, the plaintiff cannot circumscribe the market to a few buyers in an effort to manipulate those buyers' market share"); *see also Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir.

---

[11] Despite WCO's claim that the substitutes chosen by AT&T and Verizon are "inferior," WCO's own allegations demonstrate the other carriers' success, referring to T-Mobile's, Verizon's, and AT&T's "extensive spectrum holdings" and "significant market share." Am. Countercl. ¶ 62. That Verizon and AT&T are among "the nation's largest wireless carriers," *id.* ¶ 54, and have "rapidly expand[ed] their fixed wireless subscriber bases" using other mid-band spectrum as a substitute for 2.5 GHz, *id.* ¶ 62, reveals that WCO's proposed relevant market is gerrymandered for this suit. Plainly, Verizon and AT&T have purchased and used other mid-band spectrum to "accomplish the same basic task," that is, launching a 5G network, as T-Mobile has accomplished using 2.5 GHz spectrum. *Streamcast Networks, Inc. v. Skype Technologies, S.A.*, 547 F. Supp. 2d 1086, 1095 (C.D. Cal. 2007). In any event, the fact that a product is alleged to be inferior emphatically does not mean it is not an economic substitute. *Id.* (rejecting argument that products were in different markets because one "possesses some unique attributes and components that may make it more attractive and efficient").

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION TO DISMISS FIRST AMENDED COUNTERCLAIMS

2018) (any proposed product market definition "must encompass the product at issue as well as all economic substitutes for the product" (citation omitted)); *Queen City Pizza*, 124 F.3d at 437-38.  WCO's market—which is carefully limited to include *only* buyers of the particular band that T-Mobile historically has purchased, and omits all buyers of all other bands—fails that critical test.

The Court should thus dismiss WCO's Amended Counterclaims for the independent reason that WCO fails to allege a plausible relevant market.

**IV.    WCO's State Law Claims Should Be Dismissed**

WCO's state law claims should be dismissed because they fail for the same reasons as the Sherman Act claims.  At oral argument on WCO's original counterclaims, WCO conceded that the "only daylight" between WCO's federal and state law claims related to WCO's claim under California's Unfair Competition Law.  Ex. 19, Tr. 6:21-7:4.  But WCO dropped its UCL claim in its Amended Counterclaims.  WCO now only pursues a Cartwright Act claim and a claim for intentional interference with prospective economic advantage, both of which rise and fall with the Sherman Act claims.

*The Cartwright Act:* By WCO's own admission, its "Cartwright Act claims are coextensive with the federal claims."  Ex. 19, Tr. 7:20-21.  WCO premises this claim on the same allegedly "anticompetitive, exclusionary lease agreements with EBS license holders" on which it bases its Sherman Act claims.  Am. Countercl. ¶ 252.  Indeed, "California's antitrust law[] was 'modeled after the Sherman Act,'" and therefore the Court's analysis "mirrors the analysis under federal law."  *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 939 F. Supp. 2d 1002, 1011 (N.D. Cal. 2013) (citation omitted); *see Kelsey K. v. NFL Enters., LLC*, 757 F. App'x 524, 527 (9th Cir. 2018) (affirming dismissal of a Cartwright Act claim "for the same reasons" as dismissal of a Sherman Act § 1 claim).  Thus, WCO's Cartwright Act claim fails for the same reasons its Sherman Act claims fail.  *Supra* §§ I-III.

***Intentional Interference with Prospective Economic Advantage***: WCO

similarly admitted there is no "daylight" between its intentional-interference claim and its Sherman Act claims. Ex. 19, Tr. 6:21-7:4. Under California law, a plaintiff alleging intentional interference with prospective economic advantage must show: (1) an economic relationship, (2) that the defendant knew of, (3) an intentional act designed to disrupt that relationship, (4) actual disruption, and (5) harm proximately caused by the defendant. *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 902 P.2d 740, 748-49 (Cal. 1995). Notably, the third element—intentional act designed to disrupt an economic relationship—requires a plaintiff to plead and prove that a defendant's actions are independently wrongful by some measure "apart from the interference itself." *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 950 (Cal. 2003) (citing *Della Penna*, 902 P.2d at 748-49). "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Id.* at 954.

Here, WCO alleges that T-Mobile's conduct was independently wrongful because it arose from the "anticompetitive and unlawful scheme described above." Am. Countercl. ¶ 255. But, for the reasons explained at length above, T-Mobile's conduct was not anticompetitive or otherwise unlawful. Thus, WCO's intentional interference claim falls alongside its antitrust claims. *See Starlight Cinemas v. Regal Entm't Grp.*, 691 F. App'x 404, 405 (9th Cir. 2017) (intentional-interference claim properly dismissed with antitrust claims because it was "predicated upon [the] Cartwright Act claim"); *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 998 (N.D. Cal. 2015) ("[S]ince Plaintiffs have not properly pled the antitrust claim, Plaintiffs have not satisfied the element of an independent intentional wrongful act.").

## CONCLUSION

WCO's Amended Counterclaims should be dismissed with prejudice. "The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Ascon Properties Inc. v. Mobil Oil Co.*,

866 F.2d 1149, 1160 (9th Cir. 1989).  Here, it is clear that no effort to replead could fix the fundamental problems with Defendants' counterclaims.  Defendants have failed twice to adequately plead their case.  Allowing a third bite at the apple would be an exercise in futility.  It also would prejudice T-Mobile by further delaying resolution of its long-pending litigation against WCO for its nationwide criminal scheme to defraud T-Mobile of millions of dollars.  *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION TO DISMISS FIRST AMENDED COUNTERCLAIMS

Dated:  February 25, 2026

Respectfully submitted,

By: _Jeffrey A. Rosenfeld_

ALSTON & BIRD LLP
Jeffrey A. Rosenfeld (#136896)
jeffrey.rosenfeld@alston.com
Jesse Steinbach (#278923)
jesse.steinbach@alston.com
Brooke Bolender (#340689)
brooke.bolender@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Telephone: (213) 576-1143

WILLIAMS & CONNOLLY LLP
Kenneth J. Brown*
kbrown@wc.com
Jonathan B. Pitt*
jpitt@wc.com
William P. Ashworth*
washworth@wc.com
R. Kennon Poteat III*
kpoteat@wc.com
Kathryn E. Hoover*
khoover@wc.com
Ilana B. Frier*
ifrier@wc.com
Camille Wyss*
cwyss@wc.com
680 Maine Avenue, SW
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

KLEINBARD LLC
Steven J. Engelmyer*
sengelmyer@kleinbard.com
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Telephone: 215-568-2000

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION TO DISMISS FIRST AMENDED COUNTERCLAIMS

*admitted *pro hac vice*

*Attorneys for Plaintiffs*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION TO DISMISS FIRST AMENDED COUNTERCLAIMS