Brandon Baum-Zepeda (SBN 352698)
bbaum-zepeda@edelson.com
**EDELSON PC**
1255 Union St NE, Suite 850
Washington, DC 20002
Tel: (202) 270-4777

| | |
|---|---|
| Natasha Fernández-Silber (*pro hac vice*) | Patrick F. Madden (*pro hac vice*) |
| nfernandezsilber@edelson.com | pmadden@bergermontague.com |
| **EDELSON PC** | **BERGER MONTAGUE PC** |
| 200 South 1st Street | 1818 Market Street, Suite 3600 |
| Ann Arbor, MI 48104 | Philadelphia, PA 19103 |
| Tel: (312) 589-6370 | Tel: (215) 875-3035 |

*Attorneys for WCO Spectrum LLC*
*[Additional Counsel on Signature Page]*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| T Mobile US, INC., *et al.*, | No. 2:23-cv-04347-AH-E |
| *Plaintiffs*, | Hon. Anne Hwang, Ctrm 9C |
| vs. | **WCO SPECTRUM LLC'S OPPOSITION TO PLAINTIFFS' MOTION TO DISMISS FIRST AMENDED COUNTERCLAIMS** |
| WCO SPECTRUM LLC, *et al.*, | |
| *Defendants*. | Complaint Filed: June 2, 2023 |
| | Counterclaims Filed: January 7, 2026 |
| | Hearing Date: June 17, 2026 |
| | Time: 1:30 p.m. |
| | Courtroom: 9C |

# TABLE OF CONTENTS

**INTRODUCTION** ..................................................................................................1

**FACTUAL ALLEGATIONS** ...............................................................................5

    **A.**    **2.5 GHz Spectrum is a Critical Input for 5G Wireless Service** ......5

    **B.**    **TMO Has Engaged in a Scheme to Monopsonize 2.5 GHz Spectrum.** ...........................................................................................6

    **C.**    **WCO Threatened TMO's Monopsony.** ..................................................6

    **D.**    **TMO's Scheme Has Caused Anticompetitive Effects.** ....................7

    **E.**    **TMO's Scheme Caused Antitrust Injury to WCO.** ........................8

**LEGAL STANDARD** ............................................................................................8

**ARGUMENT** .........................................................................................................8

**I. WCO HAS ADEQUATELY PLED A MONOPSONIZATION CLAIM UNDER SECTION 2 OF THE SHERMAN ACT** ......................8

    **A.**    **WCO Plausibly Alleges TMO Possesses Monopsony Power.** .........9

        **1.**    **WCO pleads direct evidence of market power.** ....................9

        **2.**    **WCO pleads circumstantial evidence of market power.** ....10

        **3.**    **TMO's market power arguments are meritless.** ................11

    **B.**    **WCO Plausibly Alleges Exclusionary Conduct.** ...........................12

        **1.**    **TMO's Lease agreements are the lynchpin of the Scheme and are independently unlawful exclusive-dealing agreements.** .........................................................................13

            **a.**    **The Leases contain express exclusivity requirements.** ...............................................................14

            **b.**    **The Leases contain *de facto* exclusivity requirements** ...............................................................15

            **c.**    **TMO's Leases are independently unlawful because they substantially foreclose competition.** ..................17

i

    **d.**  **TMO's exclusive dealing arguments are meritless**. ..29

  **2.**  **TMO's Threats and Coercion Reinforce the Exclusionary Effect of the Leases**. .......................................22

  **3.**  **Direct License Acquisitions Shore Up the Scheme's Exclusionary Impact**. ............................................24

  **4.**  **The Scheme as a Whole Substantially Forecloses Competition**...............................................................26

 **C.**  **WCO Plausibly Alleges Antitrust Injury**. .....................................26

  **1.**  **TMO's antitrust injury arguments are meritless**................28

**II.**  **WCO ADEQUATELY PLEADS EXCLUSIVE DEALING UNDER SECTION 1 AND THE CARTWRIGHT ACT**. .....................................29

**III.**  **WCO PLAUSIBLY PLEADS INTENTIONAL INTERFERENCE WITH ECONOMIC ADVANTAGE**..........................................................30

# TABLE OF AUTHORITIES

**Cases**

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999) ...................................................................26

*Am. Nat'l Mfg. Inc. v. Select Comfort Corp.*,
ED CV 16-058228, 2016 WL 9450472 (C.D. Cal. Sept. 28, 2016) ........28, 29

*Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich
Legal & Pro. Publications*,
108 F.3d 1147 (9th Cir. 1997) ...................................................................12

*Am. Spirit & Cheer Essentials, Inc. v. Varsity Brands*, LLC,
No. 20-cv-02782, 2022 WL 22895737 (W.D. Tenn. Mar. 30, 2022)......18, 19

*Applied Med. Res. v. Medtronic, Inc.*,
No. 23-cv-00268, 2023 WL 5503107 (C.D. Cal. Aug. 2, 2023) .......18, 19, 26

*Bal Seal Eng'g Inc. v. Nelson Prods., Inc.*,
No. 13-cv-01880, 2016 WL 11495986 (C.D. Cal. Dec. 7, 2016)..................30

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................................................8

*Cal. Energy Co. v. S. Cal. Edison Co.*,
C 91-0319, 1992 WL 330263 (N.D. Cal. Sept. 22, 1992) ......................28, 29

*Church & Dwight v. Mayer Lab'ys, Inc.*,
No. C-10-4429, 2011 WL 1225912 (N.D. Cal. Apr. 1, 2011)......................18

*City of Anaheim v. S. Cal. Edison Co.*,
955 F.2d 1373 (9th Cir. 1992) .......................................................4, 12, 28

*Clipper Express v. Rocky Mountain Motor Tariff Bureau*,
690 F.2d 1240 (9th Cir. 1982) ...................................................................23

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962)................................................................................4, 12

*CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*,
    150 F.4th 1056 (9th Cir. 2025) ...............................................................*passim*

*Curtin Maritime v. Santa Catalina Island*,
    786 F. App'x 675 (9th Cir. 2019) ..................................................................25

*Dial Corp. v. News Corp.*,
    165 F. Supp. 3d 25 (S.D.N.Y. 2016)...............................................................18

*DIJ Catheter v. Critikon, Inc.*,
    92 CIV. 2367, 1994 WL 683424 (S.D.N.Y. Dec. 6, 1994) ...........................21

*Dominick v. Collectors Universe, Inc.*,
    No. 12-cv-04782, 2012 WL 4513548 (C.D. Cal. Oct. 1, 2012) ....................30

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
    111 F.4th 337 (4th Cir. 2024) ........................................................................12

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
    637 F.3d 435 (4th Cir. 2011) .........................................................................18

*Eastman v. Quest Diagnostics*,
    724 F. App'x 55 (9th Cir. 2018) .....................................................................24

*Erickson v. Pardus*,
    551 U.S. 89 (2007)............................................................................................8

*Fisherman's Wharf Bay Cruise Corp. v. Superior Ct. of San Francisco*,
    114 Cal. App. 4th 309 (2003) ........................................................................30

*GSI Tech. v. United Memories, Inc.*,
    No. 13-cv-01081, 2014 WL 1572358 (N.D. Cal. Apr. 18, 2014)...................25

*Gulf States Reorg. Grp., Inc. v. Nucor, Corps.*,
    466 F.3d 961 (11th Cir. 2006) .......................................................................25

*Heckman v. Live Nation Ent., Inc.*,
    No. CV 22-0047, 2025 WL 1141266 (C.D. Cal. Apr. 11, 2025)............. 19, 25

*Image Tech. Servs. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) .......................................................................12

iv

*In re Gabapentin Pat. Litig.*,
    649 F. Supp. 2d 340 (D.N.J. 2009) ........................................................24, 28

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ......................................................................8

*In re Google Digital Advert. Antitrust Litig.*,
    627 F. Supp. 3d 346 (S.D.N.Y. 2022)............................................................16

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
    933 F.3d 1136 (9th Cir. 2019) ................................................................4, 12

*In re Se. Milk Antitrust Litig.*,
    801 F. Supp. 2d 705 (E.D. Tenn. 2011) ..........................................................9

*In re Xyrem Antitrust Litig.*,
    555 F. Supp. 3d 829 (N.D. Cal. 2021) ..........................................................23

*Kartell v. Blue Shield of Mass.*,
    749 F.2d 922 (1st Cir. 1984)........................................................................24

*Knevelbaard Dairies v. Kraft Foods*,
    232 F.3d 979 (9th Cir. 2000) ........................................................................8

*Korea Supply Co. v. Lockheed Martin Corp.*,
    63 P.3d 937 (Cal. 2003) ..............................................................................30

*Le v. Zuffa*,
    216 F. Supp. 3d 1154 (D. Nev. 2016)................................................12, 18, 19

*Le v. Zuffa*,
    No. 15-cv-01045, 2023 WL 5085064 (D. Nev. Aug. 9, 2023)..........12, 18, 22

*Malheur Forest Fairness Coalition v. Iron Triangle*,
    164 F.4th 710 (9th Cir. 2026) ......................................................................25

*McWane, Inc. v. FTC*,
    783 F.3d 814 (11th Cir. 2015) ........................................................18, 19, 26

*MetroNet Servs. Corp. v. Qwest Corp.*,
   383 F.3d 1124 (9th Cir. 2004) ..................................................................9

*Nat'l Flood Servs., Inc. v. Torrent Techs., Inc.*,
   No. C05-1350Z, 2006 WL 1518886 (W.D. Wash. May 26, 2006) ..............16

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
   513 F.3d 1038 (9th Cir. 2008) .............................................................10, 11

*Novation Ventures v. J.G. Wentworth*,
   156 F. Supp. 3d 1094 (C.D. Cal. 2015) .....................................................25

*Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*,
   585 F.2d 821 (7th Cir. 1978) ....................................................................22

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
   32 F.4th 824 (9th Cir. 2022) ............................................................*passim*

*Rebel Oil Co. v. Atl. Richfield Co.*,
   51 F.3d 1421 (9th Cir. 1995) ...........................................................*passim*

*Satellite Fin. Plan. Corp. v. First Nat'l Bank of Wilmington*,
   633 F. Supp. 386 (D. Del. 1986).................................................................21

*Signature MD v. MDVIP*,
   2015 WL 3988959 (C.D. Cal. Apr. 21, 2015) ...........................................17

*Silvas v. E\*Trade Mortg. Corp.*,
   514 F.3d 1001 (9th Cir. 2008) ..........................................................*passim*

*Sonus Networks v. Inventergy, Inc.*,
   No. C-15-0322, 2015 WL 4539814 (N.D. Cal. July 27, 2015) ....................24

*Tampa Elec. Co. v. Nashville Coal Co.*,
   365 U.S. 320 (1961).................................................................................18

*Tawfilis v. Allegran*,
   157 F. Supp. 3d (C.D. Cal. 2015) .........................................................16, 21

*Tele Atlas N.V. v. NAVTEQ Corp.*,
   No. C-05-01673, 2008 WL 4911230 (N.D. Cal. Nov. 13, 2008) .............4, 12

vi

*Twin City Sportservice, Inc., v. Charles O. Finley & Co.*,
  676 F.2d 1291 (9th Cir. 1982) ........................................................................26

*U.S. ex rel. Giles v. Sardie*,
  191 F. Supp. 2d 1117 (C.D. Cal. 2000) ....................................................*passim*

*United States  v. Apple, Inc.*,
  952 F. Supp. 2d 638 (S.D.N.Y. 2013)............................................................21

*United States v. Bertelsmann SE & Co. KGaA*,
  646 F. Supp. 3d 1 (D.D.C. 2022) .............................................................10, 11

*United States v. E.I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956).......................................................................................11

*United States v. Eastman Kodak Co.*,
  63 F.3d 95 (2d Cir. 1995)...............................................................................11

*United States v. Google*,
  747 F. Supp. 3d 1 (D.D.C. 2024) ...........................................................*passim*

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966).......................................................................................12

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) .........................................................................13

*United States v. Visa, Inc.*,
  788 F. Supp. 3d 585 (S.D.N.Y. 2025)............................................................18

*Verizon v. Trinko*,
  540 U.S. 398 (2004)........................................................................................25

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
  549 U.S. 312 (2007)....................................................................................9, 24

**Statutes**
15 U.S.C. § 1 ...................................................................................*passim*

15 U.S.C. § 2 ...................................................................................*passim*

**Other Authorities**

P. Areeda & H. Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application (4th and 5th eds. 2024) ...............................................26

## **GLOSSARY**

| Term | Definition |
|---|---|
| 2.5 GHz Licenses | Licenses issued by the Federal Communications Commission ("FCC") for the use of 2.5 GHz Spectrum. |
| 2.5 GHz License Rights | Rights held by a Licensee to use, lease, or sell/assign the 2.5 GHz Spectrum authorized under its FCC License. |
| 2.5 GHz Spectrum | A "Mid-Band" Spectrum frequency. |
| Broadband Radio Service ("BRS") License | A License authorizing use of frequencies in the 2.5 GHz band, originally used for wireless cable TV. BRS Licenses are typically held by commercial entities. |
| Educational Broadband Service ("EBS") License | A License authorizing use of frequencies in the 2.5 GHz band, historically reserved for educational institutions. EBS Licenses traditionally came with educational use requirements, which the FCC has relaxed over time. |
| FAC | First Amended Counterclaim Complaint, ECF No. 218. |
| Lease | A contract between TMO and a Licensee for the use of the Licensee's 2.5 GHz License Rights. |
| License | An authorization granted by the FCC permitting the Licensee to operate on a specific frequency (or frequencies) of Spectrum within a defined geographic area. |
| Licensees | Persons or entities owning the License Rights to use 2.5 GHz Spectrum in a specific geographic area as authorized and granted by the FCC. |
| License Rights | Rights held by a Licensee to use, lease, or sell Spectrum authorized under its FCC License. |
| Mid-Band Spectrum | The range of radio frequencies between 1 GHz and 6 GHz. |
| Motion or Mot. | TMO's pending Motion to Dismiss, ECF No. 224-1. |
| Order | Order on TMO's Motion to Dismiss, ECF No. 187. |
| Relevant Market | The nationwide market for the sale or lease of 2.5 GHz Spectrum License Rights in the United States. |
| ROFR | Right of First Refusal |
| Spectrum | Bands of radio frequencies regulated by the FCC. |
| TMO | Plaintiffs and Counterclaim Defendants T-Mobile US, Inc., Clearwire Spectrum Holdings LLC, Clearwire Spectrum Holdings II LLC, Fixed Wireless Holdings LLC, NSAC LLC, TDI Acquisition Sub LLC, WBSY Licensing LLC. |
| WCO | Defendant and Counterclaim Plaintiff WCO Spectrum LLC. |

WCO SPECTRUM LLC'S OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS FIRST AMENDED COUNTERCLAIMS
CASE NO. 2:23-CV-04347-AH-E

WCO's First Amended Counterclaim ("FAC") addresses two key concerns raised by the Court in its Order dismissing WCO's original antitrust claims: **First**, it includes new, non-conclusory allegations that *all* of TMO's Leases—which give TMO the exclusive right to use the vast majority of the nation's 2.5 GHz Spectrum until 2035—contain exclusive provisions that functionally prevent Licensees from *ever* selling or leasing a critical mass of 2.5 GHz License Rights to anyone other than TMO. This means, absent Court intervention, TMO's monopsony over this key telecommunications resource will likely persist in perpetuity. WCO's new exclusive-dealing allegations establish that the Leases themselves substantially foreclose rivals' access to 2.5 GHz License Rights, even putting aside WCO's other Scheme allegations. FAC ¶¶ 117–54. **Second**, the FAC makes new, non-conclusory allegations that the Leases (along with TMO's other misconduct) directly harmed not only WCO as a competitor, but also the competitive process and consumers by tying up access to 2.5 GHz License Rights, a key input for 5G networks. *Id.* ¶¶ 200–25. Because WCO's alleged injuries flow from acts that also harm competition and consumers, the FAC adequately pleads antitrust injury.

## INTRODUCTION

This case concerns TMO's stranglehold over a key input for 5G wireless networks: 2.5 GHz Spectrum, an FCC-licensed radio frequency. Because of its unique characteristics, this Spectrum is critical for optimizing 5G networks and delivering high-quality wireless service, particularly in suburban environments, where most Americans live. To deploy the Spectrum, wireless carriers must obtain 2.5 GHz License Rights by buying or leasing a critical mass of Licenses across the country. TMO, however, exclusively controls over 85% of these rights, and is the only 5G carrier that uses this important Spectrum in its network.

WCO alleges that TMO has achieved and maintains this dominance through a three-part Scheme designed to prevent rivals from ever obtaining the critical mass of 2.5 GHz License Rights needed to deploy the Spectrum in a 5G network.

- 1 -

WCO SPECTRUM LLC'S MOTION TO DISMISS OPPOSITION    CASE NO. 2:23-CV-04347-AH-E

The first component of the Scheme is exclusive dealing. TMO has entered into over 1,000 agreements to lease 2.5 GHz Licenses. Collectively, these Leases give TMO the *exclusive* right to use the vast majority of 2.5 GHz License Rights until at least 2035. FAC ¶¶ 114–116. The Leases also include a host of additional exclusive provisions designed to prevent Licensees from *ever* selling 2.5 GHz License Rights to anyone other than TMO—even after TMO's Lease terms expire: A significant number of Leases expressly bar Licensees from selling License Rights to TMO rivals (or, in some case, any third parties). *Id.* ¶¶ 118–24. While these nakedly anticompetitive restrictions are not in 100% of the Leases, they are critical to TMO's ability to prevent competitors (like WCO) from gaining a foothold in the market: TMO has used these restrictions to bring or threaten lawsuits against numerous Licensees who sought to transact with rivals (including WCO). *Id.* ¶¶ 120–21, 159–81. And WCO identifies dozens of Licensees who refused to transact with WCO on the basis that their Leases barred them from doing so. *Id.* ¶¶ 141–54.

Moreover, *all* of the Leases contain *de facto* exclusive provisions that functionally deter third-party sales by subjecting Licensees (and would-be buyers) to unreasonable costs and burdens if they choose to deal with TMO rivals. They include requirements that Licensees share all purchase offers and related correspondence with TMO; prohibitions against the sharing of TMO's Lease terms with would-be License buyers (even though they would be required to honor those Leases in the event of a sale); and Rights of First Refusal ("ROFRs"), which give TMO the ability to match any bid or lease offer for up to three years after the Leases expires. *Id.* ¶¶ 125–38. Because of the ROFR, the only way for a Licensee to lease or sell to a non-TMO buyer would be to allow the Lease to expire, and then wait several more years for the ROFR to expire—forgoing all income in the interim. No Licensee would do this, making TMO's control perpetual and foreclosing any rival from ever gaining a competitive foothold, or even trying.

The second component of TMO's Scheme is sham litigation. TMO threatens

WCO SPECTRUM LLC'S MOTION TO DISMISS OPPOSITION          CASE No. 2:23-CV-04347-AH-E

(and in some cases files) lawsuits against Licensees to deter them from negotiating or consummating transactions with TMO rivals. FAC ¶¶ 159–81. Many of these actual or threatened lawsuits have been objectively baseless: TMO sued Albright College to stop it from selling its License to WCO on the basis that the transaction violated a Lease term barring sales to a "Competing Entity," defined as one that "offers, provides or delivers a commercially available telecommunications service using EBS or BRS spectrum within the United States." *Id.* ¶ 167. But TMO had no objectively reasonable expectation of success on this theory because WCO has *never* offered nor provided telecommunications services. *Id.* ¶¶ 168–70. TMO then forwarded its sham *Albright* complaint to other Licensees as a threat to dissuade them from dealing with WCO, causing numerous institutions to abandon or refuse to enter into negotiations with WCO. *Id.* ¶¶ 178–81.

The third component of the Scheme are direct License acquisitions. TMO has purchased hundreds of Licenses to prevent rivals like WCO from accessing them, including by exercising its ROFRs. *Id.* ¶¶ 155–58, 182–89.

TMO's Scheme results in numerous anticompetitive effects. By depriving competing carriers like AT&T and Verizon access to a critical mass of 2.5 GHz License Rights, the Scheme ensures no rival can ever match TMO's network quality. This leaves consumers with fewer 5G choices and higher prices. *Id.* ¶ 210. And by preventing rival buyers like WCO from ever gaining a foothold in the market, the Scheme leaves TMO free to pay below-market prices to Licensees. *Id.* ¶¶ 201–08.

WCO is a direct victim of the Scheme: It placed billions of dollars in bona fide offers to purchase a critical mass of Licenses. *Id.* ¶ 74. WCO would have realized significant gains on those assets by selling or leasing them via a competitive process to various wireless carriers. *Id.* ¶¶ 214–17. This would have restored competition to the market for 2.5 GHz License Rights and ended TMO's monopsony. Instead, WCO was stymied by the Scheme: Many Licensees refused to deal with WCO because their Leases with TMO barred it. *Id.* ¶¶ 142–54. Those who did seek to transact with WCO

were met with actual or threatened litigation by TMO. *Id.* ¶¶ 159–81. And, when all else failed, TMO exercised its ROFRs to block sales to WCO. *Id.* ¶¶ 182–89. As a result, WCO was forced to close operations. Because WCO's injuries—lost profits and market exclusion—flow directly from the same misconduct that harms competition and consumers, they constitute antitrust injury.

These allegations are sufficient to state a claim for violation of Section 2 of the Sherman Act (15 U.S.C. § 2) for monopsonization and Section 1 (15 U.S.C. § 1) for exclusive dealing. Rather than grapple with WCO's well-pleaded allegations, TMO's Motion invites the Court to err by analyzing whether individual components of the Scheme in isolation caused WCO antitrust injury. But this approach is proscribed by a "century[ of binding] jurisprudence."[1] TMO's conduct must be viewed ***as a whole*** by assessing how the various exclusive provisions in TMO's Leases work together to require Licensees to deal exclusively with TMO, and the "synergistic effect[s]" that TMO's exclusive-dealing Lease agreements, sham litigation, and direct License acquisitions have on competition for 2.5 GHz License Rights.[2] TMO fails to challenge WCO's exclusive-dealing claims as pled, which are based on the combined effect of numerous exclusive provisions in TMO's Leases. It also fails to challenge WCO's Scheme allegations, which rest on the combined effect of TMO's exclusive dealing, sham litigation, and License acquisitions. By failing to address either theory, TMO has waived any such challenge.[3] This is fatal to its Motion.

WCO pleads antitrust injury by alleging that it suffered lost profits and market exclusion as a direct result of TMO's exclusive dealing and the Scheme *as a whole*—

---

[1] *Tele Atlas N.V. v. NAVTEQ Corp.*, 2008 WL 4911230, at *1 (N.D. Cal. Nov. 13, 2008); *see also In re Nat'l Football League's Sunday Ticket Antitrust Litig. ("NFL Sunday Ticket")*, 933 F.3d 1136, 1152–53 (9th Cir. 2019) (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698–99 (1962)).

[2] *Tele Atlas*, 2008 WL 4911230, at *2 (quoting *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992)).

[3] *See U.S. ex rel. Giles v. Sardie*, 191 F. Supp. 2d 1117, 1127 (C.D. Cal. 2000).

conduct which also harms competition and consumers.[4] TMO's suggestion that the FAC does not plead harm to consumers, Mot. at 7, is simply wrong: By ensuring that TMO is the only carrier able to deploy 2.5 GHz Spectrum in its 5G network, the Scheme leaves downstream wireless consumers with fewer network choices, reduced service quality, and inflated prices. FAC ¶¶ 4, 100, 210.

Finally, TMO attacks the plausibility of WCO's relevant market definition. Mot. at 25. This Court has already found WCO's market definition to be sufficient. *See* Order at 20–22. As before, TMO's market challenge is "premature on this motion to dismiss." *Id*. TMO's market arguments are also wrong as a matter of law and economics. The Motion should be denied.

## FACTUAL ALLEGATIONS

### A.    2.5 GHz Spectrum is a Critical Input for 5G Wireless Service

Wireless service providers use multiple radio frequency "bands" (or Spectrum) in their networks to optimize: (1) coverage (how far the signal carries), (2) penetration (the signal's ability to permeate physical barriers), (3) capacity (how many users can be accommodated), and (4) speed (how quickly data is delivered). FAC ¶¶ 35–39. Because 5G networks support data-intensive applications and uses, they require higher speeds and greater capacity than the prior 4G networks. *Id.* ¶ 52.

This case concerns a specific "Mid-Band" frequency, 2.5 GHz Spectrum, which possesses the ideal blend of characteristics for 5G networks, including top-tier capacity and penetration with wide coverage, leading to lower infrastructure costs. *Id.* ¶¶ 41–43, 78–87. This Spectrum is particularly important to delivering 5G service in suburban environments where more than half of Americans live. *Id.* ¶ 43. 2.5 GHz Spectrum is thus a critical input for 5G carriers with nationwide networks. Absent access to this Spectrum, carriers must attempt to replace it with inferior forms of Mid-Band Spectrum. *See id.* ¶¶ 56–57, 78–87.

Incorporating a new Spectrum band into a 5G network requires band-specific

---

[4] *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 839 (9th Cir. 2022).

components that are costly to procure and deploy. No carrier will make that investment for a handful of License Rights; only a critical mass of License Rights spanning a broad geography justifies the expense. This is true of all Spectrum bands, including 2.5 GHz. *See id.* ¶¶ 35, 88, 107.

### B.    TMO Has Engaged in a Scheme to Monopsonize 2.5 GHz Spectrum.

TMO has engaged in a continuing exclusionary Scheme to foreclose rivals from the market for 2.5 GHz License Rights. The Scheme involves three components: (1) exclusive dealing involving over 1,000 Leases that lock up the vast majority of 2.5 GHz License Rights for over 30 years, *id.* ¶¶ 113–54; (2) sham litigation to prevent Licensees from selling 2.5 GHz License Rights to TMO rivals, *id.* ¶¶ 159–63; and (3) the direct acquisition of hundreds of 2.5 GHz Licenses to keep rivals from accessing a critical mass of 2.5 GHz License Rights, *id.* ¶¶ 155–58.

The Scheme has enabled TMO to eliminate competition for 2.5 GHz License Rights. As a result, it is the only wireless provider operating a 5G network built on 2.5 GHz Spectrum. *Id.* ¶ 100. Through the Scheme, TMO controls 85% of all 2.5 GHz Spectrum via lease or ownership, and forecloses rivals' future access to the critical mass of 2.5 GHz Licenses Rights needed to utilize the Spectrum in a 5G network. *Id.* ¶¶ 50, 99, 101, 107, 195, 198, 201, 212. TMO has thus erected and raised barriers to entry to protect its market dominance. *Id.* ¶¶ 111, 113, 123, 158.

### C.    WCO Threatened TMO's Monopsony.

Educational institutions hold the largest block of 2.5 GHz Licenses due to historical FCC rules requiring much of the Spectrum to be licensed for educational purposes. *Id.* ¶¶ 46–47. In 2005, the FCC allowed educational institutions to lease (but not sell) their 2.5 GHz Licenses to commercial entities. *Id.* ¶ 48. In 2020, the FCC changed its rules again to permit License sales to commercial entities. *Id.* ¶ 49. TMO and its predecessors in interest took advantage of these rule changes to acquire the vast majority of all 2.5 GHz License Rights via lease or purchase. *Id.* ¶¶ 56–57.

WCO was founded in 2020 following the most recent rule change. Its business

plan was to acquire a critical mass of 2.5 GHz Licenses and break TMO's stranglehold over the Spectrum. *Id.* ¶¶ 12, 63, 65. After acquiring a critical mass of Licenses, WCO planned to either sell or lease them to 5G carriers for use in their networks via a competitive auction process. *Id.* ¶ 63. WCO was also exploring investment in Spectrum-sharing technologies (similar to those employed in other Spectrum bands) that would allow multiple carriers to lease the same Licenses. *Id.* ¶¶ 68–72. Had WCO's plan succeeded, WCO would have realized significant profits. *Id.* ¶¶ 12, 68, 214. WCO also would have restored competition for 2.5 GHz License Rights to the benefit of Licensees (in the form of competitive prices for 2.5 GHz License Rights), 5G carriers (by giving them access to the 2.5 GHz Spectrum Rights needed to deploy the Spectrum in their networks), and consumers (who would have benefitted from more 5G network options, better service, and lower prices). *Id.* ¶ 15.

WCO obtained significant financial backing for its plan and ultimately placed $6 billion worth of offers on over 900 2.5 GHz Licenses, with even more in its investment pipeline. *Id.* ¶¶ 73–74. WCO thus represented a significant threat to TMO's dominance, which TMO sought to quash almost immediately. *Id.* ¶¶ 75–76.

**D.    TMO's Scheme Has Caused Anticompetitive Effects**

TMO's Scheme, including its exclusion of WCO, has resulted in significant and widespread anticompetitive effects: ***Harm to Licensees.*** By preventing anyone from acquiring the critical mass of 2.5 GHz Licenses needed to effectively use them as part of a 5G network, TMO has suppressed demand for Licenses and lowered lease payments and sales prices paid to Licensees. *Id.* ¶¶ 201–09. TMO has effectively leveraged the Scheme to coerce Licensees to sell at prices significantly below competitive levels. *Id.* ¶¶ 202–08. ***Harm to Consumers.*** By preventing competing 5G service providers such as Verizon and AT&T from accessing 2.5 GHz Spectrum, the Scheme also harms competition in the downstream market for 5G services, resulting in reduced network choices, poor services, and higher prices for consumers. *Id.* ¶¶ 4, 15, 210.

**E.    TMO's Scheme Caused Antitrust Injury to WCO**

TMO targeted WCO with its Scheme and successfully excluded it from the market, destroying the only serious challenge to TMO's dominance. *Id.* ¶¶ 164–94. TMO excluded WCO by imposing exclusive-dealing requirements on Licensees that prevent them from working with WCO, threatening (and in some cases filing) lawsuits against WCO counterparties purporting to enforce these unlawful agreements, and acquiring Licenses for the express purpose of keeping them out of WCO's hands. *Id.* ¶¶ 113–94. WCO's injury flows from the same exclusionary conduct that has harmed competition, Licensees, and ultimately, consumers. *Id.*

## LEGAL STANDARD

A complaint does not need detailed factual allegations to survive a motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). Rule 12(b)(6) motions are disfavored and granted only in exceptional cases; a complaint satisfies *Twombly* if the allegations, taken as a whole, are facially plausible. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). On a motion to dismiss, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Silvas v. E\*Trade Mortg. Corp.*, 514 F.3d 1001, 1003 (9th Cir. 2008). A party seeking dismissal thus may not ignore or recast well-pleaded allegations. *Knevelbaard Dairies v. Kraft Foods*, 232 F.3d 979, 989–90 (9th Cir. 2000). Arguments in support of dismissal which are not "presented in the moving papers" are functionally waived. *See Sardie*, 191 F. Supp. 2d at 1127 ("It is improper for a moving party to introduce new facts or different legal arguments in the reply brief").

## ARGUMENT

**I.    <u>WCO HAS ADEQUATELY PLED A MONOPSONIZATION CLAIM UNDER SECTION 2 OF THE SHERMAN ACT.</u>**

Monopsonization is the buy-side analog to monopolization; it occurs when a firm acquires or maintains market power as a purchaser, allowing it to suppress prices

paid to sellers below competitive levels. *See Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 321–22 (2007). To state a Section 2 monopsonization claim, WCO must allege that TMO (1) possesses monopsony power; (2) willfully acquired or maintained that power through exclusionary conduct; and (3) caused antitrust injury. *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004). The FAC meets this test.

**A.    WCO Plausibly Alleges TMO Possesses Monopsony Power.**

The first element of WCO's Section 2 claim is monopsony power—market power on the buyers' side of the relevant market. *See id.*; *Weyerhaeuser*, 549 U.S. at 320. This Court has already upheld WCO's market definition. *See* Order at 22.

WCO may plead monopsony power in two ways, each of which is independently sufficient: WCO may allege "direct evidence of the injurious exercise" of market power, which includes evidence that TMO imposes below-market prices on sellers of 2.5 GHz License Rights, or that it excludes rivals that would seek to purchase those rights. *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1068 (9th Cir. 2025); *see also In re Se. Milk Antitrust Litig.*, 801 F. Supp. 2d 705, 725 (E.D. Tenn. 2011). Alternatively, WCO may allege "circumstantial evidence" of market power—evidence that TMO possesses "a dominant share" of a properly defined relevant market. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). WCO alleges TMO's monopsony power through direct and circumstantial evidence.

**1.    WCO pleads direct evidence of market power.**

WCO alleges TMO uses market power to exclude rival buyers of 2.5 GHz License Rights, FAC ¶¶ 140, 187–94, and suppress prices paid to Licensees below competitive levels. *Id.* ¶¶ 103–04, 204–06, 209. This is direct evidence of TMO's market power, which obviates the need to define a market. *See Rebel Oil*, 51 F.3d at 1434. Moreover, TMO's power to suppress prices and exclude buyers of 2.5 GHz License Rights is evidence that the relevant market is properly defined. *See id.* ("A

'market' is any grouping of sales whose [buyers], if unified by a [monopsonist,] would have market power in dealing with any group of [sellers]."). TMO has waived any challenge to WCO's direct market power allegations by ignoring them. *See Sardie*, 191 F. Supp. 2d at 1127.

### 2.    WCO pleads circumstantial evidence of market power.

A relevant product market encompasses all products that are "reasonably interchangeable," which is assessed by reference to a product's price and its uses and characteristics. *See Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008); *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 34 (D.D.C. 2022). This is a factual inquiry not resolvable on a motion to dismiss. *Rebel Oil*, F.3d at 1435 ("definition of the relevant market is a factual inquiry for the jury").

WCO alleges that TMO possesses a dominant share (85%) of the Relevant Market, which it defined as the market for the lease or sale of 2.5 GHz License Rights. FAC ¶ 77. In support of its market definition, WCO pleads that 2.5 GHz License Rights are "not reasonably interchangeable" with other Spectrum License Rights, *id.* ¶ 78, because of 2.5 GHz Spectrum's unique properties, which make it particularly well suited for use in 5G networks. *See id.* ¶¶ 79–89; *id.* ¶ 82 (quoting TMO's admissions of 2.5 GHz Spectrum's unique and non-substitutable qualities). WCO also pleads that Licensees cannot readily "sell or lease other frequencies" in response to price fluctuations (because they are only licensed by the FCC to sell 2.5 GHz Spectrum Rights), *id.* ¶ 89, which is an additional basis to exclude other frequencies from the market. *See Rebel Oil*, 51 F.3d at 1436 (when assessing a market definition in a monopsony case, courts consider "supply" elasticity—whether suppliers in proposed market could "readily shift their production" to substitutes in response to a small but significant sustained decrease in price imposed by a hypothetical monopsonist).

These allegations support WCO's market definition, as this Court has already found. *See* Order at 22 (WCO's market "definition suffices to survive a Rule 12(b)(6)

WCO SPECTRUM LLC'S MOTION TO DISMISS OPPOSITION    Case No. 2:23-cv-04347-AH-E

motion"); *see Bertelsmann*, 646 F. Supp. 3d at 25 (market may be defined based on "practical indicia" like a product's "peculiar characteristics"). Courts will not grant a motion to dismiss "unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect," *Newcal*, 513 F.3d at 1045, and no such defect exists here.

### 3.   TMO's market power arguments are meritless.

TMO makes two flawed arguments against WCO's circumstantial evidence of market power: First, it argues WCO's proposed market improperly excludes other 5G carriers who could purchase 2.5 GHz Licenses. Mot. at 26–27. But WCO does not exclude any purchasers from its definition; rather, its definition is rooted in a product—2.5 GHz License Rights—which WCO explicitly alleges would have been purchased by other 5G carriers absent the Scheme. FAC ¶ 5. *See Newcal*, 513 F.3d at 1045 ("[T]he relevant market must be a *product* market.") (emphasis in original).

Second, TMO argues that other Mid-Band Spectrum must be "reasonably interchangeable" with 2.5 GHz Spectrum (and thus part of the Relevant Market) because rival 5G carriers have turned to other Mid-Band frequencies in lieu of the 2.5 GHz Spectrum. Mot. at 27. This completely misconstrues the FAC, which alleges that other Mid-Band Spectrum are inferior to 2.5 GHz Spectrum (meaning not reasonably interchangeable) and that rival 5G carriers use them only because their access to 2.5 GHz Spectrum is cut off by the Scheme. FAC ¶¶ 57, 78–87. TMO may not prevail on its Motion on the basis of alternative explanations for well-pleaded facts; all inferences must be drawn in WCO's favor at this stage. *Silvas*, 514 F.3d at 1003. In any event, substitution patterns resulting from anticompetitive conduct do not broaden the relevant market. *See United States v. Eastman Kodak Co.*, 63 F.3d 95, 103–05 (2d Cir. 1995) (discussing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956)); *United States v. Google*, 747 F. Supp. 3d 1, 116 n.5 (D.D.C. 2024) (monopolized markets may drive users to "highly-differentiated, out-of-market products" (cleaned up)).

- 11 -

**B.      WCO Plausibly Alleges Exclusionary Conduct.**

The second element of WCO's Section 2 claim is "willful acquisition" or maintenance of monopsony power—*i.e.*, power gained through "exclusionary conduct" and not from a "superior product, business acumen, or historic accident." *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)). Pleading "exclusionary" conduct requires only a "preliminary showing" that the conduct has "significant and more-than-temporary harmful effects on competition (and not merely upon a competitor or customer)." *Le v. Zuffa ("UFC I")*, 216 F. Supp. 3d 1154, 1167 (D. Nev. 2016) (quoting *Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publications,* 108 F.3d 1147, 1151 (9th Cir. 1997)).

Where exclusionary conduct involves varied acts which comprise an overarching anticompetitive scheme, the conduct must be assessed "as a whole," not "by dismembering it" and "tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *NFL Sunday Ticket*, 933 F.3d at 1152–53 (citations omitted).[5] "What matters is whether the 'synergistic effect' of the alleged conduct is to harm competition, and thus perpetuate a monopoly." *Tele Atlas*, 2008 WL 4911230, at *2 (quoting *Anaheim*, 955 F.2d at 1376). Even otherwise lawful conduct can be considered in assessing liability for an anticompetitive scheme, *e.g.*, *Anaheim*, 955 F.2d at 1378,[6] and lawful conduct for a

---

[5] *See, Cont'l Ore*, 370 U.S. at 698–99; *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 355 (4th Cir. 2024) ("In a monopolization case, conduct must always be analyzed 'as a whole.' A monopolist bent on preserving its dominant position is likely to engage in repeated and varied exclusionary practices. Each one viewed in isolation might be viewed as [insignificant], but the pattern gives increased plausibility to the claim."); *Le v. Zuffa ("UFC II")*, 2023 WL 5085064, at *26 (D. Nev. Aug. 9, 2023) ("the central inquiry for the Court is the overall effect of the various contract provisions and Defendant's concomitant coercive conduct").

[6] *Tele Atlas*, 2008 WL 4911230, at *3–4 (allowing jury to consider tying alongside exclusive dealing even though court held that alleged tie was not unlawful).

non-monopolist may be unlawful for a monopolist. *CoStar*, 150 F.4th at 1072 (monopolist is "precluded from employing otherwise lawful practices that unnecessarily exclude competition").

WCO pleads exclusionary conduct by alleging TMO engaged in a three-part Scheme consisting of (1) exclusive dealing, (2) sham litigation, and (3) the acquisition of 2.5 GHz Licenses. These components operate synergistically to tie up some 85% of all the available 2.5 GHz Spectrum License Rights, substantially foreclosing rivals' access to a key input for nationwide 5G networks, and unlawfully maintaining TMO's monopsony power over the Relevant Market.

### 1. TMO's Lease agreements are the lynchpin of the Scheme and are independently unlawful exclusive-dealing agreements.

The first component of the Scheme are TMO's 1,000+ exclusive-dealing Lease agreements with Licensees.[7] A monopsonist's efforts "to limit the abilities of third parties to deal with rivals" constitutes "exclusive dealing." *CoStar*, 150 F.4th at 1072. Exclusive dealing can operate as part of an unlawful scheme to exclude competition, or it may be independently unlawful where it substantially forecloses competition. *Id.* at 1067. Exclusive dealing can take the form of "express" exclusivity requirements in a contract, or requirements that *de facto* coerce parties to work exclusively with a dominant firm by raising the costs and burdens associated with dealing with rivals. *Id.* at 1073; *see also Google*, 747 F. Supp. 3d at 146 (contract limiting rivals' access to market only through "'more costly and less effective' means" is exclusive) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001)). Where an exclusive dealing claim is based on the operation of multiple provisions, courts assess contracts as whole to consider whether they are "exclusive in practice." *Google*, 747 F. Supp. 3d at 150; *see Costar*, 150 F.4th at 1073–74.

---

[7] As of 2020, TMO held approximately 1,700 such Leases, but has since acquired hundreds of 2.5 GHz Licenses, including many that were originally subject to those original 1,700 leases. FAC ¶¶ 11, 157.

WCO plausibly alleges that TMO's Leases are exclusive. All of these agreements grant TMO the exclusive right to use the subject Spectrum during the Leases' express 30-year terms (which do not expire until 2035). FAC ¶¶ 6–9, 113–16. They also contain numerous provisions that either expressly or *de facto* prevent Licensees from selling License Rights (whether via lease or purchase) to TMO's rivals even after the Leases expire. *Id.* ¶¶ 9, 117–54. These Leases and the various exclusive provisions within them work together to "effectively coerce[]" Licensees to deal exclusively with the dominant firm, TMO. *Costar*, 150 F.4th at 1073–74. TMO's exclusive Lease provisions are described below:

a.  <u>The Leases contain express exclusivity requirements.</u>

***<u>Exclusive lease provisions</u>*** in each Lease expressly grant TMO the exclusive right to use the Spectrum covered by the License for 30 years. FAC ¶¶ 114–16.

***<u>Third-party sales restrictions</u>***, which are present in a significant number of Leases, expressly prohibit Licensees from "negotiat[ing] or contract[ing] with any third party to . . . sell, assign, [or] transfer" their Licenses. *See* ECF No. 224-9 at 3 (Christian College of Georgia-TMO Lease); FAC ¶¶ 118–21. Other versions of this restriction permit sales, but only if TMO is satisfied that the purchaser is not a "Competing Entity," which is any entity that offers telecommunications services (or is affiliated with such an entity). *See* ECF No. 224-5 at 13 (Albright College-TMO Lease); FAC ¶¶ 122–24. Both versions expressly prevent Licensees from both transacting with (or even entertaining offers from) TMO's rivals for the 30-year duration of each Lease. *Id.* ¶¶ 118–24.

TMO cannot (and does not) defend these nakedly anticompetitive provisions as necessary to protect its leasehold interests: In the event of a sale, any purchaser would be *required* to comply with all obligations of the Lease until it expires.[8] The

---

[8] The Leases require any purchaser of the License to certify it will honor the Lease. FAC at 35 n.11. When TMO sued Licensees to block sales to WCO, it did not contend that WCO would not comply with the Lease obligations. *See, e.g.*, *id.* ¶¶ 166–77.

WCO SPECTRUM LLC'S MOTION TO DISMISS OPPOSITION          CASE NO. 2:23-CV-04347-AH-E

only conceivable purpose of these provisions is to foreclose access to the Spectrum by rival 5G carriers (or entities like WCO that might lease 2.5 GHz License Rights to such rivals once TMO's Leases expire).

While these express sales restrictions are not present in 100% of the Leases, WCO plausibly alleges they are present in a significant number of them, *e.g.*, *id.* ¶¶ 117–24, 167, 171, 176, and that their exclusionary impact is significant: TMO zealously enforces these exclusivity provisions, threatening or filing lawsuits against Licensees who have considered working with other buyers, including WCO, regardless of which version of the sales restriction was in their Lease. *See id.* ¶¶ 120–21; 166–77.[9] The FAC also identifies numerous Licensees who stated they could not transact with WCO because it was prohibited by their Leases with TMO. *See id.* ¶¶ 141–54 (listing 14 Licensees who declined to sell to—or in some cases *even speak to*—WCO due to their Lease agreements).

b.  The Leases contain <em>de facto</em> exclusivity requirements

Additional *de facto* exclusive provisions, which are present in **all** the Leases, functionally prevent Licensees from selling the underlying License to anyone other than TMO during the term of the Lease by making third-party sales unreasonably burdensome and/or expensive. *See id.* ¶¶ 125–38.

***"Right to Participate"*** provisions impose onerous information-sharing obligations on Licensees, which deter them from engaging in negotiations with TMO's rivals like WCO. *Id.* ¶¶ 132–33.[10] Licensees must share any purchase offers

[9] Although TMO acknowledges that the "Competing Entity" restriction does not apply to WCO (as alleged here), *see* Mot. at 14–15, it nevertheless brought two lawsuits to prevent Licensees with this sales restriction from selling to WCO. FAC ¶¶ 166–177. Either these lawsuits were shams, or the Leases prohibited a sale to WCO. Either way, they reflect anticompetitive conduct.

[10] TMO argues its Right to Participate is "*pro*-competitive" because it "merely" puts TMO "on equal footing" with bidders. Mot. at 18. This assertion is wrong and contradicts WCO's allegation that the provision (along with the Confidentiality provision) gives TMO a significant informational *advantage* (not equal treatment)

- 15 -

they receive with TMO, as well as all correspondence between the bidder and the Licensee. *Id.* ¶ 132. The requirement also subjects the Licensee to legal risk if they do entertain a rival offer, as TMO has sued for alleged breaches of this provision. *See* ECF No. 224-4 at 21–22 (TMO complaint against Licensee alleging it breached the "right to participate" provision). The provision also discourages bids from being placed, as would-be buyers know the Licensee must deliver to TMO competitively sensitive information, including how buyer values Licenses and which ones it is pursuing. FAC ¶ 133.

*__"Confidentiality"__* provisions prevent Licensees from disclosing the payments TMO makes on its Leases to potential buyers. *Id.* ¶ 134. Because the Lease payments are the primary source of value for each License during the term of the Lease, these restrictions force potential bidders to blindly speculate on the value of the underlying License. *Id.* ¶¶ 135–36. Such informational asymmetry—with TMO accessing bidders' proprietary strategies but blocking bidders' access to important information for valuing the transaction—creates a significant impediment to competitive bidding for licenses.[11] This provision, and TMO's vigorous enforcement thereof, creates additional costs for Licensees that deters them from working with rivals. *See* FAC ¶¶ 137–38.[12]

---

that discourages rival bids. FAC ¶¶ 131-37. It is also improper to adjudicate procompetitive justifications on the pleadings. *See Tawfilis v. Allegran*, 157 F. Supp. 3d, 864 (C.D. Cal. 2015).

[11] *See, e.g.*, *In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 398 (S.D.N.Y. 2022) (Google's unique access to information from its ad-buying platform about which exchanges were participating in ad auctions impaired competition by allowing Google to identify and punish rival exchanges by cutting off their ad spending).

[12] TMO cites only one case which held that a non-disclosure agreement is not anticompetitive. *See Nat'l Flood Servs., Inc. v. Torrent Techs., Inc.*, 2006 WL 1518886, at *10 (W.D. Wash. May 26, 2006). But TMO ignores contrary authority in which courts have found NDAs to violate the antitrust laws, particularly where, as here, they are part of agreements containing other restrictive terms. *See, e.g.*,

Finally, all the Leases contain **<u>Rights of First Refusal ("ROFRs")</u>** giving TMO the right to block any License sale (or new lease) TMO wants by agreeing to the same terms as rival bidders. *See id.* ¶¶ 125–30 & n.10. The ROFRs allow TMO to exclude competitors when all other provisions fail. *Id.* ¶¶ 128–130. The presence of these ROFRs in the hands of a monopsonist deters many buyers from bidding at all because they know TMO can leverage its ROFRs to block a rival from aggregating a critical mass of licenses needed to deploy the Spectrum in 5G networks. *Id.* They also deter Licensees from entertaining bids by (1) imposing burdensome procedures (including *additional* information sharing requirements), (2) delaying sales while TMO considers whether to match a rival bid, and (3) subjecting the Licensee to a meaningful risk of litigation for merely considering another offer. *See id.* ¶ 161; ECF No. 224-4 at 23-24 (complaint against Licensee alleging breach of ROFR).

Moreover, under the Leases, TMO maintains its ROFRs for one to three years ***after the Leases expire***. Because of this, the only way for a Licensee to lease or sell to a non-TMO buyer is to allow TMO's Lease to expire and then wait years for the ROFR to expire—forgoing all income in the interim. No Licensee would do this, enabling TMO to extend its exclusive control into perpetuity and foreclosing any rival from ever gaining a competitive foothold. *Le v. Zuffa*, No. 15-cv-1045, MTD Tr. at 21, ECF No. 205 (D. Nev. Nov. 20, 2015) (if contracts say monopsonist has ROFR "after a contract expires, that's not [just the lease's term]. That's forever."); *see also UFC II*, 2023 WL 5085064, at *23 (ROFRs that remain in effect after the contract's purported expiration, along with other coercive conduct, "render[ed] these contracts effectively perpetual").

       c. <u>TMO's Leases are independently unlawful because they substantially foreclose competition.</u>

---

*Signature MD v. MDVIP*, 2015 WL 3988959, at *2–3, *7–8 (C.D. Cal. Apr. 21, 2015) (non-disclosure agreement in employment contract violated Section 1 where it was paired with non-compete provision).

WCO alleges the Leases are independently unlawful because—even in the absence of TMO's other Scheme conduct—the Leases themselves substantially foreclose competition. FAC ¶¶ 118–54. TMO does not challenge WCO's allegation that the Leases independently result in substantial foreclosure, and thus waives such challenge. *Sardie*, 191 F. Supp. 2d at 1127.

Exclusive dealing agreements "substantially foreclose" competition where they "exclude competitors from so much of the market that they cannot gain a solid foothold to compete." *CoStar*, 150 F.4th at 1067. At the "pre-discovery, motion-to-dismiss stage," an antitrust plaintiff need not "allege a specific percentage of market foreclosure." *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 452 n.12 (4th Cir. 2011).[13] And "[t]here is no hard-and-fast rule for determining the point at which market foreclosure becomes 'substantial.'" *Church & Dwight v. Mayer Lab'ys, Inc.*, 2011 WL 1225912, at *6 (N.D. Cal. Apr. 1, 2011). Courts consider the share of the market affected, the duration of exclusivity, and the contracts' "probable immediate and future" impact on competition. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961). Contracts that prevent rivals from obtaining a "critical market mass" of inputs needed to compete result in substantial foreclosure. *E.g., McWane, Inc. v. FTC*, 783 F.3d 814, 821, 840 (11th Cir. 2015).[14] Substantial foreclosure can also be inferred where the "exclusive agreements cover a market in which the defendant allegedly holds monopoly power." *CoStar*, 150 F.4th at 1067.[15]

---

[13] *Applied Med. Res. v. Medtronic, Inc.*, 2023 WL 5503107, at *2 n.1 (C.D. Cal. Aug. 2, 2023) ("there is no rule that a plaintiff must calculate and allege the exact portion" of commerce foreclosed by exclusive agreements "in an initial complaint").

[14] *See, e.g., United States v. Visa, Inc.*, 788 F. Supp. 3d 585, 612 (S.D.N.Y. 2025) (unlawful to prevent rivals from "gaining the scale necessary" to compete); *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 31, 38 (S.D.N.Y. 2016) (unlawful to stagger exclusive contract expirations to prevent rivals' acquisition of a "critical mass").

[15] *See also UFC I*, 216 F. Supp. 3d at 1167 (contracts' anticompetitive effects inferred from defendant's "market share"); *Am. Spirit & Cheer Essentials, Inc. v. Varsity*

---

WCO SPECTRUM LLC'S MOTION TO DISMISS OPPOSITION    CASE NO. 2:23-CV-04347-AH-E

The FAC includes numerous facts establishing that the Leases independently result in substantial foreclosure: WCO alleges the Leases deny would-be rivals like WCO the "critical mass" of rights needed to compete. FAC ¶¶ 100–01, 109, 127–28, 185, 195–99. *See McWane*, 783 F.3d at 822, 840. WCO also alleges that the Leases cover a significant share of the relevant market in which TMO holds monopsony power. FAC ¶¶ 11, 113. *See CoStar*, 150 F.4th at 1067; *UFC I*, 216 F. Supp. 3d at 1167. And WCO alleges the Leases have effective terms of at least 30 years, with provisions that extend TMO's exclusivity even further, FAC ¶ 99, "amplif[ying] the significance of [their] foreclosure." *Google*, 747 F. Supp. 3d at 157-58.

### d.  TMO's exclusive dealing arguments are meritless.

Rather than address WCO's exclusive dealing allegations—which rest on the combined effect of the many exclusive provisions in TMO's 1,000+ Leases—TMO advances meritless arguments as to why individual Lease components, standing alone, do not establish exclusive dealing.

To begin, TMO contends—without support—that WCO's exclusive dealing claims fail because WCO does not identify each specific Lease containing the provision that expressly prohibits all third-party sales and does not allege specific foreclosure percentages associated with that specific prohibition. *See* Mot. at 13–17 & n.6. But exclusive dealing need not be pled with specificity—much less include specific foreclosure percentages. *Medtronic*, 2023 WL 5503107, at *2. General allegations of the structure of defendants' contracts and their exclusionary effects (which the FAC provides) suffice. *See Heckman v. Live Nation Ent., Inc.*, 2025 WL 1141266, at *6 (C.D. Cal. Apr. 11, 2025) (not "necessary to allege the details of each agreement"). Moreover, TMO's narrow focus on the broadest third-party sales prohibition is misplaced, because WCO's exclusive-dealing claim does not hinge on

*Brands*, *LLC*, 2022 WL 22895737, at *16 (W.D. Tenn. Mar. 30, 2022) (substantial foreclosure inferred from allegation that exclusive agreements covered a market in which defendant held 60-90% market share).

the anticompetitive effects of this provision alone: While that restriction significantly contributes to the exclusionary effect of the Leases as a whole, WCO alleges that it operates in concert with the many other exclusionary provisions (which appear in **100%** of Leases) to foreclose competition in practice. FAC ¶¶ 114–38.

TMO next argues the exclusive-dealing claim fails because WCO alleges few specific instances in which TMO enforced its exclusive provisions. Mot. at 14. TMO is wrong on the facts and law. WCO alleges numerous TMO lawsuits alleging breaches of these provisions, some of which TMO helpfully attaches to its Motion. ECF No. 224-4 (Albright College complaint); ECF No. 224-20 (St. Lucie County School Board complaint); *see also* FAC ¶ 121 (describing Lorain County Community College lawsuit). In any event, exclusive-dealing requirements foreclose competition *regardless* of the existence or frequency of enforcement acts, because the contracting parties' mutual understanding that dealing with others is not permitted deters competition. *See CoStar*, 150 F.4th at 1074. Here, WCO alleges that Licensees refused to engage with WCO because they understood their Leases to prohibit such dealings. FAC ¶¶ 141–54 (alleging Licensees holding around 100 Licenses refused to deal with WCO because of their Leases). Such allegations suffice to establish exclusionary impact. *See CoStar*, 150 F.4th at 1074 (examples of parties' understanding their contracts to "*actually* foreclose their ability to work [with] rivals" are sufficient at the pleading stage) (emphasis in original).

TMO also argues that its 30-year Lease terms are necessary to foster downstream competition in the market for the provision of 5G service. Mot. at 2–3, 13, 18.[16] And at the pleading stage, such alternative explanations for well-pleaded facts (even if plausible) cannot be credited. *Silvas*, 514 F.3d at 1003. Moreover,

---

[16] TMO's assertion that its 5G rivals have "a significant advantage" because they own the rights to use other Mid-Band Spectrum outright, Mot. at 3, is contradicted by WCO's allegations that TMO's dominance of 2.5 GHz gives it a "material spectrum advantage" over rivals that "will last for the entirety of the 5G era." FAC ¶ 110 (quoting 2020 TMO investor presentation).

WCO SPECTRUM LLC'S MOTION TO DISMISS OPPOSITION    CASE NO. 2:23-CV-04347-AH-E

supposed procompetitive justifications can never be the basis for granting a Rule 12(b)(6) motion to dismiss an otherwise plausible antitrust claim. *See Tawfilis*, 157 F. Supp. 3d at 864. TMO would also have to show that "alleged procompetitive benefits" of the Lease terms "outweigh [their] alleged anticompetitive effects," which is "a factual question" that "cannot [be] resolve[d] on the pleadings." *PLS*, 32 F.4th at 839.[17]

Even if TMO were correct that, contrary to the FAC, long-term Leases are "in the public interest" because they are "necessary" to justify network investment, Mot. at 17–18 (quotation omitted), this would not justify the existence of over 1,000 long-term exclusive Leases, which lock up the vast majority of available 2.5 GHz License Rights. WCO's substantial foreclosure allegation is based not just on the 30-year Lease term, but on the *combined effect* of the exclusivity, the duration of exclusivity, and the percentage of the market covered. FAC ¶¶ 113–63. Nowhere does TMO address these allegations.

Finally, the Court should reject TMO's assertion that its ROFRs are somehow exempt from scrutiny because they are "ubiquitous" or "permitted in EBS leases." *See* Mot. at 9. Under TMO's reasoning, ROFRs could *never* be anticompetitive because they always give rivals "the opportunity to . . . compete by submitting a bid." Mot. at 10. But none of the authorities TMO relies upon stand for such a blanket rule.[18] And courts have repeatedly recognized that the use of ROFRs, "a contract term

---

[17] Nor is TMO permitted to justify anticompetitive conduct by a desire to keep up with major rivals. *See, e.g.*, *United States v. Apple, Inc.*, 952 F. Supp. 2d 638, 707-09 (S.D.N.Y. 2013) (antitrust violation not excused because Apple was trying to compete with Amazon).

[18] Even the cases TMO cites recognize that ROFRs can violate the antitrust laws where (as here) they are part of a broader anticompetitive scheme. *See Satellite Fin. Plan. Corp. v. First Nat'l Bank of Wilmington*, 633 F. Supp. 386, 397 (D. Del. 1986) ("an overarching contractual right of first refusal might constitute illegal exclusive dealing"); *DIJ Catheter v. Critikon, Inc.*, 1994 WL 683424, at *5 (S.D.N.Y. Dec. 6, 1994) (citing a case involving "misuse" of ROFRs in an anticompetitive scheme).

WCO SPECTRUM LLC'S MOTION TO DISMISS OPPOSITION       CASE NO. 2:23-CV-04347-AH-E

inoffensive in itself," as part of *an anticompetitive scheme* can give rise to an antitrust violation. *See Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 829–30 (7th Cir. 1978) (exercise of ROFR to exclude a competitor as part of market allocation scheme gave rise to antitrust liability); *UFC II*, 2023 WL 5085064, at *22 (contract with right of first refusal, along with other provisions, "effectively negated [parties'] mobility to competitors and their ability to meaningfully negotiate with the [monopsonist's] rivals" as part of anticompetitive scheme).

### 2. TMO's Threats and Coercion Reinforce the Exclusionary Effect of the Leases.

The second component of the Scheme is sham litigation. WCO alleges that TMO threatened Licensees (often under-resourced educational institutions) with costly litigation, and in several cases, actually sued Licensees to block transactions. FAC ¶¶ 159–81. Such threats and coercion worked synergistically with the Leases to reinforce the foreclosure caused by TMO's exclusive dealing. And WCO pleads numerous facts showing that these actual and threatened lawsuits were objectively baseless and undertaken to maintain TMO's monopsony. For instance, TMO sued Licensee Albright College to stop it from selling its License to WCO on the basis that it violated a Lease provision barring sales to a "Competing Entity," defined as one that "offers, provides or delivers a commercially available telecommunications service using EBS or BRS spectrum within the United States." *Id.* ¶ 167. But TMO could not have had an objectively reasonable expectation of success on this theory: WCO has never offered nor provided telecommunications services—a matter of public record that a sophisticated entity like TMO could verify. *Id.* ¶¶ 168–70. TMO forwarded the sham *Albright* complaint to other Licensees as a threat to dissuade them from dealing with WCO, causing numerous institutions to abandon or refuse to enter negotiations with WCO. *Id.* ¶¶ 178–81.

TMO's own conduct confirms that it did not believe it could prevail on this theory in court: While TMO was engaged in litigation against *Albright*, it was also

WCO SPECTRUM LLC'S MOTION TO DISMISS OPPOSITION          CASE NO. 2:23-CV-04347-AH-E

exercising its ROFRs to purchase other Licenses targeted by WCO that were subject to identical Lease provisions, an expensive undertaking that would have been unnecessary if TMO genuinely believed WCO was a Competing Entity and the transactions could be blocked in court. *Id.* ¶ 171. TMO also never litigated any of these lawsuits to conclusion, abandoning them once the targeted Licensee—facing the prospect of ruinous litigation costs against a multi-billion-dollar corporation—withdrew from negotiations with WCO. *Id.* ¶ 163. Taken together, these allegations establish that TMO's lawsuits and threats were not genuine efforts to vindicate contractual rights, but rather a campaign to weaponize litigation against small educational institutions to preserve TMO's monopsony. *Id.* ¶¶ 160–62.

TMO claims that such litigation activity is immune from antitrust scrutiny under the *Noerr-Pennington* doctrine. Mot. at 21–25. But *Noerr-Pennington* does not apply to litigation that is "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *In re Xyrem Antitrust Litig.*, 555 F. Supp. 3d 829, 877 (N.D. Cal. 2021) (noting sham exception has two elements: (1) the lawsuit at issue must be "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits"; and (2) the petitioner's "subjective motivation" must have been "to thwart competition") (quotations omitted). The FAC meets this standard by alleging (1) that WCO could not reasonably expect to prevail on the claim that WCO qualifies as a "Competing Entity," and (2) that TMO's conduct confirms its true motivation was to preserve its monopsony, not to vindicate legitimate contract rights. In any event, "[w]hether something is a genuine effort to influence government action, or a mere sham [for *Noerr-Pennington* purposes,] is a question of fact," *Clipper Express v. Rocky Mountain Motor Tariff Bureau*, 690 F.2d 1240, 1253 (9th Cir. 1982), and "courts rarely award *Noerr-Pennington* immunity at the motion to dismiss stage,"

*Sonus Networks v. Inventergy, Inc.*, 2015 WL 4539814, at *2 (N.D. Cal. July 27, 2015).[19] TMO's *Noerr-Pennington* defense is not a basis for dismissal here.

### 3. Direct License Acquisitions Shore Up the Scheme's Exclusionary Impact.

The last component of the Scheme is TMO's direct acquisition of 2.5 GHz Licenses to prevent rivals from accessing 2.5 GHz License Rights. TMO acquired over 600 EBS Licenses after the FCC's 2020 rule change allowing sales to commercial buyers. FAC ¶ 157. These acquisitions increased TMO's market share and cemented its monopsony over 2.5 GHz License Rights. *Id.* ¶¶ 155–58. They also enabled TMO to prevent competitive threats like WCO from gaining a foothold in the market, effectively in perpetuity. TMO acquired many Licenses (including via its ROFRs) in direct response to WCO purchase offers. *Id.* ¶¶ 155–58, 187–89 (alleging numerous instances in which TMO purchased License only after WCO made a bid to prevent WCO from closing a transaction). These purchases often came after TMO threatened the Licensee with costly litigation, leaving the Licensee with no practical alternative but to sell to TMO at a suppressed price. *Id.* ¶¶ 152, 159, 187–89.

TMO argues it was merely "acquiring the inputs necessary for its business." Mot. at 19 (citation omitted).[20] But whether the acquisitions were "necessary" for

---

[19] WCO does not assert a standalone "sham litigation claim." Mot. at 20. Even if TMO's litigation activity is deemed immune from antitrust scrutiny (or otherwise legal), it would not defeat WCO's Scheme claim. *See In re Gabapentin Pat. Litig.*, 649 F. Supp. 2d 340, 360 n.23 (D.N.J. 2009) ("The Court need not address [*Noerr-Pennington*] challenges because . . . the propriety or lawfulness of the predicate activities of a monopolization scheme do not determine whether the scheme itself is actionable or unlawful.").

[20] TMO's authorities are inapposite: *Weyerhaeuser* is a predatory bidding claim with different standards. 549 U.S. at 320. *Kartell v. Blue Shield of Mass.*, 749 F.2d 922, 928 (1st Cir. 1984), concerns a monopolist using market power suppress price, not foreclose rivals' access to inputs. And *Eastman v. Quest Diagnostics*, 724 F. App'x 55, 559 (9th Cir. 2018), merely states that a *standalone* unlawful acquisition claim requires a showing of "how the acquisitions unreasonably restricted competition."—which, in any event, WCO does here.

business or an effort to maintain TMO's monopsony is a fact question not appropriate for resolution on the pleadings. *Heckman*, 2025 WL 1141266, at *13. Moreover, the antitrust laws have long recognized that asset acquisitions are unlawful where, as here, they reinforce the acquirer's market power. *Gulf States Reorg. Grp., Inc. v. Nucor, Corps.*, 466 F.3d 961, 967 (11th Cir. 2006) (asset acquisitions that "lessen competition or tend to create a monopoly" violate Section 2).

TMO also argues that its acquisition of Licenses through the exercise of ROFRs did not injure competition because WCO still had the "opportunity" to bid. Mot. at 10–11.[21] But a monopsonist's asset acquisitions to increase market share and foreclose access to key inputs violates Section 2 regardless of whether other firms had the opportunity to bid for those assets. *See, e.g.*, *Nucor*, 466 F.3d at 965–67. With each additional License it acquired (whether pursuant to the ROFR or otherwise), TMO made it increasingly difficult for any rival to ever amass the critical mass of 2.5 GHz License Rights needed to incorporate the Spectrum into a 5G network and

---

[21] The only case involving a ROFR that TMO cites for this proposition, *Malheur Forest Fairness Coalition v. Iron Triangle,* involved a defendant who, unlike TMO, lacked monopsony power when it exercised its ROFR. *See* 164 F.4th 710, 735 (9th Cir. 2026) (exercise of ROFR not unlawful where defendant did not possess market power at time of bidding). Nor was there any allegation in *Malheur* that the defendant engaged in other misconduct that deterred rivals from placing bids, as there is here. The other cases TMO cites involving anticompetitive bidding are inapposite. *See Novation Ventures v. J.G. Wentworth*, 156 F. Supp. 3d 1094 (C.D. Cal. 2015) (dismissing for failure to plead "any *facts* demonstrating [plaintiff] ha[d] actually been foreclosed" from relevant market); *GSI Tech. v. United Memories, Inc.*, 2014 WL 1572358 (N.D. Cal. Apr. 18, 2014) (losing single contract to non-monopolist competitor in unrestrained market did not establish antitrust injury). *Curtin Maritime v. Santa Catalina Island*, 786 F. App'x 675 (9th Cir. 2019), if relevant at all, supports WCO's claims, as it recognized that an exclusive lease agreement giving the defendant control over all freight shipping to Catalina Island "preclud[ed] competition" and "caus[ed] injury to competitors." *Id.* at 678. *Verizon v. Trinko*, 540 U.S. 398, 415-16 (2004), merely affirmed that a monopolist who obtains its power *lawfully* may refuse to deal with rivals in some circumstances; it has no bearing on cases like this where market power has been obtained unlawfully.

compete for TMO's wireless subscribers. TMO's License acquisitions are unlawful because they contributed to TMO's substantial foreclosure and monopsony power in the Relevant Market. *See id*.

### 4.   The Scheme as a Whole Substantially Forecloses Competition.

While WCO is not required to plead any specific foreclosure percentage at this stage, *Medtronic*, 2023 WL 5503107, at *2, the FAC alleges that TMO's Scheme has **substantially foreclosed 85% of the Relevant Market** for 2.5 GHz License Rights. FAC ¶¶ 99, 109, 195–99. This is more than sufficient to establish substantial foreclosure at the pleading stage. "[Foreclosure] [p]ercentages higher than 50 percent are routinely condemned" by courts particularly where, as here, the exclusive contract is "of fairly long duration." P. Areeda & H. Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application, ¶ 1821c. And the Ninth Circuit has condemned far lower percentages. *See, e.g.*, *Twin City Sportservice, Inc., v. Charles O. Finley & Co.*, 676 F.2d 1291, 1301 (9th Cir. 1982) (exclusive contracts covering 24% of market resulted in substantial foreclosure).[22]

### C.   WCO Plausibly Alleges Antitrust Injury.

Finally, WCO must allege antitrust injury, which requires that its injury be causally linked to conduct that harms not only WCO as a competitor, but also the competitive process. *See PLS*, 32 F.4th at 832.[23] In a competitor suit, this requirement

---

[22] WCO's failure to participate in FCC spectrum auctions or acquire BRS Licenses does not rebut WCO's claim of substantial foreclosure. Mot. at 5, 20. WCO need not allege TMO foreclosed access to every single 2.5 GHz License, but rather than it prevented rivals from gaining a "meaningfully foothold" in the market. *CoStar*, 150 F.4th at 1067; *McWane*, 783 F.3d at 840 (exclusive dealing unlawful even though plaintiff "not completely excluded" from market). WCO does this by asserting that Scheme ensured that rivals like WCO could never obtain the "critical mass" of Licenses necessary to foment competition. FAC ¶¶ 12, 63–68. A few unencumbered Licenses, however acquired, would have been commercially worthless to WCO, a fact TMO does not dispute. *Id.*

[23] *See Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir.

is met by showing the "claimed injury flows from acts [that are also] harmful to consumers." *Id.* (quoting *Rebel Oil*, 51 F.3d at 1445).

The FAC meets this test. WCO's alleged injuries—lost profits and market exclusion—were directly caused by TMO's exclusive-dealing agreements and the Scheme as a whole. WCO placed billions of dollars in bona fide offers to purchase a critical mass of 2.5 GHz Licenses; absent the Scheme, WCO would have closed on those deals and realized profits on the acquired Licenses by selling them to prospective buyers through a competitive auction, or making License Rights available for lease to multiple wireless carriers once TMO's Leases expired. FAC ¶¶ 12–13, 17, 74. But TMO prevented WCO from acquiring a critical mass of Licenses through various elements of the Scheme: TMO's exclusive-dealing Leases prevented many Licensees from transacting (or even speaking with) WCO. Those Licensees who did seek to transact with WCO were met with actual or threatened litigation by TMO, much of which constituted sham litigation. And, when all else failed, TMO exercised its ROFRs and acquired Licenses to block sales to WCO. As a result, WCO was forced to close operations. TMO's exclusive-dealing leases and the Scheme as a whole thus directly caused TMO to suffer market exclusion and lost profits, FAC ¶¶ 17, 214–17, which are cognizable forms of antitrust injury in a competitor suit. *See PLS*, 32 F.4th at 840.

WCO further alleges that its injuries flow from the same conduct that has harmed competition generally—and ultimately, consumers. The Scheme substantially forecloses rivals (including WCO) from accessing 2.5 GHz License Rights and maintains TMO's monopsony over the Relevant Market in perpetuity. Such foreclosure denies rival 5G carriers' access to a critical mass of 2.5 GHz License Rights needed for deployment in 5G networks. As a result, rival wireless

---

1999) (listing "four requirements for antitrust injury: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent").

WCO SPECTRUM LLC'S MOTION TO DISMISS OPPOSITION          CASE NO. 2:23-CV-04347-AH-E

carriers like AT&T and Verizon are unable to compete for TMO's subscribers by improving their networks. *Id.* ¶ 210. This loss of competition results in reduced network choice, poorer service, and higher prices for 5G consumers. *Id.*[24] Such allegations more than suffice to establish antitrust injury. *See PLS*, 32 F.4th at 840 (antitrust injury adequately alleged where defendant's conduct prevented plaintiff from "gaining a foothold in the market and ma[de] it virtually impossible for new competitors to enter, leaving [consumers] with fewer choices, supra-competitive prices, and lower quality products").

### 1.    TMO's antitrust injury arguments are meritless.

TMO argues that each component of the alleged Scheme, viewed in isolation, was not exclusionary and thus incapable of producing antitrust injuries.[25] For example, it insists that because ROFR exercises result in purchases at "competitive price[s]," they cannot constitute exclusionary conduct that results in antitrust injury. Mot. at 4, 10–11. Whether TMO paid "competitive price[s]" is a fact question not suitable to resolution at this stage. *Silvas*, 514 F.3d at 1003. Regardless, "compartmentaliz[ing] . . . fragments" of an alleged monopolization scheme is "inappropriate[]" when assessing a plaintiff's alleged antitrust injury. *Gabapentin*, 649 F. Supp. 2d at 355; *accord Am. Nat'l Mfg. Inc. v. Select Comfort Corp.*, 2016 WL 9450472, at *3 (C.D. Cal. Sept. 28, 2016) (citing *Anaheim*, 955 F.2d at 1376). What matters is whether TMO's Scheme—when viewed "as a whole"—resulted in WCO's claimed injury. *Cal. Energy Co. v. S. Cal. Edison Co.*, 1992 WL 330263, at *2 (N.D. Cal. Sept. 22, 1992) (when assessing antitrust injury, monopolization "allegations should not be dissected [into] individual acts"). Here, WCO alleges that the Scheme *as a whole* caused its antitrust injury. FAC ¶¶ 214–25. And while it is inappropriate to dismember the Scheme when assessing antitrust injury, WCO also

---

[24] The Scheme also results in lower demand for Licenses, harming Licensees by suppressing lease payments and sales prices they receive. FAC ¶¶ 201–02.

[25] *See* Mot. at 9–20 (separately addressing components of Scheme).

alleges that various individual components of the Scheme—such as the third-party sales prohibitions in TMO's exclusive Leases—are independently unlawful and directly harmed WCO. FAC ¶¶ 119–38, 142–54. This is sufficient to establish antitrust injury.

In the same vein, TMO complains that not every aspect of the Scheme harmed WCO. But WCO need not allege "causation and damages flowing from each act committed in furtherance of [TMO's] scheme," *Cal. Energy*, 1992 WL 330263, at *2, or that "all of [TMO's] allegedly monopolistic conduct" was "expressly directed toward" WCO. *Select Comfort*, 2016 WL 9450472, at *3. It is enough for WCO to allege it "suffered causal antitrust injury resulting from [TMO's] entire course of [anticompetitive] conduct," *Cal. Energy*, 1992 WL 330263, at *2, and that acts directed at parties other than WCO were "part of a larger scheme that purportedly injured" WCO. *Select Comfort*, 2016 WL 9450472, at *3. WCO meets this test by alleging it was injured by numerous aspects of the same overarching Scheme: the third-party sales restrictions in TMO's Leases, sham litigation against WCO's counterparties, and direct Licenses acquisitions.

Finally, TMO contends that harms to Licensees and consumers are irrelevant to WCO's antitrust injury. Mot. at 20–21. But as a competitor plaintiff, WCO must allege that its injury was caused by the same conduct that also harms the competitive process, which inevitably harms multiple market participants. *PLS*, 32 F.4th at 832.

## II. WCO ADEQUATELY PLEADS EXCLUSIVE DEALING UNDER SECTION 1 AND THE CARTWRIGHT ACT.

To state a claim for exclusive dealing under Section 1 and its California analog, the Cartwright Act, WCO must allege "(1) the existence of [] exclusive agreement[s] that (2) foreclose[] competition in a substantial share of the relevant market." *CoStar*, 150 F.4th at 1066. WCO plausibly alleges that all of TMO's Leases are exclusive agreements. *See supra* at 14. It also alleges the Leases (even absent the rest of the Scheme) substantially foreclose competition, including because they "cover a

- 29 -

market" in which TMO allegedly holds monopsony power. *See supra* at 18-19. This "is sufficient to allege substantial foreclosure" under the Sherman and Cartwright Acts. *CoStar*, 150 F.4th 1067–68 ("[A] monopolist that wields exclusive agreements to foreclose competition violates both §§ 1 and 2 of the Sherman Act.").[26]

### III. WCO PLAUSIBLY PLEADS INTENTIONAL INTERFERENCE WITH ECONOMIC ADVANTAGE.

To state a claim for intentional interference with prospective economic advantage, WCO must allege an intentional act of "independently wrongful" interference. *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 953 (Cal. 2003). TMO asserts that the only "wrongful" acts WCO alleges are TMO's antitrust violations, such that WCO's "intentional interference claim falls alongside its antitrust claims." Mot. at 29. But WCO pleads other independently wrongful conduct by TMO: WCO alleges TMO misrepresented "applicable law, FCC rules, and the meaning of contractual provisions" to Licensees and brought or threatened sham litigation against them to prevent sales to WCO. FAC ¶¶ 159–63, 166–81. Courts recognize that such conduct can independently support a claim for intentional interference. *See, e.g.*, *Bal Seal Eng'g Inc. v. Nelson Prods., Inc.*, 2016 WL 11495986, at *7 (C.D. Cal. Dec. 7, 2016) (threats and sham lawsuits sufficient); *Dominick v. Collectors Universe, Inc.*, 2012 WL 4513548, at *12 (C.D. Cal. Oct. 1, 2012) (dismissing antitrust claim but upholding intentional interference claim based on allegations defendant enlisted third parties to post false statements about plaintiffs).

---

[26] A violation of Section 1 also violates the Cartright Act. *See CoStar*, 150 F.4th at 1068. But the Cartwright Act may be broader in some respects. For example, all of a defendant's alleged misconduct may also be considered in evaluating the foreclosure caused by exclusive-dealing contracts under the Cartwright Act. *See Fisherman's Wharf Bay Cruise Corp. v. Superior Ct. of San Francisco*, 114 Cal. App. 4th 309, 338–39 (2003) (exclusive dealing pled where contracts covered 20% of market but "other unlawful practices" resulted in foreclosure of "as much as two-thirds" of market).

DATED: April 15, 2026                     Respectfully Submitted,

                                          */s/ Brandon Baum-Zepeda*
                                          **EDELSON PC**
                                          Brandon Baum-Zepeda* (SBN 352698)
                                          1255 Union St NE, Suite 850
                                          Washington, DC 20002
                                          Tel: (202) 270-4777
                                          Email: bbaum-zepeda@edelson.com
                                          *Barred only in California. Practice
                                          limited to matters authorized by D.C.
                                          Rule 49(c)(3)

                                          Natasha Fernández-Silber (*pro hac vice*)
                                          200 South 1st Street
                                          Ann Arbor, MI 48104
                                          Tel: (312) 589-6370
                                          Email: nfernandezsilber@edelson.com

                                          **BERGER MONTAGUE PC**
                                          Patrick F. Madden (*pro hac vice*)
                                          1818 Market Street, Suite 3600
                                          Philadelphia, PA 19103
                                          Tel: (215) 875-3035
                                          Email: pmadden@bergermontague.com

                                          **MITTS LAW, LLC**
                                          Maurice R. Mitts (*pro hac vice*)
                                          1822 Spruce Street
                                          Philadelphia, PA 19103
                                          Tel: (215) 866-0112
                                          Email: mmitts@mittslaw.com

                                          *Counsel for WCO Spectrum LLC*

WCO SPECTRUM LLC'S MOTION TO DISMISS OPPOSITION          CASE NO. 2:23-CV-04347-AH-E