# EXHIBIT 5

| | |
|---|---|
| **From:** | Frier, Ilana |
| **To:** | Brandon Baum-Zepeda |
| **Cc:** | Ashworth, William; Brandon Winchel; Poteat III, R. Kennon; leboff@kleinandwilson.com; Wyss, Camille; aw@winlawpc.com; jeffrey.rosenfeld@alston.com; Natasha Fernández-Silber; Maurice Mitts; Gina Stowe; Patrick F. Madden; brooke.bolender@alston.com; Brown, Kenneth |
| **Subject:** | RE: [Ext] RE: [Ext] RE: T Mobile v. WCO: Joint Stipulation re: WCO"s Motion to Compel |
| **Date:** | Thursday, August 6, 2026 3:07:03 PM |
| **Attachments:** | 2026.08.07 Joint Discovery Dispute Stipulation Pursuant to L.R. 37-2 - executed by T-Mobile.pdf |

Counsel,

Please see attached the executed version of the PDF, as requested.

Best,
Ilana

**Ilana Frier**

**Associate | Williams & Connolly LLP**

680 Maine Avenue SW, Washington, DC 20024

202-434-5193 | ifrier@wc.com | www.wc.com

---

**From:** Brandon Baum-Zepeda <bbaum-zepeda@edelson.com>
**Sent:** Thursday, August 6, 2026 2:12 PM
**To:** Frier, Ilana <ifrier@wc.com>
**Cc:** Ashworth, William <WAshworth@wc.com>; Brandon Winchel <bwinchel@kleinandwilson.com>; Poteat III, R. Kennon <kpoteat@wc.com>; leboff@kleinandwilson.com; Wyss, Camille <cwyss@wc.com>; aw@winlawpc.com; jeffrey.rosenfeld@alston.com; Natasha Fernández-Silber <nfernandezsilber@edelson.com>; Maurice Mitts <mmitts@mittslaw.com>; Gina Stowe <gstowe@mittslaw.com>; Patrick F. Madden <pmadden@bergermontague.com>; brooke.bolender@alston.com; Brown, Kenneth <KBrown@wc.com>
**Subject:** Re: [Ext] RE: [Ext] RE: T Mobile v. WCO: Joint Stipulation re: WCO's Motion to Compel

Counsel,

Please see attached a clean and redline version of the joint stip, including a PDF version for your execution.

As you can see, this version includes a TOC and a handful of nonsubstantive edits to correct some nits.

Please send us the signed copy as soon as possible.

Regards,
Brandon

On Tue, Aug 4, 2026 at 6:27 PM Frier, Ilana <ifrier@wc.com> wrote:

Counsel,

Please see attached the Joint Stipulation with T-Mobile's portions included, as well as a redline against the draft you sent on July 27.  You will receive a link shortly via Box with T-Mobile's supporting declaration and exhibits.  As you'll see, the only change we made outside of T-Mobile's sections is to insert a section break after the Table of Contents (to ensure that internal pagination remains the same after the TOC is inserted).

We also note that several of T-Mobile's exhibits were designated by WCO as Confidential – Exs. 3-6.  For those exhibits we also included slip sheets for public filing, to the extent Defendants intend to move to seal any of those documents.

Please provide a copy of the final Joint Stipulation prior to filing as required by Local Rule 37-2.2.

Best,
Ilana

**Ilana Frier**
**Associate | Williams & Connolly LLP**
680 Maine Avenue SW, Washington, DC 20024
202-434-5193 | ifrier@wc.com | www.wc.com

---

**From:** Brandon Baum-Zepeda <bbaum-zepeda@edelson.com>
**Sent:** Friday, July 31, 2026 9:20 AM
**To:** Frier, Ilana <ifrier@wc.com>
**Cc:** Ashworth, William <WAshworth@wc.com>; Brandon Winchel <bwinchel@kleinandwilson.com>; Poteat III, R. Kennon <kpoteat@wc.com>; leboff@kleinandwilson.com; Wyss, Camille <cwyss@wc.com>; aw@winlawpc.com; jeffrey.rosenfeld@alston.com; Natasha Fernández-Silber <nfernandezsilber@edelson.com>; Maurice Mitts <mmitts@mittslaw.com>; Gina Stowe <gstowe@mittslaw.com>; Patrick F. Madden <pmadden@bergermontague.com>; brooke.bolender@alston.com
**Subject:** Re: [Ext] RE: T Mobile v. WCO: Joint Stipulation re: WCO's Motion to Compel

Counsel,

You may send your portions of the Joint Stipulation by Tuesday August 4th.

Regards,
Brandon

On Thu, Jul 30, 2026 at 3:17 PM Frier, Ilana <ifrier@wc.com> wrote:

Counsel,

In light of our previous agreement to a one-day extension for Defendants to provide their portions to our Joint Stipulation, we ask that Defendants extend the same courtesy and agree that we may provide our portions to your Joint Stipulation by Tuesday August 4th.

Additionally, please include Brooke Bolender (cc'ed here) on all future correspondence.

Best,
Ilana

**Ilana Frier**
**Associate | Williams & Connolly LLP**
680 Maine Avenue SW, Washington, DC 20024
202-434-5193 | ifrier@wc.com | www.wc.com

---

**From:** Brandon Baum-Zepeda <bbaum-zepeda@edelson.com>
**Sent:** Monday, July 27, 2026 12:17 PM
**To:** Frier, Ilana <ifrier@wc.com>
**Cc:** Ashworth, William <WAshworth@wc.com>; Brandon Winchel <bwinchel@kleinandwilson.com>; Poteat III, R. Kennon <kpoteat@wc.com>; leboff@kleinandwilson.com; Wyss, Camille <cwyss@wc.com>; aw@winlawpc.com; jeffrey.rosenfeld@alston.com; Natasha Fernández-Silber <nfernandezsilber@edelson.com>; Maurice Mitts <mmitts@mittslaw.com>; Gina Stowe <gstowe@mittslaw.com>; Patrick F. Madden <pmadden@bergermontague.com>
**Subject:** T Mobile v. WCO: Joint Stipulation re: WCO's Motion to Compel

Counsel,

Defendants will be moving to compel the production of materials as described in the attached Joint Stipulation.

Please see attached Defendants' portion of the Joint Stipulation and related exhibits to be submitted in connection with this motion as required under L.R. 37-2.2.

Pursuant to L.R. 37-2.2, please provide Plaintiffs' portion of the joint stipulation by August 3.

Regards,

Brandon

On Wed, Jul 1, 2026 at 5:55 PM Frier, Ilana <ifrier@wc.com> wrote:

> Counsel,
>
> Please see the attached letter.
>
> Best,
> Ilana
>
> **Ilana Frier**
> **Associate | Williams & Connolly LLP**
> 680 Maine Avenue SW, Washington, DC 20024
> 202-434-5193 | ifrier@wc.com | www.wc.com
>
> ---
>
> **From:** Brandon Baum-Zepeda <bbaum-zepeda@edelson.com>
> **Sent:** Wednesday, June 17, 2026 5:59 PM
> **To:** Ashworth, William <WAshworth@wc.com>; Brandon Winchel
> <bwinchel@kleinandwilson.com>; Frier, Ilana <ifrier@wc.com>; Poteat III, R. Kennon
> <kpoteat@wc.com>; leboff@kleinandwilson.com; Wyss, Camille <cwyss@wc.com>;
> aw@winlawpc.com; jeffrey.rosenfeld@alston.com
> **Cc:** Natasha Fernández-Silber <nfernandezsilber@edelson.com>; Maurice Mitts
> <mmitts@mittslaw.com>; Gina Stowe <gstowe@mittslaw.com>; Patrick F. Madden
> <pmadden@bergermontague.com>
> **Subject:** T Mobile v. WCO: Correspondence re: June 9 Meet-and-Confer
>
> Counsel,
>
> Please see the attached correspondence. Please let us know your position on the
> issues discussed herein by Monday, June 22.
>
> Regards,
> Brandon
>
> --
> **Edelson PC**
> **Brandon Baum-Zepeda**
> 1255 Union St NE, Suite 850, Washington, DC 20002
> d 202.505.7608 · t 202.270.4777 · edelson.com

*Barred only in California. Practice limited to matters authorized by D.C. Rule 49(c)(3).

--
**Edelson** PC

**Brandon Baum-Zepeda**
1255 Union St NE, Suite 850, Washington, DC 20002
d 202.505.7608 · t 202.270.4777 · edelson.com
*Barred only in California. Practice limited to matters authorized by D.C. Rule 49(c)(3).

This message and any attachments are intended only for the addressee and may contain information that is privileged and confidential. If you have received this message in error, please do not read, use, copy, distribute, or disclose the contents of the message and any attachments. Instead, please delete the message and any attachments and notify the sender immediately. Thank you.

--
**Edelson** PC

**Brandon Baum-Zepeda**
1255 Union St NE, Suite 850, Washington, DC 20002
d 202.505.7608 · t 202.270.4777 · edelson.com
*Barred only in California. Practice limited to matters authorized by D.C. Rule 49(c)(3).

--
**Edelson** PC

**Brandon Baum-Zepeda**
1255 Union St NE, Suite 850, Washington, DC 20002
d 202.505.7608 · t 202.270.4777 · edelson.com
*Barred only in California. Practice limited to matters authorized by D.C. Rule 49(c)(3).

Brandon Baum-Zepeda (SBN 352698)
bbaum-zepeda@edelson.com
**EDELSON PC**
1255 Union St NE, Suite 850
Washington, DC 20002
Tel: (202) 270-4777

Patrick F. Madden (*pro hac vice*)
pmadden@bergermontague.com
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3035

Natasha Fernández-Silber (*pro hac vice*)
nfernandezsilber@edelson.com
**EDELSON PC**
200 South 1st Street
Ann Arbor, MI 48104
Tel: (312) 589-6370

*Attorneys for WCO Spectrum LLC*
*[Additional Counsel on Signature Page]*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| T-MOBILE US, INC., *et al.*,<br>　　　　Plaintiffs,<br><br>　　vs.<br><br>WCO SPECTRUM LLC, *et al.*,<br>　　　　Defendants. | No. 2:23-cv-04347-AH-E<br>Hon. Charles F. Eick<br><br>**JOINT DISCOVERY DISPUTE**<br>**STIPULATION PURSUANT TO L.R.**<br>**37-2**<br><br>Complaint Filed: June 2, 2023<br>Amended Counterclaims Filed: January 7,<br>2026<br>Hearing Date: September 4, 2026<br>Time: 9:30AM<br>Courtroom: 750 |

# <u>TABLE OF CONTENTS</u>

**WCO'S INTRODUCTORY STATEMENT**.......................................................... 1

**T-MOBILE'S INTRODUCTORY STATEMENT** ................................................ 4

**ISSUE IN DISPUTE NO. 1: DISCOVERY RELEVANT TO WCO'S UNCLEAN HANDS DEFENSE** ...................................................................... 7

    **WCO's Contentions and Points and Authorities Regarding Issue 1** ....... 8

    **T-Mobile's Contentions and Points and Authorities Regarding Issue 1**.................................................................................................. 11

        **1.**    **Background**.................................................................. 11

        **2.**    **There Is No Unclean Hands Defense Based on Anticompetitive Conduct**....................................................... 14

        **3.**    **Defendants' Procedural Argument is Meritless**.................. 19

**ISSUE IN DISPUTE NO. 2: DISCOVERY RELEVANT TO T-MOBILE'S DAMAGES** ................................................................................................ 21

    **WCO's Contentions and Points and Authorities Regarding Issue 2** ..... 22

    **T-Mobile's Contentions and Points and Authorities Regarding Issue 2**.................................................................................................. 23

        **1.**    **Background**.................................................................. 23

        **2.**    **T-Mobile's Valuations Are Irrelevant and Disproportionate to the Needs of This Case.** ....................... 27

**ISSUE IN DISPUTE No. 3: T-MOBILE'S LIMITATION OF ITS PRODUCTION TO THE LICENSES REFERENCED IN THE COMPLAINT** .......................................................................................... 30

    **WCO's Contentions and Points and Authorities Regarding Issue 3** ..... 31

    **T-Mobile's Contentions and Points and Authorities Regarding Issue 3**.................................................................................................. 32

**ISSUE IN DISPUTE No. 4: THE RELEVANT TIME PERIOD FOR T-MOBILE'S PRODUCTION** ............................................................................. 36

    **WCO's Contentions and Points and Authorities Regarding Issue 4** ..... 37

    **T-Mobile's Contentions and Points and Authorities Regarding Issue 4**.................................................................................................. 37

i

Pursuant To Central District Of California Local Rule 37-2, Defendants WCO Spectrum, LLC, Academia Spectrum, LLC, Karen Winnick, Carl Katerndahl, Andreas Bitzarakis and Tyler Kratz (collectively "Defendants" or "WCO") and Plaintiffs T-Mobile Us, Inc., Clearwire Spectrum Holdings LLC, Clearwire Spectrum Holdings II LLC, Clearwire Spectrum Holdings III LLC, Fixed Wireless Holdings LLC, NSAC LLC, TDI Acquisition Sub LLC, and WBSY Licensing LLC (collectively "T-Mobile" or "Plaintiffs"), submit this Joint Discovery Dispute Stipulation setting forth certain disputes concerning T-Mobile's responses and objections to WCO's document requests.[1]

## WCO'S INTRODUCTORY STATEMENT

This dispute concerns whether WCO is entitled to take document discovery relevant to two key issues in this litigation: (1) WCO's unclean hands defense, which is that T-Mobile ("TMO") is barred from the relief it seeks because it has engaged in its own misconduct (in the form of various anticompetitive acts resulting in T-Mobile's monopsony control over the nation's 2.5 GHz spectrum) in connection with the issues over which it has sued WCO, and (2) the damages (if any) that T-Mobile has incurred as a result of WCO's alleged conduct.

The FCC issues licenses governing the use of 2.5 GHz radio spectrum, most of which are owned by colleges and universities. While the spectrum was historically used for educational purposes, today its primary use is in nationwide 5G wireless networks, as educational institutions are permitted to lease (or sell) their licenses to telecommunications companies. Today, T-Mobile exclusively controls over 85% of all 2.5 GHz spectrum in the United States, which it has gained through exclusive leases with schools that own licenses that do not expire until 2035, or direct ownership. T-Mobile's stranglehold over 2.5 GHz spectrum gives it a major

---

[1] There is no applicable scheduling order entered in this case.

1

advantage over competing firms like Verizon and AT&T, who cannot use that spectrum (due to T-Mobile's scheme) to bolster their networks.

In 2020, WCO, an investment firm founded by telecommunications luminary Gary Winnick, attempted to upend T-Mobile's monopsony control over 2.5 GHz spectrum by making offers to buy spectrum licenses from colleges and universities at competitive prices. WCO's plan was to resell these assets in the open market (at a considerable profit) via a competitive auction process that T-Mobile and its competitors could all participate in, thus restoring competition for the spectrum. Ultimately, T-Mobile thwarted WCO's efforts by enforcing exclusive provisions in its leases with the schools, initiating (or threatening litigation) to prevent sales to WCO, or in some cases, acquiring licenses to keep them out of WCO's hands.

T-Mobile alleges that WCO's bids to colleges and universities were not bona fide offers, that WCO made those offers in bad faith to induce the schools to solicit competing offers from T-Mobile (so that WCO would be entitled to breakup fees), and that WCO's conduct constituted a violation of, *inter alia*, federal RICO law, and fraud and conversion under California state law. *See* Compl., ECF No. 1 at ¶¶ 82-182.  In its Answer, WCO asserts unclean hands as an affirmative defense, and that T-Mobile has suffered no injury or damages as a result of WCO's alleged conduct. *See* Defs.' Ans., ECF No. 132 at 52 (T-Mobile's claims for relief are "barred under the doctrine of unclean hands due to their own anticompetitive and bad-faith conduct."); *id.* at 51 ("[n]o act or omission by Answering Defendants was the proximate or actual cause of any injury to Plaintiffs"). WCO also filed antitrust counterclaims asserting that T-Mobile's conduct in connection with obtaining control over 2.5 GHz spectrum constitutes an exclusive dealing scheme in violation of Sections 1 and 2 of the Sherman Act (and analogous provisions of California antitrust law), which harmed competition and caused WCO to be unlawfully excluded from the relevant market.

On February 17, 2026, WCO served discovery requests seeking documents relevant to its unclean hands defense, and to develop the record on whether T-Mobile suffered any injury as a result of WCO's alleged conduct. As to unclean hands, WCO seeks discovery concerning T-Mobile's strategy for maintaining exclusive control over 2.5 GHz spectrum, the web of exclusive agreements it wields to maintain this control, and T-Mobile's market power. Because T-Mobile's market-wide anticompetitive conduct continues to this day, WCO seeks discovery that extends beyond the specific licenses that are the subject of T-Mobile's claims and extends to the present. T-Mobile has refused outright to produce this discovery. It asserts that WCO may not take discovery on its unclean hands defense because that defense relates to WCO's antitrust counterclaims, which remain at the pleading stage. T-Mobile has also suggested (incorrectly) that unclean hands is not a defense to its claims. Moreover, T-Mobile also refuses to produce documents relevant to damages (such as how it valued licenses that WCO bid on) because, in its view, "damages do not depend on [the licenses'] market value" and instead depend solely on alleged kickbacks received by WCO.[2]

T-Mobile's objections are plainly improper: T-Mobile has never moved to strike WCO's unclean hands defense, and the deadline to do so has long passed. Moreover, unclean hands is a well-recognized defense to T-Mobile's state-law fraud, conversion, and equitable claims. Anticompetitive conduct (as WCO alleges here) is a well-recognized basis for asserting unclean hands, regardless of whether that conduct gives rise to an antitrust claim. In addition, the case law is clear that T-Mobile's damages here must be calculated based on the difference between the price it paid and the fair market value of licenses it acquired. The discovery WCO seeks is

[2] As set forth in the attached Declaration of Natasha Fernández-Silber, the Parties have met and conferred at length and exchanged extensive correspondence but remain unable to resolve their disputes.

3

relevant to that calculation, as it may show T-Mobile acquired the at-issue licenses at prices below their fair market value (as WCO alleges), which would mean T-Mobile experienced no injury at all. Regardless, T-Mobile is not permitted to bar WCO from seeking discovery on a key issue in the case because it simply disagrees with WCO's damages theory. Finally, the Court indicated during the July 15 hearing that it may allow discovery into <u>all</u> of T-Mobile's leases—not just those that T-Mobile asserts are at issue in the RICO action—so that the Court can assess the exclusionary impact of those leases on the market. *See* July 15, 2026 Hr'g Tr. at 37:20-38:9; 48:13-49:1.

Accordingly, the Court should grant WCO's motion to compel the production of documents related to these key issues.

## T-MOBILE'S INTRODUCTORY STATEMENT

Defendants seek what amounts to full antitrust-counterclaim discovery in the guise of (i) seeking evidence to support "defenses" that far exceed the scope of T-Mobile's limited claims; and (ii) "damages" discovery that is not responsive to T-Mobile's actual damages theory. With discovery on WCO's counterclaims stayed—and WCO's second attempt at a counterclaim being the subject of a tentative dismissal ruling—none of this discovery comes close to being relevant or proportional to the needs of the case under Rule 26. It would, however, be extremely burdensome and prejudicial to T-Mobile.

This case is about Defendants' fraudulent scheme. T-Mobile has leased the right to use wireless spectrum from over 1,000 institutions that hold educational broadband service ("EBS") licenses issued by the FCC. Ex. 7, ECF 1 ("Compl.") ¶¶ 1-3, 38.[3] Those leases typically include Rights of First Refusal ("ROFR"). *Id.* After an FCC rule change allowed commercial entities to own EBS licenses, Gary Winnick, his company WCO Spectrum LLC, and associated entities and people hatched a

---

[3] All of T-Mobile's exhibits are attached to the declaration of Ilana Frier.

scheme to exploit the ROFRs in T-Mobile's leases. *Id.* ¶¶ 1-3, 42-43, 52. Specifically, WCO made sham offers to licensees at 10% above the amount it knew licensees were willing to accept, so that when T-Mobile matched the inflated offer under the ROFR, it unwittingly funded a 10% kickback to WCO by way of secret "Commitment Costs Agreements" with licensees. *Id.* ¶¶ 1-3, 52. Through their scheme, Defendants collected millions of dollars from T-Mobile. *Id.* ¶ 64. In this action, T-Mobile brings RICO and other claims to seek redress from this fraud.

Discovery to-date confirms that the scheme unfolded exactly as T-Mobile alleges. WCO first agrees on an "offer amount" with the licensee before explaining, "always over the phone," that WCO "structure[s] all of its EBS deals with a 10% closing costs agreement." Ex. 5, WCO 0004863. WCO then tells licensees:

> This is **not** a bait & switch – you will still receive 100% of the [offer amount]. Instead, we are 'grossing-up' your offer . . . by 10% to [gross purchase price] . . . . In the event that T-Mobile exercises their ROFR, they will pay you the **full** amount of the [gross purchase price], and then WCO will invoice you for the 10% closing costs agreement.

*Id.* (emphases and brackets in original). WCO also tells licensees that "[i]f you accept WCO's offer, you are obligated under your lessee's ROFR provision to share the executed agreement with T-Mobile," *id.*, confirming WCO intended for its fraudulent offers to be presented to T-Mobile to trigger the ROFR. Discovery also confirms that Defendants had neither the intent nor ability to fund their sham offers. For example, in a pitch to a potential investor to provide a "proof of funds," Jackson said: ***"The most important element to understand is that for the 'proof of funds' we're seeking, there won't ever be a capital call."*** Ex. 6, WCO 0007554 (emphasis added).

Importantly for present purposes, T-Mobile seeks overcharge damages—that is, the amounts T-Mobile paid out of pocket "in overcharges in purchase prices and fees." *Id.* ¶ 102. In contrast, T-Mobile does not seek lost profits or any other form of damages that depends on the value of any license. Consistent with this theory, T-

Mobile's damages claims relate only to the discrete set of transactions in which it was forced to exercise its ROFRs—with 11 schools identified in its Complaint. *Id.*, App'x A. Other than a few other schools referenced in the Complaint (Owasso Public Schools, Albright College, and the School Board of St. Lucie), *see id.* ¶ 44, 67, 68, no other transactions, leases, or licensees are relevant to T-Mobile's claims.

Two overarching issues are implicated by Defendants' motion. *First*, Defendants blatantly are pursuing the antitrust discovery they would seek in support of their counterclaims—which discovery remains stayed, Ex. 11, ECF 97; Ex. 17, ECF 210—under the guise of an unclean hands defense based on "anticompetitive conduct." Indeed, at the July 15 hearing on T-Mobile's motion to dismiss WCO's amended counterclaims, when asked how WCO would amend *if* the Court granted leave, WCO conceded that "we'd need the leases" (i.e., RFP 2). Ex. 21, Tr. 37:20-38:9. The Court did not, as Defendants misrepresent, "indicate . . . that it may allow discovery into all T-Mobile's leases" at the hearing—which they reference but the transcript of which they neglect to attach.[4] In any event, unclean hands based on purported "anticompetitive conduct" is not a defense to any claim—and Defendants provide zero support to the contrary. As one court put it, to suggest that "Plaintiffs were engaged in anticompetitive behavior that necessitated [Defendants'] fraud" would "make a mockery of the unclean hands defense." *LifeScan, Inc. v. Smith*, 2024 WL 1007845, at *11 (D.N.J. Feb. 15, 2024).

*Second*, Defendants attempt to probe T-Mobile's highly sensitive and proprietary valuations of its spectrum in service of a theory that is simply inapposite as a matter of law. Defendants theorize that T-Mobile suffered no damages so long as Defendants' fraudulent offers that T-Mobile matched were below the actual market value of the relevant licenses. Indeed, by Defendants' account, a plaintiff would have no recourse for having been defrauded into funding an illegal kickback

---

[4] T-Mobile attaches the transcript as Exhibit 21 to the Frier Declaration.

[PROPOSED] JOINT STIPULATION — CASE NO. 2:23-CV-04347-AH-E

as long as the kickback did not drive the price of the relevant asset above its market value.  But as Chief Judge Gee already recognized in denying Defendants' motion to dismiss T-Mobile's claims, that is not the law; "[a] claim that one was overcharged in a transaction, however, is sufficient to show injury to property."  Ex. 12, ECF 117 at 7.   The valuations of the licenses at issue are therefore irrelevant and disproportionate to the claims and defenses in the case.

Accordingly, the Court should, as to Issue 1, deny Defendants' antitrust discovery requests; as to Issue 2, deny discovery into T-Mobile's valuations; as to Issue 3, deny discovery into 1,000+ leasing relationships that have nothing to do with the claims or proper defenses; and as to Issue 4, limit Defendants to a reciprocal December 31, 2023 discovery cutoff date.

**ISSUE IN DISPUTE NO. 1: DISCOVERY RELEVANT TO WCO'S UNCLEAN HANDS DEFENSE**

| Issue in Dispute | WCO's Proposed Resolution |
|---|---|
| Discovery Relevant to WCO's Unclean Hands Affirmative Defense | Order Plaintiffs to conduct a reasonable search for documents responsive to RFP Nos. 21, 22, 24, 26-32, 38, 43-45. |

T-Mobile has refused to produce documents in response to Requests for Production Nos. 21, 22, 24, 26-32, 38, 43-45 on the basis that these Requests "impermissibly seek[] discovery regarding Defendants' Amended Counterclaims." WCO contends that these Requests are relevant to its unclean hands defense. *See* Defs.' Ans., ECF No. 132 at 52 ("Plaintiffs' claims are barred under the doctrine of unclean hands due to their own anticompetitive and bad-faith conduct."). RFP No. 21 is exemplary. The complete list of RFPs and Plaintiffs' responses and objections follows the Parties' argument as Appendix A:

> **REQUEST NO. 21:** All Documents and Communications reflecting or relating to Your business strategy for dealing with or preventing the current or future actual or potential acquisition of any License or group of Licenses by any telecommunications companies such as AT&T, Verizon, or Google.

7

**RESPONSE TO REQUEST NO. 21:** T-Mobile incorporates its General Objections and Objections to Definitions and Instructions set forth above, including in particular its Objection to the Definition of "License." T-Mobile objects to this Request as overly broad, unduly burdensome, not relevant to the claims or defenses, and not proportional to the needs of the case, including because (1) this Request seeks production of "[a]ll Communications reflecting or relating to Your business strategy for dealing with or preventing the current or future actual or potential acquisition of any License or group of Licenses by any telecommunications companies," and that includes documents and communications that do not relate to this litigation; and (2) this Request impermissibly seeks discovery regarding Defendants' Amended Counterclaims. T-Mobile further objects to this Request to the extent it seeks documents protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, or any other applicable privileges or immunities. T-Mobile further objects to this Request on the grounds that the Request would be objectionable in the event the Amended Counterclaims survive for all of the foregoing reasons. Based on the foregoing objections, T-Mobile will not produce documents in response to this Request.

## WCO's Contentions and Points and Authorities Regarding Issue 1

T-Mobile has objected to a number of WCO's RFPs on the basis that they relate to WCO's antitrust counterclaims. However, these Requests are also relevant to WCO's unclean hands affirmative defense, which is based on T-Mobile's anticompetitive conduct. *See* Defs.' Ans., ECF No. 132 at 52 ("Plaintiffs' claims are barred under the doctrine of unclean hands due to their own anticompetitive and bad-faith conduct.").

If T-Mobile contends that this defense is not legally viable, then it should have moved to strike it. T-Mobile never did, and it has long since missed the deadline to do so.[5] Having failed to strike this defense, TMO's disagreement as to the merits of

---

[5] Under Fed. R. Civ. P. 12(f), "[t]he court may strike from a pleading an insufficient

8

WCO's unclean hands allegations is not a proper basis for objecting to discovery now. *See Big City Dynasty v. FP Holdings, L.P.*, 336 F.R.D. 507, 512-513 (D. Nev. 2020) (holding that "a discovery motion before a magistrate judge is not an appropriate vehicle for seeking adjudication of merits-based arguments"); *United States v. Real Prop. & Improvements Located at 2366 San Pablo Ave., Berkeley, California*, 2014 WL 2126912, at *3 (N.D. Cal. May 22, 2014) (granting motion to compel discovery "because [defendant] is entitled to discovery that is relevant to its affirmative defenses, regardless of whether the [plaintiff] believes these defenses have merit"); *City of New York v. FedEx Ground Package Sys., Inc.,* 2016 WL 1718261, at *6 (S.D.N.Y. Apr. 27, 2016) ("[T]he Court will not preclude discovery that is relevant to a defense that was not struck.").

In any event, unclean hands is a well-recognized defense under California law and is plainly applicable here. In evaluating an unclean hands defense, courts applying California law consider "(1) analogous case law, (2) the nature of the misconduct, and (3) the relationship of the misconduct to the claimed injuries." *Kendall-Jackson Winery, Ltd. v. Superior Ct.*, 76 Cal. App. 4th 970, 979 (1999) . Each of these factors supports the defense here. ***First***, under the case law, unclean hands is a well-recognized defense to many of Plaintiffs' claims. This includes Plaintiffs' claims for fraud and conversion.[6] Unclean hands is also a defense to Plaintiffs' claims for equitable relief, including unjust enrichment.[7]

---

defense . . . on motion made by a party either before responding to the pleading or, if a response is not allowed, *within 21 days after being served* with the pleading." (emphasis added). WCO served its Answer over a year ago on March 31, 2025.

[6] *E.g.*, *Lymburner v. U.S. Fin. Funds, Inc.*, 263 F.R.D. 534, 544 (N.D. Cal. 2010) ("unclean hands defense could apply to Plaintiff's fraud claim"); *Unilogic, Inc. v. Burroughs Corp.*, 10 Cal. App. 4th 612, 623 (1992) ("defense of unclean hands was available against the legal claim for conversion").

[7] *Kendall-Jackson Winery,* 76 Cal. App. 4th at 978 ("The defense is available in

9

***Second***, anticompetitive conduct—as WCO alleges here—is a recognized basis for an unclean hands defense. *See Kendall-Jackson Winery*, 76 Cal. App. 4th at 983 (denying plaintiff's motion for summary judgment on unclean hands defense based on Plaintiffs' unlawful tying arrangements and other anticompetitive conduct); *Hall v. Wright*, 240 F.2d 787, 795 (9th Cir. 1957) ("The facts which, in the opinion of the trial court, establish unclean hands include, as to each side, many of the facts also relied upon as establishing unfair competition.").

Moreover, WCO need not prevail on its antitrust counterclaims for its unclean hands defense to succeed: WCO need not prove an antitrust violation to show unclean hands; any conduct that "violates conscience, or good faith, or other equitable standards of conduct is sufficient cause to invoke" unclean hands. *Kendall-Jackson Winery*, 76 Cal. App. 4th at 978 ("the misconduct need not be a crime or an actionable tort"). *See Hall v. Wright*, 240 F.2d 787, 795 (9th Cir. 1957) ("Conduct which may be found to call for application of the doctrine of unclean hands may or may not constitute unfair competition under the substantive law of California"). And WCO's antitrust counterclaims may be dismissed even for reasons which have no bearing on whether or not TMO has committed anticompetitive acts, such as WCO's standing as a plaintiff.

***Finally***, there is no meaningful dispute that TMO's anticompetitive conduct is sufficiently related to Plaintiffs' claims. WCO alleges that TMO acquired the licenses at issue *as part of* its anticompetitive scheme. *See* Defs' Ans., ECF No. 132 at 1 ¶ 1. Unclean hands is plainly applicable where—as here—WCO's and T-Mobile's alleged "misconduct occurred in the same transaction that forms the subject of this litigation." *Unilogic, Inc.*, 10 Cal. App. 4th at 623. *See also Kendall-Jackson Winery*, 76 Cal. App. 4th at 980 ("Any unconscientious conduct connected with the

legal as well as equitable actions.").

10

controversy before the court was sufficient to warrant application of the unclean hands defense.”). Accordingly, each of these factors supports WCO's asserted unclean hands defense.

In addition to WCO's unclean hands defense, discovery concerning T-Mobile's alleged anticompetitive conduct is relevant to whether it has suffered damages. In a case involving fraud, the standard measure of damages is the difference in the “actual value” between what the plaintiff paid and received. *All. Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1240 (1995). Accordingly, the proper measure of damages here is likely the difference between (1) the price at which Plaintiffs purchased the licenses at issue, and (2) the actual or fair market value of those licenses. *See id.*; *see also First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994) (“the fraud defendant is not liable for all losses that may occur, but only for those actually suffered”). WCO contends that T-Mobile's anticompetitive conduct has artificially suppressed prices for 2.5 GHz licenses. Accordingly, WCO is entitled to discovery concerning this anticompetitive conduct to determine its effect on the value of these licenses—and the fair market value of the licenses that would prevail absent T-Mobile's conduct.

### T-Mobile's Contentions and Points and Authorities Regarding Issue 1

### 1. Background

This case has been pending since June 2023. *See* Ex. 7, ECF. 1. After accepting service in June 2023, Defendants twice sought extensions of their August 7, 2023 deadline to respond to the complaint because counsel supposedly was “indisposed” at a trial and unable to prepare the response. Ex. 8, ECF 39 at 2 (stipulation dated August 14, 2023). Two days later, on August 16, 2023, shortly after Plaintiffs served document requests and interrogatories, Defendants somehow were able to file a lengthy motion to stay discovery during the pendency of their forthcoming motion to dismiss Plaintiffs' claims. *See* Ex. 9, ECF 66 at 1. The

11

following month, Defendants filed a motion to dismiss, and in November 2023, Defendants' motion to stay and motion to dismiss were denied for failure to comply with the local rules. *Id.* Also that month, Defendant Gary Winnick passed away. Ex. 10, ECF 72 at 1. The case sat idle until Karen Winnick was substituted as a defendant in February 2024. *Id.* Defendants sought another stay of discovery, and in April 2024, over T-Mobile's objection, Chief Judge Gee ordered a discovery stay. Ex. 11, ECF 97 at 3. After the parties briefed Defendants' renewed motion to dismiss, Chief Judge Gee denied the motion in October 2024. Ex. 12, ECF 117. The case remained stayed while the parties attempted to mediate. Ex. 13, ECF 119. After mediation was unsuccessful, Defendants injected another six weeks of delay through an extension to file their response to the complaint. Ex. 14, ECF 123. When Defendants answered in March 2025, they asserted 23 affirmative defenses and brought antitrust counterclaims. Ex. 15, ECF 132. T-Mobile moved to dismiss WCO's counterclaims and the Court granted that motion in October 2025. Ex. 16, ECF 187. On January 6, 2026, the Court lifted the discovery stay for the limited purpose of "conducting written discovery on Plaintiffs' claims" only. Ex. 17, ECF 210.

Notwithstanding the limitation on discovery to "Plaintiffs' claims," Defendants' requests for production on T-Mobile seek broad antitrust discovery. *See* App'x A at 1-7. Defendants did not include most of the requests at issue in the body of their sections, instead burying them in an Appendix. But a look at the requests at issue is revealing. For example, Defendants seek documents regarding, *e.g.*, (i) any "strategy" for "preventing" acquisitions of licenses by "telecommunications companies such as AT&T, Verizon or Google" (RFP 21); (ii) T-Mobile's "market share" (RFP 22); (iii) "competition for access to 2.5 GHz spectrum" and barriers to market entry (RFP 27); (iv) the "competitive impact of T-Mobile's acquisition of Licenses" (RFP 28); (v) the "interchangeability" of 2.5 GHz spectrum and its

12

"qualities and characteristics" (RFP 29); (vi) "non-T-Mobile actual and potential Licensees' business operations" (RFP 30); "spectrum sharing" or "dynamic allocation" of spectrum (RFP 31); (vii) "development of commercial markets for 2.5 GHz spectrum rights" (RFP 32); and (viii) "antitrust compliance policies" (RFP 45).

T-Mobile objected on the grounds that this discovery impermissibly seeks discovery on Defendants' Amended Counterclaims and does not relate to T-Mobile's claims or Defendants' defenses thereto.  T-Mobile also objected to certain requests included in Issue 1 as vague (*e.g.*, RFPs 24, 30); as probing irrelevant subject matters (*e.g.*, RFPs 21, 28, 30, 32, 38, 43, 44); and that the information can be obtained more easily from public sources (RFP 43).  Defendants do not challenge any of those objections.

Defendants initially took the position that the requests included in Issue 1 are "central to Defendants' unclean hands and anticompetitive conduct defenses." *E.g.*, Defs. Ex. 2, May 1 Ltr. at 1, 2, 3.  Those defenses are Affirmative Defense 6 ("Plaintiffs' claims are barred under the doctrine of unclean hands due to their own anticompetitive and bad-faith conduct"), and Affirmative Defense 17 ("Plaintiffs' claims are part of an illegal anticompetitive campaign and are unenforceable as a matter of law").  Ex. 15, ECF 132 at 51-52.  T-Mobile explained, among other points, that "'[a]nticompetitive conduct' is not a defense to RICO, fraud or any of T-Mobile's other claims," Ex. 19, May 22 Ltr. at 1—a point which Defendants effectively have conceded.  In their subsequent correspondence and in this Joint Stipulation, Defendants shifted (slightly) to contend that antitrust discovery is warranted by their "unclean hands affirmative defense, which is based on Plaintiffs' anticompetitive conduct."  Defs. Ex. 3, June 17 Ltr. at 2 (citing Affirmative Defense 6); Defs. Ex. 4, July 1 Ltr. at 2; *see* Joint Stip. 8.

While discovery was ongoing, WCO filed its First Amended Counterclaims. On July 15, 2026, the Court issued its tentative order dismissing the First Amended

13

Counterclaims.  Ex. 20.  The parties currently are briefing the question of whether that dismissal should be with prejudice.  *See* Ex. 21, Tr. 60:11-21; Ex. 24, ECF 247 (T-Mobile's July 29 Supplemental Brief).

In their Joint Stipulation, Defendants argue that the antitrust discovery they seek is related to an unclean hands defense and also is relevant to damages.  They additionally argue that T-Mobile cannot challenge the relevance or proportionality of these requests because T-Mobile did not move to strike their affirmative defenses.  Those arguments lack merit, as explained below.

**2. There Is No Unclean Hands Defense Based on Anticompetitive Conduct**

"Anticompetitive conduct" is not itself a defense to RICO, fraud, or any of T-Mobile's other claims, and Defendants no longer contend otherwise.  *See LifeScan, Inc. v. Smith*, 2024 WL 1007845, at *1, *7 (D.N.J. Feb. 15, 2024) (rejecting "illegality of antitrust laws" as a defense to RICO and fraud claims).  Instead, Defendants now put all their eggs in the "unclean hands" basket.  But regardless of their minor change in packaging, "anticompetitive conduct" is not a defense that bars any of T-Mobile's claims.  Expansive (and enormously expensive) antitrust discovery is thus necessarily irrelevant to the claims and defenses and disproportionate to the needs of the case.

As a matter of law, unclean hands—whatever the underlying theory—is not a defense to many of T-Mobile's claims, including RICO.  *In re Nat'l Mortg. Equity Corp. Mortg. Pool Certificates Secs. Litig.*, 636 F. Supp. 1138, 1156 (C.D. Cal. 1986) (RICO); *FLIR Sys., Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1284 (Cal. App. 2009) (UCL); *see also Monex Deposit Co. v. Gilliam*, 680 F. Supp. 2d 1148, 1167 (C.D. Cal. 2010) (likely no defense to Cal Penal Code § 496(c) claim, based on *Monex's* analysis of neighboring statutes).  Defendants concede as much, suggesting only that unclean hands is a defense to T-Mobile's claims for fraud, conversion and unjust

enrichment.  Joint Stip. 9.

There is no support, however, for unclean hands "due to anticompetitive conduct" as a valid defense to any of T-Mobile's claims.  *See Lifescan*, 2024 WL 1007845, at *11.  Unclean hands based on anticompetitive conduct is not even a defense to *antitrust* claims.  It is well-settled that if a plaintiff was "guilty of infractions of the antitrust laws, they could be held responsible in appropriate proceedings brought against them," but any "alleged illegal conduct of [the plaintiff], however, could not legalize the unlawful combination by respondents nor immunize them against liability to those they injured."  *Kiefer-Stewart Co. v. Joesph E. Seagram & Sons,* 340 U.S. 211, 214 (1951).  WCO took exactly this approach, bringing antitrust counterclaims against T-Mobile, and has now twice failed to state any plausible antitrust claim.

Courts likewise have rejected that anticompetitive conduct can be smuggled through an unclean hands defense to bar claims sounding in fraud.  For example, in *Lifescan*, the plaintiffs brought claims for RICO, fraud, unjust enrichment, negligent misrepresentation and tortious interference to remedy a fraudulent overcharge scheme. 2024 WL 1007845, at *1.  The defendants asserted as affirmative defenses "illegality for violation of antitrust laws" and unclean hands, both premised on alleged price discrimination, exclusive dealing and monopolization, among other anticompetitive conduct.  *Id.* at *2.  The court found no support for this "illegality" defense and ruled that the defendants "cannot rely" on the alleged anticompetitive conduct "in defense of Plaintiffs' RICO and fraud claims."  *Id.* at *9.  It was likewise "unable to find any authority for the proposition that the anticompetitive conduct alleged by the Hughes Parties can support an unclean hands defense to an action alleging RICO and fraud claims."  *Id.* at *11.  But even if such authority existed, the defense nevertheless failed because any anticompetitive conduct lacked the requisite nexus to what plaintiffs sought in their lawsuit—relief from a fraudulent scheme.

15

"The Hughes Parties cannot wash their hands of their alleged fraud by alleging that the Plaintiffs were engaged in anticompetitive behavior that necessitated their fraud. Such a conclusion would make a mockery of the unclean hands defense." *Id.* at *11. Here too, Defendants cannot "negate liability for their fraud by asserting that they would not have needed to commit fraud if [T-Mobile] did not engage in anticompetitive behavior." *Id.*; *see also, e.g., United States v. Ali*, 620 F.3d 1062, 1070-71 (9th Cir. 2010) (alleged illegal behavior and antitrust violations by Microsoft did not "immunize Defendants' fraud"); *United States v. Weinstein*, 762 F.2d 1522, 1533 (11th Cir. 1985) (rejecting argument that "the pricing scheme avoided by their [fraudulent] misrepresentations was itself illegal under antitrust law" and explaining that "if defendants doubted the legality of that practice their recourse would have been through an antitrust action, not through a scheme of misrepresentations").

Defendants nevertheless suggest that "anticompetitive conduct . . . is a recognized basis for an unclean hands defense." Joint Stip. 9. They are flat wrong. They cite only two cases for this proposition, but neither of them involved any alleged antitrust violation or any other conduct characterized as "anticompetitive." First, the unclean hands defense in *Kendall-Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970 (Cal. App. 1999) was not "based on Plaintiffs' unlawful tying arrangements and other anticompetitive conduct." *See* Joint Stip. 10. The misconduct alleged there was an alcohol producer's marketing practices, specifically, its "ties with retailers and movement of a competitor's product" which "violate[d] the letter and the spirit of the Alcoholic Beverage Control Act." *Id.* at 983.[8] WCO

---

[8] For context, the Alcoholic Beverage Control Act prohibits an alcohol producer from "[p]roviding services in the form of rearranging a retailer's displays" and "interfering with the product display of competing sellers inside retail outlets." *Id.* at 982. The defendant-producer allegedly "works too closely with retailers . . . and uses its considerable influence in the industry to achieve favorable shelf schematics," including by participating in restocking and "physically moving a competitor's

16

appears to misread the word "tie." But *Kendall-Jackson Winery* had nothing to do with any antitrust violations let alone a "tying arrangement."[9] Second, in *Hall v. Wright*, 240 F.2d 787 (9th Cir. 1957), the conduct constituting unclean hands—which barred *both* parties from obtaining any relief on their respective claims—was that "each party indulged in self-help after this action was instituted" which "immensely complicated the issues in the case" and "made it almost impossible to render justice between the parties." *Id.* at 796.[10] Nothing remotely similar is purported to constitute unclean hands here. Neither *Kendall-Jackson* nor *Hall* held that an unclean hands defense can be based on an antitrust violation or "anticompetitive conduct."

Defendants further argue that "WCO need not prevail on its antitrust counterclaims for its unclean hands defense to succeed." Joint Stip. 10. This is nonsensical. For one, there is no basis for an unclean hands defense premised on "anticompetitive conduct" that already has been (twice) adjudicated *not* to constitute anticompetitive conduct, Ex. 16; Ex. 20, and Defendants do not suggest otherwise. But irrespective of their counterclaims, this conduct would still not constitute misconduct that bars Plaintiffs' claims under the doctrine of unclean hands. Whether labeled as an "antitrust" violation or "anticompetitive conduct," the same problem

---

product" at retailers' stores in violation of the statute. *Id.* at 982-93.

[9] A "tying agreement," a term of art in antitrust law, is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Malheur Forest Fairness Coal. v. Iron Triangle, LLC*, 164 F.4th 710, 736 (9th Cir. 2026) (citation omitted).

[10] The court noted that the *plaintiff* originally brought an antitrust claim against the defendant. *Id.* at 789. That claim, however, appears to have been disposed of earlier in the case, *id.* at 790, and there is no reference to any antitrust claim or "anticompetitive conduct" alleged by the defendant against the plaintiff. Nor is there any discussion of any "anticompetitive conduct" forming the basis of the unclean hands defense.

17

remains: there is zero support—and Defendants provide none—for an unclean hands defense to fraud, conversion or equitable claims based on "anticompetitive conduct," as explained above.[11]  *See* Joint Stip. 9 (arguing that the unclean hands defense turns on "analogous case law" and the specific "nature of the misconduct").

Defendants also ignore a key limitation on the unclean hands defense—it must be *related* to the claims at issue.  The defense of "unclean hands" is not a talisman parties can invoke to justify boundless discovery into whatever acts they claim their adversary committed.  It is strictly limited to inequitable conduct in connection with the transactions for which the plaintiff seeks relief.  *See, e.g.*, *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 841 (9th Cir. 2002) ("[U]nclean hands does not constitute 'misconduct in the abstract, unrelated to the claim to which it is asserted as a defense.'" (citation omitted).  As to those transactions, T-Mobile already has agreed to provide discovery.

WCO, in contrast, "seeks discovery that extends beyond the specific licenses that are the subject of T-Mobile's claims."  *See* Joint Stip. 3.  Such wide-ranging discovery cannot support an unclean hands defense.  The doctrine "requires that the plaintiff have 'dirtied [his hands] in acquiring the right he now asserts, or that the manner of dirtying renders inequitable the assertion of such rights against the defendant.'" *Ins. of Cetacean Research v. Sea Shepherd Conservation Soc.*, 725 F.3d 940, 947 (9th Cir. 2013) (citation omitted & alteration in original).  That is, there must be a "causal connection" between the conduct by plaintiff alleged to support this defense and the rights for which the plaintiff seeks a remedy.  *See TMF Trustee Ltd. v. M/T Megacore Philomena*, 792 F. App'x 472, 475 (9th Cir. 2019) (rejecting that plaintiff's "unclean hands in securing the ship's arrest" prevented it from seeking

---

[11] Even if there were, Defendants would still have no need for the antitrust-specific discovery they seek, such as discovery into, *e.g.*, "market share" (RFP 22), barriers to entry (RFP 27) or the "interchangeability" of 2.5 GHz spectrum (RFP 29).

18

remedies for missed loan payments, because the defendant "has not shown that the arrest caused its later failure to make the maturity payment"); *Ins. of Cetacean Research*, 725 F.3d at 947 (no direct link between a plaintiff's own violations of law and its assertion of "the rights to safe navigation and protection from pirate attacks" because "Cetacean has done nothing to acquire th[ose] rights," they rather "flow automatically from customary international law and treatises"); *see also Jaramillo v. County of Orange*, 200 Cal. App. 4th 811, 820-21 (Cal. App. 2011) (because the focus of unclean hands is "specifically whether the unclean hands affected the transaction at issue," a plaintiff's alleged misconduct was not "related to" his wrongful discharge because he "was not fired because of" the misconduct alleged). It defies law and logic to suggest that any purported anticompetitive conduct by T-Mobile *caused* Defendants' fraud in any sense, much less in the specific 11 transactions for which T-Mobile seeks damages. *E.g.*, *LifeScan*, 2024 WL 1007845, at *11.

Nor is "anticompetitive conduct" relevant to damages. Defendants assert that "discovery concerning anticompetitive conduct" is relevant "to determine its effect on the value of these licenses." Joint Stip. 11. Defendants' arguments about the discoverability of valuations fail for the reasons explained below in Issue 2. It also makes no difference whether antitrust discovery is sought in support of an affirmative defense like unclean hands or a defense that negates an element of a claim. The thrust of WCO's argument is the same. *See Medimpact Healthcare Sys. Inc. v. IQVIA Inc.*, 2022 WL 126307, at *3 (S.D. Cal. Jan. 13, 2022) (rejecting arguments that discovery into a product other than the product at issue in the plaintiff's complaint went to plaintiff's damages or unclean hands).

### 3. Defendants' Procedural Argument is Meritless

With nowhere to turn on the merits, Defendants resort to procedure. They argue that because T-Mobile did not move to strike Defendants affirmative defenses

in the spring of 2025, T-Mobile cannot now object to any discovery into them.

Motions to strike have been described as "time wasters" and "disfavored." *E.g.*, *Stewart v. Wachowski*, 2004 WL 5618386, at \*2, \*5 (C.D. Cal. Sept. 28, 2004) (citation omitted). That is especially true where a party takes the "'kitchen sink' approach to affirmative defenses," as WCO did here, alleging every possible "defense" regardless of whether they are true affirmative defenses, as opposed to defenses that negate an element of a claim or merely restate a claim. *See Miles v. Kirkland's Stores, Inc.*, 2018 WL 10879443, \*2-3 (C.D. Cal. Sept. 12, 2018); Ex. 15, ECF 132 at 50-53. Parties are not put to the choice of having to move to strike every inapplicable defense at the outset of a case, and courts are likewise not put to the burden of adjudicating such motions. *See id.* at \*3 ("find[ing] itself in accord with other district courts that have questioned the utility of such motions" and denying motion to strike improperly plead affirmative defenses); *FTC v. AMG Servs., Inc.*, 2014 WL 5454170, at \*10 (D. Nev. Oct. 27, 2014) (explaining that if discovery was sought on "affirmative defenses that fail as a matter of law, the court will apply Rule 26 in light of an appropriate discovery motion").

None of Defendants' cases support the proposition that T-Mobile had to file a disfavored Rule 12(f) motion, while briefing on WCO's (soon to be twice-dismissed) counterclaims was ongoing, and while antitrust discovery was stayed, in order to challenge these discovery requests as irrelevant, overly broad, and disproportionate to the needs of this case.[12]

---

[12] As for *United States v. Real Prop. & Improvements Located at 2366 San Pablo Ave., Berkeley, Cal.*, 2014 WL 2126912, at \*3 (N.D. Cal. May 22, 2014), Defendants cite a discussion regarding admissions, not RFPs, which thus says nothing about the proportionality of ordering expansive antitrust discovery in a case with no antitrust claims and a stay of antitrust discovery, and in any event the court found the discovery relevant to "a number of other issues." *Big City Dynasty v. FP Holdings, L.P.*, 336 F.R.D. 507, 512-513 (D. Nev. 2020) rejected that the party's mere intent to file a dispositive motion on the defense sufficed to show lack of relevance, whereas here the merits of the "anticompetitive conduct" that Defendants allege has been

20

\* \* \*

At bottom, Defendants ask the Court to order expansive antitrust discovery in a case with no antitrust claims.  They cite no similar case in which such discovery was compelled, and for all of the reasons set forth above the Court should not break new ground here.

**ISSUE IN DISPUTE NO. 2: DISCOVERY RELEVANT TO T-MOBILE'S DAMAGES**

| Issue in Dispute | WCO's  Proposed Resolution |
| --- | --- |
| Discovery Relevant to T-Mobile's Damages | Order Plaintiffs to conduct a reasonable search for documents responsive to RFP Nos. 20, 24, 37-39. |

T-Mobile has refused to produce certain documents in response to Requests for Production Nos. 20, 24, 37-39 on the basis that "T-Mobile's valuation and pricing of Licenses is both a trade secret and unrelated to T-Mobile's claims or Defendants' defenses thereto." WCO contends that these Requests are relevant to damages, which is based on the difference between the fair market value of each license and the price at which T-Mobile acquired it. RFP No. 24 is exemplary. The complete list of RFPs and Plaintiffs' responses and objections follows the Parties' argument as Appendix A:

> **REQUEST NO. 24:** All Documents and Communications relating to the current or projected value of T-Mobile's spectrum License access, including all Licenses that you own or that are subject to a Lease Agreement with T-Mobile.

> **RESPONSE TO REQUEST NO. 24:** T-Mobile incorporates its General Objections and Objections to Definitions and Instructions set forth above, including in particular its Objection

extensively litigated and rejected.  And in *City of New York v. FedEx Ground Package Sys., Inc.,* that court said it would not bar "discovery that is relevant to a defense that was not struck" in reference to defenses that had been challenged and *upheld* in a prior motion.  2016 WL 1718261, at \*6 (S.D.N.Y. Apr. 27, 2016).

21

to the Definition of "License." T-Mobile objects to this Request as overly broad, unduly burdensome, not relevant to the claims or defenses, and not proportional to the needs of the case, including because this Request (1) purports to seek Documents and Communications relating to "spectrum License access" distinct from Licenses that T-Mobile owns or are subject to a Lease Agreement with T-Mobile; and (2) impermissibly seeks discovery on Defendants' Amended Counterclaims. T-Mobile objects to the Requests to the extent they purport to require T-Mobile to produce trade secret information. T-Mobile's valuation and pricing of Licenses is both a trade secret and unrelated to T-Mobile's claims or Defendants' defenses thereto. T-Mobile will not produce such trade secret information. T-Mobile further objects to this Request to the extent it seeks documents protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, or any other applicable privileges or immunities. T-Mobile further objects to this Request on the grounds that the Request would be objectionable in the event the Amended Counterclaims survive for all of the foregoing reasons.

Based on the foregoing objections, T-Mobile will not produce documents in response to this Request.

### **WCO's Contentions and Points and Authorities Regarding Issue 2**

T-Mobile has objected to several of WCO's RFPs concerning T-Mobile's valuation of 2.5 GHz licenses on the basis of relevance, and because this discovery purportedly implicates T-Mobile trade secrets. This discovery is plainly relevant to whether T-Mobile has suffered "provable damages" and must be produced. *Com. Union Assur. Co., plc v. Milken*, 17 F.3d 608, 612 (2d Cir. 1994). In a RICO action, damages are compensatory: they must place plaintiffs "in the same position they would have been in but for the illegal conduct." *Id.* Accordingly, the proper measure of damages here is the difference between (1) the price at which T-Mobile purchased the licenses at issue, and (2) the actual or fair market value of those licenses. *See All. Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1240 (1995) (standard measure of damages in a fraud case is the difference in the "actual value" between what the plaintiff paid

22

and received); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994) ("the fraud defendant is not liable for all losses that may occur, but only for those actually suffered").

If the record shows that T-Mobile acquired the licenses *below* their actual market value, then it did not suffer compensable damages under RICO; the discovery is therefore relevant to a core element of T-Mobile's RICO claims (i.e., injury). *See Com. Union*, 17 F.3d at 612 (denying recovery in a RICO claim where plaintiffs had recouped their initial investment and a return on capital). This discovery is also relevant to T-Mobile's assertion that it was forced to pay "artificially inflated prices for EBS licenses." Compl. ¶ 146.

T-Mobile's trade secret objection is also plainly improper. The Court has entered a protective order in this case which allows parties to designate materials as "attorney's eyes only" and expressly contemplates the production of trade secrets. Protective Order § 1(c), ECF No. 205-1. Moreover, T-Mobile's boilerplate objection does not meet its burden to establish that the requested discovery constitutes a trade secret. *See Bluprint Clothing Corp. v. Walmart Inc.*, 2025 WL 1090164, at *3 (C.D. Cal. Apr. 2, 2025) ("conclusory arguments are insufficient to establish that the requested information includes highly confidential documents or trade secrets and is meritorious of confidential status and protection"); *Paulsen v. Case Corp.*, 168 F.R.D. 285, 289 (C.D. Cal. 1996) ("If defendant corporation believes that disclosure of this information might be harmful, it must explain and support its claim, or seek a protective order under Rule 26(c), rather than refuse to produce the documents.").

### **T-Mobile's Contentions and Points and Authorities Regarding Issue 2**

### **1. Background**

As explained above, T-Mobile alleges a kickback scheme. Specifically, T-Mobile alleges that the scheme worked as follows: WCO first negotiated with the licensee and agreed on a price for purchasing the license. Compl. ¶¶ 4, 49, 52a-b.

23

After entering into an NDA with the licensee, Defendants had the licensee execute the CCA and inflated the agreed-upon purchase price by 10% to account for Defendants' kickbacks. *Id.* ¶¶ 3, 52c-d. WCO would send the licensee a sham non-binding, written offer letter—reflecting the amount the licensee was willing to accept *plus* the additional 10% kickback—knowing and intending that the sham offer would be communicated to T-Mobile. *Id.* ¶¶ 3, 52e-f. Finally, the licensee would present the sham, inflated offer to T-Mobile pursuant to the ROFR provision. *Id.* ¶ 3. When T-Mobile matched the sham offers, it unwittingly paid the licensee the 10% kickback that the licensee would pass on to WCO, pursuant to the CCA. *Id.* ¶¶ 3, 52d-e. T-Mobile also alleges that Defendants had no ability or intent to finance the deals for which it made sham offers. *Id.* ¶¶ 3-4, 52, 56. Rather, Defendants' conduct was designed to defraud T-Mobile and "funnel kickbacks from T-Mobile's payments to educational institutions for purchase of EBS licenses to Defendants to support their criminal activities." *Id.* ¶ 5. T-Mobile seeks damages in the form of "overcharges in purchase prices and fees" that it would not have paid but for Defendants' fraudulent and criminal kickback scheme. *Id.* ¶ 102. T-Mobile does not seek any damages that turn on the value of the licenses.

In 2024, Defendants unsuccessfully moved to dismiss T-Mobile's RICO claims based in part on the purported failure to allege a cognizable RICO injury. Ex. 12, ECF 117 at 7. Specifically, they argued the Complaint was deficient because "it neither alleges nor attempts to determine what an objective 'market' price for the licenses would be," which Chief Judge Gee rejected because "[t]here is no such requirement." *Id.* As Chief Judge Gee found, "[a] claim that one was overcharged in a transaction, however, is sufficient to show injury to property." *Id.* (citing *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 976 (9th Cir. 2008)).

Discovery on T-Mobile's claims has confirmed that the scheme in fact operated exactly as T-Mobile alleged. In an internal email, WCO Senior Vice

24

President Roger Jackson internally circulated his "script" for "how I structure the (always on the phone) pitch on the CCA, delivered after the NDA is signed." Ex. 5, WCO 0004863. He laid out eleven points, starting with: "If you accept WCO's offer, you are obligated under your lease's ROFR provision to share the executed agreement with T-Mobile." *Id.* He then explains that WCO "structure[s] all of our EBS deals with a 10% closing costs agreement" to "still get compensated in the event T-Mobile exercises their ROFR." Points 6 through 11 are as follows:

> 6. This means WCO gets a 10% breakup-fee ONLY in the event that T-Mobile exercise their ROFR
> 7. This is **not** a bait & switch - you will still receive 100% of the [offer amount]
> 8. Instead, we are "grossing-up" your offer that offer amount by 10% to [gross purchase price]
> 9. In the event that WCO buys the license(s) we will pay you the **full** amount of the [gross purchase price]
> 10. In the event that T-Mobile exercise their ROFR, they will pay you the **full** amount of the [gross purchase price], and then WCO will invoice you for the 10% closing costs agreement
> 11. Next steps are for me to send you the Closing Costs Agreement and the (unsigned) Formal Offer.

*Id.* (emphasis & brackets in original). In another email, Jackson reiterated that the "initial offer is always **Net** $ number they'd receive **after** WCO's 10%." Ex. 4, WCO 0012031 (emphasis in original). And "[w]e explain" to the licensee that "the 10% Closing Costs Agreement . . . won't impact the existing Net number since now we're 'grossing up' the original offer by 10%." *Id.*

Discovery thus far also supports T-Mobile's allegations that WCO had no ability or intent to make good on these sham offers. For example, in a pitch to a potential investor for a "proof of funds," Jackson explained: ***"The most important element to understand is that for the 'proof of funds' we're seeking, there won't ever be a capital call."*** Ex. 6, WCO 0007554 (emphasis added).

25

WCO's dealings with licensees unfolded as Jackson explained. For example, with respect to the Owasso transaction, on July 1, 2021, WCO sent Owasso an initial offer for $4,859,000. Ex. 1, Owasso SD 456. On July 19, 2021, Owasso and WCO executed an NDA. Ex. 2, Owasso SD 270. And on July 23, 2021, WCO sent Owasso the CCA and a second offer—which it expressly described as a "formal offer *in Gross amount* of $5,398,889." Ex. 3, WCO 0005432 (emphasis added). In that email, Jackson explained: "[a]s discussed, once the CCA is signed . . . we will then immediately sign (execute) the *unsigned* License Purchase Offer," at which point he directed Owasso to "notify your lessee of the WCO offer" and trigger T-Mobile's decision as to "whether to exercise their Right of First Refusal and match the WCO purchase price." *Id.* (emphasis in original).

In their RFPs, Defendants seek broad discovery into T-Mobile's valuation of licenses. Specifically, Defendants seek: (i) "analysis, calculation, or estimate or the actual or potential value or price of any License," including "the market price . . . under competitive market conditions," and analyses of how the "value or price" would change if "AT&T, Verizon or Google sought to acquire such licenses" (RFP 20); (ii) "the current or projected value of T-Mobile's spectrum License access" (RFP 24); (iii) "profits or potential profitability" of any transaction with any licensee (RFP 37); (iv) "all funding sources" available to T-Mobile (RFP 38); and (v) estimates of "payment obligations on" any "forthcoming" leases (RFP 39).[13]

Defendants seek this discovery based on the theory that if T-Mobile "acquired the licenses *below* their actual market value, then it did not suffer compensable damages under RICO." Joint Stip. 22-23. That is, Defendants contend that they were free to engage in a fraudulent scheme to funnel kickbacks to themselves as long as their fraudulent offers did not drive the price of the licenses above market value. T-Mobile's position is simple: its damages are the overcharges T-Mobile paid that it

---

[13] RFPs 24 and 38 also overlap with Issue 1. *See* App'x A at 2, 6.

would not have paid but for Defendants' fraudulent scheme, measured by the amount of the commitment costs.  This straightforward damages theory is well-supported in the case law.  *See, e.g.*, *Canyon Cnty.*, 519 F.3d 969 at 976.

### 2. T-Mobile's Valuations Are Irrelevant and Disproportionate to the Needs of This Case.

T-Mobile's valuations of licenses are irrelevant and complex, and discovery into such internal valuations is not proportional to the needs of the case.  T-Mobile seeks overcharge damages, which Chief Judge Gee already has found are compensable irrespective of market value.  *See supra* pp. 24.

In overcharge cases, courts have rejected the argument Defendants advance— that a RICO plaintiff suffers no compensable injury so long as the amount of the overcharge does not exceed market value.  For example, *Amazon.com, Inc. v. WDC Holdings LLC*, Amazon similarly alleged that a fraudulent kickback scheme caused Amazon to pay more for property than it would have absent the kickbacks.  155 F.4th 313, 320-22, 327 (4th Cir. 2025).  Like here, the theory was that the defendants fraudulently misled Amazon into paying inflated prices for property acquisitions, and a percentage of the purchase price was "secretly earmarked" to fund the defendants' kickbacks.  *Id.*  The Fourth Circuit rejected that "Amazon could prove that it overpaid only by first 'establishing the market value of the properties.'"  *Id.* at 327.  Rather, "Amazon has produced sufficient expert evidence from which a jury could conclude that it paid more for these properties than it would have paid absent the kickback scheme.  Proof that Amazon paid above-market prices isn't necessary to create a genuine dispute about whether Amazon overpaid."  *Id.*[14]  California courts

---

[14] While the Fourth Circuit noted that the defendants were free to make arguments about the lack of market value evidence to the jury, *id.* at 327 n.7, it made clear that Amazon's measure of damages was proper.  If above market value is not necessary to prove that a plaintiff overpaid, it necessarily follows that below market value cannot *dis*prove that a plaintiff overpaid.

are in accord.  *See Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 931, 936 (N.D. Cal. Apr. 25, 2013) ("Plaintiffs allege they paid the marked-up fees. Wells Fargo's argument that no 'injury in fact' exists where the charges assessed were within the market rate is not persuasive. A consumer who has been overcharged can claim injury to property under RICO based on a wrongful deprivation of money, which is a form of property." (citing *Canyon County*, 519 F.3d at 976)).

T-Mobile's damages theory is straightforward.  What matters is the amount of the kickback—the "commitment costs" received by WCO.  Or, in WCO's words, the difference between the "*offer amount*"—the amount the licensee agreed to accept, which they "still receive 100% of" under the scheme—and the "*gross purchase price*"—the "offer amount" inflated by 10%.  Ex. 5, WCO 0004863 (emphasis added).  In this case, any purported market value is simply irrelevant.

To suggest otherwise, WCO relies on inapposite cases.  It cherry-picks quotes from two Second Circuit cases that do not remotely support the proposition that T-Mobile suffered no "provable damages" from Defendants' kickback scheme absent above-market-value sales.  In *Commercial Union Assurance Co., plc v. Milken*, an investment fraud case, the defendants had already *paid the plaintiffs back*.  17 F.3d 608, 611-12 (2d Cir. 1994).  Those plaintiffs thus "actually suffered no out-of-pocket loss since their investments were fully repaid, plus interest."  *Id.* at 609.  *First Nationwide Bank v. Gelt Funding Corp.*, which involved fraudulently procured loans, similarly turned on whether "the borrower repaid the loan in full with interest."  27 F.3d 763, 767-68 (2d Cir. 1994).  Claims based on "unforeclosed loans" were therefore not ripe because any "actual loss" was not yet clear (but as to foreclosed loans, injury was apparently undisputed, *see id.* at 767).  *Id.*  Finally, *Alliance Mortgage Co. v. Rothwell*, 10 Cal. 4th 1226, 1240 (1995) stands for the unremarkable proposition that common law fraud damages are typically measured by out-of-pocket losses.  Even under Defendants' formulation, the "actual" value of the licenses here

28

would be the amounts at which the licensees and WCO agreed to transact *without* the kickback.  *See Bias*, 942 F. Supp. 2d at 943-44 (finding fraud claim premised on injury from undisclosed "mark-up costs" sufficiently pled under California law).

Discovery into T-Mobile's valuations is thus non-responsive to its damages theory (and any response to it by Defendants).  Additionally, regardless of the protective order's governance of trade secrets, T-Mobile's valuation methodology remains highly sensitive and competitive business information.  A protective order is not a license to probe sensitive and proprietary business information that has no relevance to the claims in the case.  *See Cacique, Inc. v. Robert Reiser & Co., Inc.*, 169 F.3d 619, 622-23 (9th Cir. 1999) (explaining that "[a] protective order's 'purpose . . . is to prevent harm by limiting disclosure of *relevant and necessary* information'" and finding that discovery into an inapplicable damages theory was an abuse of discretion (citation omitted) (emphasis in original)).  This discovery would be a resource-intensive, unduly burdensome side show into an irrelevant theory untethered to the damages T-Mobile actually seeks.  T-Mobile's internal valuations are complex in light of the unique nature of this asset and would inevitably lead to further fact and expert discovery to understand and explain them.  Defendants also seek expansive discovery into T-Mobile's funding sources, payment obligations, and budgeting materials which impose tremendous additional burdens to locate outside of custodial searches and review.  Rule 26 does not permit such broad discovery in service of an irrelevant distraction.

At bottom, WCO's argument is that a plaintiff has no recourse for having been defrauded into funding an illegal kickback scheme so long as the kickbacks did not drive the price of the asset above "market value."  As Judge Gee already has recognized, that is not the law, Ex. 12, ECF 117 at 7; *see also Amazon*, 155 F.4th at 326-27; *Bias*, 942 F. Supp. 2d at 936, and Defendants' demand for intrusive, disproportionate discovery related to this legally flawed theory should be denied.

29

**ISSUE IN DISPUTE NO. 3: T-MOBILE'S LIMITATION OF ITS
PRODUCTION TO THE LICENSES REFERENCED IN THE
COMPLAINT**

| Issue in Dispute | WCO's Proposed Resolution |
|---|---|
| T-Mobile's refusal to produce documents (including its lease agreements, licenses, licensee communications, and internal lease-enforcement assessments) concerning any license other than those specifically referenced in the Complaint | Order Plaintiffs to (1) produce all 2.5 GHz spectrum lease agreements (RFP No. 2) and licenses (RFP No. 3) in their possession, custody, or control on a "go-get" basis; (2) conduct a reasonable search for documents responsive to RFP Nos. 6-15, 17, 40, and 49 as to all of T-Mobile's 2.5 GHz licenses and leases, not merely those referenced in the Complaint. |

T-Mobile has confined its production across these Requests to the eleven transactions identified in Appendix A to the Complaint. It has agreed to collect its leases and licenses (RFP Nos. 2 and 3) only as to the licenses specifically referenced in the Complaint and will produce documents concerning other licenses (RFP Nos. 6-15, 17, 40, and 49) only "to the extent they hit on T-Mobile's search terms," which T-Mobile acknowledges are themselves largely limited to the licenses identified in the Complaint. RFP No. 2 is exemplary. The complete list of RFPs and Plaintiffs' responses and objections follows the Parties' argument as Appendix A:

> **REQUEST FOR PRODUCTION NO. 2.** Copies of each License held by or leased to T-Mobile during the Relevant Time Period.

> **RESPONSE TO REQUEST FOR PRODUCTION NO. 2.** T-Mobile incorporates its General Objections and Objections to Definitions and Instructions set forth above, including in particular T-Mobile's Objections to the Definitions of "Lease Agreements" and "Licensee." T-Mobile further objects to this Request as overly broad, unduly burdensome, not relevant to the claims or defenses, and not proportional to the needs of the case, including because (1) the Request seeks production of "[a]ll draft and final Lease Agreements between" T-Mobile "and any

30

Licensee," and most of those documents have no relevance to T-Mobile's claims and Defendants' defenses thereto; and (2) the Request impermissibly seeks discovery related to Defendants' Amended Counterclaims. T-Mobile further objects to this Request to the extent it seeks documents protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, or any other applicable privileges or immunities. T-Mobile further objects to this Request on the grounds that the Request would be objectionable in the event the Amended Counterclaims survive for all of the foregoing reasons. Subject to the foregoing Specific and General Objections and without waiver of any objection, T-Mobile responds that it will produce the final Lease Agreements between T-Mobile and Licensees identified on Appendix A to or otherwise referenced in T-Mobile's Complaint.

## **WCO's Contentions and Points and Authorities Regarding Issue 3**

First, these Requests are relevant to WCO's unclean hands defense. WCO alleges that T-Mobile maintains monopsony control over the nation's 2.5 GHz spectrum through exclusive lease agreements that contain rights of first refusal, transfer restrictions, and other exclusionary provisions that T-Mobile uses to suppress competition for the purchase of spectrum licenses and to keep lease rates artificially low. *See* Defs.' Ans., ECF No. 132 at 52. WCO's allegations are not confined to the eleven transactions identified in Appendix A to the Complaint. The terms of T-Mobile's leases, T-Mobile's communications with licensees concerning lease terms and potential sales, including efforts to discourage transactions with potential purchasers, are direct evidence of that scheme. Also, for the reasons stated as to Issue 1, *supra*, T-Mobile's disagreement with the merits of a defense it never moved to strike is not a basis for withholding relevant discovery.

Second, unclean hands defense aside, the Court indicated during the July 15 hearing that it may allow discovery into all of T-Mobile's leases—not just those T-Mobile asserts are at issue in the RICO action—so that the Court can assess the exclusionary impact of those leases on the market. *See* July 15, 2026 Hr'g Tr. at

31

37:20-38:9; 48:13-49:1. Accordingly, this discovery is appropriate regardless of WCO's unclean hands defense.

Finally, these materials are relevant to causation. T-Mobile alleges that it was "forced" to match WCO's offers and exercise rights of first refusal in order to preserve its access to 2.5 GHz spectrum. But WCO placed bids on hundreds of licenses, and T-Mobile exercised its ROFR as to only a handful of them. In other instances, T-Mobile instead enforced exclusivity provisions in its leases to block sales to WCO, threatened or initiated litigation, or simply declined to act. If T-Mobile could have protected its spectrum access by enforcing its lease agreements—as it did in several other instances—rather than by purchasing the at-issue licenses, that undermines T-Mobile's theory that WCO's alleged misrepresentations caused it to exercise its ROFRs and incur the claimed damages. Defendants are entitled to discovery concerning T-Mobile's other leases and licenses to test whether WCO's purported misrepresentations "forced" T-Mobile to exercise its ROFRs, or whether T-Mobile's decisions were driven by other factors.[15]

### T-Mobile's Contentions and Points and Authorities Regarding Issue 3

Defendants seek expansive discovery into all aspects of T-Mobile's relationships with more than 1,000 licensees that have nothing to do with the overcharge damages T-Mobile seeks based on a limited set of transactions with 11 licensees, or any purported "unclean hands" defense related to the at-issue transactions.[16] As to 1,000+ leasing relationships, Defendants seek, *e.g.*, (i) all final

---

[15] Nor can T-Mobile credibly contend that discovery across its license portfolio is disproportionate to the needs of the case. T-Mobile has itself demanded the collection and processing of more than 400,000 documents from Defendants spanning every offer WCO ever made to any EBS licensee. Thus, T-Mobile's own discovery demands foreclose any argument that market-wide discovery is unduly burdensome in this case.

[16] In a footnote, Defendants state that "T-Mobile has itself demanded the collection and processing of more than 400,000 documents from Defendants spanning every

32

and draft leases, most of which are decades old (RFP 2); (ii) all licenses (RFP 3); (iii) all payments made under all leases (RFP 6); (iv) all communications regarding all leases (RFP 6); (v) all communications "related to Your relationship with any Licensee" (RFP 7); (vi) considerations regarding "whether to acquire" any license (RFP 8); (vii) whether to exercise a ROFR in connection with any offer by anyone (RFP 9); (viii) offers made by anyone (RFP 10); and (ix) T-Mobile's "actual or considered acquisition" of any license and the "effect of any such acquisition" (RFP 13).

At the threshold, Defendants make the sweeping assertion that 15 separate RFPs are "relevant to WCO's unclean hands defense," citing zero case law and making no argument about any particular category of information sought. *See* Joint Stip. 31. As the parties seeking to compel discovery, Defendants bear the burden to establish relevance and proportionality. *Nosirrah Mgmt., LLC v. Franklin Wireless Corp.*, 2022 WL 1667048, at *3 (S.D. Cal. May 25, 2022). They fail that burden, as they "have not endeavored to set forth arguments as to just how the information requested even advances an unclean hands defense," which alone warrants denial. *See id.*

Defendants also are wrong that "relatedness" under unclean hands is assessed by reference to what "*WCO* alleges," as opposed to what *T-Mobile* alleges. Joint Stip. 31. As discussed, unclean hands must "[]relate to the claim as to which it is asserted as a defense," *Jarrow*, 304 F.3d at 841, and there must be a "causal connection" between T-Mobile's claims for overcharge damages and the conduct that purportedly bars that relief, *TMF*, 792 F. App'x at 475. T-Mobile seeks damages

offer WCO ever made to any EBS licensee." They misleadingly suggest that *T-Mobile* "demanded" that Defendants search the names of hundreds of licensees. That is false. *Defendants* affirmatively proposed those terms. Ex. 18. They did so presumably so that they could demand symmetrical discovery from T-Mobile and cry foul when T-Mobile inevitably (and reasonably) objected.

33

based on 11 transactions.  As to those licenses and leases, T-Mobile has agreed to produce the requested discovery.  What Defendants seek is far broader, as explained above.  Courts routinely deny discovery in support of unclean hands defenses where the requested discovery exceeds the transactions that the plaintiff put at issue.  For example, in *Medimpact Healthcare Sys., Inc. v. IQVIA Inc.*, the plaintiffs alleged that defendants misappropriated trade secrets from one platform, and the defendant sought discovery into a separate platform as well as plaintiffs' alleged own theft of trade secrets in purported support of an unclean hands defense.  2022 WL 126307, at *2-3 (S.D. Cal. Jan. 13, 2022).  The court refused to order discovery into the second platform, which "is neither named nor referenced" in the complaint and as to which the plaintiffs are "not seeking any damages." *Id.* at *3.  And it refused to order discovery into the plaintiffs' alleged theft because "[t]his discovery does not arise out of the claims raised in Plaintiffs' FAC." *Id.* at *14.[17]

---

[17] *See also Surefire, LLC v. Jetbeam USA*, 2014 WL 1512983, at *2 (S.D. Cal. Apr. 16, 2014) (finding that "[e]ven if arguably relevant to the affirmative defense of unclean hands," RFPs that "are not limited in time or to products manufactured incorporating the patents-in-suit" are "overbroad on their face"); *Strategic Partners, Inc. v. FIGS, Inc.*, 2020 WL 4354172, at *8 (C.D. Cal. May 18, 2020) (denying discovery into plaintiff's products, because "[a]n unclean hands defense, therefore, would allow for discovery *as to the controversy at issue*, which here, only concerns FIGS's representations and advertising about its antimicrobial products, not [plaintiff's] products or advertising." (emphasis in original)); *ACON Labs., Inc. v. Alltests Clinical Sols. LLC*, 2024 WL 947813, at *5 (S.D. Cal. Jan. 5, 2024) (denying motion to compel where the alleged misconduct "did not directly affect [the plaintiff's] damages.  ACON's alleged damages derive from two shipments unpaid by Alltests.  ACON prioritizing third-party distributors' orders over Alltests' does not directly relate to payment for the two shipments that Alltests allegedly owes ACON."); *Winiadaewoo Elecs. Am., Inc. v. Opta Corp.*, 2018 U.S. Dist. LEXIS 121121, *5-6 (N.D. Cal. July 19, 2018) (denying motion to compel because "in order for the interrogatory to be relevant to Defendant's unclean hands defense, 'the misconduct that brings the [un]clean hands doctrine into play must relate directly to the cause at issue.  Past improper conduct or prior misconduct that only indirectly affects the problem before the court does not suffice'" (quoting *Kendall-Jackson*

34

To be clear, T-Mobile is not limiting its production *only* to documents that reference the 11 at-issue transactions.  For example, T-Mobile has agreed to many broad search terms that are not limited to the specific transactions at issue, such as "WCO" (and each Defendant's name) and produce responsive, non-privileged documents irrespective of whether they relate to the transactions listed in Appendix A to the Complaint.  Ex. 19, May 22 Ltr at 2 n.2; Defs. Ex. 4 at 3.  Defendants want T-Mobile to go beyond those broad terms and also search for documents using terms specific to 1000+ licensees—irrespective of whether they relate to WCO or any other Defendant.  Ex. 23, July 23 Email.  This additional discovery would drastically increase T-Mobile's burden and present no marginal benefit.  It amounts to no more than "a fishing expedition to discover[] support for a conclusory unclean hands defense" that, as to transactions outside the 11 at issue, is barred as a matter of law. *See Strategic Partners*, 2020 WL 4354172, at *9 (denying unclean hands discovery into "thousands of documents related to many of [plaintiff's] products and advertising related to those products" on proportionality grounds); *Nosirrah*, 2022 WL 1667048, at *3 ("Because the discovery has no relevance, virtually any burden to Plaintiff would result in the discovery being overly burdensome.").

As for WCO's suggestion that the Court is inclined to order discovery of the leases, WCO misrepresents the July 15 hearing.  At that hearing, the Court *asked* WCO how it would amend *if* the Court granted leaves to do so, and WCO responded that it would seek pre-amendment discovery of the leases.  Ex. 21, Tr. 37:20-38:9.[18] The Court did not express one way or another how it intended to rule on that issue.

*Winery*, 76 Cal. App. 4th at 979)).

[18] As explained in T-Mobile's supplemental motion to dismiss brief, the Ninth Circuit has rejected the idea that "courts retain discretion to permit discovery whenever a plaintiff has failed to satisfy Rule 8's plausibility standard" because "it is simply incompatible with *Iqbal* and *Twombly*."  Ex. 24, ECF 247 at 8 (quoting *Mujica v. AirScan Inc.*, 771 F.3d 580, 593 & n.7 (9th Cir. 2014)).

35

That Defendants make this argument only goes to show that the true purpose of this motion is to fish for discovery in an effort resuscitate their futile antitrust claims.

Finally, discovery into all 1,000+ 2.5 GHz spectrum leases and licenses is not relevant to causation.  Defendants argue that "if T-Mobile could have protected its spectrum access by enforcing its lease agreements" to block these sales instead of exercising ROFRs, that "undermines T-Mobile's theory" of the case.  Joint Stip. 32.  This is a remarkable assertion given that Defendants simultaneously are claiming that efforts to enforce T-Mobile's lease agreements violated the antitrust laws.  Defendants' position thus appears to be that because T-Mobile could have engaged in purportedly anticompetitive conduct to thwart Defendant's kickback scheme, Defendants somehow did not cause any harm.  That makes no sense, and it is wholly unsupported by citation to any law.[19]

## ISSUE IN DISPUTE NO. 4: THE RELEVANT TIME PERIOD FOR T-MOBILE'S PRODUCTION

| Issue in Dispute | WCO's  Proposed Resolution |
| --- | --- |
| T-Mobile's limitation of its search and production to the period January 1, 2020 through December 31, 2023 | Order Plaintiffs to search for and produce responsive documents for the period January 1, 2020 through the present. |

T-Mobile has limited its search for responsive documents to the period beginning January 1, 2020 and ending December 31, 2023. WCO contends that documents post-dating 2023 are relevant to both its unclean hands defense and to the calculation of T-Mobile's alleged damages.  Thus, T-Mobile's time limitation improperly excludes relevant evidence across all of WCO's Requests.

---

[19] For the same reasons as explained herein, the many third-party subpoenas Defendants have served on licensees outside of the 11 that engaged in the at-issue transactions (as well has the three others discussed in the Complaint) are improper.

36

**WCO's Contentions and Points and Authorities Regarding Issue 4**

WCO's unclean hands defense is not limited to conduct predating the Complaint. "[U]nclean hands concerns the far broader question of a party's misconduct in the matter," including a party's ongoing conduct in relation to the controversy. *Kendall-Jackson Winery*, 76 Cal. App. 4th at 986. WCO alleges that T-Mobile's anticompetitive scheme to maintain monopsony control over 2.5 GHz spectrum is ongoing. T-Mobile continues to enforce its web of exclusive leases, suppress competing demand for licenses, and prevent educational institutions from realizing the market value of their spectrum assets. T-Mobile's continued conduct in relation to this matter is squarely relevant to the defense, and a December 31, 2023 cutoff is arbitrary.

Moreover, the present value of the at-issue licenses is relevant to the proper measure of damages. In a RICO action, damages must place plaintiffs "in the same position they would have been in but for the illegal conduct." *Com. Union*, 17 F.3d at 612. If the licenses T-Mobile acquired are now worth more than what T-Mobile paid for them, T-Mobile may not both retain that appreciation and recover damages from Defendants measured as if the licenses were worthless overpayments. *See id*.; *King v. Wang,* 2021 WL 5403871 (S.D.N.Y. Nov. 17, 2021) (rejecting RICO damages theory that would "giv[e] a putative victim who was out of pocket virtually nothing a windfall recovery"). Post-2023 documents are necessary to establish the licenses' present value.

T-Mobile's argument that its own claims are "predicated on conduct occurring before this lawsuit was filed" misses the point. The post-2023 discovery WCO seeks is relevant to WCO's defenses and to damages – not to the dates of the predicate acts T-Mobile alleges in support of its own claims.

**T-Mobile's Contentions and Points and Authorities Regarding Issue 4**

This Court already has ruled, in response to T-Mobile's motion to compel, that

37

"the end-date of the relevant time period shall be December 31, 2023." Ex. 22, ECF 243 at 1. And for good reason. The conduct described in the Complaint does not extend past June 2023. *See generally* Compl. Defendants have also maintained that WCO ceased operations on October 31, 2023, though with Gary Winnick's death in November 2023 it continued winding up its affairs until the end of the year.

As explained, unclean hands requires a "causal connection" between the conduct forming the defense and the relief T-Mobile seeks. *TMF*, 792 F. App'x at 475. As such, nothing that occurred *after* T-Mobile acquired the rights it asserts in this lawsuit can constitute unclean hands, because T-Mobile's "claims, and injuries, were *complete* by the time of any purported misconduct." *See Brewster v. City of Los Angeles*, 672 F. Supp. 3d 872, 1004 (C.D. Cal. May 9, 2023) (emphasis in original). *Kendall-Jackson Winery* is not to the contrary. Indeed, courts have cited that case for the proposition that when "purported misconduct transpired *after* Defendants' unlawful[]" conduct, "there is no 'direct relationship between the misconduct and the claimed injuries.'" *Id.* (second quoting *Kendall-Jackson Winery*, 76 Cal. App. 4th at 979) (emphasis in original).

Defendants are also wrong that the present value of the licenses is relevant to damages. Indeed, their own authority disproves their argument: "present value damages" are not available under RICO. *See King v. Wang*, 2021 WL 5403871, at *5-7 (S.D.N.Y. Nov. 17, 2021) (rejecting a RICO claim for "appreciation damages"); *see also All. Mortgage*, 10 Cal. 4th at 1240 (fraud damages are measured "at the time of the transaction"). Any discovery into present value is thus necessarily irrelevant and disproportionate to the needs of the case. Nor is *Commercial Union* on point for the reasons explained *supra* pp. 28. December 31, 2023 is the date the Court ordered for Defendants' discovery responses, *see* Ex. 22, ECF 243 at 1, and Defendants have articulated no reason why that date should not be reciprocal.

38

DATED: August 7, 2026

Respectfully Submitted,

/s/
**EDELSON PC**
Brandon Baum-Zepeda* (SBN 352698)
1255 Union St NE, Suite 850
Washington, DC 20002
Tel: (202) 270-4777
Email: bbaum-zepeda@edelson.com
*Barred only in California. Practice limited to matters authorized by D.C. Rule 49(c)(3)

Natasha Fernández-Silber (*pro hac vice*)
200 South 1st Street
Ann Arbor, MI 48104
Tel: (312) 589-6370
Email: nfernandezsilber@edelson.com

**BERGER MONTAGUE PC**
Patrick F. Madden (*pro hac vice*)
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3035
Email: pmadden@bergermontague.com

*Counsel for WCO Spectrum LLC*

**MITTS LAW, LLC**
Maurice R. Mitts (*pro hac vice*)
1822 Spruce Street
Philadelphia, PA 19103
Tel: (215) 866-0112
Email: mmitts@mittslaw.com

*Counsel for Defendants*

39

Dated:  August 7, 2026

Respectfully submitted,

By: */s/ Jeffrey A. Rosenfeld*
ALSTON & BIRD LLP
Jeffrey A. Rosenfeld (#136896)
jeffrey.rosenfeld@alston.com
Jesse Steinbach (#278923)
jesse.steinbach@alston.com
Brooke Bolender (#340689)
brooke.bolender@alston.com
350 South Grand Avenue, 51st Floor
Los Angeles, CA 90071
Telephone: (213) 576-1143

WILLIAMS & CONNOLLY LLP
Kenneth J. Brown*
kbrown@wc.com
Jonathan B. Pitt*
jpitt@wc.com
William P. Ashworth*
washworth@wc.com
R. Kennon Poteat III*
kpoteat@wc.com
Kathryn E. Hoover*
khoover@wc.com
Ilana B. Frier*
ifrier@wc.com
Camille Wyss*
cwyss@wc.com
680 Maine Avenue, SW
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

KLEINBARD LLC
Steven J. Engelmyer*
sengelmyer@kleinbard.com
Three Logan Square
1717 Arch Street, 5th Floor

40

Philadelphia, PA 19103
Telephone: 215-568-2000

*admitted *pro hac vice*

*Attorneys for Plaintiffs*

41

## **LOCAL RULE 5-4.3.4(a)(2)(i) CERTIFICATION**

The filer of this document attests that all other signatories listed above on whose behalf this filing is submitted concur in the filing's content and have authorized the filing.

*/s/ DRAFT*

42