UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | 2:23-cv-04347-AH-Ex | Date | October 19, 2026 |
| Title | *T-Mobile US, Inc. et al. v. WCO Spectrum LLC et al.* | | |

| | |
|---|---|
| Present: The Honorable | Anne Hwang, United States District Judge |

| | |
|---|---|
| Yolanda Skipper | Not Reported |
| Deputy Clerk | Court Reporter |
| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
| None Present | None Present |

**Proceedings: (IN CHAMBERS) ORDER GRANTING MOTION TO DISMISS FIRST AMENDED COUNTERCLAIMS (DKT. NO. 224)**

Before the Court is a Motion to Dismiss the First Amended Counterclaims ("Motion") filed by Plaintiffs and Counter-Defendants T-Mobile US, Inc.; Clearwire Spectrum Holdings LLC; Clearwire Spectrum Holdings II LLC; Clearwire Spectrum Holdings III LLC; Fixed Wireless Holdings LLC; NSAC LLC; TDI Acquisition Sub LLC; and WBSY Licensing LLC (collectively, "T-Mobile"). Dkt. No. 224. Defendant and Counter-Claimant WCO Spectrum LLC ("WCO") filed an Opposition. Dkt. No. 227. T-Mobile filed a Reply. Dkt. No. 228. The Court heard oral argument on July 15, 2026, after which the Court permitted the parties to file supplemental briefing. T-Mobile filed a supplemental brief.[1] Dkt. No. 247. WCO filed a supplemental brief in response. Dkt. No. 255. For the following reasons, the Court GRANTS the Motion.

[1] T-Mobile filed the supplemental brief as a Motion to Supplement Brief, which the Court grants. Dkt. No. 247. T-Mobile also filed an ex parte application for leave to file a Reply to WCO's supplemental brief, along with the proposed Reply. Dkt. No. 267. WCO opposed the ex parte application. Dkt. No. 268. The Court grants the request and considers the proposed Reply in the interest of judicial economy and efficiency, without reaching whether good cause exists.

# I. BACKGROUND[2]

The parties are familiar with the factual background of this case, which the Court previously set forth in its prior Order on T-Mobile's motion to dismiss the original Counterclaims. *See* Order Granting Mot. to Dismiss ("Order") at 2-3, Dkt. No. 187. The Court incorporates the factual background and summarizes the relevant allegations from the FACC for the purposes of the instant Motion below.

WCO alleges T-Mobile holds monopsony power in the market for 2.5 GHz spectrum rights in the United States. FACC ¶ 1. WCO alleges T-Mobile has exclusive control over roughly 85% of all 2.5 GHz spectrum including exclusive access to more than 1,700 out of approximately 2,200 total Educational Broadband Service ("EBS") 2.5 GHz spectrum licenses via lease contracts with EBS license holders or outright ownership. *Id.* ¶¶ 9, 11, 50, 113. WCO alleges T-Mobile engages in three types of anticompetitive conduct: (1) entering into long-term leases with "exclusionary" provisions, including exclusivity, right of first refusal ("ROFR"), right to participate, and confidentiality provisions; (2) pursuing and threatening "sham litigation" against license holders; and (3) acquiring hundreds of licenses for T-Mobile's exclusive use. *Id.* ¶¶ 1-2, 112, 140. WCO alleges T-Mobile's conduct has excluded WCO from the market, reduced competition in the market for 2.5 GHz spectrum license rights, and foreclosed other 5G service providers from using the 2.5 GHz spectrum, resulting in suppressed prices for license holders and lower quality service and increased prices for wireless consumers. *Id.* ¶¶ 4, 17, 202, 210-11.

WCO alleges it placed offers on 936 EBS licenses, but T-Mobile exercised its ROFR to acquire 69 of these EBS licenses and allegedly "blocked some 857" other proposed sales "using other anticompetitive tactics." *Id.* ¶¶ 13, 186. WCO alleges many of T-Mobile's leases contain an exclusivity provision that prohibits the sale of the license to any third party before a certain period, while some other leases contain an exclusivity provision that prohibits the sale or assignment of the license to any competitor of T-Mobile in telecommunications services. *Id.* ¶¶ 118, 122. WCO identifies two instances in which T-Mobile invoked a lease's exclusivity provision to prevent a sale or assignment of a license to WCO: Christian College of Georgia and Lorain County Community College. *Id.* ¶¶ 120-

[2] The following facts are taken from WCO's First Amended Counterclaims ("FACC"). Dkt. No. 218. The Court construes well-pleaded factual allegations as true for the purposes of this Motion.

21. Additionally, WCO identifies approximately 19 license holders who declined to sell their licenses to WCO due to its contractual obligations with T-Mobile or aversion to litigation.[3] *Id.* ¶¶ 142-54.

WCO filed its antitrust counterclaims on March 31, 2025. Dkt. No. 132. T-Mobile moved to dismiss the counterclaims on May 30, 2025. Dkt. No. 149. The Court granted T-Mobile's motion and dismissed the counterclaims with leave to amend on October 31, 2025. Dkt. No. 187. WCO filed the FACC on January 7, 2026. Dkt. No. 218. The FACC brings Counterclaim I for monopsonization under 15 U.S.C. § 2; Counterclaim II for exclusionary agreements under 15 U.S.C. § 1; Counterclaim III for agreements in violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, *et seq.*; and Counterclaim IV for intentional interference with prospective economic advantage under California law. *See generally* FACC. T-Mobile moved to dismiss the FACC on February 25, 2026. Dkt. No. 224.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed because of a "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A dismissal under a 12(b)(6) motion can be based on either a "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged

---

[3] WCO alleges the following 19 license holders declined to sell to WCO: Point Park University; Willwoods; St. Louis Community College; Lackawanna College; South Suburban College; University of Cincinnati; the Board of Education of the Cincinnati City School District; Views on Learning; Sinclair Community College; Wright State University; Dayton Educational TV; Bishop Kelley High School; Educational Service Center Region 12; Clark County School District; California Human Development Corporation; Northwest Florida State College Board; Wilkes University; Albright College; and St. Lucie School Board. FACC ¶¶ 142-54, 174, 177. WCO does not specify how many licenses these license holders collectively owned. T-Mobile represents that WCO identifies 16 license holders that collectively owned 25 licenses, which WCO does not dispute. Mot. at 13. The Court also notes WCO's allegation that counsel for "license holders possessing 76 combined 2.5 GHz licenses, including Bishop Kelly High School," expressed concerns over the lease terms. FACC ¶ 150. Drawing reasonable inferences in favor of WCO at this stage, the Court presumes that between 25 and approximately 95 licenses were allegedly implicated.

under a cognizable legal theory." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (citation modified). On a 12(b)(6) motion, courts accept as true all well-pleaded allegations of material fact and construe them in a light most favorable to the non-moving party. *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1030-31 (9th Cir. 2008). To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not" suffice. *Id.* (citation modified). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Leave to amend a dismissed complaint should be granted unless it is clear the complaint cannot be saved by any amendment. *See Manzarek*, 519 F.3d at 1031. However, a "district court may dismiss without leave where a plaintiff's proposed amendments would fail to cure the pleading deficiencies and amendment would be futile." *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011). Otherwise, leave to amend shall be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). "The district court's discretion to deny leave to amend is particularly broad where the court has already given the plaintiff an opportunity to amend his complaint." *Fid. Fin. Corp. v. Fed. Home Loan Bank of San Francisco*, 792 F.2d 1432, 1438 (9th Cir. 1986).

## III. DISCUSSION

### A. Request for Judicial Notice

When ruling on a motion to dismiss, a court may consider the allegations contained in the pleadings, materials attached to or referenced in the complaint, and matters properly subject to judicial notice. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Courts may consider "unattached evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." *U.S. v. Corinthian Colleges,* 655 F.3d 984, 990 (9th Cir. 2011) (citation omitted); *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (noting that district courts may consider documents incorporated by reference "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim"). Courts may also take judicial

notice of information "not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see*, *e.g.*, *Bhatia v. Silvergate Bank*, 725 F. Supp. 3d 1079, 1101 (S.D. Cal. 2024) ("[A] court may consider documents properly subject to judicial notice, including the existence of court dockets and filings in related proceedings, . . . [but] cannot take judicial notice of those documents for the truth of any matter asserted therein.").

T-Mobile requests judicial notice of (1) court filings and orders in prior lawsuits it filed against lessor schools, and (2) excerpts from lease agreements between T-Mobile and EBS licensees. Request for Judicial Notice ("RJN"), Dkt. No. 224-2. WCO did not oppose the RJN. In its supplemental brief, WCO also requests judicial notice of additional leases that purportedly include exclusivity clauses. Dkt. No. 255. The FACC refers extensively to multiple provisions in T-Mobile's lease agreements, which are the basis of WCO's antitrust claims. *See*, *e.g.*, FACC ¶¶ 117-36. The FACC also refers extensively to two particular lawsuits, the Albright College lawsuit and the St. Lucie School Board lawsuit, as the basis for its arguments regarding "sham litigation." *See id.* ¶¶ 166-77. The Court takes judicial notice of the existence of the court documents, but not the truth of the matters asserted therein, and additionally finds that the lease agreements as well as the court documents from the Albright College and St. Lucie School Board lawsuits are incorporated by reference into the FACC.

### B. Sherman Act Claims

In its prior Order, the Court set forth the governing legal standards for claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2. *See* Order at 6-9. The Court incorporates the prior Order and addresses the new allegations in the FACC and the arguments raised by the parties with this Motion.

#### 1. <u>Relevant Market</u>

##### *i. Market Definition*

The Court set forth in its prior Order the requirement to define a "relevant market" in order to state a valid claim under both Sections 1 and 2 of the Sherman Act. Order at 20-21; *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) (an antitrust complaint "may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable."). The Court

cited cases indicating that the relevant market in monopsony cases is "comprised of buyers who are seen by sellers as being reasonably good substitutes." *See Todd v. Exxon Corp.*, 275 F.3d 191, 202 (2d Cir. 2001).[4] Whether sellers view certain buyers as "reasonably good substitutes" may affect market definition to the extent that the introduction of new buyers in a market causes sellers to produce alternative, but interchangeable, products to suitable buyers. *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995) (explaining that a reasonable market definition must be based on both "demand elasticity" and "supply elasticity," the latter of which "measures the responsiveness of producers to price increases," such as whether "producers of product X can readily shift their production facilities to produce product Y").

WCO argues the relevant product market is the market for 2.5 GHz spectrum license rights because this mid-band frequency is superior to and not interchangeable with other mid-spectrum bands. FACC ¶¶ 77-79. T-Mobile argues WCO's definition is underinclusive because 2.5 GHz spectrum is interchangeable with other forms of mid-band spectrum. Mot. at 26. In its prior Order, the Court found that WCO's definition of the relevant market was not "facially unsustainable" and survived the pleading stage. Order at 22. In the instant Motion, T-Mobile argues that WCO's new allegations in the FACC undermine its definition of the relevant market, and that instead, all telecommunication carriers are interchangeable as buyers and multiple mid-spectrum bands are substitutes for the 2.5 GHz band. Mot. at 25-27.

For instance, T-Mobile argues other 5G service providers such as AT&T and Verizon are also potential purchasers of 2.5 GHz spectrum licenses, given that WCO newly alleges in the FACC that its business model is "to acquire a critical mass of 2.5 GHz spectrum licenses and make them available in the aggregate for

---

[4] T-Mobile argues these cases involved whether horizontal buy-side conspirators comprised enough of the market to harm competition or whether there were adequate substitutes to those buyers, whereas this case involves single-firm conduct and vertical agreements that allegedly foreclose competition for the sale of licenses. Mot. at 26 n.10. T-Mobile does not then cite any cases that are more appropriate for the circumstances of this case. For example, in arguing that the relevant market must encompass all prospective buyers and all products those buyers regard as reasonable substitutes, T-Mobile cites *Campfield v. State Farm Mut. Auto Ins. Co.*, 532 F.3d 1111, 1118-19 (10th Cir. 2008), a case that relies on the same seller-focused inquiry as *Todd*.

lease or sale, thereby attracting bids from multiple wireless carriers seeking to supplement their 5G and/or fixed wireless networks." Mot. at 26; *compare* FACC ¶ 12 *with* Countercl. ¶ 19-21, Dkt. No. 132 (describing WCO's "spectrum sharing" business model where WCO would acquire EBS licenses and lease them to T-Mobile, AT&T, Verizon, or others on a shared basis). On the selling side, WCO argues that because EBS license holders can only sell 2.5 GHz spectrum rights, other frequencies should be excluded from the market. Opp'n at 10; *see Rebel Oil*, 51 F.3d at 1436.

T-Mobile also points to WCO's allegations that AT&T and Verizon turned to purchasing C-Band and 3.45 GHz spectrum, which are also "capable of supporting large-scale 5G deployment" and allowed AT&T and Verizon "to remain somewhat competitive with T-Mobile among 5G consumers" and "expand their fixed wireless subscriber bases." FACC ¶¶ 54, 56-57, 62. WCO responds that 2.5 GHz license rights are not reasonably interchangeable because of 2.5 GHz's superior properties for 5G network use. Opp'n at 10; *see* FACC ¶¶ 79-88. T-Mobile argues that WCO has clearly alleged that from a seller's perspective, all telecommunication carriers are interchangeable as buyers. Mot. at 25. WCO responds that its market definition includes all telecommunication carriers, including Verizon and AT&T, to the extent that they participate in the market for 2.5 GHz spectrum. *See* Opp'n at 11. Additionally, WCO argues that substitution patterns resulting from anticompetitive conduct do not broaden the relevant market. *Id.* at 10.

The Court agrees with WCO that its alleged market definition does not impermissibly exclude other telecommunication carriers as potential buyers. Any telecommunication carrier that sellers view as a suitable buyer for 2.5 GHz spectrum license would presumably be reflected in the market through its market share. Since the only rights EBS license-holders possess are for 2.5 GHz spectrum, WCO plausibly alleges these license-holders cannot readily switch production to an interchangeable product. *See Rebel Oil Co.*, 51 F.3d at 1436 (9th Cir. 1995). Even if the Court were to adopt T-Mobile's proposed inquiry, examining whether buyers in the market view all mid-band spectrum as interchangeable, WCO alleges evidence that T-Mobile, the dominant buyer in the market, claims that its 2.5 GHz spectrum "could not be replaced with other mobile wireless bands." FACC ¶¶ 82.

The Court notes that the allegation that other wireless carriers have turned to other mid-frequency bands for their 5G networks may indicate that they

"accomplish the same basic task" as 2.5 GHz spectrum. *See, e.g.*, *Streamcast Networks, Inc. v. Skype Techs., S.A.*, 547 F. Supp. 2d 1086, 1095 (C.D. Cal. 2007) ("[W]hile StreamCast pleads that FastTrack possesses some unique attributes and components that may make it more attractive and efficient, it still does not (and undoubtedly cannot) plead that other P2P applications and networks do not permit users to accomplish the same basic task of searching for and downloading a variety of media files from the internet."). On the other hand, the Court also acknowledges that, in some cases, buyers switching to alternative products may "be the product of [monopsony] power rather than a belief on the part of [buyers] that the products are good substitutes for one another." *See United States v. Eastman Kodak Co.*, 63 F.3d 95, 105 (2d Cir. 1995). Nonetheless, these questions of elasticity of supply and demand are fact-intensive and not suitable for resolution at the pleading stage. *See*, *e.g.*, *Kamakahi v. Am. Soc. for Reprod. Med.*, 2013 WL 1768706, at *11 (N.D. Cal. Mar. 29, 2013) (whether prospective human egg donors in alleged buyer-side conspiracy would view blood, platelet, or plasma banks as substitute buyers for alternative income generating opportunities is "not appropriate for resolution at the pleading stage."). Finding no "fatal legal defect" in the alleged market definition, the Court finds the Relevant Market suffices to survive a Rule 12(b)(6) motion. *See Newcal Indus., Inc.*, 513 F.3d at 1045.

*ii. Market Power*

"Monopoly power may be demonstrated through direct or circumstantial evidence." *Malheur Forest Fairness Coal. v. Iron Triangle, LLC*, 164 F.4th 710, 724 (9th Cir. 2026). To demonstrate market power with circumstantial evidence, a plaintiff must: "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Rebel Oil Co.*, 51 F.3d at 1434. "Entry barriers are 'additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants,' or 'factors in the market that deter entry while permitting incumbent firms to earn monopoly returns.'" *Id.* at 1439. In an alleged monopsony case, courts may consider new and existing competitors' ability to increase their input. *See*, *e.g.*, *Le v. Zuffa, LLC*, 2023 WL 5085064, at *20 (D. Nev. Aug. 9, 2023) ("[E]xclusionary contracts limit the ability for new entrants to obtain the essential input—fighter services—for the business" making it "prohibitively expensive and difficult for new entrants in the input (and output) market to effectively compete with" alleged monopsonist).

WCO alleges that T-Mobile exclusively controls around 85% of 2.5 GHz spectrum (measured in "MHz-Pop") or 78% of available 2.5 GHz licenses in the United States through either direct ownership or long-term exclusive leases. FACC ¶ 99. T-Mobile does not dispute its market share in the market for 2.5 GHz spectrum but instead argues that its share should not be used to demonstrate market power because the alleged Relevant Market is improper. Mot. at 27. Since the Court finds WCO plausibly alleged a Relevant Market for 2.5 GHz spectrum rights, WCO plausibly alleges that T-Mobile controls a dominant market share. *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) (For a monopolization claim, "[c]ourts generally require a 65% market share to establish a prima facie case of market power.").

"Barriers to entry are insignificant when natural market forces will likely cure the problem. In such cases, judicial intervention into the market is unwarranted. For example, with easy entry, a predator charging supracompetitive prices will quickly lose market share (as well as any chance of reaping monopoly profits) as new rivals enter the market and undercut its high price." *Rebel Oil Co.*, 51 F.3d at 1439. One player's high market share is not itself a barrier to entry for the remainder of a market where the remainder of the market operates through open bidding. *Malheur Forest Fairness*, 164 F.4th at 729 (upholding that plaintiffs failed to allege significant barriers to entry in market where alleged barriers were (1) a federal government contract granting single player ROFR on 70% of the market, (2) a non-plausible tying arrangement, and (3) a non-plausible predatory bidding theory).

WCO alleges that high barriers to entry in the Relevant Market prevent new buyers from entering the market and existing buyers from increasing input. FACC ¶ 105. WCO alleges that new buyers would not enter the market unless they were able to acquire a "critical mass" of rights to 2.5 GHz spectrum in critical regions around the country. *Id.* ¶ 107. Because all licenses for the 2.5 GHz band have been distributed by the FCC, WCO alleges that potential buyers would need to approach current license holders, the vast majority of which are owned or leased by T-Mobile. *Id.* ¶¶ 105, 108. WCO further alleges it is not economically feasible for existing buyers to purchase licenses in the remainder of the Relevant Market because these licenses would not collectively constitute a "critical mass," and buyers would need "the ability (and financing) to wait for the expiration of T-Mobile's exclusive lease rights." *Id.* ¶¶ 108-09. Additionally, WCO alleges T-Mobile has acknowledged high barriers to entry in investor presentations describing how AT&T and Verizon do not "have a path to match" T-Mobile and

"could not hope to 'close the mid-band spectrum gap despite massive spending.'" *Id.* ¶ 110. While T-Mobile does not contest significant barriers to entry, it argues WCO admits to competing in the Relevant Market. T-Mobile Suppl. Br. at 4. WCO responds that the ability to place bids is not tantamount to participating in the market or "gain[ing] a solid foothold to compete," particularly where license-holders could not legally accept those bids. WCO Suppl. Br. at 10 (citing *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1067 (9th Cir. 2025), *cert. denied*, 146 S. Ct. 1836 (2026)).

The Court finds WCO has plausibly alleged significant barriers to entry. WCO plausibly alleges that new entrants and existing market players would incur additional long-run costs not incurred by the dominant firm. *See Rebel Oil Co.*, 51 F.3d at 1434. Here, T-Mobile was able to lease and buy sufficient 2.5 GHz spectrum to support its 5G network in a competitive marketplace, unencumbered by long-term exclusive leases and other contractual positions imposed by a dominant player in the market. That is not the case for new entrants and existing, non-dominant, market players. Unlike the *Malheur* plaintiffs' allegations in the Harvest Rights Market, WCO does not solely allege T-Mobile's existing control of 85% of the market is itself an entry barrier. Instead, WCO plausibly alleges that it is not economically feasible for new entrants to compete in the remainder of the market since the available leases do not supply the geographic range necessary to attract competitors. *See* FACC ¶ 119.

Since WCO has plausibly established a relevant market, T-Mobile's dominant market share, and significant barriers to entry, the Court finds that WCO has plausibly alleged that T-Mobile holds monopsony power in the market for 2.5 GHz spectrum rights. Accordingly, the Court need not consider WCO's alleged direct evidence of T-Mobile's monopsony power.

## 2. **Anticompetitive Conduct Causing Antitrust Injury**

WCO alleges T-Mobile's conduct excluded WCO from the marketplace and caused lost profits, forced EBS license holders to accept lower prices, and resulted in lower quality service and higher prices for wireless consumers. *Id.* ¶¶ 214-15. WCO advances the theory that its injury, namely market exclusion and lost profits, flows from the same conduct that has harmed competition generally resulting in reduced network choice, poorer service, and higher prices for 5G consumers. Opp'n at 26-27. T-Mobile argues that WCO fails to plead market exclusion

resulting from anticompetitive conduct and cannot rely on injuries to non-parties to establish antitrust injury. Mot. at 8, 20.

As an initial matter, the parties dispute whether the Court must consider T-Mobile's alleged anticompetitive conduct "as a whole" when assessing antitrust injury. Opp'n at 28-29; Reply at 3. While "'plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components . . . ,' there can be no synergistic result . . . from a number of acts none of which show causal antitrust injury." *Cal. Comput. Prods., Inc. v. Int'l Bus. Machs. Corp.*, 613 F.2d 727, 746 (9th Cir. 1979) (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). Therefore if "each individual action alleged by [a plaintiff] does not rise to anticompetitive conduct in the relevant market, their collective sum likewise does not." *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1143 (9th Cir. 2022). Thus, even when considering the overall combined effect of T-Mobile's conduct, WCO must plausibly allege anticompetitive conduct causing an antitrust injury. *See City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect. At the same time, if all we are shown is a number of perfectly legal acts, it becomes much more difficult to find overall wrongdoing.").

WCO argues that T-Mobile's conduct as a whole "operate[s] synergistically to tie up some 85% of all the available 2.5 GHz Spectrum License Rights." Opp'n at 13. According to the FACC, "[b]uilding out or supplementing mobile and fixed wireless networks with new spectrum requires substantial investment in infrastructure and integration." FACC ¶ 67. Because of this "significant investment," "wireless carriers would only seek to supplement their networks with 2.5 GHz spectrum if they could access rights to a critical mass of licenses across the country." *Id.* ¶ 12. Unlike the initial Counterclaims, the FACC newly alleges that "WCO's strategy was to acquire licenses at prices above the depressed values created by T-Mobile's monopsony power as the dominant buyer and lessee in the market, then assemble a portfolio that could command competitive market pricing for sale as T-Mobile's leases approached expiration." *Id.* ¶ 68. "[I]n the interim," "WCO was actively monitoring emerging technologies for efficient 2.5 GHz 'spectrum sharing' similar to the spectrum sharing technology that debuted in 2020

for another mid-band spectrum: Citizens Broadband Radio Service ('CBRS')."[5] *Id*. ¶ 69. The FACC further alleges that T-Mobile exclusively controls around 85% of 2.5 GHz spectrum in the United States and "[a]s a result, T-Mobile is the only cellular service provider offering a 5G wireless network that utilizes 2.5 GHz spectrum, though other cellular service providers would develop 5G wireless networks or supplement their existing 5G wireless networks with 2.5 GHz spectrum if a critical mass of 2.5 GHz spectrum licenses across the country became available for sale or lease." *Id*. ¶¶ 99-100.

The FACC alleges that T-Mobile's EBS leases give T-Mobile the exclusive right to operate and use the license-holder's channels for a 30-year lease, plus a covenant not to compete for up to a year after expiration. *Id.* ¶¶ 114-16. The FACC further alleges that "many" leases contain an exclusivity clause barring license holders from selling the licenses before the last six to twelve months of the term of the agreement, and "other T-Mobile EBS leases" permit some sales or assignment transactions so long as the purchaser is not a competitor to T-Mobile in providing telecommunication services. *Id.* ¶¶ 118, 122.

The FACC alleges that "all of T-Mobile's leases contain a" ROFR to purchase the license for 12 to 36 months beyond term of lease. *Id.* ¶ 125. In addition, "many of T-Mobile's EBS leases also contain a Right to Participate provision" under which license holders are required to offer T-Mobile "the ability to submit bids, receive information concerning other bids and counters, and counter other bids." *Id*. ¶ 131. This provision is alleged to subject license holders to "extremely burdensome and costly information requests from T-Mobile, which discourage them from entertaining offers like those submitted by WCO." *Id.* ¶ 132. The provision also gives T-Mobile insight into a competing buyer's willingness to pay, negotiation tactics, and strategic planning. *Id*. ¶ 133. Finally,

---

[5] Unlike the initial counterclaims, it is not entirely clear that WCO even continues to allege that there is a market for spectrum sharing during the lease term, given that WCO seems to now allege that its strategy was to sell a portfolio as T-Mobile's leases approached expiration. The FACC alleges that "[t]hrough this strategy, WCO aimed to provide potential entrants and expanding carriers with access to the critical mass of licenses necessary to justify investment in building, expanding, or supplementing their 5G or fixed wireless networks." FACC ¶ 68. As to spectrum sharing, on the other hand, described in the FACC as "emerging technologies," the FACC only references the possibility of "some other non-T-Mobile competitor or group of competitors." *Id.* ¶ 71.

the FACC alleges the leases contain a confidentiality provision which impairs purchasers' ability to value the license accurately and determine a true competitive price for it. *Id*. ¶ 134.

Considering all conduct and lease provisions together, some of which the Court addresses individually below and others which the Court addressed in its prior Order, at bottom WCO complains of being shut out of the market because all or a substantial majority of T-Mobile's EBS leases were exclusive long-term leases with a ROFR and other terms favoring T-Mobile's purchase over another potential buyer, and EBS license holders did not want to "deal with any potential buyer of 2.5 GHz spectrum rights other than T-Mobile" based on the lease terms and threats of litigation. *Id.* ¶ 139. The FACC alleges that T-Mobile used the ROFRs "to block just 69 of WCO's 936 proposed EBS license acquisitions. T-Mobile blocked some 857 proposed sales (the vast majority) using the other anticompetitive tactics comprising the Scheme." *Id.* ¶ 186. WCO does not allege facts regarding the reasons it was given by the "vast majority" of schools to either decline to entertain or to reject offers by WCO, and its allegations about the "synergistic effect" are conclusory.

The Court considers whether any of the individual actions alleged by WCO rises to anticompetitive conduct. *See Dreamstime.com*, 54 F.4th at 1143. The Court finds that T-Mobile's alleged exclusivity provisions in leases, acquisitions of licenses, and litigation conduct each do not rise to anticompetitive conduct. Consequently, the Court finds WCO has not adequately plead antitrust injury. *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1056 (9th Cir. 1999) ("Without a violation of the antitrust laws, there can be no antitrust injury.").

*i. ROFRs, Confidentiality, and Right to Participate Clauses*

In its prior Order, the Court addressed WCO's allegations regarding its inability to close purchases with license holders, and WCO continues to primarily rely on the ROFRs and the same small number of examples for this argument.[6] There are insufficient allegations that EBS license holders could not entertain competitive bids, other than during the lease term. The ROFR merely allows T-Mobile to place a matching or higher bid than WCO, and just because T-Mobile could match a bona fide offer does not mean that it would—indeed, WCO alleges

[6] The Court's prior Order discusses the ROFR provisions in further detail, as well as WCO's judicial admissions that it was able to competitively bid, which the Court incorporates here. Order at 10-12.

T-Mobile only exercised the ROFR "selectively" on 69 licenses out of WCO's 936 offers, even though *all* of its leases contain a ROFR. FACC ¶¶ 125, 186. And as to the Right to Participate and confidentiality provisions, WCO claims that these provisions create information asymmetry that raises costs for WCO to submit bids and lease holders to solicit bids. *Id.* ¶¶ 131-35, 137. But WCO does not provide any examples where lease holders were specifically discouraged from entertaining bids because of these provisions and only provides one example where these provisions increased WCO's own costs. *Id.* ¶ 138. Thus, WCO has not plausibly alleged these provisions result in substantial market foreclosure.

*ii. Acquisition of Licenses*

WCO has not explained how T-Mobile's acquisition of licenses constitutes anticompetitive conduct. As T-Mobile notes, WCO does not allege T-Mobile purchased any licenses it was not already leasing and WCO does not allege that T-Mobile's acquisition was pursuant to an anticompetitive process (except as discussed herein). WCO argues the lease acquisitions "cemented [T-Mobile's] monopsony" and prevented WCO from "gaining a foothold in the market," suggesting that "acquisitions are unlawful where . . . they reinforce the acquirer's market power." Opp'n at 24-25. The case cited for this proposition, however, involved the acquisition of assets of a competitor. *See Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 466 F.3d 961, 964 (11th Cir. 2006) (explaining controversy involved direct competitor asset purchase in bankruptcy auction). Here, on the other hand, the alleged asset acquisition is T-Mobile's purchase of inputs required to provide its telecommunications services, the fair market value for which WCO does not allege it was unable to compete. *See* FACC ¶ 87 ("Mid Band spectrum licenses are generally a critical input to 5G mobile and fixed wireless networks, as 2.5 GHz spectrum is uniquely well-suited to those uses . . . ."). WCO does not advance theories of predatory bidding or predatory overbuying, and does not otherwise explain why T-Mobile's purchase of a superior input is anticompetitive, particularly where WCO itself alleges in the FACC that a "critical mass" is necessary. *See id.* ¶ 109. To the contrary, it alleges that T-Mobile, Verizon, and AT&T have all "leveraged their extensive spectrum holdings to rapidly expand their fixed wireless subscriber bases and capture significant market share." *Id.* ¶ 62; *see Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 322 n.3 (2007) (noting that predatory bidding and predatory overbuying are "not analytically different" as both involve attempts "to exclude rival input purchasers," and that a firm may legitimately "acquire more inputs as a part of a procompetitive strategy to gain market share in the output market").

*iii. Litigation Conduct*

T-Mobile argues its litigation conduct is subject to *Noerr-Pennington* immunity. Mot. at 21. The Court set forth the legal standards on the *Noerr-Pennington* doctrine in its prior Order and incorporates the discussion here.[7] *See* Order at 17-19.

WCO argues T-Mobile's actual and threatened lawsuits against license holders were "objectively baseless and undertaken to maintain [T-Mobile's] monopsony," focusing on T-Mobile's lawsuit against Albright College to halt the sale of the license to WCO based on the exclusivity provision barring sales to a "Competing Entity." Opp'n at 22. WCO argues T-Mobile did not have an objectively reasonable expectation of success on this theory because WCO is not a competitor in telecommunication services. *Id.* T-Mobile, however, counters that this lawsuit merely alleged that Albright College and WCO did not provide sufficient information to establish whether WCO was a Competing Entity, not that WCO was indeed a Competing Entity.[8] Reply at 11-12. And as the Court

---

[7] The Court noted in its prior Order that there were two types of "sham litigation" relevant in this case: "[F]irst, where the lawsuit is objectively baseless and the defendant's motive in bringing it was unlawful, *Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 54 (1993) (*PREI*); [and] second, where the conduct involves a series of lawsuits 'brought pursuant to a policy of starting legal proceedings without regard to the merits' and for an unlawful purpose, *USS–POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council*, 31 F.3d 800, 810-11 (9th Cir. 1994) (*POSCO*)." *Relevant Grp., LLC v. Nourmand*, 116 F.4th 917, 928 (9th Cir. 2024). The Court determined that the *PREI* framework, not the *POSCO* framework, applied in this case. Order at 18. As to the instant Motion, WCO no longer argues that the *POSCO* framework applies. *See* Opp'n at 23.

[8] The complaint in the Albright College lawsuit alleges: "Although both [Albright and WCO] . . . have offered purely conclusory statements to the effect that WCO is not a 'Competing Entity,' both Albright and WCO have refused to provide any information that would substantiate (or disprove) those statements . . . . Accordingly, unless and until Albright establishes that the exception to exclusivity applies—including, most significantly, that WCO is not a 'Competing Entity'—it should not be permitted to sell or assign the License to WCO . . . ." RJN, Ex. 1 at 4, Dkt. No. 224-4 (T-Mobile's First Amended Complaint against Albright College).

previously noted, T-Mobile's lawsuits also alleged breaches of the leases' ROFR provisions, which require offers to be "bona fide." FACC ¶¶ 169, 176; *see, e.g.*, RJN, Ex. 17, Dkt. No. 224-20 (T-Mobile's Complaint against the School Board of St. Lucie County). Aside from conclusory statements, WCO still does not provide reasons to believe that "no reasonable litigant could realistically expect success on the merits" of these claims, as required to show objective baselessness. *See PREI*, 508 U.S. at 60. WCO also points to T-Mobile's conduct of exercising its ROFR to purchase other licenses subject to the same exclusivity provisions and not litigating lawsuits to their conclusion, but these facts do not mean the lawsuits were objectively baseless. As the Court has already noted, the fact that lessors abandoned their sales to WCO following the lawsuits indicate there may be a "reasonable belief that there is a chance that [T-Mobile's claims] may be held valid upon adjudication." *See id.* at 62-63; *see also Relevant*, 116 F.4th at 932 ("[S]ettlement indicates a lawsuit is not objectively baseless."). Because WCO has not plausibly alleged that the actual or threatened litigation was objectively baseless, the Court need not consider T-Mobile's subjective motivation. *See PREI*, 508 U.S. at 60. Applying the *Noerr–Pennington* doctrine, the Court finds that T-Mobile's litigation activity is immune and cannot support WCO's claims of anticompetitive conduct.[9]

*iv. Exclusive Dealing*

To prevail on an exclusive dealing claim, "[a] plaintiff must plausibly allege (1) the existence of an exclusive agreement that (2) forecloses competition in a substantial share of the relevant market." *CoStar Grp., Inc*, 150 F.4th at 1068. "Because monopoly power is the substantial ability to control prices or exclude competition, if a monopolist enters into exclusive agreements with its customers, those agreements can substantially foreclose competition." *Id.* at 167 (citations and internal quotations omitted). "To plausibly allege foreclosure of the . . . market—in a substantial share or otherwise—plaintiffs at the very least needed to plead facts sufficient to support the inference that the exclusive dealing arrangements have some appreciable impact on the market." *See Eastman v. Quest Diagnostics Inc*., 724 F. Appx. 556, 558 (9th Cir. Feb. 12, 2018) (finding the lack

[9] WCO argues that whether a suit is a mere sham is a question of fact, but where "there is no dispute over the predicate facts of the underlying legal proceeding, a court may decide probable cause as a matter of law." *PREI*, 508 U.S. at 63; *see also Relevant*, 116 F.4th at 932 (holding that the district court properly decided objective baselessness as a matter of law where there were no factual disputes about the underlying proceedings).

of allegations of how many medical providers entered into agreements with the defendant or how the arrangements impacted other laboratories in the market to be "significant because, without such allegations, there are no facts that allow the court to evaluate the effect of the exclusive dealing arrangements in the plan/outpatient market"). Courts may aggregate exclusive contracts in a relevant market to assess their combined impact on the market. *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1302 (9th Cir. 1982) (holding that the district court "correctly assessed [Defendant's] aggregate pattern of conduct in the relevant market" where the court was not "limited to looking at the market implications of the one contract between the antitrust plaintiff and defendant.").

In *CoStar*, the Ninth Circuit held that a competitor-plaintiff plausibly alleged anticompetitive conduct by pleading that CoStar (1) held monopoly power in the relevant market, (2) required *de facto* exclusive contracts for all its customers, and (3) erected technological barriers preventing customers from working with CoStar's competitors. *CoStar Grp., Inc*, 150 F.4th at 1066, 1075. WCO argues, under *Costar*, substantial foreclosure may "be inferred where the 'exclusive agreements cover a market in which the defendant allegedly holds monopoly power.'" Opp'n at 18 (citing *id.* at 1067). T-Mobile responds that unlike *CoStar*, WCO fails to allege uniformity within the lease terms between T-Mobile and license holders. Reply at 8.

The FACC lacks facts sufficient to support the inference that exclusive leases between T-Mobile and EBS license holders foreclosed a substantial portion of the market.[10] *See Twin City Sportservice, Inc.*, 676 F.2d at 1301-02 (finding exclusive contracts resulted in substantial foreclosure and reasoning the purpose of the substantial foreclosure test is "to determine the anticompetitive effects of

[10] Since WCO alleges T-Mobile owns 600 of the 1,700 leases within its control, at a maximum, 65% of EBS licenses may be affected by exclusive lease agreements (an unpleaded percentage of the total market for 2.5 GHz spectrum). *See* FACC ¶ 11. The FACC alleges T-Mobile exclusively controls 78% of "available 2.5 GHz licenses" including 1,700 out of the 2,200 total EBS licenses (approximately 77% of EBS licenses). *Id.* ¶ 99, 157. Because the alleged Relevant Market includes both EBS licenses and BRS licenses and WCO pleads no anticompetitive conduct regarding BRS licenses, either (1) T-Mobile's share of BRS licenses or (2) an approximate ratio of EBS to BRS licenses is needed to calculate a substantial portion of the Relevant Market under WCO's theory that "many" or "all" of the licenses have exclusive dealing language.

exclusive-dealing arrangements" including the "influence of these contracts on a substantial share of the market."). Unlike *CoStar*, where the plaintiff plausibly alleged that exclusive terms applied to all customers, WCO has not presented sufficient allegations that exclusive terms limiting entrants from "gain[ing] a solid foothold to compete" "cover" the Relevant Market. *CoStar*, 150 F.4th at 1067, 1071 ("[B]ecause the allegedly exclusive agreements cover the same market over which CoStar allegedly holds monopoly power and the agreements apply to all brokers using CoStar's services, CREXi has also plausibly alleged that those agreements substantially foreclosed competition under § 1.").

Despite its broad, conclusory allegations as to "many" or "all" EBS leases, WCO's evidence suggests a lack of uniformity within the relevant portions of various leases. Some agreements permit assignment (but not sale) during the lease term so long as the assignee is not a Competing Entity, which the parties appear to agree that WCO is not. *See*, *e.g.*, RJN, Ex. 3A § 3(a)-(b), Dkt. No. 224-6. One template Exclusivity clause provides that "[d]uring the term, Licensee will not negotiate or contract with any third party to lease, sell, assign, transfer or use any of the capacity of the Channels or any option therefore."[11] RJN, Ex. 6 § 3(a), Dkt. 224-9. The Albright College lease contains this same Exclusivity clause, but also provides that a Licensee may negotiate and enter into any contract to assign the License to a third party provided that, among other things, "the assignee is not a Competing Entity" as defined. RJN, Ex. 2 §§ 3(a), 10(c), Dkt. 224-5.[12] In

[11] To the extent WCO argues that the leases bar licensees from ever selling License Rights, this ignores that the agreements are limited in time, in other words, "during the term" of the agreement. Opp'n at 2. However, T-Mobile does not sufficiently address the Court's consideration of the length of the lease term in this particular market at this motion to dismiss stage, and the Court therefore assumes anticompetitive conduct due to sufficient agreements that actually bar the sale of License Rights to anyone during the lease term, even if they do not bar sale at the end of the term, *i.e.*, notwithstanding that the exclusivity is for a specified duration and not an outright ban.

[12] Additionally, some leases contain provisions titled "Options to Purchase and Sell the License" which state that if FCC rules change in a manner that allows T-Mobile to operate EBS Channels, "and if Licensee elects to sell its License to a commercial entity, Licensee may offer the License to commercial entities for sale, subject to [T-Mobile's ROFR]." RJN, Ex. 4A § 21(a), Dkt. No. 224-7. WCO argues that, since these leases also contain Exclusivity provisions barring sales to third parties, *see id.* § 1(c), they are at a minimum *de facto* exclusive. *See CoStar*,

Supplemental Briefing, WCO argues the Exclusivity provision in leases that provide a limited right to assignment or transfer to a third party still bar all third-party sales, even in leases where T-Mobile argues the agreements only restrict sales to "Competing Entities." WCO Suppl. Br. at 3 n.1. Yet the FACC alleges that terms in the Albright College lease, along with leases for Grand Ledge Public Schools and Palomar Community College District, allow sales to non-Competing Entities,"[13] contradicting WCO's expansive reading of the interaction between the Exclusivity clause and Transfers and Assignments clause.[14] *Compare* RJN, Ex. 2 § 3(a), Dkt. 224-5 *with* FACC ¶¶ 167, 171. Moreover, as T-Mobile argues, WCO alleges that T-Mobile exercised its ROFR for a number of agreements that presumably also contain the same exclusivity language in "many" or "all" of the agreements, which demonstrates the lack of a coherent theory in the FACC that schools were actually prevented from entertaining offers from WCO, given that the FACC does not plausibly allege that these ROFRS were exercised at the end of the lease term.

---

150 F.4th at 1074. WCO does not explain how its reading of the agreement would not render the rule change provision superfluous. Still, WCO puts forward no allegation that specific schools found these provisions exclusive even though WCO alleges that there was such a rule change, nor does WCO explain its basis for presuming these terms make up a small minority of all leases.

[13] To the extent these lease terms are representative of the full set, and WCO fails to adequately plead they are, at minimum, *de facto* exclusive, WCO faces an additional challenge to pleading antitrust injury. WCO must allege that injury to itself (i.e., sufficient market exclusion) was caused by T-Mobile's anticompetitive actions. That "Competing Entities" suffer market exclusion is insufficient to establish WCO's antitrust injury. *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1200 (9th Cir. 2012) (explaining that a plaintiff "must plead 'antitrust injury' . . . in addition to, rather than in lieu of, injury to competition"). Further, WCO's unique status as a willing buyer, but non-Competing Entity, may even provide WCO with a market advantage over T-Mobile's telecommunications rivals. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986) (holding competitors lacked antitrust standing to sue alleged price-fixing cartel because they "stand to gain from any conspiracy to raise the market price").

[14] The agreement was entered into as of March 2, 2007, and covered an initial term of 15 years, with an automatic renewal term of 15 years. The FACC alleges that Plaintiffs sued Albright College on May 28, 2021, which suggests that WCO made its offer during the pendency of the lease. FACC ¶ 166.

In *CoStar*, the Ninth Circuit found contracts lacking expressly exclusive language *de facto* exclusive where the plaintiff presented evidence from customers interpreting contractual terms as exclusive. *CoStar*, 150 F.4th at 1074. While the FACC points to 17 specific license holders who allegedly turned down offers or would not entertain offers to sell based on unspecified lease terms, FACC ¶¶ 139-54, WCO fails to connect these License holders' refusals with allegedly exclusive dealing terms. To the extent WCO relies on the theory that the Exclusivity clauses found in the Albright College lease are widespread and schools construe these terms to prevent third-party sales, WCO does not reconcile Albright College's approach (entertaining an offer to buy from WCO) with responses from other schools.

Additionally, WCO pleads no facts that make it plausible to infer the leases it has located are representative of the rest. For instance, WCO does not allege T-Mobile's counterparties are similarly situated, that the agreements were made around the same time, or some other factor suggesting uniform dealing. Further, WCO alleges it placed offers on some 936 EBS licenses, *id.* ¶ 74, but aside from the 17 schools previously discussed, the FACC contains no information about how schools generally responded to WCO's offers. This asymmetry does not support a plausible inference that schools across a sufficient percentage of the market did not entertain offers from WCO because of exclusive dealing provisions in their leases with T-Mobile.

### C. State Law Claims

WCO also brings counterclaims for violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, *et seq.*, and intentional interference with prospective economic advantage under California law. The parties largely rely on the Sherman Act claims and did not extensively brief the state law claims. *See* Mot. at 28-29 (arguing that the California law claims fail for the same reasons as its Sherman Act claims); Opp'n at 29-30 (arguing that the California law claims survive because WCO sufficiently alleged claims under the Sherman Act).

As to the Cartwright Act claim, WCO argues that the Cartwright Act "may be broader" than the Sherman Act, suggesting that all of a defendant's alleged conduct may be considered in evaluating the foreclosure caused by exclusive dealing contracts under the Cartright Act, but does not then offer further argument about what conduct should be considered under the Cartwright Act. *Id.* at 30 n.26. As to the tort claim, WCO argues it alleges an independently wrongful act besides

antitrust violations,[15] namely T-Mobile's alleged misrepresentation of "applicable law, FCC rules, and the meaning of contractual provisions" during the pursuit or threats of lawsuits against license holders. *Id.* at 30; FACC ¶ 160. These allegations, however, are part of WCO's antitrust claims and involve T-Mobile's litigation conduct, which is immune from scrutiny under the *Noerr-Pennington* doctrine. *See Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008) (holding that "the Noerr–Pennington doctrine applies to . . . state law tortious interference with prospective economic advantage claims"). Accordingly, the Court dismisses the state law claims on the same grounds as the Sherman Act claims with leave to amend.

**D. Leave to Amend**

Following the hearing on this Motion, the parties submitted supplemental briefing on whether the Court should grant leave to amend. WCO indicates it would amend its counterclaims to (1) describe over 200 more leases that WCO has located, including those judicially noticed herein, and allege that these leases are "representative of [T-Mobile's] Leases as a whole," and (2) allege that owners of roughly 100 total licenses who declined to transact with WCO due to their leases with T-Mobile are "representative of the other 900 or so schools that just simply would not entertain offers." WCO Suppl. Br. at 10.

The Court finds the FACC's deficiencies are not entirely incurable. *See Manzarek*, 519 F.3d at 1031. Out of the varied leases T-Mobile has with EBS license holders, only those with express or *de facto* exclusive terms may be used to determine substantial foreclosure coverage, and there is a possibility that amended pleadings will reach this threshold. Simply alleging in conclusory fashion that the leases that WCO has located are representative of all leases will not save WCO's claim if WCO does not present a coherent narrative regarding schools' varied responses, connecting specific lease terms to specific responses received from schools. Amended counterclaims may reveal, for example, that Albright College's entertainment of WCO's offer to buy despite the contractual exclusivity language was an aberration rather than the norm; they may also address that ROFRs were

---

[15] "To establish a claim for interference with prospective economic advantage, . . . a plaintiff must plead that the defendant engaged in an independently wrongful act . . . . [A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1158-59 (2003).

exercised in situations without exclusive dealing restrictions. WCO must also present a plausible basis to infer that such exclusive dealing terms are representative of a substantial percentage. WCO's allegations assume there are (1) schools who expressly declined to transact with WCO because of unspecified lease terms or litigation risks, and (2) schools who did not entertain offers, for unspecified reasons. If certain terms disproportionately apply to the latter group of schools—*e.g.*, terms such as those in Albright College's lease that are alleged in the counterclaim to allow transfer to non-Competing Entities like WCO—it is less plausible that these terms substantially foreclosed WCO from the market. Moreover, to the extent WCO actually received information that certain schools did not entertain offers for reasons other than an exclusive dealing provision, WCO cannot include such schools in its overall figure.

While WCO is not required to allege an exact number or percentage of exclusive leases, "some further factual enhancement" is necessary to plausibly connect non-uniform lease terms to WCO's alleged market exclusion. *See Twombly*, 550 U.S. at 546. Because WCO has not "nudged [its] claims across the line from conceivable to plausible," the claims must be dismissed. *Id.* at 570.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS the Motion and dismisses the counterclaims with leave to amend. Any amended counterclaims must be filed within 30 days.

**IT IS SO ORDERED.**